UNITED STATES DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE MICHAEL S. RULLE FAMILY DYNASTY TRUST<br><br>    Plaintiff<br><br>    vs.<br><br>AGL LIFE ASSURANCE COMPANY,<br><br>    Defendant | Civil Action No.<br><br><br><br><br>**COMPLAINT** |

## THE PARTIES

1.      This is an action filed by the Michael S. Rulle Family Dynasty Trust, an irrevocable trust created on or about September 21, 2001 ("Plaintiff"), c/o Alaska Trust Company, Resolution Plaza, 1029 W Third Ave., Ste 400, Anchorage, AK 99501-1981.

2.      Plaintiff is a beneficiary and contract holder under a variable life insurance policy issued by Defendant AGL Life Assurance Company ("Defendant" or "AGL"). Pursuant to the variable universal life insurance policy, Plaintiff entrusted certain monies to Defendant which were invested in the Tremont Opportunity Fund III, L.P. ("the Tremont Opportunity Fund") which was managed by Tremont Group Holdings, Inc. and Tremont Partners, Inc. through the period December 22, 2008.

3.      Defendant AGL is an insurance and financial services organization having a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania. It issues policies and enters into insurance contracts with residents and businesses in the New York, New Jersey, Connecticut and Pennsylvania areas.

## NATURE OF ACTION

4.      This action arises out of Defendant's actions in connection with Plaintiff's premiums paid pursuant to the variable universal life insurance policy, and its associated death benefits, entered into between Plaintiff and Defendant.  The policy provided that Plaintiff's account was to be valued in accordance only with the capital gains or losses, and interest of the funds in which it was invested.

5.      As more fully set forth herein, although Plaintiff was given some discretion in opting to invest some or all of the premiums in Tremont Opportunity Fund, , Plaintiff was expressly barred from having any communication  with the general partner, Tremont Partners, or with the Partnership.  In addition, Defendant affirmatively represented that only 5% to 6% would be invested in any one fund, which was not true. In addition, Defendant characterized these funds as "equity market neutral", which was patently untrue.

6.      Rather than investing the premiums in accordance with the terms of the policy agreement and their representations to Plaintiff, Defendant caused the monies to be transferred to investment funds that were ultimately managed or sub-managed by Bernard L. Madoff and/or Madoff Investment Securities LLC ("hereafter collectively referred to as "Madoff"), where they were never invested, but rather taken by Madoff. Specifically, Madoff was arrested by the Federal Bureau of Investigation on or about December 11, 2008 on criminal charges of securities fraud.  Madoff's business was in fact "a giant Ponzi scheme" and the estimated losses pursuant to his Ponzi scheme fraudulent action are reported to be in excess of $50 billion.  On or about March 12, 2009, Madoff pled guilty to charges of having defrauded investors with this "Ponzi"

scheme and admitted to the fact that he never implemented his strategy of investment. Thus, all losses associated with Madoff were not due to losses in securities or funds, but directly tied to Madoff's theft of the monies deposited with funds he controlled.

7.      Upon learning of the fraudulent scheme of Madoff, Defendant improperly advised Plaintiff that the value of the portion of Plaintiff's account that had been transferred to funds controlled by Madoff (believed to be approximately 23% of Plaintiff's total account) was zero, due to the fraudulent actions of Madoff. Defendant's actions in connection with the valuation of Plaintiff's variable life insurance account constitute a breach of contract.

8.      In addition to Defendant's breach of contract in connection with the valuation of Plaintiff's account, Defendant also had a contractual and fiduciary obligation to Plaintiff to invest the funds in accordance with the terms of the policy. In addition, Defendant had duties under various state and federal statutes in connection with its provision of a variable life insurance policy to Plaintiff.   Defendant breached and/or violated each and every one of these duties and/or obligations.

9.      Among other things, Defendant knowingly and/or recklessly allowed Plaintiff's monies to become placed in certain "investment accounts" held by Rye Select Broad Market Prime Fund L.P., Rye Select Broad Market Fund L.P., Rye Select Broad Market XL Fund L.P., and Rye Select Equities Fund, all of which were controlled by Madoff, without taking a comprehensive and proper due diligence review to assess the risks involved, given Madoff's connection with these funds and the warning signs present.  As a direct result of Defendant's actions, Plaintiff has suffered damages and/or sustained substantial losses.

3

10.    Moreover, Defendant profited generously from this arrangement by unjustly receiving significant revenue on the premiums paid and on management fees for entrusting and/or depositing their funds with sub-managers such as Madoff. This conduct caused Plaintiff to suffer losses.

11.    The actions of Defendant and others have caused damage to Plaintiff. Plaintiff seeks to recover damages as well as other fees in amounts paid to Defendant. Additionally, management fees and investment monies paid by Plaintiff should be returned to Plaintiff. Such losses were suffered as a direct result of Defendant's breach of contract, breach of fiduciary duty, violations of state and federal insurance, trade practices, and securities law, negligence, gross negligence, negligent misrepresentation, and unjust enrichment.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332 as complete diversity exists between Plaintiff and Defendant and the amount in controversy exceeds the jurisdictional minimum of this Court.

13.    Venue is proper in this district because Defendant maintains its place of business in the district and/or conducts substantial business in the district.

## PLAINTIFF'S VARIABLE UNIVERSAL LIFE INSURANCE POLICY

14.    AGL offered variable universal life insurance policies, which are a form of life insurance also known as a cash value insurance policy. Variable universal life insurance policies are designed to allow policy holders to invest a portion of their premiums in optional investment accounts which are offered under the policy. Because the investments are held within a policy, gains inside the policy are shielded from income

4

taxes, as is the payout upon death. Policy holders are able to access their money during their lifetime by withdrawing or borrowing funds, tax free, from the policy.

15.     AGL entered into the Flexible Premium Variable Life Insurance Contract with Plaintiff, policy number VL30022 on or about October 5, 2001 ("Policy/Contract"). Plaintiff is defined therein as "contract holder" and "beneficiary".

16.     The Policy/Contract provides that it is governed, in part, by the laws of the State of Alaska.

17.     The Policy/Contract further provides that the Variable Account is comprised of Investment Accounts and established under Pennsylvania law.

18.     The Policy/Contract represents that each of the Investment Accounts is invested in securities authorized by Pennsylvania law.

19.     The Policy/Contract had an initial face amount death benefit of $17,600,000. The initial premium of $1,200,000 was paid by Plaintiff on or about October 2001, and additional premiums of $1,200,000, $1,000,000 and $250,000 were paid yearly in 2002, 2003, and 2004 on subsequent anniversary dates.

20.     The express terms of the Policy/Contract contract between Plaintiff and Defendant provide for valuation of Plaintiff's account to be made in accordance with the following:

The value of an Investment Account reflects:

- Any amounts transferred to the Investment Account during the current Valuation Period;

- The investment income and realized and unrealized capital gains credited to such assets in the Valuation Period;

- Any amounts transferred from an Investment Account during the current Valuation Period;

- Realized and unrealized capital losses charged against those assets during the Valuation Period;

- Any amount charged or reserved against the Investment Account for taxes;

- Any expenses charged or reserved against the Investment Account for expenses incurred in operating such Investment Account;

- The mortality and expense risk change for the Valuation Period; and

- Any other Monthly Charges deducted from the Investment Account for This Contract.

. . .

The Account Value when the Initial Premium is received is equal to the Net Premium invested in the Investment Accounts; less:

    (a)    Cost of Insurance Charges (deducted on each monthly calculation date); and
    (b)    Policy loads; and
    (c)    Any Charges for Special Insurance Class Rating;

The Account Value on any subsequent Valuation Day is equal to the Account Value on the prior Valuation Day plus:

    (a)    any new Net Premium invested in the Investment Accounts; and
    (b)    any increase in value of the Investment Account due to investment results (net of Mortality and Expense Risk Charges and any Asset Charges; and
    (c)    any interest credited to the Borrowed Fund;
less;
    (a)    any decrease in value of the Investment Account; and
    (b)    Cost of Insurance Charges (deducted only on Monthly Calculation Date); and
    (c)    any Partial Withdrawals taken; and
    (d)    any Rider Charges deducted from the Account Value; and
    (e)    any Policy Loads; and
    (f)    any Charges for Special Insurance Class Rating; and
    (g)    any Other Charges as stated in Contract Schedule B.

See Policy/Contract, attached hereto as **Exhibit "A"**.

21.     The Policy/Contract Contract further provides that the "Net Account Value is the Account Value minus any Contract Loan balance and accrued unpaid interest" and provides for the following charges to be deducted from the Account Value: Cost of Insurance, Rider Charges, Policy Loads and Charges for Substandard Insurance Class Rating.

22.     On or about November 30, 2008, Plaintiff received notification from Defendant that the portion of Plaintiff's account attributable to investment in accounts controlled by Madoff, was zero. Defendant's explanation for its claim that a portion of Plaintiff's account now had a zero value was that the monies had been lost through the fraudulent schemes of Madoff, by which Plaintiff's monies had in fact never been invested in the securities and strategies described by the Policy/Contract, and as represented by Defendant.

23.     By the express terms of the Policy/Contract, only "income, gains and losses . . . from each Investment Account" were to be charged against that account, "without regard to the income, gains or losses of any other Investment Account and without regard to any of our other income, gains or losses." Thus, by the express terms of the Policy/Contract Contract, as well as a matter of law, absent legitimate investment losses, Plaintiff's account value should have been the amount determined by the provisions set forth above, i.e., the amounts deposited, minus certain charges. Accordingly, Defendant's actions were improper and constitute a breach of contract.

24.     Pursuant to the Policy/Contract, Plaintiff was allowed to choose how the Policy/Contract was invested. It allocated the annual net premium payment ($1,160,200 per year for 2001 and for 2002) to an investment account option entitled "American

7

Masters Opportunity Insurance Fund, L.P. Account." American Masters Opportunity
Insurance Fund , L.P. later changed its name to Tremont Opportunity Fund. As stated in
the Policy/Contract, the objective of such account option was to achieve long-term capital
appreciation and consistently generate positive returns irrespective of stock market
volatility or direction while focusing on the preservation of capital.

25.     To achieve that objective, AGL offered a policy "investment strategy to
invest with various portfolio managers believed to be able to meet the Partnership's
objective". The investment was targeted to insurance companies' high net worth clients.

26.     In connection with the selection of investment alternatives under the
Policy/Contract,  AGL  provided to Plaintiff for its consideration and review the Second
Amended and Restated Confidential Private Placement Memorandum dated August, 2008
(hereafter the "Private Placement Memorandum") for the Tremont Opportunity Fund.
The Private Placement Memorandum stated that the objective of the fund was to (i)
achieve long-term capital appreciation, and (ii) consistently generate positive return
irrespective of stock market volatility or direction, while focusing on preservation of
capital.

27.     The Private Placement Memorandum described the offering of limited
partnership interests in the Tremont Opportunity Fund to insurance companies, and others
which interests are designated to be an investment option under the insurance contract
sold by the insurance companies. Although the interests were exempt from registration
under the Securities Act of 1933, as amended, pursuant to Regulation D, the interests still
constitute securities and were, and are, subject to federal and state securities laws to the
extent applicable.

8

28.     As explained in both the Policy/Contract and the Private Placement
Memorandum, the owners of variable life insurance contracts issued by the insurance
companies could opt to have the insurance company invest their premiums in Tremont
Opportunity Fund. The policy owners, however, were expressly restricted from any
contact, communication, either direct or indirect, with the general partner, Tremont
Partners, and with the Partnership. Thus, Plaintiff was barred from having any
communication with the general partner or the Partnership. Only the Defendant, AGL,
could have any communication or contact with the general partner or the Partnership.

29.     AGL knew, or should have known, how important it was to analyze and
evaluate any prospective manager of the investments of the Partnership as each manager
chosen by the general partner was to be granted full discretion over all matters relating to
the manner, method and timing of investment and trading transaction with respect to the
partnership assets allocated to the manager, subject to the investment objectives, policies
and restrictions related to the Partnership or as "otherwise communicated to the manager
by the general partner".

30.     AGL represented, through the Private Placement Memorandum, that "[t]he
general partner believes... that given its alternative investment market experience, it
should be able to obtain sufficient information about potential managers or investment
vehicles to select them effectively". As expressly provided in the Private Placement
Memorandum, the general partner is accountable to the Partnership as a fiduciary and
consequently must exercise good faith and integrity in the handling of the partnership's
affairs.

9

31.     AGL, by issuing the Private Placement Memorandum and the partnership agreement of the Tremont Opportunity Fund to Plaintiff and publishing to Plaintiff the statements made therein, mislead Plaintiff because the investments made by it of Plaintiff's funds were not ultimately invested pursuant to the investment strategy outlined as set forth above. The Partnership deposited its funds in Rye Select, and ultimately, in Madoff, as managers of the funds and these funds were subject to Madoff's Ponzi scheme where the funds were not invested but held by Madoff and ultimately lost.

32.     AGL conveyed the false impression that it conducted a thorough investigation and due diligence review of the managers of the funds in which Plaintiff's premiums were to be invested. In reality, AGL did not conduct a comprehensive due diligence review and ignored the warnings that would have alerted it to Madoff's Ponzi scheme.

## COUNT I

### Breach of Contract

33.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 32 and incorporates the same herein by reference.

34.     By the express terms of the Policy/Contract, Plaintiff's account was to be valued in accordance only with investment performance, and applicable administrative charges. In addition, any other "losses" were expressly precluded from consideration in the valuation of the account.

35.     Rather than causing Plaintiff's account to be valued in accordance with the terms and conditions of the Policy/Contract, however, Defendant caused a portion of the account to be valued at zero, based solely on the fraudulent activities of Madoff.

36.    Defendant's actions in causing a portion of Plaintiff's account to be valued at zero based solely on the fraudulent actions of Madoff constitute a breach of the provisions of the Policy/Contract and are further contrary to law.

37.    As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages and is entitled to recover damages against Defendant, as well as the return of all fees paid to Defendant.

**COUNT II**

**Breach of Fiduciary Duty**

38.    Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 37 and incorporate the same herein by reference.

39.    Pursuant to the express terms of the Policy/Contract, Defendant retained exclusive control over selection of investment managers, contractual dealings with such investment managers, and all changes in investment accounts, including, but not limited to, establishment of additional investment accounts, other investment options, substitution of new portfolios, combination and elimination of investment accounts and transfer of assets from one investment account to another.

40.    The Policy/Contract further provided that Plaintiff was expressly restricted from any contact, communication, either direct or indirect, with the general partner, Tremont Partners, and with the Partnership. Thus, only the insurance company, AGL, could have any communication or contact with the general partner or the Partnership.

41.    By asserting the exclusive right to control all aspects of the investment account, Defendant assumed a fiduciary duty to Plaintiff and was obligated to act in good faith and with due care in representing the interests of Plaintiff.

42. Defendant further owed a fiduciary duty to Plaintiff based on its obligation in connection with the Policy/Contract to exercise its best judgment in determining how to protect and increase Plaintiff's investment.

43. Further, under Alaska law, there is a fiduciary relationship inherent in every insurance contract.

44. Plaintiff entrusted its monies to AGL, which in turn purported to place the monies in Tremont Opportunity Fund, Tremont Partnership, and Tremont pursuant to the terms and conditions of the Policy/Contract.

45. Defendant breached its fiduciary duties owed to Plaintiff by: (a) failing to deal fairly and honestly with Plaintiff; (b) failing to act with reasonable care to verify the truthfulness of the information set forth in the written materials provided to Plaintiff and others, and the representations communicated to and relied upon by Plaintiff; (c) failing to oversee that the investment assets were made and maintained in a prudent and professional manner; (d) failing to perform due diligence and to maintain oversight and transparency as to the activities of any fund manager that managed the investment assets; and (e) failing to exercise the prudent and cautious judgment and best practices required to act for the benefit of Plaintiff.

46. Specifically, Defendant failed to conduct adequate and comprehensive due diligence reviews on the investment accounts and investment managers that it offered to Plaintiff. As a result, Defendant ignored numerous warning signs that would have warned it of the fraudulent scheme perpetrated by Madoff. Defendant further caused the dissemination of false and misleading statements and omissions alleged herein.

47. Defendant knew or should have known how to perform its obligations pursuant to the Policy/Contract and its fiduciary obligations arising from the Policy/Contract/Contract in monitoring the safety and performance of Plaintiff's assets in a prudent and professional manner.

48. As a direct and proximate result of Defendant's breaches, Plaintiff has suffered damages and is entitled to recover damages against Defendant, as well as the return of all fees paid to Defendant.

49. Defendant is further liable for punitive damages as a result of its wanton and grossly negligent course of conduct.

## COUNT III

### Common Law Duty of Good Faith and Fair Dealing

50. Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 49 and incorporates the same herein by reference.

51. There is implied in every contract a duty of good faith and fair dealing that neither party will do anything to deprive the other of the fruits of the contract.

52. The Policy/Contract contained said implied duty of good faith and fair dealing, as a matter of law.

53. By failing to act in accordance with the provisions of the Policy/Contract, and by improperly removing Plaintiff's monies from Plaintiff's account, Defendant has not only deprived Plaintiff of the fruits of the contract, but has caused further losses to Plaintiff. Said actions constitute breaches of the implied covenant of good faith and fair dealing.

54.     Further, the fiduciary relationship inherent in every insurance contract under Alaska law gives rise to an implied covenant of good faith and fair dealing. Defendant's breach of said implied covenant gives rise to an action in tort.

55.     Defendant's breaches of the implied covenant of good faith and fair dealing entitle Plaintiff to damages caused by Defendant's breaches, as well as punitive damages.

## COUNT IV

### Securities Fraud Pursuant to 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)

56.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 55 and incorporates the same herein by reference.

57.     Pursuant to the Policy/Contract, Plaintiff elected to invest its monies in an investment account option entitled "American Masters Opportunity Insurance Fund, L.P. Account," later named Tremont Opportunity Fund. As stated in the Policy/Contract, the objective of such account option was to achieve long-term capital appreciation and consistently generate positive returns irrespective of stock market volatility or direction while focusing on the preservation of capital.

58.     Defendant represented that Plaintiff's investment would be placed in such accounts, consistent with Plaintiff's investment objectives and the terms of the Policy/Contract and Prospectus provided to Plaintiff by Defendant.

59.     Rather than investing the premiums in accordance with the terms of the Policy/Contract, Defendant caused a portion of Plaintiff's monies to be transferred to investment funds that were controlled, taken and lost by Madoff in a fraudulent scheme.

60.     Section 10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b) forbids the "use or employ[ment of] . . . any manipulative or deceptive device or contrivance," "in connection with the purchase or sale of any security," and "in contravention of [SEC] rules and regulations."

61.     SEC regulations forbid the making "of any untrue statement of a material fact or to omit or state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security.

62.     Defendant failed to disclose to Plaintiff that the premiums entrusted to Defendant would be invested in fund groups controlled by Madoff.

63.     Defendant's misrepresentations and/or omissions were material to Plaintiff, based both on Plaintiff's investment objectives, expectations under the terms of the Policy/Contract/Contract and as a matter of sound and prudent investment principles.

64.     Defendant's misrepresentations and/or omissions were material and misleading at the time they were made (or failed to be made) and were made knowingly, with reckless disregard for their truth or falsity and/or without a genuine belief that the information disclosed was accurate and complete in all material respects.

65.     Defendant's misrepresentations and/or omissions were made in connection with the purchase or sale of a security pursuant to the prospectus furnished to Plaintiff by Defendant, upon which Plaintiff relied in entering in to the Policy/Contract with Defendant.

66.     But for Defendant's misrepresentations and/or omissions, Plaintiff would not have placed the premium monies with Defendant for investment.

67.    Defendant's misrepresentations and/or omissions were a substantial factor in causing the economic loss suffered by Plaintiff.

## COUNT V

### Violation of Pennsylvania Securities Act, 70 P.S. § 1-101, et seq.

68.    Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 67 and incorporates the same herein by reference.

69.    Sections 1-401(b) and 1-501(g) of the Pennsylvania Securities Act provides that one who, inter alia, "makes any untrue statement of material fact or omits stating a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading . . . [is] liable to the person purchasing the security."

70.    Defendant's misrepresentations and/or omissions as set forth in Count IV, supra., also constitute a violation of 70 P.S. §1-501(g) and 1-401(b).

71.    Pursuant to the Pennsylvania Securities Act, Defendant is liable to Plaintiff for all amounts paid to Defendant in connection with the investment, plus interest at the legal rate from the date of payment.

## COUNT VI

### Negligence and Gross Negligence

72.    Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 71 and incorporates the same herein by reference.

73.    As investment managers with discretionary control over the assets entrusted to it by Plaintiff, Defendant owed Plaintiff a duty to manage and monitor the investments of Plaintiff with reasonable care. Defendant breached that duty.

16

74.     Defendant further breached its duty of care by failing to take all reasonable steps to ensure that the investment of the assets of Plaintiff were made and maintained in a prudent and professional manner, and it failed to take all reasonable steps to preserve the value of Plaintiff's investments, failed to perform all necessary and adequate due diligence, and it failed to exercise generally the degree of prudence, caution and good business practice that would be expected of any reasonable investment professional.

75     As a direct and proximate result of Defendant's negligence and gross negligence, Plaintiff has suffered damages.

## COUNT VII

### Negligent Misrepresentation

76.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 75 and incorporates the same herein by reference.

77.     Defendant owed Plaintiff a duty to act with a reasonable care in connection with the assets entrusted to it by Plaintiff and to conduct due diligence to determine the accuracy and preparation of information contained in the policy statements, the Private Memorandum, and the partnership agreements executed by Plaintiff in reference thereto.

78.     Defendant has breached its duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made reflecting the value of the monies and/or policies, in light of the circumstances under which they were made, not misleading.

79.     At the time of the misrepresentations and omissions of material facts by Defendant, Plaintiff was ignorant of their falsity and believed them to be true. Plaintiff relied upon the misrepresentations made by Defendant. Had Plaintiff been aware of the true facts, Plaintiff would not have invested in the Tremont Opportunity Fund and, consequently, the Rye Select funds.

80.     Among the facts concealed by Defendant was the fact that approximately 23% of Plaintiff's account had been invested in a single fund. Defendant had affirmatively represented that no more than 5% to 6% of Plaintiff's monies would be invested in any one account, which was an affirmative misrepresentation.

81.     Defendant further mislead, misrepresented and deceived Plaintiff by referring to the Madoff accounts as "equity market neutral."

82.     Neither Plaintiff nor its agents knew of any of the falsity and/or misleading nature of Defendant's statements and omissions and, therefore, relied upon the representations made by Defendant.

83.     Defendant's conduct constitutes the making of negligent misrepresentation (including negligent omissions to state facts in the connection with statements that were made) under all applicable law. As a direct and proximate result of the negligent misrepresentations/omissions, and in reliance thereon, Plaintiff has suffered damages.

## COUNT VIII

### Unjust Enrichment

82.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 81 of the Complaint and incorporate the same herein by reference.

83.     Defendant financially benefited from its unlawful acts as it collected improper management fees based upon the Policy/Contract's net asset values. These unlawful acts caused Plaintiff to suffer injury and monetary loss.

84.     As a result, it is unjust and inequitable for Defendant to have enriched themselves in this manner.

85.     Plaintiff is entitled to restitution of the revenue derived from Defendant's unjust enrichment and inequitable conduct.

**WHEREFORE,** Plaintiff hereby demands judgment against Defendant AGL Life Assurance Company as follows:

A.     Awarding it compensatory damages suffered as a result of the wrong complained of herein together with appropriate interest;

B.     Awarding it costs and expenses of this litigation, including reasonable attorneys' fees and costs of suit;

C.     Awarding punitive damages in accordance with applicable law; and

D.     Awarding it damages for unjust enrichment, and for such other relief as the court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

NOEL, KOVACS & McGUIRE, P.C.

By:  Nicholas Noel, III, Esq.

LAW OFFICES OF WILLIAM R. CONNELLY, LLC

By:  William R. Connelly, Esq.

19

## DESIGNATION OF TRIAL COUNSEL

William R. Connelly, Esq. is designated as trial counsel in this matter.

_____

William R. Connelly, Esq.

Dated: January 15, 2010

Exhibit "A"

# AGL Life Assurance Company

## FLEXIBLE PREMIUM VARIABLE
## LIFE INSURANCE CONTRACT

**Provision of Benefits**

AGL Life Assurance Company promises to provide the benefits described in this Contract. This promise is subject to the terms of this Contract. It is made in return for your Application and payment of the required premiums. This is a legal contract between you and us. PLEASE READ THIS CONTRACT CAREFULLY. The words "we," "us," "our," and "company" refer to AGL Life Assurance Company.

This Contract takes effect on the Policy Date. It continues in force as long as the Net Account Value is sufficient to pay the Monthly Charges, as described herein.

**Notice of 10 Day Right to Examine Your Policy (Free Look Period)**

**This Contract may be canceled at any time within ten (10) days after it is received or within forty five (45) days after the date of the Application, whichever is later. This Contract must be returned to us at our Home Office or to the agent through whom it was purchased. Written notice of cancellation is also needed. If this Contract is canceled, it will be as though this Contract had never been issued. Any premium paid will be returned to you minus any Death Benefits paid, Partial Withdrawals taken, and any Contract Loans, together with accrued but unpaid interest on such Contract Loans, if allowed by the law of the Governing Jurisdiction.**

This Contract is issued by a stock company and is governed by the laws of the Governing Jurisdiction (See Contract Schedule A).

This policy may only be sold to an accredited investor as defined by law or in an offer and sale which otherwise satisfies all conditions applicable to offers and sales made under Regulation D. Its ownership may not be transferred without our permission. It may only be transferred to another accredited investor or in an offer and sale which otherwise satisfies all the conditions otherwise applicable to offers and sales made under Regulation D. If you cease to be an accredited investor or if all the conditions applicable to offers and sales made under Regulation D are no longer satisfied, then we may exchange this policy for another policy that is exempt from registration or is registered as required by law. If you do not accept such change, you must notify us in writing within thirty (30) days of receipt of the new policy. We also reserve the right to prevent an exchange of this policy in accordance with Internal Revenue Code Section 1035 in a situation where such exchange would violate the investor control requirements of the Internal Revenue Code.

**ALL VALUES OR PAYMENTS PROVIDED BY THIS CONTRACT WHEN BASED ON THE EXPERIENCE OF A VARIABLE ACCOUNT MAY INCREASE OR DECREASE AND ARE NOT GUARANTEED AS TO DOLLAR AMOUNT. THE AMOUNT AND DURATION OF THE DEATH BENEFIT MAY BE VARIABLE OR FIXED UNDER CERTAIN CONDITIONS (SEE PART 2, INSURANCE PLAN).**

Signed at Plymouth Meeting, Pennsylvania, on the Policy Date.

SECRETARY                                    PRESIDENT

**Variable Life Insurance.**
**Face Amount payable if Insured dies while the policy is in force.**
**Flexible Premiums payable while the Insured is living until the Maturity Date.**
**Non participating, no dividends are payable.**

**Home Office: 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania 19462**

VL-299

# TABLE OF CONTENTS

| Section | Policy Provisions | Page |
|---|---|---|
| Schedule A. | General Contract and Insured Information | 3 |
| Schedule B. | Contract Charges and Fees | 4 |
| Schedule C. | The Investment Accounts | 5 |
| Schedule D. | Face Amount | 6 |
| Schedule E. | Cost of Insurance | 7 |
| Schedule F. | Death Benefit Computation | 8 |
| Part 1. | Definitions | 9 |
| Part 2. | Insurance Plan | 10 |
| Part 3. | Variable Life Insurance Coverage | 11 |
| Part 4. | Premium Payments | 11 |
| Part 5. | The Investment Accounts | 13 |
| Part 6. | Account Value | 15 |
| Part 7. | Contract Loans | 16 |
| Part 8. | Partial Withdrawals | 17 |
| Part 9. | Reports to Contract Holder | 17 |
| Part 10. | Termination Provisions | 17 |
| Part 11. | General Provisions | 18 |

## CONTRACT SCHEDULE A

### GENERAL CONTRACT AND INSURED INFORMATION

| | |
|---|---|
| Contract Number: | VL300222 |
| Contract Holder: | The Michael S. Rulle Family Dynasty Trust Agreement of 2001, dtd 9/27/01 |
| Contract Year: | October 5 through October 4 |
| Policy Date: | October 5, 2001 |
| Maturity Date: | October 5, 2049 |
| Beneficiary: | The Michael S. Rulle Family Dynasty Trust Agreement of 2001, dtd 9/27/01 |

Depending on the premium paid, coverage may not continue to the Maturity Date. If coverage continues to the Maturity Date, the net account value to be paid may be zero or small.

### INSURED INFORMATION

| | |
|---|---|
| Insured: | Michael S. Rulle |
| Date of Birth: | 7/22/50 |
| Issue Age: | 51 |
| Sex: | Male |
| Underwriting Class: | Advantage |
| Smoker Status: | Non-smoker |
| Social Security Number: | 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 |
| Residence: | 165 Cherry Lane |
| | Mendham, NJ 07945 |

### BASIC CONTRACT INFORMATION

| | |
|---|---|
| Plan: | Flexible Premium Variable Life Insurance |
| Death Benefit Option: | Option 1 |
| Riders: | None |
| Governing Jurisdiction: | AK |
| State of Issuance: | AK |
| Initial Face Amount: | $17,600,000.00 |
| Initial Premium: | $1,200,000.00 |
| Initial Net Premium: | $1,160,200.00 |
| Maximum Premium: | n.a. |
| Minimum Premium: | $250,000.00 |

### NET PREMIUM ALLOCATION LIMITATIONS

You may direct the allocation of the Net Premium to any Investment Account as described in Contract Schedule C.

During the Free Look Period, however, the allocation of the Net Premium will be limited to the Money Market Investment Account.

No Net Premium may be allocated by you to our General Account.

PARTIAL WITHDRAWALS

| | |
|---|---|
| Minimum withdrawal Amount: | $10,000.00 |

### BASIS OF COMPUTATIONS

| | |
|---|---|
| Mortality Table: | 1980 Commissioners Standard Ordinary Table, Age Nearest Birthday |
| Interest Rate: | 4.00% per year |
| | 0.327374% monthly equivalent |

## CONTRACT SCHEDULE B

### CONTRACT CHARGES AND FEES

Charges displayed in this schedule are the maximum charges under this Contract. Current charges may be lower than those shown.

### PREMIUM LOADS

Premium Loads are deducted from each premium payment.

| | |
|---|---|
| Distribution Charge: | 3.50% of Initial Premium |
| | 3.50% of Subsequent Premium |
| Premium Tax Charge: | A charge calculated to approximate the aggregate of taxes based on premiums received imposed on us by the jurisdiction in which you reside. |

### MONTHLY CHARGES

Monthly Charges are deducted from the Account Value.

| | |
|---|---|
| Asset Charges: | Asset Charges are deducted by us on a daily basis from each Investment Account managed directly by one or more investment managers. The Asset Charges for the Investment Accounts are shown in Contract Schedule C. |
| Mortality and Expense Risk Charge: | 0.103575% monthly (equivalent to 1.25% annually) |
| Cost of Insurance: | See Contract Schedule E. |

### ANNUAL CHARGES

Annual Loan Charges are added to the Loan Amount.

| | |
|---|---|
| Loan Interest: | 4.60% annually in arrears. |
| Loan Interest Spread: | 0.60% |

### POLICY LOAD

A policy load is deducted on the policy date and on the effective date of any increase in Face Amount.

| | |
|---|---|
| Policy Load: | The smaller of the following: |
| | (i) $700.00; or |
| | (ii) Larger of $200.00 or $0.10 per $1,000 of face amount. |

### OTHER CHARGES

We reserve the right to deduct from this Contract's Account Value an amount equivalent to any federal, state, or local taxes or other governmental charge that we determine to be properly attributable to this Contract.

## CONTRACT SCHEDULE C

### VARIABLE ACCOUNT

The Variable Account for this policy is the Life Variable Portfolio. The assets of the Variable Account shall be available to cover the liabilities of the general account only to the extent that the assets of the Variable Account exceed the liabilities of the Variable Account arising under the policies supported by the Variable Account. The assets of the Variable Account shall be valued as often as policy benefits vary but at least monthly. See the Valuation Period provision on page 13 for more details.

### THE INVESTMENT ACCOUNTS

Each of the Investment Accounts invests in securities authorized by Pennsylvania law.

This Schedule may be amended from time to time to add or delete Investment Accounts. The investment policy of an Investment Account may not be changed without the approval of the Pennsylvania insurance commissioner. The approval process is on file with the commissioner.

### LIMITATION ON TRANSFER

The maximum number of transfers allowed among Investment Accounts per Contract Year is four (4)

### Investment Account 1 – Money Market Account*

| | |
|---|---|
| Objective: | To achieve high current income consistent with preservation of capital and maintenance of liquidity. |
| Strategy: | Investing primarily in investment grade securities with an average maturity of 91 days or less. |

Asset Charges: 0.20%[†] (annual equivalent)

### Investment Account 2 – American Masters Opportunity Insurance Fund, L.P. Account

| | |
|---|---|
| Objective: | To (i) achieve long-term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on the preservation of capital. |
| Strategy: | Investment strategy is to invest with various portfolio managers believed to be able to meet the Partnership's objectives. |

Asset Charges: 1.00%[†] (annual equivalent) for net assets up to $25,000,000;

0.75%[†] (annual equivalent) for net assets over $25,000,000.

[†]   Amounts shown are in addition to fees directly charged as a result of investments.
[*]   This account is designated the Money Market Investment Account.

## CONTRACT SCHEDULE D

### FACE AMOUNT

Minimum Face Amount:   $50,000

Maximum Face Amount:   Subject to underwriting.

Increases in Face Amount will require evidence of insurability. Increases will be subject to a policy load as shown in Contract Schedule B.

| Contract Years | Table of Selected Face Amounts |
|:---:|:---:|
| All | $17,600,000 |

We reserve the right to reduce the Death Benefit of this policy by requiring one or more partial withdrawals. The function of these partial withdrawals shall be to limit the Net Amount at Risk to an amount not greater than Maximum Net Amount at Risk shown below. Failure to require any partial withdrawal under this provision shall not be deemed to waive our right to require future withdrawals permitted by this endorsement.

Maximum Net Amount at Risk:   The smaller of (1) $17,600,000 and (2) the reduced Face Amount should you choose to reduce the Face Amount at a later date.

## CONTRACT SCHEDULE E

### COST OF INSURANCE

The maximum monthly Cost of Insurance rates are for each $1,000 of Net Amount at Risk (NAR). Current charges may be lower than those shown. The applicable monthly rates for this policy are the amounts shown below.

| Attained Age | Male | Female | Attained Age | Male | Female | Attained Age | Male | Female |
|---|---|---|---|---|---|---|---|---|
| 0 | 0.349002 | 0.241153 | 35 | 0.176004 | 0.137604 | 70 | 3.353673 | 1.861440 |
| 1 | 0.089210 | 0.072529 | 36 | 0.186859 | 0.146785 | 71 | 3.681990 | 2.041944 |
| 2 | 0.082538 | 0.067525 | 37 | 0.200220 | 0.157637 | 72 | 4.060290 | 2.267226 |
| 3 | 0.081703 | 0.065857 | 38 | 0.215255 | 0.170159 | 73 | 4.496204 | 2.544475 |
| 4 | 0.079201 | 0.064189 | 39 | 0.232798 | 0.185189 | 74 | 4.983518 | 2.872449 |
| 5 | 0.075031 | 0.063355 | 40 | 0.252016 | 0.201891 | 75 | 5.513314 | 3.243922 |
| 6 | 0.071695 | 0.060854 | 41 | 0.274581 | 0.220267 | 76 | 6.076525 | 3.653355 |
| 7 | 0.066691 | 0.060020 | 42 | 0.297152 | 0.239482 | 77 | 6.665690 | 4.094284 |
| 8 | 0.063355 | 0.058352 | 43 | 0.323074 | 0.257865 | 78 | 7.275881 | 4.567162 |
| 9 | 0.061688 | 0.057518 | 44 | 0.349839 | 0.277089 | 79 | 7.923872 | 5.085703 |
| 10 | 0.060854 | 0.056684 | 45 | 0.379960 | 0.297152 | 80 | 8.635205 | 5.672859 |
| 11 | 0.064189 | 0.057518 | 46 | 0.410928 | 0.317220 | 81 | 9.430778 | 6.350514 |
| 12 | 0.070861 | 0.060020 | 47 | 0.444418 | 0.338128 | 82 | 10.338952 | 7.140527 |
| 13 | 0.082538 | 0.062522 | 48 | 0.479596 | 0.361551 | 83 | 11.373499 | 8.058585 |
| 14 | 0.095884 | 0.066691 | 49 | 0.518979 | 0.386655 | 84 | 12.513845 | 9.091985 |
| 15 | 0.110901 | 0.070861 | 50 | 0.560894 | 0.414276 | 85 | 13.737727 | 10.231576 |
| 16 | 0.125921 | 0.075031 | 51 | 0.610378 | 0.443581 | 86 | 15.021846 | 11.470894 |
| 17 | 0.139273 | 0.079201 | 52 | 0.665766 | 0.476246 | 87 | 16.356613 | 12.808170 |
| 18 | 0.148455 | 0.081703 | 53 | 0.728747 | 0.513950 | 88 | 17.737983 | 14.246631 |
| 19 | 0.155132 | 0.085040 | 54 | 0.800179 | 0.552509 | 89 | 19.171986 | 15.797873 |
| 20 | 0.158471 | 0.087542 | 55 | 0.876715 | 0.592762 | 90 | 20.677655 | 17.482656 |
| 21 | 0.159306 | 0.089210 | 56 | 0.960053 | 0.633033 | 91 | 22.287142 | 19.335048 |
| 22 | 0.157637 | 0.090879 | 57 | 1.046840 | 0.671642 | 92 | 24.063468 | 21.418993 |
| 23 | 0.155132 | 0.092547 | 58 | 1.139616 | 0.708588 | 93 | 26.119928 | 23.852379 |
| 24 | 0.151793 | 0.095050 | 59 | 1.239245 | 0.748070 | 94 | 28.812997 | 26.926360 |
| 25 | 0.147620 | 0.096718 | 60 | 1.349979 | 0.792613 | 95 | 32.817580 | 31.310115 |
| 26 | 0.144281 | 0.099221 | 61 | 1.473551 | 0.848112 | 96 | 39.642945 | 38.504789 |
| 27 | 0.142612 | 0.101724 | 62 | 1.613407 | 0.917954 | 97 | 53.066045 | 52.275714 |
| 28 | 0.141777 | 0.105061 | 63 | 1.772172 | 1.007228 | 98 | 83.333333 | 83.333333 |
| 29 | 0.142612 | 0.108398 | 64 | 1.949093 | 1.110930 | | | |
| 30 | 0.144281 | 0.112570 | 65 | 2.143422 | 1.224040 | | | |
| 31 | 0.148455 | 0.116742 | 66 | 2.350996 | 1.343212 | | | |
| 32 | 0.152628 | 0.120914 | 67 | 2.572761 | 1.464235 | | | |
| 33 | 0.159306 | 0.125086 | 68 | 2.808822 | 1.583722 | | | |
| 34 | 0.166820 | 0.131762 | 69 | 3.065321 | 1.712709 | | | |

## CONTRACT SCHEDULE F

### DEATH BENEFIT COMPUTATION

### TABLE OF MINIMUM DEATH BENEFIT FACTORS

| Attained Age | Factor | Attained Age | Factor |
|---|---|---|---|
| 0-40 | 2.50 | 60 | 1.30 |
| 41 | 2.43 | 61 | 1.28 |
| 42 | 2.36 | 62 | 1.26 |
| 43 | 2.29 | 63 | 1.24 |
| 44 | 2.22 | 64 | 1.22 |
| 45 | 2.15 | 65 | 1.20 |
| 46 | 2.09 | 66 | 1.19 |
| 47 | 2.03 | 67 | 1.18 |
| 48 | 1.97 | 68 | 1.17 |
| 49 | 1.91 | 69 | 1.16 |
| 50 | 1.85 | 70 | 1.15 |
| 51 | 1.78 | 71 | 1.13 |
| 52 | 1.71 | 72 | 1.11 |
| 53 | 1.64 | 73 | 1.09 |
| 54 | 1.57 | 74 | 1.07 |
| 55 | 1.50 | 75-90 | 1.05 |
| 56 | 1.46 | 91 | 1.04 |
| 57 | 1.42 | 92 | 1.03 |
| 58 | 1.38 | 93 | 1.02 |
| 59 | 1.34 | 94 | 1.01 |
| | | 95-98 | 1.00 |

## Part 1. Definitions

The following terms have special meaning as they are used in this policy. That meaning is explained here. Other terms that have special meaning are explained in the policy.

**Accumulation Units.** Accumulation Units are used to measure the Account Value allocated to each Investment Account.

**Age.** The Issue Age plus the number of completed Contract Years. Issue Age is the Attained Age of the Insured on the birthday nearest the Policy Date. Issue Age is shown in Schedule A.

**Beneficiary.** Any person or entity named in our records to receive the insurance proceeds after the Insured dies.

**Borrowed Fund.** An account established for any amounts transferred from the Investment Accounts as a result of loans. The account is credited with interest and is not based on the experience of any Investment Account.

**Contract Anniversary.** The day that marks the start of a new Contract Year.

**Contract Holder.** Referred to as You or Your. The owner of this Contract, as shown in our records. All of the rights and benefits of this Contract belong to you, unless otherwise stated herein.

**Contract Year.** Each successive twelve month period starting on the Policy Date.

**Face Amount.** The amount of insurance under this Contract. The Initial Face Amount is shown in Contract Schedule A. Thereafter, it may change in accordance with the terms of the provisions of Part 2, Insurance Plan, Part 8, Partial Withdrawals and Contract Schedule D.

**Governing Jurisdiction.** The state or jurisdiction in which this Contract is delivered and whose laws govern its terms.

**Investment Account.** Each of the Investment Accounts collectively comprise the Variable Account. The assets of each Investment account are invested separately.

**Policy Date.** The date used to begin calculating Monthly Charges and Annual Charges. The Policy Date is shown in Contract Schedule A. Computation of Contract Months starts with the Policy Date.

**Monthly Calculation Date.** This date determines the day for calculating Monthly Charges under this Contract. The day Monthly Charges are deducted from the Account Value. It is the same day of each succeeding month as the Policy Date except that whenever the Monthly Calculation Date falls on a day other than a Valuation Day it is deemed to be the next Valuation Day. If any Monthly Calculation Date would be the 29th, 30th, or 31st of a month that does not have that number of days, then the Monthly Calculation Date will be the last day of that month. If the Initial Premium is received after the Policy Date, the Monthly Charges are still calculated beginning on the Policy Date and deducted on the on the date the Initial Premium is received.

**Net Amount At Risk (NAR).** The Net Amount At Risk is calculated on any Monthly Calculation Date by subtracting the Account Value from the Death Benefit discounted to such Monthly Calculation Date at the interest rate specified in Contract Schedule A, under Basis of Computations.

**Net Investment Factor.** The Net Investment Factor is an index that measures the investment performance of an Investment Account from one Valuation Day to the next.

**NonSmoker.** A person who does not currently use and has not in the twelve months before the application is signed smoked any cigarettes.

**S.E.C.** The United States Securities and Exchange Commission.

**Smoker.** A person who is not a NonSmoker as defined above.

**Valuation Day.** Valuation will occur periodically at such intervals as we may reasonably determine. It will be at least as often as policy benefits vary but at least monthly. The day a valuation takes place will be called Valuation Day. Each Valuation Day ends at the Valuation Time.

**Valuation Time.** The Valuation Time is the close of trading on the New York Stock Exchange (or any successor exchange) or, if the securities in which the assets of an Investment Account are invested are not traded on the New York Stock Exchange, the close of trading on any exchange on which such securities are traded, except when the S.E.C. determines that an emergency exists that would make the determination of the value of the securities not reasonably practicable.

**Variable Account.** The Variable Account has been established under Pennsylvania Law. The Variable Account is not part of our General Account.

## Part 2. Insurance Plan

This Contract provides insurance coverage on the life of the Insured. The Insured is named in Contract Schedule A.

### Death Benefit

If the Insured dies while this Contract is in force, a Death Benefit is payable to the Beneficiary when we receive due proof of death. The amount of Death Benefit depends on the Death Benefit Option selected by you and shown in Contract Schedule A and Contract Schedule D, if any. The amount of the Death Benefit payable is also adjusted as follows:

(1) by deducting the amount of any unpaid Monthly Charges against the Account Value to the date of death; and

(2) by deducting the amount of any Contract Loans outstanding against the Account Value on the date of death plus interest accrued but unpaid on such Contract Loans on the date of death; and

(3) by deducting the amount of any unpaid charges for benefits provided by Rider, if any.

### Death Benefit Options

There are two Death Benefit Options, described below. The Death Benefit Option for this Contract on the Policy Date is shown in Contract Schedule A.

Option 1: The greater of:

(a) the Face Amount in effect on the date of death; and

(b) the Account Value on the date of death multiplied by the Minimum Death Benefit Factor shown in Contract Schedule F.

Option 2: The greater of:

(a) the Face Amount plus the Account Value on the date of death; and

(b) the Account Value on the date of death multiplied by the Minimum Death Benefit Factor shown in Contract Schedule F.

### Face Amount

Unless otherwise agreed, the Face Amount for this Contract may not be greater than that determined according to Contract Schedule D. The Face Amount on the Policy Date is shown in Contract Schedule A. The table of Selected Face Amounts is shown in Contract Schedule D.

### Minimum Death Benefit Factor

A table of Minimum Death Benefit Factors is included in Contract Schedule F. To ensure that the Contract will qualify as life insurance under the Internal Revenue Code, the Death Benefit will never be less than the Account Value multiplied by the appropriate Minimum Death Benefit Factor.

### Changing the Face Amount

You may, subject to our approval, change the Face Amount or the Table of Selected Face Amounts. You must request the change by notifying us in writing. If we approve the change, it will take effect on the next Contract Anniversary that is at least thirty (30) days after all the required information has been provided to us. Any limitations on the number and/or amount of such changes are shown in Contract Schedule D. Cost of Insurance amounts charged to the Account Value will be adjusted to provide for the change. No such change will be effective if the Insured dies before the date of such change.

### Changing the Death Benefit Option

The Death Benefit Option for this Contract may be changed while this Contract is in effect. You must request the change by notifying us in writing. If we approve the change, it will take effect on the next Contract Anniversary that is at least thirty (30) days after all the required information has been provided to us. The Cost of Insurance amounts will be adjusted to provide for the change. No such change will be effective if the Insured dies before the date of change.

**If the Death Benefit is changed from Option 1 to Option 2, the Face Amount after the change will equal the Face Amount immediately prior to the change less the Account Value at the time of the change.**

**If the Death Benefit is changed from Option 2 to Option 1, the Face Amount after the change will equal the Death Benefit immediately prior to the change.**

### Time of Payment of Death Benefit

A Death Benefit will usually be paid within seven (7) days of the date due proof of the Insured's death is received by us at our Home Office and any other requirements are satisfied. Payment of any amount of Death Benefit based upon an Investment Account may be delayed if:

(1) the New York Stock Exchange (or its successor or, if the securities in which the assets of the Investment Accounts are invested are not traded on the New York Stock Exchange, any principal exchange on which such securities are traded) is closed; or

(2) the S.E.C. determines that an emergency exists that would make the disposal of securities held in the Investment Account or the determination of their value not reasonably practicable.

Settlement of any amounts not based upon an Investment Account will be made not more than six (6) months after due proof of death is received.

### Interest on Death Benefits

Interest on Death Benefits will be credited as prescribed by law.

### Beneficiary

You may name or change a Beneficiary by sending written notice to us. A Beneficiary may be revocable or irrevocable. An irrevocable Beneficiary may not be changed without his or her consent. Also an Irrevocable Beneficiary must consent to the exercise of certain other rights by you. There may be different classes of Beneficiaries, such as primary and secondary. These classes set the order of payments. There may be more than one Beneficiary in a class. The Beneficiary designation in effect on the Policy Date is stated in the Application for this Contract.

### Suicide Exclusion

If the Insured or substitute insured commits suicide, while sane or insane, within two years from the date coverage becomes effective on such person under this Contract, only a limited Death Benefit will be payable. In such case, the amount of the Death Benefit will be equal to the amount of the Net Premiums less any Partial Withdrawals and Contract Loans and any loan interest accrued but unpaid.

Furthermore, if the Insured commits suicide within two years from the date of receipt of any Subsequent Premium Payment which increases the amount of the Death Benefit, or any change of Face Amount or change of Death Benefit Option which increases the amount of the Death Benefit, the amount of the increase in the Death Benefit will be limited to a refund of the Cost of Insurance charges made for such increase.

### Part 4. Premium Payments

### A. Premium Payments Generally

You may make premium payments at any time, subject to limitations described in this Contract. However, we have the right to promptly refund any amount of premium paid (1) in order to keep this Contract in compliance with state and federal laws and (2) if the premium increases the Net Amount at Risk and requested evidence of insurability is not provided or does not satisfy current underwriting requirements. All funds received by us will be credited to this Contract as a premium payment unless clearly marked otherwise.

### Where to Pay Premiums

All premiums are payable to us at our Home Office.

### Premium Loads

Any Premium Loads shown in Contract Schedule B are deducted from premiums received by us prior to allocation to the Investment Accounts. Premium Loads include charges for sales and distribution expenses as well as premium taxes.

### Net Premiums

A Net Premium is any premium we receive minus any Premium Load.

### Initial Premium

The Initial Premium is the first premium received and accepted by us.

### Initial Net Premium

The Initial Net Premium for this Contract is stated in Contract Schedule A.

4

## Part 4. Premium Payments (Continued)

**Minimum Net Premium**
The Minimum Net Premium at any time is equal to twelve (12) times the first Monthly Charges for the current Contract Year.

**Minimum Premium**
The Minimum Premium at any time is equal to the Minimum Net Premium plus the Premium Loads.

**Maximum Premium**
The largest amount of premium which can be paid in any policy year is an amount such that the sum of the premiums paid under the policy will not, at any time, exceed the guideline premium limitation referred to in Section 7702 of the Internal Revenue Code of 1986, as amended, or as set forth in any applicable successor provision thereto. This limit is in addition to all other limitations stated in the policy.

**Subsequent Premiums**
Each premium payment made after the Initial Premium has been paid is known as a Subsequent Premium payment. Subsequent Premium payments may be made on any Valuation Day and in any amount, subject to certain limitations. The premium may not be less than the minimum premium stated in Schedule A. If the premium increases the Net Amount at Risk, evidence of insurability may be required.

**Premium Payment to Prevent Lapse**
Whenever this Contract is in danger of lapsing because the Net Account Value is insufficient to pay the Monthly Charges, the amount of premium required to prevent lapse is equal to three (3) times the Monthly Charges then due plus any applicable Premium Loads.

**Premium Payments to Reinstate Insurance Coverage**
When insurance coverage has lapsed due to insufficient Net Account Value, the amount of premium required to reinstate the insurance coverage is equal to three (3) times the Monthly Charges due on the Monthly Calculation Date immediately preceding the effective date of Reinstatement, plus any applicable Premium Loads. Evidence of insurability satisfactory to us is required to reinstate.

**Premium Notices**
Notices of any premium payments necessary to prevent lapse of insurance coverage or to reinstate insurance coverage will be sent to you.

### B. Allocation of Net Premiums to or among the Investment Accounts

Net Premiums are allocated to or among the Investment Accounts in accordance with your instructions, subject to the Net Premium Allocation Limitations stated in Contract Schedule A, and further subject to any limitations stated in Contract Schedule C. If no instructions are received from you with a premium payment, such Net Premiums will be allocated to the Investment Accounts in the same proportions as stated in the most recent recorded instructions received from you.

**Timing**
Net Premiums received prior to the Valuation Time on any Valuation Day will be allocated as of the date they are received. Net Premiums received after such time will be allocated on the next Valuation Day.

**During Free Look Period**
Any Net Premiums received prior to the end of the Free Look Period will be allocated to the Money Market Investment Account. At the end of such period, the Net Account Value will be allocated to any Investment Accounts then available according to your instructions for allocation of Net Premiums. No allocation instructions received from you during the Free Look Period will be acted upon.

**Part 5. The Investment Accounts**

Subject to the conditions set forth in this Part, you have the right to allocate and re-allocate the Account Value of this Contract among the Investment Accounts on any Valuation Day.

**The Investment Accounts**

The assets in each Investment Account are kept segregated from our General Account and from any other of our Investment Accounts. We own the assets of the Investment Accounts. Those assets will only be used to support our variable products and for any other purposes permitted by applicable laws and regulations. The portion of the assets of an Investment Account equal to the reserves and other Contract liabilities with respect to such Investment Account will not be charged with liabilities that arise from any other business we may conduct. We may, however, transfer from an Investment Account to our General Account assets that exceed the reserves and other Contract liabilities with respect to such Investment Account. Income, gains, and losses, whether or not realized, from each Investment Account are credited to or charged against that Investment Account and without regard to the income, gains, or losses of any other Investment Account and without regard to any of our other income, gains, or losses.

With respect to the assets required to be maintained in the Investment Account for the benefit of you, the term "reserves" will in no event be less than an amount equal to the sum of the Net Account Value, pursuant to part 6-Account Value.

We reserve the right to: (1) establish and operate the Variable Account as a managed account or an account which purchases shares from the portfolios of funds managed by investment managers retained by us; (2) register or deregister the Variable Account under the Investment Company Act of 1940; (3) operate the Investment Accounts as unit investment trust registered, or exempt from registration, under the Investment Company Act of 1940 or any other form permitted by law

**Transfers**

Transfers between or among Investment Accounts may be made on any Valuation Day (see, however, Availability of Funds, in Part 11). Transfers must be requested by you in a form acceptable to us. We reserve the right to limit the amount of any transfer. The maximum number of transfers per Contract Year is shown in Contract Schedule C. Written confirmation of each transfer will be sent to you.

**Investments of the Accounts**

We may contract with investment managers to manage directly the assets held in the Investment Accounts. We may deduct an Asset Charge from the Account Value allocated to Investment Accounts that are managed directly as well as any costs and expenses arising from such Investment Accounts. In either case, investment managers are selected by us in our discretion.

**Changes in the Investment Accounts**

We have the right to establish additional Investment Accounts, and to establish other investment options, from time to time. For any Investment Account, we have the right to substitute a new portfolio for the portfolio in which the Investment Account invests, to substitute new Investment Accounts, to combine two or more Investment Accounts, and to eliminate any existing Investment Accounts or any other investment option. Subject to any required regulatory approvals, we reserve the right to transfer assets of an Investment Account to another Investment Account that we determine to be associated with the class of contracts to which the Contract belongs.

**Valuation Period**

The Valuation Period is the period of time between Valuation Times. The Valuation Period begins as of the end of the previous Valuation Day.

The value of an Investment Account reflects:

- Any amounts transferred to the Investment Account during the current Valuation Period;
- The investment income and realized and unrealized capital gains credited to such assets in the Valuation Period;
- Any amounts transferred from an Investment Account during the current Valuation Period;
- Realized and unrealized capital losses charged against those assets during the Valuation Period;
- Any amount charged or reserved against the Investment Account for taxes;
- Any expenses charged or reserved against the Investment Account for expenses incurred in operating such Investment Account;
- The mortality and expense risk charge for the Valuation Period; and
- Any other Monthly Charges deducted from the Investment Account for This Contract.

## Part 5. The Investment Accounts (Continued)

The Account Value will increase or decrease in accordance with the increases and decreases in the value of the Investment Accounts in which the Account Value is invested.

### Accumulation Units

Accumulation Units are used to measure the Account Value allocated to each Investment Account. The value of a unit is determined as of the Valuation Time on each Valuation Day. The value of any unit will vary from Valuation Day to Valuation Day to reflect the investment performance of the Investment Account applicable to that unit.

Amounts allocated to the Investment Accounts are applied to provide Accumulation Units in each Investment Account. The number of Accumulation Units credited to each Investment Account is determined by dividing the amount allocated to an Investment Account by the dollar value of one Accumulation Unit for such Investment Account.

We reserve the right to split or consolidate the number of Accumulation Units credited to this Contract with a corresponding increase or decrease in the unit values. We may exercise this right whenever we consider an adjustment of units to be desirable. No adjustment will have any material effect on the benefits, provisions or investment return of this Contract, or on you, the Insured, any Beneficiary, any assignee or other person, or on us.

### Accumulation Unit Value

The Value of an Accumulation Unit in each Investment Account is $1.00 on the first Valuation Day for that Investment Account. The value of any Accumulation Unit on any subsequent Valuation Day is equal to its value on the preceding Valuation Day multiplied by the Net Investment Factor for that Investment Account for the Valuation Period.

### Gross Investment Rate

The Gross Investment Rate of an Investment Account for any Valuation Period is equal to the net earnings of that Investment Account during the Valuation Period divided by the value of the total assets of that Investment Account at the beginning of the Valuation Period.

### Net Earnings

The Net Earnings of each Investment Account is equal to the accrued investment income and capital gains and losses (realized and unrealized) of that Investment Account, reduced by any amount charged against that Investment Account for taxes paid or reserved by us.

The Gross Investment Rate and Net Earnings of each Investment Account will be determined by us in accordance with generally accepted accounting principles and applicable laws, rules, and regulations.

### Mortality and Expense Risk Charge

The Mortality and Expense Risk Charge is deducted daily from each Investment Account. The maximum charge is stated in Contract Schedule B.

### Asset Charge

An Asset Charge may be deducted daily from each Investment Account managed directly by one or more investment managers. It consists of the money management fees, any custodial fees and other investment related expenses. Any Asset Charges applicable to such Investment Accounts are shown in Contract Schedule C.

### Net Investment Factor

The Net Investment Factor is determined for each Investment Account for each Valuation Period. The Net Investment Factor equals the Gross Investment Rate for such period plus one (1.0) and minus the Mortality and Expense Risk Charge and any Asset Charge.

### Crediting and Canceling Accumulation Units

Transactions that require the crediting and canceling of Accumulation Units will be made as of the Valuation Time on the Valuation Day in which the transaction is effected. Premium payments and requests for loans, withdrawals, transfers, etc. received after the Valuation Time will be effective on the next Valuation Day.

Part 6. Account Value

## A. Contract Values

### Account Value

The Account Value of this Contract on any date is the value of the Investment Accounts plus the value of the Borrowed Fund.

The Account Value when the Initial Premium is received is equal to the Net Premium invested in the Investment Accounts, less:

    (a) Cost of Insurance Charges (deducted on each monthly calculation date) ; and

    (b) Policy Loads; and

    (c) any Charges for Special Insurance Class Rating.

The Account Value on any subsequent Valuation Day is equal to the Account Value on the prior Valuation Day plus:

    (a) any new Net Premium invested in the Investment Accounts; and

    (b) any increase in value of the Investment Account due to investment results (net of Mortality and Expense Risk Charges and any Asset Charges); and

    (c) any interest credited to the Borrowed Fund;

less:

    (a) any decrease in value of the Investment Account due to investment results (net of Mortality and Expense Risk Charges and any Asset Charges); and

    (b) Cost of Insurance Charges (deducted only on Monthly Calculation Date); and

    (c) any Partial Withdrawals taken; and

    (d) any Rider Charges deducted from the Account Value; and

    (e) any Policy Loads; and

    (f) any Charges for Special Insurance Class Rating; and

    (g) any Other Charges as stated in Contract Schedule B.

Contract Values are not less than required by the state in which the policy is delivered.

### Net Account Value

Net Account Value is the Account Value minus any Contract Loan balance and accrued unpaid interest.

## B. Charges Deducted from the Account Value

The following charges may be deducted from the Account Value that is invested in the Investment Accounts. These charges are deducted pro-rata from each Investment Account.

### Cost of Insurance

Cost of Insurance (COI) Charges are deducted from the Account Value on each Monthly Calculation Date. Guaranteed Cost of Insurance Charges are determined by multiplying the applicable COI rates from the table or tables in Contract Schedule E times the Net Amount At Risk (NAR) calculated as of the last day of the prior Contract Month, divided by 1,000. Current COI charges may be lower.

### Rider Charges

Charges for Riders, if any, deducted from the Account Value are shown in the Contract Schedules for such Riders.

### Policy Loads

Policy Loads may apply at issue and upon increases in Face Amount and changes in Death Benefit Option. These charges are deducted at issue or at the time of the increase in Face Amount or change in Death Benefit Option. Any Policy Loads are shown in Contract Schedule B.

### Charges for Substandard Insurance Class Rating

If the Insured has a Substandard Insurance Class Rating, charges applicable to such Ratings may apply. These charges are deducted from the Account Value on each Monthly Calculation Date. If any charges apply, they are shown in Contract Schedule B.

## Part 7. Contract Loans

**Contract Loans**

You may request a loan against this Contract. This Contract must be assigned to us as sole security for the loans. A loan may take place only on a Monthly Calculation Date. An amount equal to the amount borrowed will be transferred from the Investment Accounts to the Borrowed Fund of our general account. Any such transfer is made by canceling Accumulation Units in the Investment Accounts and applying the value of those units to the Borrowed Fund. Unless other specific instructions are received from you, the loan will be taken from the Investment Accounts in proportion to the amount of your then current Account Value in each Investment Account.

**Maximum Loan**

The Maximum Loan amount for this Contract is equal to the Account Value less the sum of the following:

    (a)  outstanding loan amount together with unpaid accrued loan interest; and

    (b)  the Minimum Net Premium for the current Contract Year; and

    (c)  loan interest charges until the next Contract Anniversary.

**Borrowed Fund**

The Borrowed Fund is a portion of our general account reserved for amounts held as collateral for Contract Loans. The initial amount of the Borrowed Fund will be equal to any loan principal. Interest will be credited to the Borrowed Fund at the Borrowed Fund Crediting Rate described below.

Interest credited to the Borrowed Fund will be transferred to the Investment Accounts on each Contract Anniversary. The amount so transferred will be allocated among the Investment Accounts in proportion to the Account Value in each Investment Account.

Amounts of interest charged against the loan principal and unpaid on each Contract Anniversary will be added to the amount of the loan principal in the Borrowed Fund. An amount equal to the unpaid interest will be transferred from the Investment Accounts to the Borrowed Fund on the Contract Anniversary. This amount will be transferred from the Investment Accounts in proportion to the Account Value in each Investment Account.

**Borrowed Fund Crediting Rate**

Interest credited to amounts held in the Borrowed Fund as collateral for loans will be at least equal to the rate stated under "Basis of Computations" in Contract Schedule A. Interest will be credited such that the Borrowed Fund Crediting Rate is always equal to the Loan Interest Rate less the Loan Interest Spread stated in Contract Schedule B. The Borrowed Fund Crediting Rate may not be changed more frequently than annually. Any change in the Borrowed Fund Crediting Rate for this Contract will be effective on a Contract Anniversary. You will be notified of any such change.

**Loan Interest Rate**

The current Loan Interest Rate will be applied to the entire outstanding loan balance. Interest is due annually in arrears. Any unpaid interest on any outstanding loans will be added to the outstanding loan amount as of the Contract Anniversary.

**Repayment of Loan**

All or part of any Contract Loan plus accrued interest may be paid at any time while this Contract is in force.

Any repayment of a Contract Loan will result in the transfer of values equal to the repayment out of the Borrowed Fund and the application of those values to the Investment Account as a Net Premium payment. Unless other specific instructions are received from you, these values will be applied to the Investment Accounts in proportion to the amount of your current Account Value in each Investment Account.

## Part 8. Partial Withdrawals

### Partial Withdrawals

Withdrawals from the Investment Accounts may be made on any Monthly Calculation Date. The withdrawal must be requested by you in a form acceptable to us.

Unless other specific instructions are received from you, the withdrawal will be taken from each Investment Account in proportion to your current Account Value in each Investment Account.

If Death Benefit Option 1 is in effect, the Face Amount and future scheduled Face Amounts will be reduced by the amount withdrawn. In every case, the Death Benefit will change according to the Death Benefit provision on page 10.

### Maximum Withdrawal Amount

The Maximum Withdrawal Amount for this Contract is equal to the Account Value less the sum of the following:

    (a) outstanding loan amount together with unpaid accrued loan interest; and

    (b) the Minimum Net Premium for the current Contract Year; and

    (c) loan interest until the next Contract Anniversary.

However, the Maximum Withdrawal Amount is exceeded whenever such withdrawal would reduce the Face Amount below the Minimum Face Amount stated in Contract Schedule D.

### Minimum Withdrawal Amount

The amount of each withdrawal must be at least equal to the Minimum Withdrawal Amount shown in Contract Schedule A.

## Part 9. Reports to Contract Holder

### Annual Report

Each year within 30 days after the Contract Anniversary, we will mail a report to you. The report will show the Account Value at the beginning of the previous Contract Year and all premiums paid since that time. It will also show the additions to, and deductions from, the Account Value during the Contract Year, and the Account Value, Death Benefit, Net Account Value, outstanding Contract Loans and accrued loan interest as of the current Contract Anniversary. This report will also include any additional information required by applicable law or regulation.

## Part 10. Termination Provisions

### Continuation of Insurance

If premium payments cease, coverage provided under this Contract will continue subject to the Grace Period provision for as long as the Net Account Value is sufficient to cover the Monthly Charges. Any remaining Net Account Value will be payable on the Maturity Date.

### Grace Period

If the Net Account Value is not sufficient to cover the Monthly Charges due on any Monthly Calculation Date, a Grace Period is allowed for payment of the amount of premium needed to increase the Account Value so that the deduction of monthly charges can be made. This Grace Period begins on the date the deduction is due. It ends 61 days from that date or, if later, 61 days after the date we mail a written notice to you at the last known address shown on our records. This notice will state the amount needed to increase the Account Value to cover the Monthly Charges. During the Grace Period, the insurance coverage will continue in effect.

During the Grace Period, to continue the insurance coverage in force, you must make an additional premium payment at least equal to three (3) times the Monthly Charges due when the Grace Period began, plus any Premium Loads.

### Contract Termination

This Contract will terminate on the earliest of the following:

    (1) the end of the Grace Period for this Contract; or

    (2) this Contract is surrendered by you; or

    (3) the Maturity Date of this Contract; or

    (4) when all our obligations under this Contract have been fulfilled.

### Surrender

This Contract may be surrendered for its Net Account Value on any Valuation Date. You must request a Surrender in a form acceptable to us.

## Part 10. Termination Provisions (Continued)

### Reinstatement

This Contract may be reinstated, prior to the Maturity Date, provided:

(1) satisfactory evidence of insurability is provided to us; and

(2) this Contract has not been surrendered for cash; and

(3) you must request the Reinstatement in a form acceptable to us; and

(4) the request must be within five (5) years of the date of Contract termination; and

(5) the Reinstatement Premium must be paid at the time of Reinstatement. The Reinstatement Premium must be no less than the amount specified in Part 4, Premium Payments; and

(6) the Insured must be alive on the date the Reinstatement becomes effective. The Reinstatement will become effective on the date that it is approved by us.

### Maturity Date

No insurance coverage will be effective on or after the Maturity Date. If the Insured is living and this Contract is in force on this date the Net Account Value will be paid to you, and of our liability under this Contract will cease.

## Part 11. General Provisions

### Entire Contract

This Contract is issued in consideration of the Application and the initial premium payment. This Contract and Application, a copy of which is attached, together with any Contract Schedules, any Riders constitute the entire Contract. Any waiver or change of any provision in this Contract must be in writing and signed by an officer of our Company.

### Waiver Not Estoppel

Our failure to enforce any provision of this Contract will not constitute or be construed as a waiver of such provision or of the right to enforce it at a later time, nor will the waiver of any provision by us on one or more occasions constitute or be construed as a waiver for all occasions and we will not be estopped from enforcing any provision of this Contract except as may be otherwise agreed to in writing by an officer of our Company.

### Right to Amend

If any provision in this Contract is in conflict with the laws of the state that govern this Contract, the provision will be deemed to be amended to conform with such laws. In addition, this Contract may be amended from time to time by us as may be required to meet the definition of "life insurance" under the Internal Revenue Code, its regulations or published rulings. You will be given the right to reject this change.

### Right to Transfer this Contract

This Contract may be transferred to the life of a substitute insured. Transfer will be effective on the Transfer Date discussed in the next provision. Transfer will be subject to the following conditions:

(1) The substitute insured must not have been under 20 years of age on the birthday nearest the Policy Date of this Contract;

(2) The substitute insured must not be over 65 years of age on the birthday nearest the Transfer Date;

(3) The substitute insured must consent to be insured;

(4) This Contract must be in force on the Transfer Date;

(5) You must have an insurable interest in the life of the substitute insured after the transfer;

(6) A written application for the transfer must be received by us at our Home Office;

(7) Evidence of insurability of the substitute insured, satisfactory to us, will be required.

(8) After transfer, the Policy Date will be the same as it was before transfer.

### Contract Holder Covenants

If any information contained in this Contract, Application or Contract Schedules is inaccurate or untrue on the date it is issued, you agree to promptly notify us and provide corrected information.

### Company Covenants

We agree that all statements in the Application will be deemed representations and not warranties. We also agree that no statement will be used to void this Contract or be used in defense of a claim for the insurance benefits under this Contract unless contained in the Application signed either by you or by the proposed Insured. A copy of the Application is attached to this Contract at issue.

## Part 11. General Provisions (Continued)

### Misstatement of Age or Sex
If it is found that the amount of any benefit provided by this Contract is incorrect because of misstatement as to the age or sex (if applicable), the amount of the benefit will be adjusted on the basis of the correct facts. The death benefit will be that purchased by the most recent mortality charge at the correct age or sex. We will not adjust the Account Value due to a misstatement of age or sex.

### Incontestability
During but not after the contestable period, we can contest the validity of this policy or deny payment of benefits if there is any material misrepresentation of fact in the application. The contestable period starts when the policy becomes effective and, except for any agreement providing benefits for disability or for accidental death, ends after it has been in force during the lifetime of the Insured for two years from the Policy Date or from the effective date of any change requiring Evidence of Insurability.

### Evidence of Insurability
Evidence of insurability may be required for any transaction that increases the Net Amount At Risk (NAR) of this Contract. Transactions that increase the NAR may include: Payment of Subsequent Premiums, a Change of Face Amount or Death Benefit Option, Partial Withdrawal, Reinstatement, or a substitute of insured.

### Method of Computing Values
A detailed statement of the method used to compute this Contract's benefits and values is filed with the insurance regulatory authority of the Governing Jurisdiction. These benefits and values are not less than those required by the laws of the Governing Jurisdiction.

### Availability of Funds
Cash payments from this Contract for Contract Loans, Partial Withdrawals or Surrender, and Accumulation Units transferred between or among Investment Accounts will usually be effected within seven days after a satisfactory request is received at our Home Office. Payment may be delayed, however, (except when used to pay amounts due under this Contract) during any period that:

(1) the New York Stock Exchange (or its successor or, if the securities in which the assets of the Investment Accounts are invested are not traded on the New York Stock Exchange, any principal exchange on which such securities are traded) is closed; or

(2) the S.E.C. determines that a state of emergency exists that would make the determination of the value of the securities not reasonably practicable; or

(3) the S.E.C. permits by an order the postponement for the protection of Contract Holders.

### Claims of Creditors
The proceeds of this Contract will be free from creditor's claims to the extent allowed by law.

### Notice
Any written notice required by this Contract to be given by us to you will be effective five (5) days after it is mailed by first class mail or fifteen (15) days after it is mailed by third class mail (or when received, if sent by any other means) to you at your last known address as noted on our records. Any written notice required by this Contract to be given by you to us will be effective when received in a form acceptable to us at our Home Office. To be acceptable, a notice must be in written form, in the English language (except where applicable law requires otherwise), must include all pertinent information, and must be signed by you or an individual authorized to act for you and so designated on our records.

### Assignment
Neither this Contract nor any rights of you or the Beneficiary under it may be assigned or transferred without our written permission.

### Trustee
If a trustee is Owner, Beneficiary or Assignee of this policy, our actions will be determined by the terms of this policy and without regard to the provisions of any trust agreement. We will not be responsible for the application or disposal of any money paid to a trustee. Any such payment shall fully discharge our liability for the amount paid.

### Severability
In the event any provision of this Contract is declared illegal or otherwise unenforceable, it will be severed from this Contract and the remainder of this Contract will be valid and enforceable.

### Time Periods
All time periods mentioned in this Contract will begin and end at 12:01 A.M. local time at the owners address on the date in question.

# AGL LIFE ASSURANCE COMPANY
## Plymouth Meeting, Pennsylvania
## ENDORSEMENT

This policy is amended by the following.

You have the right to elect an Extended Maturity Date. You may do this during the twelve-month period before the Policy's original Maturity Date. That date is shown in Schedule A. The Extended Maturity Date must be a Policy Anniversary. It may not be later than the anniversary when the Insured is Age 120. If this is a Survivorship Policy, Age 120 of the younger Insured is the maximum Extended Maturity Date. The Account Value must be a positive amount on the original Maturity Date for this election to take effect.

The terms below will apply after the original Maturity Date. They are:

1. The Death Benefit shall be the Account Value while the Policy continues in effect;

2. Maturity Date shall mean the Extended Maturity Date;

3. The maximum monthly Cost of Insurance rates in Schedule E. shall be 0.0833333 for all future years;

4. Minimum Death Benefit Factors for all ages beyond those shown in Schedule F shall be 1.00;

5. The Death Benefit Option in Part 2. Insurance Plan shall be Option 1 and it may not be changed;

6. We may reject any Premium;

7. The Policy shall not terminate on the original Maturity Date as specified Part 10. Termination Provisions; and

8. All coverage shall cease at the Extended Maturity Date.

Unless modified here, all other terms and provisions of this Policy will continue in effect. You are responsible for all tax consequences arising from the existence of or exercise of this option. This endorsement is attached to and made a part of this policy effective on the Policy Date unless a later date is shown here:

Secretary                                    President

# AGL LIFE ASSURANCE COMPANY
## PLYMOUTH MEETING, PENNSYLVANIA
## ENDORSEMENT

This policy is amended by deleting the Notice of 10 Day Right to Examine Your Policy (Free Look Period) replacing it with the following provision.

Notice of 10 Day Right to Examine Your Policy (Free Look Period)
**This Contract may be canceled at any time within ten (10) days after it is received or within forty five (45) days after the date of the Application, whichever is later. This Contract must be returned to us at our Home Office or to the agent through whom it was purchased. Written notice of cancellation is also needed. If this Contract is canceled, it will be as though this Contract had never been issued. The Account Value plus all charges and fees will be returned to you minus any Death Benefits paid, Partial Withdrawals taken, and any Contract Loans, together with accrued but unpaid interest on such Contract Loans, if allowed by the law of the Governing Jurisdiction.**

It is further understood that Policy provisions stating that the allocation of the Net Premium will be limited to the Money Market Investment Account during the Free Look Period are rescinded.

This endorsement is attached to and made a part of this policy effective on the Policy Date.


Secretary                                    President


END-100

# AGL LIFE ASSURANCE COMPANY
## Plymouth Meeting, PENNSYLVANIA
# ENDORSEMENT

This policy is amended by adding the following.

The provisions of this endorsement are in addition to all other terms and conditions of this policy.

Payment of a Death Benefit, Withdrawal Benefit, or Loan Amount may be delayed if the securities in which the assets of the Investment Accounts are invested are not actively traded. That delay may continue until we determine that it is practical to trade such securities. You and any party to whom payment is due may agree to receive the securities as payment. The value of the securities for purposes of that payment will be determined based upon an appraisal by an independent third party. The value assigned to the securities must be accepted in writing by you, the party to whom payment is due, if other than you, and by us. The cost of any appraisal will be deducted from the payment due.

Payment of any amount due that is in no way related to the value of assets that are not actively traded will not be delayed by this endorsement. Such payments will be made in accord with the provisions specified elsewhere in this policy. (Payment of a death benefit consists of the value of assets and the net amount at risk, face amount less account value. Therefore, the death benefit is related to the value of assets.)

This endorsement is attached to and made a part of this policy effective on the Policy Date unless a later date is shown here:


Secretary                          President

END-199

## AGL LIFE ASSURANCE COMPANY
### APPLICATION FOR LIFE INSURANCE–Part I

| NAME  First        Middle        Last | Birthdate | Age Nearest | State of Birth | ☒ Male ☐ Female |
|---|---|---|---|---|
| Michael    S.    Rulle | 7-22-50 | 51 | NY | |

| S.S. no. 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 | Occupation(s) President | Marital Status Married | Maiden Name N/A |
|---|---|---|---|

Address–Residence ☐ Send Notices to this address; Choose one only
165 Cherry Lane   Mendham, NJ 07945     Telephone 973-543-0438

Address–Business ☐ Send Notices to this address; Choose one only
Hamilton Partners Ltd.
915 Madison Avenue, New York, NY 10017,     Telephone 212-527-8454

| NAME  First  Middle  Last The Michael S Rulle Family Dynasty Trust Agreement of 2001, dtd 9/27/01 | Relationship to Insured Trust | S.SJ Tax ID no. 92-6032251 |
|---|---|---|

Address ☐ Send Notices to this address; Choose one only
Alaska Trust Company, Resolution Plaza
1029 W. Third Avenue, Suite 601 Anchorage, AK 97501-1981    Telephone 907-278-6775    Yrs. There

Alternative name/address to Send Notices to; complete only if choice not selected above

| Plan of Insurance – Preferred class (if available) ☐ Yes ☒ No ☒ Non Smoker ☐ Smoker Flexible Premium Variable Life | Amount $ 17,600,000 | Additional Benefits ☐ Waiver of Premium ☐ Accidental Death ___ Units Family Rider |
|---|---|---|
| Rider Plans    N/A | Amount or units | ___ Units Children's Rider ☐ Other _____ |

Is this insurance intended to replace or change any existing insurance or annuities on any proposed insured? ☐ Yes ☒ No

Death Benefit Option (only if Universal Life) ☒ Specify amount only. ☐ Specify amount + cash value.

Premium Mode ☒ Annually ☐ Semi-Annually ☐ Quarterly ☐ Monthly PAC ☐ Other ___

Paid with application $ ___ 0 ___ Planned Premium (only if UL) $ ___ — ___ Special Policy Date:

Primary: Name     Relationship
The Michael S. Rulle Family Dynasty Trust
Agreement of 2001, dtd 9/27/01

Contingent: Name     Relationship

The Beneficiary designation for Family, Spouse or Child Riders is stated in the contract.
Unless otherwise specified, the Owner reserves the right to change the Beneficiary.

| Full Name    N/A | Birth Date | Age | Sex | Relationship[1] | Height | Weight | Insurance[2] |
|---|---|---|---|---|---|---|---|

1) Relationship to Insured; only children under 18 are eligible for family or children's rider.
2) Total insurance in force and/or applied for.

| Company | Policy No. | Year Iss. | Type Plan | Life Amount | ADB Amount |
|---|---|---|---|---|---|
| Phoenix | | 1992 | Life | 4,000,000 | |
| Phoenix | | 1994 | Life | 2,000,000 | |
| Phoenix | | 1996 | Life | 3,000,000 | |
| Phoenix | | 1994 | Surv. Life | 2,000,000 | |
| Nationwide | | 2000 | Life | 750,000 | |

## APPLICATION FOR LIFE INSURANCE–Part I (Continued)

| Has any person proposed for insurance: | Yes | No |
|---|---|---|
| (a) Flown in the last 2 years, or do you intend to take flights other than as a fare paying passenger on a scheduled airline? If yes, complete Aviation Supplement. | ☐ | ☒ |
| (b) Engaged in or intend to engage in any hazardous sport such as any type of land, water or air vehicle racing, parachuting, hang/kite gliding or skin/scuba diving? If yes, give details in Section I. | ☐ | ☒ |
| (c) Had a driver's license suspended or revoked or been convicted in the last 3 yrs. of a moving violation, or of driving while impaired or intoxicated? License no. R42 125 44 826 7502 KJ | ☒ | ☐ |

| | Yes | No |
|---|---|---|
| (d) Had any military deferment, rejection or discharge due to a physical or mental condition? | ☐ | ☒ |
| (e) In the past three years or intend in the next 12 months, lived, traveled or worked outside of the United States or, Canada, or have a temporary or student visa? | ☒ | ☐ |
| (f) Ever requested or received a pension, benefits or payment because of an injury, sickness or disability, or left occupation for more than one month because of health? | ☐ | ☒ |
| (g) Ever been convicted of a felony? | ☐ | ☒ |
| (h) Had any application or policy for life or health insurance declined, rated, restricted, postponed, canceled or reinstatement denied? | ☐ | ☒ |

1. Proposed Insured's   Height: . 5 . . . ft . 10 . . in.,  Weight . . 188 . . . lbs.  (Additional Insureds answer under E.)

2. Personal Physician(s)  (Full name, address, telephone no. If none, so state.)
Dr. Scott Campbell   2345 Lamington Road, Ste #104   Bedminster, NJ 07921

| 3. Has any Proposed Insured ever had, been treated for, or been told by a member of the medical profession that they had any indication of: | Yes | No |
|---|---|---|
| (a) Disorder of eyes, ears, nose or throat? | ☐ | ☒ |
| (b) Dizziness, fainting, convulsions, headache; speech defect, paralysis, stroke or any other disorder of the brain or nervous system; mental or emotional disorder? | ☐ | ☒ |
| (c) Shortness of breath, persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☒ | ☐ |
| (d) Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☒ |
| (e) Cirrhosis, jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, other disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☒ |
| (f) Sugar, albumin, blood or pus in urine; venereal disease; stone or other disorder of the kidney, bladder, prostate? | ☐ | ☒ |
| (g) Diabetes; thyroid or other endocrine disorders? | ☐ | ☒ |
| (h) Neuritis, sciatica, arthritis, gout, or disorder of the muscles or bones, including the spine, back, or joints? | ☐ | ☒ |
| (i) Deformity, lameness or amputation? | ☐ | ☒ |
| (j) Disorder of skin, lymph glands, cyst, tumor, or cancer? | ☐ | ☒ |
| (k) Allergies, anemia, leukemia or other disorder of the blood? | ☐ | ☒ |
| (l) Acquired Immune Deficiency Syndrome (AIDS), "AIDS" Related Complex (ARC); or infection with the "AIDS" (Human T-Cell Lymphotropic, Type III, HTLV-III) virus? | ☐ | ☒ |
| (m) Abnormal menstruation, pregnancy; disease of the uterus, ovaries, breasts, prostate or testicles; other disorder of reproductive organs? | ☐ | ☒ |

| 4. Does any Proposed Insured use alcohol? | ☒ | ☐ |
|---|---|---|
| How much?          How often? | | |

0-2 glasses of wine          A night

| 5. Has any Proposed Insured : | Yes | No |
|---|---|---|
| (a) Ever used alcohol or other drugs to a degree that required treatment or advice from a physician, licensed practitioner, or any organization which helps those who have an alcohol or drug problem? | ☐ | ☒ |
| (b) Ever used marijuana, barbiturates, amphetamines, hallucinogens, heroin, opiates, tranquilizers, Dilaudid, Demerol, codeine, morphine or cocaine?   How much?    How often? | ☐ | ☒ |
| (c) Had any change in weight in the past year? | ☐ | ☒ |
| (d) Smoked cigarettes or used tobacco in any form in the last 12 months? Yes, circle those that apply:  Cigarettes, Cigars, Pipe, Other  Amount Used Daily: | ☐ | ☒ |
| (e) In the past five years, had a checkup, consultation, illness, injury, electrocardiogram, or other diagnostic test or surgery? | ☒ | ☐ |
| (f) In the past five years, been a patient in a hospital, clinic, sanitarium, or other medical facility? | ☐ | ☒ |
| 6. Is any Proposed Insured now under observation or taking any treatment or medication? | ☒ | ☐ |
| 7. Has any member of any Proposed Insured's immediate family been diagnosed or treated for heart disease; high blood pressure; diabetes cancer; or mental or nervous disorder? | ☐ | ☒ |

8. Family History:

| | Proposed Insured | Add'l Insured |
|---|---|---|
| **Father** | | |
| Age if living or age @ death | 70's | |
| Health if living or cause of death | Heart Disease | |
| **Mother** | | |
| Age if living or age @ death | 70's | |
| Health if living or cause of death | Heart Disease | |

APPLICATION FOR LIFE INSURANCE - Part 1 (Continued)

GIVE COMPLETE DETAILS FOR ANY PART OF SECTION G AND FOR SECTION K, QUESTIONS 3, 5, 6 AND 7 ANSWERED "YES".
(Identify person by name)

| Section/Question | Nature of disorder, frequency of attacks and treatment | Date and Duration | Name & address of doctors, practitioner, hospital, medical institution or facility. |
|---|---|---|---|
| 5(f) | Spending Tibbets | | |
| 5(f) | (illegible) | | Letitia ___ Generals, best 12 months. Camp ___ delay |
| 2(f) | Asthma as a child | | no problems since age 17 |
| 5(g) | 5G - Asthma 1 | | Banoza annual checkup a ___ |
| | Stress camp - normal | | Dr. ___ |
| | Anxiety annual checkups | | Dr. Campbell |
| | Colonoscopy - doctor | | Dr. Bernstein |
| G | Multiple ___ | | N.P. ___ |

Home Office Use Only (See K 3. below)

I/We represent that all answers to the questions in this application and any medical examinations required, are complete and true to the best of my/our knowledge and belief, and I/we agree that:

(1) The answers to these questions, together with this agreement, are the basis for issuing any policy;
(2) Only the President or a Vice President of the Company can make or change any contract or waive any of the Company's rights or requirements;
(3) By accepting any policy issued, I/we ratify any changes made to this application by the Company and set out in the "Additions and Amendments" section (No change will be made as to age, amount, class, plan or benefits unless the Owner agrees in writing.);
(4) Except as provided in the Conditional Receipt, no insurance will take effect until the first modal premium is paid and the policy is delivered to the Owner while there has been no change in the insurability from the date of application of all persons proposed for insurance.

I/We authorize any physician, medical practitioner, hospital, clinic, other medical or medically related facility, Veterans Administration, insurance or reinsurance company, the Medical Information Bureau, consumer reporting agency or other organization, institution, employer, relative, friend or neighbor to disclose to AGL Life Assurance Company and/or its reinsurers, medical and other information pertaining to me/us or any of my/our minor children who are proposed for insurance. The information that may be disclosed includes information about employment, other insurance, physical, mental, drug and/or alcohol conditions, character, habits, avocations, finances, general reputation, credit and other personal characteristics. I/we understand that the information obtained is for the purpose of determining eligibility for insurance and that this information may be reviewed in connection with claims that are later submitted. I/we agree that this authorization will be valid for two and one-half years from the date signed and that a photographic copy of this authorization is as valid as the original. I/we may request a copy of this authorization.

☐ If an investigative consumer report is obtained about me/us, I/we wish to be interviewed.

I/we have read and understand these representations, conditions and authorization and acknowledge receipt of notices regarding disclosure and the underwriting process.

Signed at (City, State) _Anchorage, AK_   on (Month, Day) _Oct. 5_  20 _0_

X _____
Proposed Insured's Signature (parent or guardian if minor)

X _____
Spouse's Signature (if insured)

X _____
Agent's Signature

_____
Owner's Signature (if other than Proposed Insured)
(if business is owner, signature & title of company officer)

Signatures of Additional Proposed Insureds, if any

X _____
Celia R. Bulls, Trustee

X _____
Frank DeLardia, Trustee

APP-001

## AGENT'S REPORT

1. Has Proposed Insured lived at present address at least 5 years? ☒ Yes ☐ No
   If no, give previous address _____

2. What is Proposed Insured's Income? $_____ Earned, $_____ Unearned; Net Worth? $23,416,913

3. Give name and address of Proposed Insured's employer _Hamilton Partners Ltd_
   _415 Madison Ave , New York , NY 10017_
   Time in occupation? _1 1/2_  Describe duties _Administration / Investment decisions_
   Previous employment and address if less than 3 years. _CIBC Oppenheimer , World Fin. Center NY_

4. Do you know or have reason to believe that replacement of insurance is involved? ☐ Yes ☒ No
   If yes, explain and complete replacement form where required.
   _____

5. Have arrangements been made for an examination? ☒ Yes ☐ No
   Date _4-12-01_   Examiner _APPS_

6. If Proposed Insured is under age 15, amount of insurance on head of household  $ _N/A_

7. If Proposed Insured is married, insurance on spouse for benefit of Proposed Insured  $ _____

8. If Owner is a corporation: State of incorporation? _____ . Does the corporation own any other insurance on
   the life of the Proposed Insured? ☐ Yes ☐ No; Amount $_____ Company _____
   If Owner is a partnership: Exact name of partnership _____
   Current value of business _____
   Full names of partners and percentage of business owned:
   _____ % _____ %
   _____ % _____ %
   Are all partners insured or applying for insurance? ☐ Yes ☐ No; If no, explain _____

9. If Owner or Beneficiary is a Trustee, give date of Trust _9/27/01_ ; specify in Owner or Beneficiary designation.

10. If this application is on a PAC, bank draft, basis and added to an existing account, give the Insured's name and
    policy number _N/A_

11. What is the primary purpose of this sale? _Tax and Estate Planning_

12. Other Details



1. Name:  Agent _Mark Dunn_        General Agent _____
2. Number: _10044_        _____

I represent that: ☒ I have personally seen
                  ☐ I have not personally seen (Explain under A.12. above)
all the persons proposed for insurance. I affirm that I have made a true and accurate record on this application of the
information as supplied to me by the Proposed Insured(s) and/or the Owner/Applicant. To the best of my knowledge and
belief there is nothing adversely affecting the insurability of any person proposed for insurance that has not been
recorded in this application. I have provided all required disclosures and notices as required by law or regulation.

Agent's Signature  X _Mark Dunn_ ————— Date (Month, Day) _10-5_ , 20 _01_

Application Supplement for Variable Life Insurance
Issued and Administered
by
## AGL LIFE ASSURANCE COMPANY

Complete this application supplement and mail it along with Application Part I to
AGL Life Assurance Company
510 West Germantown Pike, Suite 460, Plymouth Meeting, PA 19462

### A. Owner's Name

Name
The Michael B. Rulle Family Dynasty Trust Agreement of 2001, dtd 9/27/01

### B. Net Premium Allocation

The Amounts allocated are in percentages or dollars (in whole numbers of not less than 10% or $250).

| Investment Account | Percent | or | Dollar Amount |
|---|---|---|---|
| ☑ American Masters Opportunity Fus Fund L.P. Account | 100 % | or | $_____ |
| ☐ _____ | ____% | or | $_____ |
| ☐ _____ | ____% | or | $_____ |
| ☐ _____ | ____% | or | $_____ |
| ☐ _____ | ____% | or | $_____ |
| ☐ _____ | ____% | or | $_____ |
| ☐ _____ | ____% | or | $_____ |
| Total | 100% | or | $_____ |

### C. Please read these sections and sign below.

**SUITABILITY**

BY SIGNING BELOW, YOU ACKNOWLEDGE RECEIPT OF THE PRIVATE PLACEMENT MEMORANDUM. THE CONTRACT VALUE AND CASH SURRENDER VALUE WHEN BASED ON A SEPARATE ACCOUNT MAY INCREASE OR DECREASE ON ANY DAY DEPENDING UPON THE INVESTMENT RESULTS. NO MINIMUM CASH SURRENDER VALUE IS GUARANTEED. ALL SURRENDER VALUES UNDER THE CONTRACT ARE VARIABLE AND ARE NOT GUARANTEED AS TO FIXED DOLLAR AMOUNTS. THE DEATH BENEFIT MAY BE VARIABLE OR FIXED UNDER SPECIFIED CONDITIONS.

**AGREEMENT**

I understand the entire portion of any net purchase payment that I allocate to the Variable Account will be invested in the Money Market Subaccount until the end of the Free Look period.

I recognize that AGL Life Assurance Company is not a bank and shares of the subaccounts are not backed or guaranteed by any bank or insured by the FDIC.

ALL PREMIUM CHECKS MUST BE MADE PAYABLE TO AGL LIFE ASSURANCE COMPANY.

DO NOT MAKE THE CHECK PAYABLE TO ANY AGENT. PLEASE DO NOT LEAVE PAYEE BLANK.

Date of Private Placement Memorandum Received _10/5/01_

Signed at

City _Anchorage_   State _AK_   on (Date) 10/5/01

Owner X _____   Agent Signature X _____

X _____   X _____
Della R. Rulle, Trustee   Frank Galardin, Trustee

VLSP-296

THE LIFE INSURANCE COMPANY
APPLICATION FOR LIFE INSURANCE—Part II

NJ Forms
APPS

☑ New Business  ☐ Requalification

## A. PROPOSED INSURED

NAME First *Michael*  Middle *Miller*  Last  S.S. no *021 38 4658*

Address *165 Cherry Lane* Street  City *Mendam*  State *NJ*  Zip Code *07945*

## B. INSURABILITY DATA

1. Personal Physician(s) (Full name, address, and telephone no. If none, so state.) *2345 Lexington Rd*
*Scott Campbell, MD  Palmyra, NJ*

2. Has any Proposed Insured ever had, been treated for, or been told by a member of the medical profession that they had any indication of:

| | Yes | No |
|---|---|---|
| (a) Disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| (b) Dizziness, fainting, convulsions, headache; speech defect, paralysis, stroke or any other disorder of the brain or nervous system; mental or emotional disorder? | ☐ | ☑ |
| (c) Shortness of breath, persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☑ | ☐ |
| (d) Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☑ |
| (e) Cirrhosis, jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, other disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ |
| (f) Sugar, albumin, blood or pus in urine; venereal disease; stone or other disorder of the kidney, bladder, prostate? | ☐ | ☑ |
| (g) Diabetes; thyroid or other endocrine disorders? | ☐ | ☑ |
| (h) Neuritis, sciatica, arthritis, gout, or disorder of the muscles or bones, including the spine, back, or joints? | ☐ | ☑ |
| (i) Deformity, lameness or amputation? | ☐ | ☑ |
| (j) Disorder of skin, lymph glands, cyst, tumor, or cancer? | ☐ | ☑ |
| (k) Allergies, anemia, leukemia or other disorder of the blood? | ☐ | ☑ |
| (l) Abnormal menstruation, pregnancy; disease of uterus, ovaries, breasts, prostate, testicles; other disorder of reproductive organs? | ☐ | ☑ |

3. Has any Proposed Insured been diagnosed by a member of the medical profession as having Acquired Immune Deficiency Syndrome (AIDS), or an "AIDS" Related Complex (ARC)?   Yes ☐  No ☑

4. Does the proposed insured use alcohol? Yes ☑ No ☐
How much?  How often? *0-2 glasses wine/night*

5. Has proposed insured
(a) Ever used alcohol or other drugs to a degree that required treatment or advice from a physician, licensed practitioner, or any organization which helps those who have an alcohol or drug problem?  ☐ ☑
(b) Ever used marijuana, barbiturates, amphetamines, hallucinogens, heroin, opiates, tranquilizers, Dilaudid, Demerol, codeine, morphine or cocaine? How much? How often?  ☐ ☑
(c) Had any change in weight in the past year?  ☐ ☑
(d) Smoked cigarettes or used tobacco in any form in the last 12 months? Yes, as follows: Cigarettes, Cigars, Pipe, Other. Amount Used Daily:  ☐ ☑
(e) In the past five years, had a checkup, consultation, illness, injury, electrocardiogram, or other diagnostic test or surgery?  ☑ ☐
(f) In the past five years, been a patient in a hospital, clinic, sanitarium, or other medical facility?  ☐ ☑

6. Is Proposed Insured now under observation or taking any treatment or medication?  ☑ ☐

7. Has any member of Proposed Insured's immediate family been diagnosed or treated for heart disease; high blood pressure; diabetes; cancer; disorders of the immune system or mental or nervous disorder?  ☐ ☑

## C. DETAILS

GIVE COMPLETE DETAILS FOR ANY PART OF SECTION B QUESTIONS 2, 3, 5, 6 and 7 ANSWERED "YES"

| Question | Nature of disorder, frequency of attacks and treatment | Date and Duration | Name & address of doctors, practitioner, hospital, medical institution or facility. |
|---|---|---|---|
| 2c | Asthma as child — no recurring since age 17 | | |
| 5e | ECG = normal | Done | done as annual checkup |
| | Stress Echo = normal | last week | as routine |
| | | | Done by Dr. Lawrence Tarco  East 70th St  New York City |
| 5e | Previous annual checkups | Dr. Scott Campbell  same address above |
| 5e | Colonoscopy | Dr. Bernstein, New York City, test was negative |

## D. REPRESENTATIONS AND AUTHORIZATION

6. Taking Lipitor Rx 2 months

I represent that all answers to the questions in this application are complete and true to the best of my knowledge and belief. I understand that (1) this completed application part will be part of my application for insurance and any policy issued; and (2) that any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.  7 Both grand-dad in 70's & heart disease

I authorize any physician, medical practitioner, hospital, clinic, other medical or medically related facility, Medical Information Bureau or other organization or person to disclose to AGL Life Assurance Company and/or its reinsurers, medical and other information pertaining to me or my minor child proposed for insurance. The information that may be disclosed includes information about employment, other insurance, physical, mental, drug and/or alcohol conditions, character, habits, avocations, finances, general reputation, credit and other personal characteristics. I understand that the information obtained is for the purpose of determining eligibility for insurance and that this information may be reviewed in connection with claims submitted later. I agree that this authorization will be valid for two and one-half years from the date signed and that a photographic copy of this authorization is as valid as the original. I may request a copy of this authorization.

I have read and understand these representations and this authorization.

Signed at (City, State)  on (Month, Day) *4/12*  *2001*

Proposed Insured's Signature (parent or guardian if minor)    Witness: Examiner/Underwriting Technician

## APPLICATION FOR LIFE INSURANCE–Part II (Continued)

### E. HISTORY

| Place of Birth: New York City | Occupation: Investment Manager |
|---|---|
| Birth Date: 7/22/50 | Employer: Hamilton Partners |

| Family History | Spouse | | Father | | Mother | |
|---|---|---|---|---|---|---|
| Age if living or age @ death | 44 | | 70's | | 70's | |
| Health if living or cause of death | Excellent | | heart disease | | heart disease | |
| Brothers/Sisters (Circle B or S) | B/S | B/S | B/S | B/S | B/S | B/S |
| Age if living or age @ death | 59 | 38 | | | | |
| Health if living or cause of death | A+W | Breast Cancer | | | | |

### F. MEDICAL REPORT - TO BE COMPLETED AND SIGNED BY EXAMINER/UNDERWRITING TECHNICIAN

| 1 | Height (in shoes) | Weight (clothed) | Chest (Full Inspiration) | Chest (Full Expiration) | Abdomen, at umbilicus |
|---|---|---|---|---|---|
| | 5'10 in. | 188 lbs. | 42 1/2 in. | 40 in. | 37 in. |

| 2  Blood Pressure (Record ALL readings.) | | At Rest | Immediately Post Exercise |
|---|---|---|---|
| | Systolic | 120 | 130 |
| | Diastolic, 5th phase | 86 | 78 |

| 3  Pulse | | At Rest | After Exercise | 3 Minutes Later |
|---|---|---|---|---|
| | Rate | 67 | 130 (Sitting) | 102 |
| | Irregularities per minute | NO | NO | NO |

4. Heart: Is there any — Enlargement? [ ] Yes [✓] No   Murmur(s)? [ ] Yes [✓] No   Dyspnea? [ ] Yes [✓] No   Edema? [ ] Yes [✓] No
(Describe below - if more than one, describe separately)

Location [ ] [ ]

| | | |
|---|---|---|
| Constant | [ ] | [ ] |
| Inconstant | [ ] | [ ] |
| Transmitted | [ ] | [ ] |
| Localized | [ ] | [ ] |
| Systolic | [ ] | [ ] |
| Presystolic | [ ] | [ ] |
| Diastolic | [ ] | [ ] |
| Soft (Gr. 1-2) | [ ] | [ ] |
| Mod. (Gr. 3-4) | [ ] | [ ] |
| Loud (Gr. 5-6) | [ ] | [ ] |
| After exercise: | | |
| Increased | [ ] | [ ] |
| Absent | [ ] | [ ] |
| Unchanged | [ ] | [ ] |
| Decreased | [ ] | [ ] |

MSL
MCL

Indicate apex by   x
Indicate murmur area by   0
Indicate transmission by   →

Is there on examination any abnormality of the following (circle items that apply and give details):

| | Yes | No | DETAILS |
|---|---|---|---|
| (a) Eyes, ears, nose, mouth, pharynx? If vision or hearing markedly impaired indicate degree and correction. | [ ] | [✓] | |
| (b) Skin (incl. scars); lymph nodes; varicose veins or peripheral arteries? | [ ] | [✓] | |
| (c) Nervous system (include reflexes, gait, paralysis)? | [ ] | [✓] | |
| (d) Respiratory system? | [ ] | [✓] | |
| (e) Abdomen (include scars)? | [ ] | [✓] | Trouble |
| (f) Genitourinary system (include prostate)? | [ ] | [✓] | declined, has recently → PMD |
| (g) Endocrine system (incl. thyroid and breasts)? | [ ] | [✓] | |
| (h) Musculoskeletal system (include spine, joints, amputations, deformities? | [ ] | [✓] | |
| 6  Are there any:   (a) hernias? | [ ] | [✓] | |
| (b) hemorrhoids? | [ ] | [✓] | |

7. Are you aware of any additional medical history? [ ] [✓]
(A confidential report may be sent to the Medical Director.)

8. A home office urine specimen is required as part of this examination. Has it been sent? [✓] [ ]

9. Classify applicant's general health: Excellent [✓] Average [ ] Poor [ ]

10. NAME OF AGENT REQUESTING EXAMINATION.

Examined at _Medical Office_ . Date _4/12/01_ . Time _12:00 P.M._

Examiner/Underwriting Technician _Anthony Iuzzolino, M.D._
Print Name

Address: _33 Overlook Rd. Suite 303 Summit, NJ 07901_

For Requalification mail to: Preferred Insured Dept., Box 846, Blue Bell, PA 19422   P.O. Box 45
For New Business mail to: New Business Dept., Box 876, Blue Bell, PA 19422   MAPLEWOOD, NJ

# FLEXIBLE PREMIUM VARIABLE LIFE INSURANCE CONTRACT

**Variable Life Insurance.**
**Face Amount payable if Insured dies while the policy is in force.**
**Flexible Premiums payable while the Insured is living until the Maturity Date.**
**Non participating, no dividends are payable.**

# AGL Life Assurance Company

**Home Office: 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania 19462**

VL-299