## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL S. RULLE FAMILY DYNASTY TRUST,

     Plaintiff,

     v.

AGL LIFE ASSURANCE COMPANY,

     Defendant

Civil Action No. 2:10-cv-00231-BMS

Hon. Berle M. Schiller

### AFFIDAVIT OF WILLIAM R. CONNELLY

STATE OF NEW JERSEY:
                  :SS
COUNTY OF MORRIS   :

     WILLIAM R. CONNELLY, being duly sworn, deposes and says:

     1.     I am the attorney for the plaintiff in the above captioned matter and I make this Affidavit in support of the plaintiff's application for leave to file an Amended Complaint pursuant to R. 15(a). I am fully familiar with the facts hereafter stated.

     2.     The defendant has filed a Motion to Dismiss on March 26, 2010. Among the many basis set forth in the Motion to Dismiss filed by the defendant is the fact that defendant claims deficiencies in the Complaint respecting certain allegations of fraud and argues that the Complaint fails to provide sufficient particularity and details as to those allegations.

     3.     Additionally, in support of the defendant's Motion to Dismiss, defendant has provided a series of exhibits which prior to the receipt of the Motion to Dismiss had not been in possession of counsel or the plaintiff but which served to provide additional facts pertinent to the claims being made in this case.

4.     Under R. 15(a), a party had an automatic right to amend its pleadings a single time before a response is filed thereto within twenty (20) days after the original pleading or response thereto was served.  The Motion to Dismiss was served upon our office on March 29, 2010.  Accordingly, there have been thirty-one (31) days since the receipt and service of defendant's Motion for Leave to Appeal.  Accordingly, we are beyond the twenty (20) day period by eleven (11) days and, therefore, leave to file the amended pleading is required.  Attached hereto as **Exhibit A** is a true copy of the Amended Complaint.

5.     There has been no answer filed by the defendant in this case and no discovery has been served.  It is respectfully requested that in the interest of justice that this application be granted as there is no undue burden on the defendant.  In addition, as set forth under the comments to R. 15, federal courts have held that where a complaint deficiency can be cured by an amendment, leave to grant must be given.  Shan v. Fauver, 213 F.3rd 113 (3rd Cir. 2000).

6.     For the foregoing reasons, it is respectfully requested that the court grant plaintiff's motion for leave to file and serve an amended complaint.

I respectfully request that the court grant this motion or such other relief as the court may deem just and proper.

_____
William R. Connelly

Sworn to before me this
30th day of April, 2010

_____
MARCELLA POTOCZAK
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 5/10/2014

Exhibit "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE MICHAEL S. RULLE FAMILY DYNASTY TRUST<br><br>Plaintiff<br><br>vs.<br><br>AGL LIFE ASSURANCE COMPANY<br><br>Defendant | Civil Action No. 2:10-cv-00231-BMS<br><br>Hon. Berle M. Schiller<br><br>**AMENDED COMPLAINT** |

### THE PARTIES

1.      This is an action filed by the Michael S. Rulle Family Dynasty Trust, an irrevocable trust created on or about September 21, 2001 ("Plaintiff"), having an address c/o Alaska Trust Company, Resolution Plaza, 1029 W. Third Ave., Ste 400, Anchorage, AK 99501-1981.  The grantor of the trust is Michael S. Rulle ("Rulle").

2.      Plaintiff is a beneficiary and contract holder under a variable life insurance policy known as the Flexible Premium Variable Life Insurance Contract, policy number VL30022, issued on or about October 5, 2001 (the "Policy") (see **Exhibit** A) by Defendant AGL Life Assurance Company ("AGL").  AGL is an affiliate company of the Phoenix Companies, Inc... The Phoenix Companies, Inc. have a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania.

3.      AGL is an insurance and financial services organization having a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania.  The sole and exclusive products offered by AGL are private placement variable insurance products such as the policy sold to the Plaintiff as identified above.

4.      Phoenix Equity Planning Corporation, formerly named PFG Distribution Company, having a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania (hereafter "Phoenix Equity") is a broker-dealer licensed by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, and is a member of the National Association of Securities Dealers, Inc. ("NASD").  Phoenix Equity is also an affiliate of the Phoenix Companies, Inc.

5.      Phoenix Equity is also registered with the Financial Industry Regulatory Association ("FINRA") and lists among its types of businesses "Broker or Dealer selling variable life insurance or annuities" on its FINRA registration.  Both Defendants AGL and Phoenix Equity are sister companies under common control by the same holding company known as PFG Holdings, Inc. ("PFG"), a closely held company domiciled in Pennsylvania having a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania.

6.      AGL entered into a Principal Underwriting Agreement with Phoenix Equity on or about January 1, 1996 for the purpose of permitting AGL to sell its variable life insurance securities products through Phoenix Equity as the licensed broker-dealer. Therefore, Phoenix Equity is, in association with AGL, actually a seller and distributor of products such as that sold to the Plaintiff.

7.      AGL and Phoenix Equity are licensed to operate in the respective capacities through the fifty (50) United States, including the State of Alaska where the Plaintiff is domiciled.

8.      Both AGL and Phoenix Equity share a commonality in their membership of their Board of Directors and Officers.  Both companies list John K. Hillman, Phillip K.

2

Polkinghorn, and Robert Primmer as Directors.  Both companies list the following

persons as Officers:

> John H. Beers, Vice President and Assistant Secretary
> Joseph A. Fillip, Jr., Vice President, General Counsel and Assistant Secretary
> John T. Fischer, Vice President
> John K. Hillman, President and CEO or Vice President
> Karen A. Jones, Vice President
> Kent C. Keim, Vice President and Treasurer
> Marlene E. Luebeck, Assistant Vice President and Assistant Treasurer
> Maryanne C. McKinney, Underwriting Officer/Assistant Compliance Officer
> Todd R. Miller, Vice President and Controller/Chief Financial Officer
> James J. Nolan, Second Vice President and Assistant Treasurer
> Susan M. Oberlies, Vice President, General Counsel and Secretary
> Tracy R. Rich, Vice President and Assistant Secretary
> Murray F. Ridyard, Counsel and Assistant Secretary

9.      By virtue of their common directorship, ownership and offices, and by

virtue of the Principal Underwriting Agreement, AGL and Phoenix are joint actors and

alter egos of each other.

10.     John K. Hillman, Director, President and Chief Executive Officer of AGL,

and Director and Vice President of Phoenix Equities, is a FINRA licensed broker and is

approved by FINRA as a licensed Investment Company and Variable Contracts

Representative (Series 6) and an Investment Company Variable Contracts Principal

(Series 26).

11.     Susan M. Oberlies, Vice-President, General Counsel, and Secretary of

AGL and of Phoenix Equities, is a FINRA licensed broker and is also approved by

FINRA as a licensed Investment Company and Variable Contracts Representative (Series

6) and an Investment Company Variable Contracts Principal (Series 26).  Both John K.

Hillman and Susan M. Oberlies executed the Policy that was issued to the Plaintiff.

12.     Pursuant to the variable universal life insurance policy, Plaintiff entrusted certain monies to AGL which were invested in what was then identified under the policy as "Investment Account 2 – American Masters Opportunity Insurance Fund, L.P. Account" ("American Opportunity Fund").  American Opportunity Fund was subsequently renamed Tremont Opportunity Insurance Funds, L.P. and thereafter was re-named Tremont Opportunity Fund III, L.P. (collectively this fund is hereafter referred to as ("Tremont Opportunity Fund").

13.     Tremont Opportunity Fund is a Delaware partnership. At all times material and relevant, the Tremont Opportunity Fund was managed by Tremont Partners, Inc.

14.     The Rye Select Broad Market Prime, L.P., Rye Select Broad Market Prime, L.P., Rye Select Board Market XL Fund, L.P., and the Rye Select Equities Fund (collectively the "Rye Select Funds") are hedge funds in which the Plaintiff's monies were placed by Tremont as the general partner of the Tremont Opportunity Fund.  The day-to-day operations and the investment management of the Rye Select Funds were conducted by its general partner, Tremont Partners, Inc. ("Tremont Partners"), now famous as one of the largest "feeder funds" associated with the Madoff Ponzi Scheme exposed on or about December of 2008. Tremont Partners selected Madoff or his company as the exclusive manager of the Rye Select Funds.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332 as complete diversity exists between Plaintiff and Defendant and the amount in controversy exceeds the jurisdictional minimum of this Court.

16.     Venue is proper in this district because Defendant maintains its place of business in the district and/or conducts substantial business in the district.

## DEFENDANT SOLICITED PLAINTIFF

17.     This action arises out of losses attributed to the Plaintiff by the Defendant, AGL, in connection with the policy purchased by the Plaintiff from AGL and distributed through Phoenix Equities. The Defendant failed to conduct adequate and necessary due diligence with respect to the moneys invested under the Policy, it failed to insure that the moneys were properly diversified as required under the Policy and accompanying private placement memorandums, and it improperly allocated certain theft and fraud losses to the account valuations under the Policy which served to decrease Plaintiff's account values by the amount of such theft and fraud loss.

18.     The initial contacts between Defendant and the Plaintiff were made by John Hillman, Director, President and CEO of AGL and Director and Vice President of Phoenix Equities ("Hillman"), who solicited Rulle, a resident of New Jersey, for purposes of convincing Rulle to purchase certain insurance investment products offered by AGL and distributed through Phoenix Equities.

19.     After many discussions over a period of months, in or about the spring 2001, Hillman informed Rulle that Defendants had obtained a "fund of funds" entitled American Masters Opportunity Insurance Fund, L.P.("American Opportunity Fund"), later renamed on two occasions and which has been identified herein as the Tremont Opportunity Fund.

20.     Hillman represented to Rulle that the American Opportunity Fund was a highly professional and reputable "fund of funds" which had been selected by AGL to

participate in the Flexible Premium Variable Rate Life Insurance Policy of AGL as one of the two Investment Accounts in which net premiums could be allocated.  Hillman also represented that Tremont Opportunity Fund was a highly diversified fund and that, to satisfy IRS and other requirements, the investor would be as far removed from making investment decisions as possible.

21.    At the time of these conversations, Rulle had not yet created the Plaintiff trust but contemplated doing so and, therefore, was specifically interested in a fund of funds for the purposes of investing the Plaintiff trust assets.  A "fund of funds" refers to a fund of hedge funds or other investment managers which exists primarily to mitigate risk to the investors, who are either accredited investors or institutional investors and for whom stability investments is critical to capital reserves and otherwise financial solvency.

22.    When asked to specify the degree of investment management diversity that the fund would allocate among investment managers, Hillman stated that there would significant diversity consistent with industry standards and in the range of 7% or less of the funds would be placed with any one manager.

### THE POLICY

23.    In or about September 27, 2001, Rulle created the Michael S. Rulle Family Dynasty Trust (the "Plaintiff" or the "Trust") which was established pursuant to the laws of the State of Alaska for the benefit of Rulle and his family.  The Trust was funded by Rulle, as the grantor, and became the applicant investor under the Policy. Plaintiff is identified therein as "Contract Holder" and "Beneficiary".

24.     AGL offered variable universal life insurance policies, which are a form of life insurance also known as cash value insurance policies. Variable universal life insurance policies are designed to allow policy holders to invest a portion of their premiums in optional investment accounts which are offered under the policy. Because the investments are held under a policy, gains inside the policy are shielded from income taxes, as is the payout upon death. Policy holders are able to access their money during their lifetime by withdrawing or borrowing funds, tax free, from the Policy.

25.     The Policy provides that its "Governing Jurisdiction" is the state of Alaska and that its "State of Issuance" is the state of Alaska.

26.     The Policy has an initial face amount death benefit of $17,600,000.00.

27.     The policy offered the same two investment account options (Money Market Account and/or American Opportunity Fund) and further describes, in pertinent part, how account values were to be determined. The Policy states:

> The value of an Investment Account reflects:
>
> • Any amounts transferred to the Investment Account during the current Valuation Period;
>
> • The investment income and realized and unrealized capital gains credited to such assets in the Valuation Period;
>
> • Any amounts transferred from an Investment Account during the current Valuation Period;
>
> • Realized and unrealized capital losses charged against those assets during the Valuation Period;
>
> • Any amount charged or reserved against the Investment Account for taxes;
>
> • Any expenses charged or reserved against the Investment Account for expenses incurred in operating such Investment Account;

- The mortality and expense risk change for the Valuation Period; and

- Any other Monthly Charges deducted from the Investment Account for This Contract.

. . .

The Account Value when the Initial Premium is received is equal to the Net Premium invested in the Investment Accounts; less:

(a)   Cost of Insurance Charges (deducted on each monthly calculation date); and
(b)   Policy loads; and
(c)   Any Charges for Special Insurance Class Rating;

The Account Value on any subsequent Valuation Day is equal to the Account Value on the prior Valuation Day plus:

(a)   any new Net Premium invested in the Investment Accounts; and
(b)   any increase in value of the Investment Account due to investment results (net of Mortality and Expense Risk Charges and any Asset Charges; and
(c)   any interest credited to the Borrowed Fund;
less;
(a)   any decrease in value of the Investment Account; and
(b)   Cost of Insurance Charges (deducted only on Monthly Calculation Date); and
(c)   any Partial Withdrawals taken; and
(d)   any Rider Charges deducted from the Account Value; and
(e)   any Policy Loads; and
(f)   any Charges for Special Insurance Class Rating; and
(g)   any Other Charges as stated in Contract Schedule B.

28.   The Policy further provides that the "Net Account Value is the Account Value minus any Contract Loan balance and accrued unpaid interest" and provides for the following charges to be deducted from the Account Value:  Cost of Insurance, Rider Charges, Policy Loads and Charges for Substandard Insurance Class Rating.

29.   The Policy expressly stated that it was the strategy of the American Opportunity Fund that funds would be invested "with various portfolio managers

8

believed to be able to meet the Partnerships objectives". Nevertheless, the Policy reserved to AGL :

> ...the right to: (1) establish and operate the Variable Account as a managed account or an account which purchases shares from the portfolios of funds managed by investment managers retained by us; (2) register or deregister the Variable Account under the Investment Company Act of 1947; (3) operate the Investment Accounts as unit investment trust registered, or exempt from registration, under the Investment Company Act of 1940 or any other form permitted by law.

30.    The Policy additionally reserved to AGL the right to contract with investment managers or managed directly the assets held in the Investment Accounts.  It stated "We may deduct an Asset Charge from the Account Value allocated to Investment Accounts that are managed directly as well as any costs and expenses arising from such Investment Accounts.  In either case, investment managers are selected by us in our discretion".( **Emphasis added)**.

## AGL PRIVATE PLACEMENT MEMORANDUM

31.    Hillman, on behalf of the Defendant, provided to Rulle a private placement memorandum entitled "AGL Life Assurance Company Private Placement Memorandum" bearing private placement memorandum number 704, dated October 2, 2001 (the "AGL PPM").

32.    As explained in the AGL PPM, the insurance contract would offer only two investment account choices – (1) Money Market Account or (2) American Masters Opportunity Insurance Fund, L.P. Account.  These accounts are designated as the "investment accounts".  On page 38 of the AGL PPM it is stated, in pertinent part, the following:

The partnership seeks to (i) achieve long-term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on the preservation of capital. The account is managed by Tremont Partners, Inc. ("General Partner") which will attempt to accomplish these investment objectives by investing with various portfolio managers (the "Managers") which the General Partner believes are able to meet the Partnerships objectives. The terms "opportunity" and "opportunistic" refer to a broad range of investment strategies, including but not limited to: long-short equity strategies, hedging and arbitrage techniques in the equity, fixed income and currency markets; index arbitrage; interest rate arbitrage; convertible bond and warrant hedging; merger arbitrage, statistical long-short equity strategies; pairs trading and investment in non-US securities. These sophisticated investment strategies often require the use of derivative trading vehicles such as stock options and index options.

The use of a multi-manager format, whereby investments are made through a variety of managers utilizing different and, if possible, non-correlated investment strategies and trading techniques, it is designed to provide investors with a diversified investment portfolio, as well as enable them to obtain above-average returns over a market cycle.

33.     As further explained by the AGL PPM, the policy owner pays premiums into an AGL Variable Account, a separate account of AGL established to fund the offered "Investment Accounts". The assets of the AGL Variable Account are owned by AGL and are placed by AGL into one or both of the designated Investment Accounts at the election of the investor.

34.     Under the topic heading "Summary Description of the Policy" of the AGL

PPM, it states the following:

> **The Investment Account**.  The account value
> of the Investment Account selected by the
> investment managers and its sub-advisors will
> increase or decrease depending <u>upon the</u>
> <u>performance of the investments</u> selected by the
> investment managers of these Investment
> Accounts.  Accordingly, policy owners bear the
> entire <u>investment</u> risk, including the risk of loss
> of principal for all amounts invested in the
> policy.

> **Policy Values**.  Net premium is allocated to
> one or more Investment Accounts.  Depending
> on the <u>investment performance</u> of these
> accounts, the Account Value of the Policy may
> increase or decrease on any Valuation Day.  The
> Policy Owner bears the entire <u>investment</u> risk
> associated with the <u>investments</u> of the Investment
> Accounts, and there is no guaranteed minimum
> Account Value...

**(Underline added)**.

35.     The AGL PPM describes the relationship of the investor vis-a-vis

American  Opportunity Fund as lacking any privity and in bold type, at page 3

emphasizes that "It is the company on behalf of its separate account and not the policy

owners that will be the limited partner in the partnership".

36.     The AGL PPM advises policy owners to read "The attached American

Masters Opportunity Insurance Fund, L.P. Private Placement Memorandum and Limited

Partnership Agreement for additional information regarding this partnership".  The said

limited partnership agreement is dated January 1, 2001 and expressly precludes the

General Partner from accepting any communications from any policy owners concerning

the assets held in the insurance company's separate account.  Subsequent private

11

placement memorandums prepared and disseminated by Defendants and the Tremont

Opportunity Fund boldly contain the following advisory:

> **OWNERS OF VARIABLE CONTRACT ARE RESTRICTED IN THAT THEY SHALL HAVE NO CONTACT, EITHER DIRECTLY OR INDIRECTLY, WITH THE GENERAL PARTNERS REGARDING ANY INVESTMENT MATTERS REGARDING THE GENERAL PARTNERS' INVESTMENT STRATEGIES AND DECISIONS CONCERNING INVESTMENT PARTNERSHIP ASSETS.  EACH PARTICIPATING INSURANCE COMPANY MUST FULLY DISCLOSE SUCH PROHIBITION ON COMMUNICATIONS TO THE VARIABLE CONTRACT OWNERS.**

### DIMINISHMENT OF PLAINTIFF'S ACCOUNT VALUE

37.     The AGL PPM does not define the term "investment performance" as

encompassing moneys lost by fraud or theft, nor did the Plaintiff intend for that to be the

case.

38.     The Policy does not define the term "investment results" as encompassing

moneys lost by fraud or theft, nor did the Plaintiff intend for that to be the case.

39.     The American Masters Opportunity Insurance Fund, L.P. Private

Placement Memorandum and the Limited Partnership Agreement issued and distributed

by the Defendant, do not define the terms of any investment performance, investment

result, or investment loss as encompassing moneys lost by fraud or theft nor did Plaintiff

intend for that to be the case.

40.     In reliance upon the statements made to Rulle by Hillman, the AGL PPM

and the policy and other related documents, and in accordance with Defendants'

representations to Plaintiff, Plaintiff purchased the variable rate life insurance product

and transferred premium funds to AGL for investment under the policy.

41.     The initial premium of $1,200,000.00 was paid by Plaintiff on or about

October 2001, and additional premiums of $1,200,000.00, $1,000,000.00 and

$250,000.00 were paid yearly in 2002, 2003, and 2004 on subsequent anniversary dates.

42.     Rather than investing the premiums in accordance with the terms of the

policy agreement and their representations to Plaintiff, AGL caused the monies to be

transferred to investment funds that were ultimately managed or sub-managed by Bernard

L. Madoff and/or Madoff Investment Securities LLC ("hereafter collectively referred to

as "Madoff"), where they were never invested, but rather taken by Madoff.

Specifically, Madoff was arrested by the Federal Bureau of Investigation on or about

December 11, 2008 on criminal charges of securities fraud.  Madoff's business was in

fact "a giant Ponzi scheme" and the estimated losses pursuant to his Ponzi scheme

fraudulent action are reported to be in excess of $50 billion.  On or about March 12,

2009, Madoff pled guilty to charges of having defrauded investors with this "Ponzi"

scheme and admitted to the fact that he never implemented his strategy of investment.

Thus, all losses associated with Madoff were not due to losses in securities or funds, but

directly tied to Madoff's theft of the monies deposited with funds he controlled.

43.     Upon learning of the fraudulent scheme of Madoff, AGL improperly

advised Plaintiff that the value of the portion of Plaintiff's account that had been

transferred to funds controlled by Madoff (believed to be approximately 23% of

Plaintiff's total account) was zero, due to the fraudulent actions of Madoff.  AGL's

13

actions in connection with the diminished valuation of Plaintiff's variable life insurance account constitute a breach of contract.

44.     By the express terms of the Policy, only "income, gains and losses . . . from each Investment Account" were to be charged against that account, "without regard to the income, gains or losses of any other Investment Account and without regard to any of our other income, gains or losses." Thus, by the express terms of the Policy, as well as a matter of law, absent legitimate investment losses, Plaintiff's account value should have been the amount determined by the provisions set forth above, i.e., the amounts deposited minus certain charges.   Accordingly, AGL's actions were improper and constitute a breach of contract.

## FAILURE OF DUE DILIGENCE

45.     Pursuant to the Policy, Plaintiff was allowed to choose among two investment accounts for investment of the Policy premiums.  It allocated the annual net premium payment ($1,160,200 per year for 2001 and for 2002) to an investment account option entitled "American Masters Opportunity Insurance Fund, L.P. Account."("American Opportunity Fund"). American Opportunity Fund later changed its name to Tremont Opportunity Fund. As stated in the Policy, the objective of such account option was to achieve long-term capital appreciation and consistently generate positive returns irrespective of stock market volatility or direction while focusing on the preservation of capital.

46.     To achieve that objective, AGL offered American Opportunity Fund as an investment account promoting an "investment strategy to invest with various portfolio

managers believed to be able to meet the Partnership's objective". The investment was targeted to insurance companies' high net worth clients.

47.     The AGL PPM described the offering of limited partnership interests in the Tremont Opportunity Fund to insurance companies, and others which interests are designated to be an investment option under the Policy sold and distributed by the Defendants. Although the interests were exempt from registration under the Securities Act of 1933, as amended, pursuant to Regulation D, the interests still constitute securities and were, and are, subject to federal and state securities laws to the extent applicable.

48.     Among other things, Defendant knowingly and/or recklessly allowed Plaintiff's moneys to become placed in certain "investment accounts" held by Rye Select Broad Market Prime Fund L.P., Rye Select Broad Market Fund L.P., Rye Select Broad Market XL Fund L.P., and Rye Select Equities Fund (the "Rye Select Funds"), all of which were controlled by a single manager, Madoff, without taking a comprehensive and proper due diligence review to assess the Tremont Opportunity Fund or the investment accounts, given Madoff's connection with Tremont Partners , the general partner of the Rye Select Funds, and Tremont Partners selection of Madoff as its sole investment manager.

49.     Defendant AGL knowingly, recklessly, and/or negligently ignored numerous warning signs that could have alerted them to the fact that Madoff was running an illegitimate and illegal Ponzi scheme. Such warning signs included the following:

> (a)  The fact that Madoff offered consistent investment returns, beyond a reasonable investment bench marks, in both up and down markets.
>
> (b)  The fact that there was a discrepancy between the trading activity in which Madoff claimed to be buying and

selling puts and calls and the open interest of index option
contracts.

(c) The fact that Madoff was audited by a small operation
owned by Madoff's brother-in-law only.

(d) The fact that Madoff did not employ any third party
administrators or custodians but instead ran his own
"back office" operations.

(e) The fact that Madoff lacked transparency and limited
access to his books and records thereby maintaining a
false appearance of exclusivity and

(f) The fact that Madoff admitted to illegally manipulating
his accounting records by personally subsidizing returns
in slow quarters in order to minimize risk and to maximize
reported performance.

50.    AGL and its officers and staff held themselves out to Rulle and others as

professional, informed and knowledgeable investment advisors

51.    Despite such representations by AGL, AGL either failed to discover

Madoff's involvement with the Tremont Partnership and the Rye Select Funds, or it

chose to ignore such involvement despite available public skepticism concerning Madoff

and his lack of transparency .

52.    Among the many examples of such public skepticism were the May 2001

published article entitled " Madoff Tops Charts; Skeptics Ask How" in *MAR/Hedge*, a

semi-monthly newsletter reporting on the hedge fund industry, which reported that

Madoff had reported positive returns for the last 11-plus years for Fairfield Sentry and

other feeder funds, but that current and former traders, other money managers,

consultants, quantitative analysts and fund -of- fund executives, many of whom were

familiar with the so-called split-strike conversion strategy used by Madoff, questioned the

consistency of the returns. These professionals noted that others using the strategy had

nowhere near the same degree of success, and that Gateway, a publicly traded mutual fund, which also used the same strategy purported employed by Madoff, had experienced far greater volatility and lower returns than Madoff.

53.     Another example of such public skepticism was the May 27, 2001 *Barron's* published article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." As reported in *Barron's*, Madoff's accounts have produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year. When *Barron's* asked Madoff how he accomplishes this , he says, 'It's a proprietary strategy. I can't go into it in great detail.' Nor were the firms that market Madoff's fund forthcoming.

The article reported that some on Wall Street, including three option strategists for major investment banks, were skeptical about how Madoff achieved his double-digit returns using options alone, and told Barron's they couldn't understand how "Madoff churns out such numbers using this strategy." The article further reported that "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy..."As further reported in the article, one investment manager who took over a pool of assets that included an investment in a Madoff fund stated that ' When he couldn't explain to my satisfaction how they were up or down in a particular month, I pulled out.'

54.     These warning signs were in fact recognized by various other investment advisors in the industry and as a result of these warning signs, they chose not to invest

with Madoff or any of his affiliated funds.  By contrast, Defendant failed to conduct basic due diligence review that would have alerted them to Madoff's fraudulent scheme.

55.     Ignoring the red flags, AGL and Phoenix Equity acted as a "feeder fund", to Madoff by investing in or permitting Plaintiff's moneys and/or policies to be invested in Tremont Opportunity Fund and the investment funds which were controlled by Madoff

56.     Moreover, Defendants profited generously from this arrangement by unjustly receiving significant management fees for entrusting and/or depositing their funds with sub-managers such as Madoff.  This conduct caused Plaintiff to suffer losses.

57.     The actions of Defendant have caused damage to Plaintiff.  Plaintiff seeks to recover damages as well as other fees in amounts paid to Defendant.  Additionally, management fees and investment monies paid by Plaintiff should be returned to Plaintiff. Such losses were suffered as a direct result of Defendant's breach of contract, breach of fiduciary duty, violations of state and federal insurance, trade practices, and securities law, negligence, gross negligence, negligent misrepresentation, and unjust enrichment.

## AGL FAILED TO INSURE DIVERSIFICATION OF THE FUNDS

58.     AGL had a contractual and fiduciary obligation to the Plaintiff to invest the funds in accordance with the terms of the Policy and the AGL PPM.  Such duties also arise under various state and federal statutes in connection with the provision of the Policy.

59.     As set forth under the AGL PPM, the Policy, and in accordance with the representations of Hillman, the investment strategy for Investment Account #2 (American Opportunity Fund) was to invest the money among diverse and separate investment

managers thus insuring a wide diversification of the investment and a significant reduction in the risk of loss.

60.     Over the course of the period October 2001 through December 2008, Plaintiff requested information from AGL concerning the diversification of the investment. The last such inquiry occurred in or about September 2008 when Plaintiff was advised by AGL representative, Stanley Geyelen, that the top ten portfolio holdings allocated by investment managers were as follows:

| | |
|---|---|
| Rye Select Broad Market Prime Fund LP<br>Equity Market Neutral | 10.35% |
| Rye Select Broad Market Prime LP<br>Equity Market Neutral | 6.53% |
| Rye Select Broad Market XL Fund LP<br>Equity Market Neutral | 3.76% |
| Green Light Capital Qualify LP<br>Long/short equity | 3.09% |
| Scoggin Capital Management LP II<br>Event Driven | 2.70% |
| Stark Investments LP<br>Multi-strategy | 2.28% |
| Draw Bridge Special Opportunities Fund LP<br>Event Driven | 2.27% |
| Rye Select Equities Fund<br>Long/short equity | 2.24% |
| High Bridge Asia Opportunities Fund LP<br>Multi-strategy | 2.19% |
| D.B. Zwirn Special Opportunities Fund LP | 2.05% |

61.     Although the reportings of AGL regarding the diversification of the funds appeared to indicate an allocation among managers which were diversified and for which

there was no high concentration in any one manager, in fact, the designated Rye Select

Fund managers were not separate managers as represented by AGL but instead were all

funds that were directly transferred to Madoff. Of the top ten funds identified by AGL as

having separate managers as of September 30, 2008, in fact four of them were not

separate managers at all but instead were direct fees to Madoff resulting in some 23% of

the investment funds ultimately being controlled by a single individual – Bernard

Madoff.

62.     Contrary to the representations that had been made by AGL, and as

required by the AGL PPM, the allocations of 23% of the funds were not consistent with

those representations and are not consistent with the proper allocation of diversified fund

of funds as expected pursuant to usual industry practices or the Plaintiff's stated

investment objectives and were therefore unsuitable.

63.     Just prior to the outing of Bernard Madoff's Ponzi Scheme in December

2008, Tremont Opportunity Fund issued and distributed in August 2008 the Tremont

Private Placement Memorandum which was then modified to allow for a 30% allocation

to any money manager. Plaintiff was not advised of this modification to the diversity

requirements of the Tremont Opportunity Fund and Defendants failed to provide any

explanation or call attention to this modification permitting higher allocations and less

diversity in the fund. Such modification was a marked and significant deviation from the

AGL PPM in the prior private placement memorandums offered by the partnership.

64.     It is highly suspicious that the Tremont Opportunity Fund modified their

private placement memorandum in 2008 just before the outing of Madoff's Ponzi Scheme

to reflect a higher allocation among property managers in an amount consistent with the

amount allocated to the Rye Select Funds. The Defendant failed to advise Plaintiff that these higher diversification allowances had been enacted, and more importantly, that they in fact had been employed, which resulted in a significantly higher concentration of Plaintiff's moneys to be held in the hands of the Madoff controlled funds which AGL now claims were lost pursuant to AGL's valuation of Plaintiff's account.

## COUNT I

### Breach of Contract

65.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 64 and incorporates the same herein by reference.

66.     By the express terms of the Policy, Plaintiff's account was to be valued in accordance only with investment performance, and applicable administrative charges. In addition, any other "losses" were expressly precluded from consideration in the valuation of the account.

67.     Rather than causing Plaintiff's account to be valued in accordance with the terms and conditions of the Policy, however, AGL caused a portion of the account to be valued at zero, based solely on the fraudulent activities of Madoff.

68.     Defendants' actions in causing a portion of Plaintiff's account to be valued at zero based solely on the fraudulent actions of Madoff constitute a breach of the provisions of the Policy and are further contrary to law.

69.     As a direct and proximate result of AGL's breach, Plaintiff has suffered damages and is entitled to recover damages against Defendants, as well as the return of all fees paid to Defendants.

## COUNT II

### Breach of Fiduciary Duty

70.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 69 and incorporate the same herein by reference.

71.     Pursuant to the express terms of the Policy, AGL retained exclusive control over selection of investment managers, contractual dealings with such investment managers, and all changes in investment accounts, including, but not limited to, establishment of additional investment accounts, other investment options, substitution of new portfolios, combination and elimination of investment accounts and transfer of assets from one investment account to another.

72.     The Policy further provided that Plaintiff was expressly restricted from any contact, communication, either direct or indirect, with the general partner, Tremont Partners, and with the Partnership.  Thus, only the insurance company, AGL, could have any communication or contact with the general partner or the Partnership.

73.     By asserting the exclusive right to control all aspects of the investment account,  AGL assumed a fiduciary duty to Plaintiff and was obligated to act in good faith and with due care in representing the interests of Plaintiff.

74.     Defendant, in conjunction with Phoenix Equity, as brokers/broker-dealer, owed a common law duty of care to the Plaintiff as a fiduciary and as agent of the Plaintiff to manage the investment of the Plaintiff's funds with care, competence and diligence.

75.     AGL knew or should have known how to perform its obligations pursuant to the Policy and its fiduciary obligations arising from the Policy in monitoring the safety and performance of Plaintiff's assets in a prudent and professional manner.

76.     Had Defendant met its fiduciary duties to the Plaintiff, it would have investigated the Tremont Opportunity Fund and found that its general partner, Tremont Partners, was heavily connected with and invested with Madoff as a feeder-fund to Madoff. Defendant should have investigated Tremont Opportunity Funds connections with Madoff through the Tremont Partnership. The Defendant should have required Tremont Partners to disclose what, if any, due diligence investigations had been performed by Tremont Partners or Tremont Opportunity Group with respect to moneys invested or to be invested with Madoff.

77.     Had Defendant conducted proper due diligence investigation it would have, in the exercise of sound and reasonable judgment, declined to have the Tremont Opportunity Fund as one of the two Investment Account options available in its insurance product.

78.     Had Defendant adequately investigated, monitored and followed-up on the investment of moneys made by Plaintiff through the Policy and placed with Tremont Opportunity Fund, they would have determined that the reported diversification of investment among money managers was in fact highly concentrated and not adequately diversified as required by the Policy and the AGL PPM.

79.     As a direct and proximate result of Defendant's breaches, Plaintiff has suffered damages and is entitled to recover damages against Defendant, as well as the return of all fees paid to Defendant.

80.      Defendant is further liable for punitive damages as a result of its wanton and grossly negligent course of conduct.

## COUNT III

### Common Law Duty of Good Faith and Fair Dealing

81.      Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 80 and incorporates the same herein by reference.

82.      There is implied in every contract a duty of good faith and fair dealing that neither party will do anything to deprive the other of the fruits of the contract.

83.      The Policy contained said implied duty of good faith and fair dealing, as a matter of law.

84.      By failing to act in accordance with the provisions of the Policy, and by improperly diminishing the account value set forth in Plaintiff's account, Defendant has not only deprived Plaintiff of the fruits of the contract, but has caused further losses to Plaintiff.  Said actions constitute breaches of the implied covenant of good faith and fair dealing.

85.      Further, the fiduciary relationship inherent in every insurance contract under Alaska law gives rise to an implied covenant of good faith and fair dealing. Defendant's breach of said implied covenant gives rise to an action in tort.

86.      Defendant's breaches of the implied covenant of good faith and fair dealing entitle Plaintiff to damages caused by Defendant's breaches, as well as punitive damages.

24

## COUNT IV

**Securities Fraud Pursuant to 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)**

87.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 86 and incorporates the same herein by reference.

88.     Pursuant to the Policy, Plaintiff elected to invest its moneys in an investment account option entitled "American Masters Opportunity Insurance Fund, L.P. Account," later named Tremont Opportunity Fund.  As stated in the Policy, the objective of such account option was to achieve long-term capital appreciation and consistently generate positive returns irrespective of stock market volatility or direction while focusing on the preservation of capital.

89.     Defendants represented that Plaintiff's investment would be placed in such accounts, consistent with Plaintiff's investment objectives and the terms of the Policy and Prospectus provided to Plaintiff by Defendant.

90.     Rather than investing the premiums in accordance with the terms of the Policy, Defendant caused a portion of Plaintiff's moneys to be transferred to investment funds that were controlled, taken and lost by Madoff in a fraudulent scheme.

91.     Section 10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b) forbids the "use or employ[ment of] . . . any manipulative or deceptive device or contrivance," "in connection with the purchase or sale of any security," and "in contravention of [SEC] rules and regulations."

92.     SEC regulations forbid  the making "of any untrue statement of a material fact or to omit or state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security.

93.     The AGL PPM contain multiple false and misleading statements as well as omitted material information that should have been contained therein as to constitute a reckless state of mind and the dissemination of the materials.  The false and misleading statements contained in the AGL PPM are as follows:

- It stated that the Tremont Opportunity Fund had a "multi-manager concept" which would provide significant diversification and lessening of risks associated with the investment.

- It gave multiple standards for evaluation of the investment which implied that it was actually tracking the value of the investment.

- It failed to state that AGL had not done any due diligence on any funds, including the Tremont Opportunity Fund, either prior to offering or during the time of the Policy.

- It failed to state that almost 23% of the entire investment pool would be in the hands of one manager, thereby effectively eliminating or greatly reducing the concept of diversification.

Such conduct as described above is reckless and materially misleading and in violation of both federal and state security laws.

94.     Defendant's misrepresentations and/or omissions were material to Plaintiff, based both on Plaintiff's investment objectives, expectations under the terms of the Policy and as a matter of sound and prudent investment principles.

95.     Defendant's misrepresentations and/or omissions were material and misleading at the time they were made (or failed to be made) and were made knowingly, with reckless disregard for their truth or falsity and/or without a genuine belief that the information disclosed  was accurate and complete in all material respects.

96.     Defendant's misrepresentations and/or omissions were made in connection with the purchase or sale of a security pursuant to the prospectus furnished to Plaintiff by Defendant, upon which Plaintiff relied in entering into the Policy with Defendant.

97.     But for Defendant's misrepresentations and/or omissions, Plaintiff would not have placed the premium moneys with AGL for investment.

98.     Defendant's misrepresentations and/or omissions were a substantial factor in causing the economic loss suffered by Plaintiff.

## COUNT V

### Violation of Alaska and Pennsylvania Securities Acts

99.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 98 and incorporates the same herein by reference.

100.    The Alaska Securities Act at AS 45 Chapter 55 §900(a)(7) identifies the variable rate life insurance policy product which is the subject matter of this litigation as a security governed by the provisions of the Alaska Securities Act.

101.    Under AS 45:55-10(a) et seq., a person may not in connection with the offer, sale or purchase of a security, directly or indirectly employ a device, scheme or artifice to defraud, nor may they make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, and in the light of the circumstances under which they are made, not misleading, nor may they engage in

any act, practice or course of business that operates or would operate as a fraud or deceit upon a person.

102.    Sections 1-401(b) and 1-501(g) of the Pennsylvania Securities Act provides that one who, inter alia, "makes any untrue statement of material fact or omits stating a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading . . . [is] liable to the person purchasing the security."

103.    The Defendant's misrepresentations and/or omissions as set forth in Count IV supra, also constitute a violation of the Alaska Securities Act and the Pennsylvania Securities Act.

104.    Pursuant to the Alaska Securities Act and the Pennsylvania Securities Act, Defendant is liable to Plaintiff for all amounts paid to Defendant in connection with the investment, plus interest at the legal rate from the date of payment.

## COUNT VI

### Professional Negligence, Gross Negligence, and Negligence

105.    Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 104 and incorporates the same herein by reference.

106.    As an investment manager with discretionary control over the assets entrusted to it by Plaintiff, AGL owed Plaintiff a duty to manage and monitor the investments of Plaintiff with reasonable care.  AGL breached that duty.

107.    Defendant further breached its duty of care by failing to take all reasonable steps to ensure that the investment of the assets of Plaintiff were made and maintained in a prudent and professional manner, and it failed to take all reasonable steps

to preserve the value of Plaintiff's investments, failed to perform all necessary and adequate due diligence, and it failed to exercise generally the degree of prudence, caution and good business practice that would be expected of any reasonable investment professional.

108.   Defendant held itself out to be a professional investment adviser and as such was under a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise.

109.   As a direct and proximate result of Defendant's professional negligence, gross negligence, and negligence, Plaintiff has suffered damages.

## COUNT VII

### Negligent Misrepresentation

110.   Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 109 and incorporates the same herein by reference.

111.   Defendant owed Plaintiff a duty to act with a reasonable care in connection with the assets entrusted to AGL by Plaintiff and to conduct due diligence to determine the accuracy of information contained in the Policy , the private placement memorandums, and the partnership agreements provided by them to Plaintiff.

112.   Defendant has breached its duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made reflecting the value of the monies and/or policies, in light of the circumstances under which they were made, not misleading.

113.   At the time of the misrepresentations and omissions of material facts by Defendant, Plaintiff was ignorant of their falsity and believed them to be true.  Plaintiff relied upon the misrepresentations made by Defendant.   Had Plaintiff been aware of the true facts, Plaintiff would not have invested in the Tremont Opportunity Fund and, consequently, the Rye Select funds.

114.   Among the facts concealed by Defendant was the fact that approximately 23% of Plaintiff's account had been invested in a single fund. The Defendant had affirmatively represented that a significantly less percentage of the aggregate of such funds  would be invested in with any one investment manager, which was an affirmative misrepresentation.

115.   Defendant further mislead, misrepresented and deceived Plaintiff by referring to the Madoff accounts as "equity market neutral." when they were not.

116.   Neither Plaintiff nor its agents knew of any of the falsity and/or misleading nature of Defendant's statements and omissions and, therefore, relied upon the representations made by Defendant.

117.   Defendant's conduct constitutes the making of negligent misrepresentation (including negligent omissions to state facts in the connection with statements that were made) under all applicable law.  As a direct and proximate result of the negligent misrepresentations/omissions, and in reliance thereon, Plaintiff has suffered damages.

## COUNT VIII

### Unjust Enrichment

118.   Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 117 of the Complaint and incorporate the same herein by reference.

119.     Defendant financially benefited from its unlawful acts as it collected improper management fees based upon the Policy's net asset values.  These unlawful acts caused Plaintiff to suffer injury and monetary loss.

120.     As a result, it is unjust and inequitable for Defendant to have enriched itself in this manner.

121.     Plaintiff is entitled to restitution of the revenue derived from Defendant's unjust enrichment and inequitable conduct.

**WHEREFORE**, Plaintiff hereby demands judgment against Defendant  AGL Life Assurance Company as follows:

A.  Awarding it compensatory damages suffered as a result of the wrong complained of herein together with appropriate interest;

B.  Awarding it costs and expenses of this litigation, including reasonable attorneys' fees and costs of suit;

C.  Awarding punitive damages in accordance with applicable law; and

D.  Awarding it damages for unjust enrichment and for such other relief as the court may deem just and proper under the circumstances.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

NOEL, KOVACS & McGUIRE, P.C.

By:  Nicholas Noel, III, Esq.

LAW OFFICES OF WILLIAM R. CONNELLY, LLC

By:  William R. Connelly, Esq.

31

## DESIGNATION OF TRIAL COUNSEL

William R. Connelly, Esq. is designated as trial counsel in this matter.

_____
William R. Connelly, Esq.

Dated:  April 30, 2010

Exhibit "A"

# AGL Life Assurance Company

## FLEXIBLE PREMIUM VARIABLE
## LIFE INSURANCE CONTRACT

**Provision of Benefits**

AGL Life Assurance Company promises to provide the benefits described in this Contract. This promise is subject to the terms of this Contract. It is made in return for your Application and payment of the required premiums. This is a legal contract between you and us. PLEASE READ THIS CONTRACT CAREFULLY. The words "we," "us," "our," and "company" refer to AGL Life Assurance Company.

This Contract takes effect on the Policy Date. It continues in force as long as the Net Account Value is sufficient to pay the Monthly Charges, as described herein.

**Notice of 10 Day Right to Examine Your Policy (Free Look Period)**
**This Contract may be canceled at any time within ten (10) days after it is received or within forty five (45) days after the date of the Application, whichever is later. This Contract must be returned to us at our Home Office or to the agent through whom it was purchased. Written notice of cancellation is also needed. If this Contract is canceled, it will be as though this Contract had never been issued. Any premium paid will be returned to you minus any Death Benefits paid, Partial Withdrawals taken, and any Contract Loans, together with accrued but unpaid interest on such Contract Loans, if allowed by the law of the Governing Jurisdiction.**

This Contract is issued by a stock company and is governed by the laws of the Governing Jurisdiction (See Contract Schedule A).

This policy may only be sold to an accredited investor as defined by law or in an offer and sale which otherwise satisfies all conditions applicable to offers and sales made under Regulation D. Its ownership may not be transferred without our permission. It may only be transferred to another accredited investor or in an offer and sale which otherwise satisfies all the conditions otherwise applicable to offers and sales made under Regulation D. If you cease to be an accredited investor or if all the conditions applicable to offers and sales made under Regulation D are no longer satisfied, then we may exchange this policy for another policy that is exempt from registration or is registered as required by law. If you do not accept such change, you must notify us in writing within thirty (30) days of receipt of the new policy. We also reserve the right to prevent an exchange of this policy in accordance with Internal Revenue Code Section 1035 in a situation where such exchange would violate the investor control requirements of the Internal Revenue Code.

**ALL VALUES OR PAYMENTS PROVIDED BY THIS CONTRACT WHEN BASED ON THE EXPERIENCE OF A VARIABLE ACCOUNT MAY INCREASE OR DECREASE AND ARE NOT GUARANTEED AS TO DOLLAR AMOUNT. THE AMOUNT AND DURATION OF THE DEATH BENEFIT MAY BE VARIABLE OR FIXED UNDER CERTAIN CONDITIONS (SEE PART 2, INSURANCE PLAN).**

Signed at Plymouth Meeting, Pennsylvania, on the Policy Date.

SECRETARY                                    PRESIDENT

**Variable Life Insurance.**
**Face Amount payable if Insured dies while the policy is in force.**
**Flexible Premiums payable while the Insured is living until the Maturity Date.**
**Non participating, no dividends are payable.**

**Home Office: 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania 19462**

VL-299

# TABLE OF CONTENTS

| Section | Policy Provisions | Page |
|---|---|---|
| Schedule A. | General Contract and Insured Information | 3 |
| Schedule B. | Contract Charges and Fees | 4 |
| Schedule C. | The Investment Accounts | 5 |
| Schedule D. | Face Amount | 6 |
| Schedule E. | Cost of Insurance | 7 |
| Schedule F. | Death Benefit Computation | 8 |
| Part 1. | Definitions | 9 |
| Part 2. | Insurance Plan | 10 |
| Part 3. | Variable Life Insurance Coverage | 11 |
| Part 4. | Premium Payments | 11 |
| Part 5. | The Investment Accounts | 13 |
| Part 6. | Account Value | 15 |
| Part 7. | Contract Loans | 16 |
| Part 8. | Partial Withdrawals | 17 |
| Part 9. | Reports to Contract Holder | 17 |
| Part 10. | Termination Provisions | 17 |
| Part 11. | General Provisions | 18 |

VL-299

## CONTRACT SCHEDULE A

### GENERAL CONTRACT AND INSURED INFORMATION

Contract Number:          VL300222

Contract Holder:          The Michael S. Rulle Family Dynasty Trust Agreement of
                          2001, dtd 9/27/01

Contract Year:            October 5 through October 4

Policy Date:              October 5, 2001

Maturity Date:            October 5, 2049

Beneficiary:              The Michael S. Rulle Family Dynasty Trust Agreement of
                          2001, dtd 9/27/01

Depending on the premium paid, coverage may not continue to the Maturity Date. If coverage continues to the Maturity Date, the net account value to be paid may be zero or small.

### INSURED INFORMATION

Insured:                  Michael S. Rulle

Date of Birth:            7/22/50

Issue Age:                51

Sex:                      Male

Underwriting Class:       Advantage

Smoker Status:            Non-smoker

Social Security Number:   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

Residence:                165 Cherry Lane
                          Mendham, NJ  07945

### BASIC CONTRACT INFORMATION

Plan:                     Flexible Premium Variable Life Insurance

Death Benefit Option:     Option 1

Riders:                   None

Governing Jurisdiction:   AK

State of Issuance:        AK

Initial Face Amount:      $17,600,000.00

Initial Premium:          $1,200,000.00

Initial Net Premium:      $1,160,200.00

Maximum Premium:                            n.a.

Minimum Premium:          $250,000.00

### NET PREMIUM ALLOCATION LIMITATIONS

You may direct the allocation of the Net Premium to any Investment Account as described in Contract Schedule C.

During the Free Look Period, however, the allocation of the Net Premium will be limited to the Money Market Investment Account.

No Net Premium may be allocated by you to our General Account.

PARTIAL WITHDRAWALS

Minimum withdrawal Amount:    $10,000.00

### BASIS OF COMPUTATIONS

Mortality Table:          1980 Commissioners Standard Ordinary Table,
                          Age Nearest Birthday

Interest Rate:            4.00% per year
                          0.327374% monthly equivalent

# CONTRACT SCHEDULE B

## CONTRACT CHARGES AND FEES

Charges displayed in this schedule are the maximum charges under this Contract. Current charges may be lower than those shown.

### PREMIUM LOADS

Premium Loads are deducted from each premium payment.

| | |
|---|---|
| Distribution Charge: | 3.50% of Initial Premium |
| | 3.50% of Subsequent Premium |
| Premium Tax Charge: | A charge calculated to approximate the aggregate of taxes based on premiums received imposed on us by the jurisdiction in which you reside. |

### MONTHLY CHARGES

Monthly Charges are deducted from the Account Value.

| | |
|---|---|
| Asset Charges: | Asset Charges are deducted by us on a daily basis from each Investment Account managed directly by one or more investment managers. The Asset Charges for the Investment Accounts are shown in Contract Schedule C. |
| Mortality and Expense Risk Charge: | 0.103575% monthly (equivalent to 1.25% annually) |
| Cost of Insurance: | See Contract Schedule E. |

### ANNUAL CHARGES

Annual Loan Charges are added to the Loan Amount.

| | |
|---|---|
| Loan Interest: | 4.60% annually in arrears. |
| Loan Interest Spread: | 0.60% |

### POLICY LOAD

A policy load is deducted on the policy date and on the effective date of any increase in Face Amount.

| | |
|---|---|
| Policy Load: | The smaller of the following: |
| | (i) $700.00; or |
| | (ii) Larger of $200.00 or $0.10 per $1,000 of face amount. |

### OTHER CHARGES

We reserve the right to deduct from this Contract's Account Value an amount equivalent to any federal, state, or local taxes or other governmental charge that we determine to be properly attributable to this Contract.

## CONTRACT SCHEDULE C

### VARIABLE ACCOUNT

The Variable Account for this policy is the Life Variable Portfolio. The assets of the Variable Account shall be available to cover the liabilities of the general account only to the extent that the assets of the Variable Account exceed the liabilities of the Variable Account arising under the policies supported by the Variable Account. The assets of the Variable Account shall be valued as often as policy benefits vary but at least monthly. See the Valuation Period provision on page 13 for more details.

### THE INVESTMENT ACCOUNTS

Each of the Investment Accounts invests in securities authorized by Pennsylvania law.

This Schedule may be amended from time to time to add or delete Investment Accounts. The investment policy of an Investment Account may not be changed without the approval of the Pennsylvania insurance commissioner. The approval process is on file with the commissioner.

### LIMITATION ON TRANSFER

The maximum number of transfers allowed among Investment Accounts per Contract Year is four (4)

#### Investment Account 1 – Money Market Account*

Objective:     To achieve high current income consistent with preservation of capital and maintenance of liquidity.

Strategy:     Investing primarily in investment grade securities with an average maturity of 91 days or less.

Asset Charges: 0.20%$^{†}$ (annual equivalent)

#### Investment Account 2 – American Masters Opportunity Insurance Fund, L.P. Account

Objective:     To (i) achieve long-term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on the preservation of capital.

Strategy:     Investment strategy is to invest with various portfolio managers believed to be able to meet the Partnership's objectives.

Asset Charges: 1.00%$^{†}$ (annual equivalent) for net assets up to $25,000,000;

0.75%$^{†}$ (annual equivalent) for net assets over $25,000,000.

† Amounts shown are in addition to fees directly charged as a result of investments.
* This account is designated the Money Market Investment Account.

## CONTRACT SCHEDULE D

### FACE AMOUNT

Minimum Face Amount:   $50,000

Maximum Face Amount:   Subject to underwriting.

Increases in Face Amount will require evidence of insurability. Increases will be subject to a policy load as shown in Contract Schedule B.

|  Contract Years | Table of Selected Face Amounts |
|:---:|:---:|
| All | $17,600,000 |

We reserve the right to reduce the Death Benefit of this policy by requiring one or more partial withdrawals. The function of these partial withdrawals shall be to limit the Net Amount at Risk to an amount not greater than Maximum Net Amount at Risk shown below. Failure to require any partial withdrawal under this provision shall not be deemed to waive our right to require future withdrawals permitted by this endorsement.

Maximum Net Amount at Risk:  The smaller of (1) $17,600,000 and (2) the reduced Face Amount should you choose to reduce the Face Amount at a later date.

# CONTRACT SCHEDULE E

## COST OF INSURANCE

The maximum monthly Cost of Insurance rates are for each $1,000 of Net Amount at Risk (NAR). Current charges may be lower than those shown. The applicable monthly rates for this policy are the amounts shown below.

| Attained Age | Male | Female | Attained Age | Male | Female | Attained Age | Male | Female |
|---|---|---|---|---|---|---|---|---|
| 0 | 0.349002 | 0.241153 | 35 | 0.176004 | 0.137604 | 70 | 3.353673 | 1.861440 |
| 1 | 0.089210 | 0.072529 | 36 | 0.186859 | 0.146785 | 71 | 3.681990 | 2.041944 |
| 2 | 0.082538 | 0.067525 | 37 | 0.200220 | 0.157637 | 72 | 4.060290 | 2.267226 |
| 3 | 0.081703 | 0.065857 | 38 | 0.215255 | 0.170159 | 73 | 4.496204 | 2.544475 |
| 4 | 0.079201 | 0.064189 | 39 | 0.232798 | 0.185189 | 74 | 4.983518 | 2.872449 |
| 5 | 0.075031 | 0.063355 | 40 | 0.252016 | 0.201891 | 75 | 5.513314 | 3.243922 |
| 6 | 0.071695 | 0.060854 | 41 | 0.274581 | 0.220267 | 76 | 6.076525 | 3.653355 |
| 7 | 0.066691 | 0.060020 | 42 | 0.297152 | 0.239482 | 77 | 6.665690 | 4.094284 |
| 8 | 0.063355 | 0.058352 | 43 | 0.323074 | 0.257865 | 78 | 7.275881 | 4.567162 |
| 9 | 0.061688 | 0.057518 | 44 | 0.349839 | 0.277089 | 79 | 7.923872 | 5.085703 |
| 10 | 0.060854 | 0.056684 | 45 | 0.379960 | 0.297152 | 80 | 8.635205 | 5.672859 |
| 11 | 0.064189 | 0.057518 | 46 | 0.410928 | 0.317220 | 81 | 9.430778 | 6.350514 |
| 12 | 0.070861 | 0.060020 | 47 | 0.444418 | 0.338128 | 82 | 10.338952 | 7.140527 |
| 13 | 0.082538 | 0.062522 | 48 | 0.479596 | 0.361551 | 83 | 11.373499 | 8.058585 |
| 14 | 0.095884 | 0.066691 | 49 | 0.518979 | 0.386655 | 84 | 12.513845 | 9.091985 |
| 15 | 0.110901 | 0.070861 | 50 | 0.560894 | 0.414276 | 85 | 13.737727 | 10.231576 |
| 16 | 0.125921 | 0.075031 | 51 | 0.610378 | 0.443581 | 86 | 15.021846 | 11.470894 |
| 17 | 0.139273 | 0.079201 | 52 | 0.665766 | 0.476246 | 87 | 16.356613 | 12.808170 |
| 18 | 0.148455 | 0.081703 | 53 | 0.728747 | 0.513950 | 88 | 17.737983 | 14.246631 |
| 19 | 0.155132 | 0.085040 | 54 | 0.800179 | 0.552509 | 89 | 19.171986 | 15.797873 |
| 20 | 0.158471 | 0.087542 | 55 | 0.876715 | 0.592762 | 90 | 20.677655 | 17.482656 |
| 21 | 0.159306 | 0.089210 | 56 | 0.960053 | 0.633033 | 91 | 22.287142 | 19.335048 |
| 22 | 0.157637 | 0.090879 | 57 | 1.046840 | 0.671642 | 92 | 24.063468 | 21.418993 |
| 23 | 0.155132 | 0.092547 | 58 | 1.139616 | 0.708588 | 93 | 26.119928 | 23.852379 |
| 24 | 0.151793 | 0.095050 | 59 | 1.239245 | 0.748070 | 94 | 28.812997 | 26.926360 |
| 25 | 0.147620 | 0.096718 | 60 | 1.349979 | 0.792613 | 95 | 32.817580 | 31.310115 |
| 26 | 0.144281 | 0.099221 | 61 | 1.473551 | 0.848112 | 96 | 39.642945 | 38.504789 |
| 27 | 0.142612 | 0.101724 | 62 | 1.613407 | 0.917954 | 97 | 53.066045 | 52.275714 |
| 28 | 0.141777 | 0.105061 | 63 | 1.772172 | 1.007228 | 98 | 83.333333 | 83.333333 |
| 29 | 0.142612 | 0.108398 | 64 | 1.949093 | 1.110930 | | | |
| 30 | 0.144281 | 0.112570 | 65 | 2.143422 | 1.224040 | | | |
| 31 | 0.148455 | 0.116742 | 66 | 2.350996 | 1.343212 | | | |
| 32 | 0.152628 | 0.120914 | 67 | 2.572761 | 1.464235 | | | |
| 33 | 0.159306 | 0.125086 | 68 | 2.808822 | 1.583722 | | | |
| 34 | 0.166820 | 0.131762 | 69 | 3.065321 | 1.712709 | | | |

# CONTRACT SCHEDULE F

## DEATH BENEFIT COMPUTATION

### TABLE OF MINIMUM DEATH BENEFIT FACTORS

| Attained Age | Factor | Attained Age | Factor |
|---|---|---|---|
| 0-40 | 2.50 | 60 | 1.30 |
| 41 | 2.43 | 61 | 1.28 |
| 42 | 2.36 | 62 | 1.26 |
| 43 | 2.29 | 63 | 1.24 |
| 44 | 2.22 | 64 | 1.22 |
| 45 | 2.15 | 65 | 1.20 |
| 46 | 2.09 | 66 | 1.19 |
| 47 | 2.03 | 67 | 1.18 |
| 48 | 1.97 | 68 | 1.17 |
| 49 | 1.91 | 69 | 1.16 |
| 50 | 1.85 | 70 | 1.15 |
| 51 | 1.78 | 71 | 1.13 |
| 52 | 1.71 | 72 | 1.11 |
| 53 | 1.64 | 73 | 1.09 |
| 54 | 1.57 | 74 | 1.07 |
| 55 | 1.50 | 75-90 | 1.05 |
| 56 | 1.46 | 91 | 1.04 |
| 57 | 1.42 | 92 | 1.03 |
| 58 | 1.38 | 93 | 1.02 |
| 59 | 1.34 | 94 | 1.01 |
|  |  | 95-98 | 1.00 |

The following terms have special meaning as they are used in this policy. That meaning is explained here. Other terms that have special meaning are explained in the policy.

**Accumulation Units**. Accumulation Units are used to measure the Account Value allocated to each Investment Account.

**Age**. The Issue Age plus the number of completed Contract Years. Issue Age is the Attained Age of the Insured on the birthday nearest the Policy Date. Issue Age is shown in Schedule A.

**Beneficiary**. Any person or entity named in our records to receive the insurance proceeds after the Insured dies.

**Borrowed Fund**. An account established for any amounts transferred from the Investment Accounts as a result of loans. The account is credited with interest and is not based on the experience of any Investment Account.

**Contract Anniversary**. The day that marks the start of a new Contract Year.

**Contract Holder**. Referred to as You or Your. The owner of this Contract, as shown in our records. All of the rights and benefits of this Contract belong to you, unless otherwise stated herein.

**Contract Year**. Each successive twelve month period starting on the Policy Date.

**Face Amount**. The amount of insurance under this Contract. The Initial Face Amount is shown in Contract Schedule A. Thereafter, it may change in accordance with the terms of the provisions of Part 2, Insurance Plan, Part 8, Partial Withdrawals and Contract Schedule D.

**Governing Jurisdiction**. The state or jurisdiction in which this Contract is delivered and whose laws govern its terms.

**Investment Account**. Each of the Investment Accounts collectively comprise the Variable Account. The assets of each Investment account are invested separately.

**Policy Date**. The date used to begin calculating Monthly Charges and Annual Charges. The Policy Date is shown in Contract Schedule A. Computation of Contract Months starts with the Policy Date.

**Monthly Calculation Date**. This date determines the day for calculating Monthly Charges under this Contract. The day Monthly Charges are deducted from the Account Value. It is the same day of each succeeding month as the Policy Date except that whenever the Monthly Calculation Date falls on a day other than a Valuation Day it is deemed to be the next Valuation Day. If any Monthly Calculation Date would be the 29th, 30th, or 31st of a month that does not have that number of days, then the Monthly Calculation Date will be the last day of that month. If the Initial Premium is received after the Policy Date, the Monthly Charges are still calculated beginning on the Policy Date and deducted on the on the date the Initial Premium is received.

**Net Amount At Risk (NAR)**. The Net Amount At Risk is calculated on any Monthly Calculation Date by subtracting the Account Value from the Death Benefit discounted to such Monthly Calculation Date at the interest rate specified in Contract Schedule A, under Basis of Computations.

**Net Investment Factor**. The Net Investment Factor is an index that measures the investment performance of an Investment Account from one Valuation Day to the next.

**NonSmoker**. A person who does not currently use and has not in the twelve months before the application is signed smoked any cigarettes.

**S.E.C.** The United States Securities and Exchange Commission.

**Smoker**. A person who is not a NonSmoker as defined above.

**Valuation Day**. Valuation will occur periodically at such intervals as we may reasonably determine. It will be at least as often as policy benefits vary but at least monthly. The day a valuation takes place will be called Valuation Day. Each Valuation Day ends at the Valuation Time.

**Valuation Time**. The Valuation Time is the close of trading on the New York Stock Exchange (or any successor exchange) or, if the securities in which the assets of an Investment Account are invested are not traded on the New York Stock Exchange, the close of trading on any exchange on which such securities are traded, except when the S.E.C. determines that an emergency exists that would make the determination of the value of the securities not reasonably practicable.

**Variable Account**. The Variable Account has been established under Pennsylvania Law. The Variable Account is not part of our General Account.

## Part 2. Insurance Plan

This Contract provides insurance coverage on the life of the Insured. The Insured is named in Contract Schedule A.

### Death Benefit

If the Insured dies while this Contract is in force, a Death Benefit is payable to the Beneficiary when we receive due proof of death. The amount of Death Benefit depends on the Death Benefit Option selected by you and shown in Contract Schedule A and Contract Schedule D, if any. The amount of the Death Benefit payable is also adjusted as follows:

  (1) by deducting the amount of any unpaid Monthly Charges against the Account Value to the date of death; and

  (2) by deducting the amount of any Contract Loans outstanding against the Account Value on the date of death plus interest accrued but unpaid on such Contract Loans on the date of death; and

  (3) by deducting the amount of any unpaid charges for benefits provided by Rider, if any.

### Death Benefit Options

There are two Death Benefit Options, described below. The Death Benefit Option for this Contract on the Policy Date is shown in Contract Schedule A.

Option 1: The greater of:

  (a) the Face Amount in effect on the date of death; and

  (b) the Account Value on the date of death multiplied by the Minimum Death Benefit Factor shown in Contract Schedule F.

Option 2: The greater of:

  (a) the Face Amount plus the Account Value on the date of death; and

  (b) the Account Value on the date of death multiplied by the Minimum Death Benefit Factor shown in Contract Schedule F.

### Face Amount

Unless otherwise agreed, the Face Amount for this Contract may not be greater than that determined according to Contract Schedule D. The Face Amount on the Policy Date is shown in Contract Schedule A. The table of Selected Face Amounts is shown in Contract Schedule D.

### Minimum Death Benefit Factor

A table of Minimum Death Benefit Factors is included in Contract Schedule F. To ensure that the Contract will qualify as life insurance under the Internal Revenue Code, the Death Benefit will never be less than the Account Value multiplied by the appropriate Minimum Death Benefit Factor.

### Changing the Face Amount

You may, subject to our approval, change the Face Amount or the Table of Selected Face Amounts. You must request the change by notifying us in writing. If we approve the change, it will take effect on the next Contract Anniversary that is at least thirty (30) days after all the required information has been provided to us. Any limitations on the number and/or amount of such changes are shown in Contract Schedule D. Cost of Insurance amounts charged to the Account Value will be adjusted to provide for the change. No such change will be effective if the Insured dies before the date of such change.

### Changing the Death Benefit Option

The Death Benefit Option for this Contract may be changed while this Contract is in effect. You must request the change by notifying us in writing. If we approve the change, it will take effect on the next Contract Anniversary that is at least thirty (30) days after all the required information has been provided to us. The Cost of Insurance amounts will be adjusted to provide for the change. No such change will be effective if the Insured dies before the date of change.

**If the Death Benefit is changed from Option 1 to Option 2, the Face Amount after the change will equal the Face Amount immediately prior to the change less the Account Value at the time of the change.**

**If the Death Benefit is changed from Option 2 to Option 1, the Face Amount after the change will equal the Death Benefit immediately prior to the change.**

Part 3. Variable Life Insurance Coverage

### Time of Payment of Death Benefit

A Death Benefit will usually be paid within seven (7) days of the date due proof of the Insured's death is received by us at our Home Office and any other requirements are satisfied. Payment of any amount of Death Benefit based upon an Investment Account may be delayed if:

    (1) the New York Stock Exchange (or its successor or, if the securities in which the assets of the Investment Accounts are invested are not traded on the New York Stock Exchange, any principal exchange on which such securities are traded) is closed; or

    (2) the S.E.C. determines that an emergency exists that would make the disposal of securities held in the Investment Account or the determination of their value not reasonably practicable.

Settlement of any amounts not based upon an Investment Account will be made not more than six (6) months after due proof of death is received.

### Interest on Death Benefits

Interest on Death Benefits will be credited as prescribed by law.

### Beneficiary

You may name or change a Beneficiary by sending written notice to us. A Beneficiary may be revocable or irrevocable. An irrevocable Beneficiary may not be changed without his or her consent. Also an Irrevocable Beneficiary must consent to the exercise of certain other rights by you. There may be different classes of Beneficiaries, such as primary and secondary. These classes set the order of payments. There may be more than one Beneficiary in a class. The Beneficiary designation in effect on the Policy Date is stated in the Application for this Contract.

### Suicide Exclusion

If the Insured or substitute insured commits suicide, while sane or insane, within two years from the date coverage becomes effective on such person under this Contract, only a limited Death Benefit will be payable. In such case, the amount of the Death Benefit will be equal to the amount of the Net Premiums less any Partial Withdrawals and Contract Loans and any loan interest accrued but unpaid.

Furthermore, if the Insured commits suicide within two years from the date of receipt of any Subsequent Premium Payment which increases the amount of the Death Benefit, or any change of Face Amount or change of Death Benefit Option which increases the amount of the Death Benefit, the amount of the increase in the Death Benefit will be limited to a refund of the Cost of Insurance charges made for such increase.

## Part 4. Premium Payments

### A. Premium Payments Generally

You may make premium payments at any time, subject to limitations described in this Contract. However, we have the right to promptly refund any amount of premium paid (1) in order to keep this Contract in compliance with state and federal laws and (2) if the premium increases the Net Amount at Risk and requested evidence of insurability is not provided or does not satisfy current underwriting requirements. All funds received by us will be credited to this Contract as a premium payment unless clearly marked otherwise.

### Where to Pay Premiums

All premiums are payable to us at our Home Office.

### Premium Loads

Any Premium Loads shown in Contract Schedule B are deducted from premiums received by us prior to allocation to the Investment Accounts. Premium Loads include charges for sales and distribution expenses as well as premium taxes.

### Net Premiums

A Net Premium is any premium we receive minus any Premium Load.

### Initial Premium

The Initial Premium is the first premium received and accepted by us.

### Initial Net Premium

The Initial Net Premium for this Contract is stated in Contract Schedule A.

## Part 4. Premium Payments (Continued)

**Minimum Net Premium**

The Minimum Net Premium at any time is equal to twelve (12) times the first Monthly Charges for the current Contract Year.

**Minimum Premium**

The Minimum Premium at any time is equal to the Minimum Net Premium plus the Premium Loads.

**Maximum Premium**

The largest amount of premium which can be paid in any policy year is an amount such that the sum of the premiums paid under the policy will not, at any time, exceed the guideline premium limitation referred to in Section 7702 of the Internal Revenue Code of 1986, as amended, or as set forth in any applicable successor provision thereto. This limit is in addition to all other limitations stated in the policy.

**Subsequent Premiums**

Each premium payment made after the Initial Premium has been paid is known as a Subsequent Premium payment. Subsequent Premium payments may be made on any Valuation Day and in any amount, subject to certain limitations. The premium may not be less than the minimum premium stated in Schedule A. If the premium increases the Net Amount at Risk, evidence of insurability may be required.

**Premium Payment to Prevent Lapse**

Whenever this Contract is in danger of lapsing because the Net Account Value is insufficient to pay the Monthly Charges, the amount of premium required to prevent lapse is equal to three (3) times the Monthly Charges then due plus any applicable Premium Loads.

**Premium Payments to Reinstate Insurance Coverage**

When insurance coverage has lapsed due to insufficient Net Account Value, the amount of premium required to reinstate the insurance coverage is equal to three (3) times the Monthly Charges due on the Monthly Calculation Date immediately preceding the effective date of Reinstatement, plus any applicable Premium Loads. Evidence of insurability satisfactory to us is required to reinstate.

**Premium Notices**

Notices of any premium payments necessary to prevent lapse of insurance coverage or to reinstate insurance coverage will be sent to you.

## B. Allocation of Net Premiums to or among the Investment Accounts

Net Premiums are allocated to or among the Investment Accounts in accordance with your instructions, subject to the Net Premium Allocation Limitations stated in Contract Schedule A, and further subject to any limitations stated in Contract Schedule C. If no instructions are received from you with a premium payment, such Net Premiums will be allocated to the Investment Accounts in the same proportions as stated in the most recent recorded instructions received from you.

**Timing**

Net Premiums received prior to the Valuation Time on any Valuation Day will be allocated as of the date they are received. Net Premiums received after such time will be allocated on the next Valuation Day.

**During Free Look Period**

Any Net Premiums received prior to the end of the Free Look Period will be allocated to the Money Market Investment Account. At the end of such period, the Net Account Value will be allocated to any Investment Accounts then available according to your instructions for allocation of Net Premiums. No allocation instructions received from you during the Free Look Period will be acted upon.

## Part 5: The Investment Accounts

Subject to the conditions set forth in this Part, you have the right to allocate and re-allocate the Account Value of this Contract among the Investment Accounts on any Valuation Day.

### The Investment Accounts

The assets in each Investment Account are kept segregated from our General Account and from any other of our Investment Accounts. We own the assets of the Investment Accounts. Those assets will only be used to support our variable products and for any other purposes permitted by applicable laws and regulations. The portion of the assets of an Investment Account equal to the reserves and other Contract liabilities with respect to such Investment Account will not be charged with liabilities that arise from any other business we may conduct. We may, however, transfer from an Investment Account to our General Account assets that exceed the reserves and other Contract liabilities with respect to such Investment Account. Income, gains, and losses, whether or not realized, from each Investment Account are credited to or charged against that Investment Account and without regard to the income, gains, or losses of any other Investment Account and without regard to any of our other income, gains, or losses.

With respect to the assets required to be maintained in the Investment Account for the benefit of you, the term "reserves" will in no event be less than an amount equal to the sum of the Net Account Value, pursuant to part 6-Account Value.

We reserve the right to: (1) establish and operate the Variable Account as a managed account or an account which purchases shares from the portfolios of funds managed by investment managers retained by us; (2) register or deregister the Variable Account under the Investment Company Act of 1940; (3) operate the Investment Accounts as unit investment trust registered, or exempt from registration, under the Investment Company Act of 1940 or any other form permitted by law

### Transfers

Transfers between or among Investment Accounts may be made on any Valuation Day (see, however, Availability of Funds, in Part 11). Transfers must be requested by you in a form acceptable to us. We reserve the right to limit the amount of any transfer. The maximum number of transfers per Contract Year is shown in Contract Schedule C. Written confirmation of each transfer will be sent to you.

### Investments of the Accounts

We may contract with investment managers to manage directly the assets held in the Investment Accounts. We may deduct an Asset Charge from the Account Value allocated to Investment Accounts that are managed directly as well as any costs and expenses arising from such Investment Accounts. In either case, investment managers are selected by us in our discretion.

### Changes in the Investment Accounts

We have the right to establish additional Investment Accounts, and to establish other investment options, from time to time. For any Investment Account, we have the right to substitute a new portfolio for the portfolio in which the Investment Account invests, to substitute new Investment Accounts, to combine two or more Investment Accounts, and to eliminate any existing Investment Accounts or any other investment option. Subject to any required regulatory approvals, we reserve the right to transfer assets of an Investment Account to another Investment Account that we determine to be associated with the class of contracts to which the Contract belongs.

### Valuation Period

The Valuation Period is the period of time between Valuation Times. The Valuation Period begins as of the end of the previous Valuation Day.

The value of an Investment Account reflects:

- Any amounts transferred to the Investment Account during the current Valuation Period;
- The investment income and realized and unrealized capital gains credited to such assets in the Valuation Period;
- Any amounts transferred from an Investment Account during the current Valuation Period;
- Realized and unrealized capital losses charged against those assets during the Valuation Period;
- Any amount charged or reserved against the Investment Account for taxes;
- Any expenses charged or reserved against the Investment Account for expenses incurred in operating such Investment Account;
- The mortality and expense risk charge for the Valuation Period; and
- Any other Monthly Charges deducted from the Investment Account for This Contract.

VL-299

## Part 5. The Investment Accounts (Continued)

The Account Value will increase or decrease in accordance with the increases and decreases in the value of the Investment Accounts in which the Account Value is invested.

**Accumulation Units**

Accumulation Units are used to measure the Account Value allocated to each Investment Account. The value of a unit is determined as of the Valuation Time on each Valuation Day. The value of any unit will vary from Valuation Day to Valuation Day to reflect the investment performance of the Investment Account applicable to that unit.

Amounts allocated to the Investment Accounts are applied to provide Accumulation Units in each Investment Account. The number of Accumulation Units credited to each Investment Account is determined by dividing the amount allocated to an Investment Account by the dollar value of one Accumulation Unit for such Investment Account.

We reserve the right to split or consolidate the number of Accumulation Units credited to this Contract with a corresponding increase or decrease in the unit values. We may exercise this right whenever we consider an adjustment of units to be desirable. No adjustment will have any material effect on the benefits, provisions or investment return of this Contract, or on you, the Insured, any Beneficiary, any assignee or other person, or on us.

**Accumulation Unit Value**

The Value of an Accumulation Unit in each Investment Account is $1.00 on the first Valuation Day for that Investment Account. The value of any Accumulation Unit on any subsequent Valuation Day is equal to its value on the preceding Valuation Day multiplied by the Net Investment Factor for that Investment Account for the Valuation Period.

**Gross Investment Rate**

The Gross Investment Rate of an Investment Account for any Valuation Period is equal to the net earnings of that Investment Account during the Valuation Period divided by the value of the total assets of that Investment Account at the beginning of the Valuation Period.

**Net Earnings**

The Net Earnings of each Investment Account is equal to the accrued investment income and capital gains and losses (realized and unrealized) of that Investment Account, reduced by any amount charged against that Investment Account for taxes paid or reserved by us.

The Gross Investment Rate and Net Earnings of each Investment Account will be determined by us in accordance with generally accepted accounting principles and applicable laws, rules, and regulations.

**Mortality and Expense Risk Charge**

The Mortality and Expense Risk Charge is deducted daily from each Investment Account. The maximum charge is stated in Contract Schedule B.

**Asset Charge**

An Asset Charge may be deducted daily from each Investment Account managed directly by one or more investment managers. It consists of the money management fees, any custodial fees and other investment related expenses. Any Asset Charges applicable to such Investment Accounts are shown in Contract Schedule C.

**Net Investment Factor**

The Net Investment Factor is determined for each Investment Account for each Valuation Period. The Net Investment Factor equals the Gross Investment Rate for such period plus one (1.0) and minus the Mortality and Expense Risk Charge and any Asset Charge.

**Crediting and Canceling Accumulation Units**

Transactions that require the crediting and canceling of Accumulation Units will be made as of the Valuation Time on the Valuation Day in which the transaction is effected. Premium payments and requests for loans, withdrawals, transfers, etc. received after the Valuation Time will be effective on the next Valuation Day.

Payment Account Value

## A. Contract Values

### Account Value
The Account Value of this Contract on any date is the value of the Investment Accounts plus the value of the Borrowed Fund.

The Account Value when the Initial Premium is received is equal to the Net Premium invested in the Investment Accounts, less:

    (a) Cost of Insurance Charges (deducted on each monthly calculation date) ; and
    (b) Policy Loads; and
    (c) any Charges for Special Insurance Class Rating.

The Account Value on any subsequent Valuation Day is equal to the Account Value on the prior Valuation Day plus:

    (a) any new Net Premium invested in the Investment Accounts; and
    (b) any increase in value of the Investment Account due to investment results (net of Mortality and Expense Risk Charges and any Asset Charges); and
    (c) any interest credited to the Borrowed Fund;

less;

    (a) any decrease in value of the Investment Account due to investment results (net of Mortality and Expense Risk Charges and any Asset Charges); and
    (b) Cost of Insurance Charges (deducted only on Monthly Calculation Date); and
    (c) any Partial Withdrawals taken; and
    (d) any Rider Charges deducted from the Account Value; and
    (e) any Policy Loads; and
    (f) any Charges for Special Insurance Class Rating; and
    (g) any Other Charges as stated in Contract Schedule B.

Contract Values are not less than required by the state in which the policy is delivered.

### Net Account Value
Net Account Value is the Account Value minus any Contract Loan balance and accrued unpaid interest.

## B. Charges Deducted from the Account Value

The following charges may be deducted from the Account Value that is invested in the Investment Accounts. These charges are deducted pro-rata from each Investment Account.

### Cost of Insurance
Cost of Insurance (COI) Charges are deducted from the Account Value on each Monthly Calculation Date. Guaranteed Cost of Insurance Charges are determined by multiplying the applicable COI rates from the table or tables in Contract Schedule E times the Net Amount At Risk (NAR) calculated as of the last day of the prior Contract Month, divided by 1,000. Current COI charges may be lower.

### Rider Charges
Charges for Riders, if any, deducted from the Account Value are shown in the Contract Schedules for such Riders.

### Policy Loads
Policy Loads may apply at issue and upon increases in Face Amount and changes in Death Benefit Option. These charges are deducted at issue or at the time of the increase in Face Amount or change in Death Benefit Option. Any Policy Loads are shown in Contract Schedule B.

### Charges for Substandard Insurance Class Rating
If the Insured has a Substandard Insurance Class Rating, charges applicable to such Ratings may apply. These charges are deducted from the Account Value on each Monthly Calculation Date. If any charges apply, they are shown in Contract Schedule B.

VL-299

## Part 7. Contract Loans

**Contract Loans**

You may request a loan against this Contract. This Contract must be assigned to us as sole security for the loans. A loan may take place only on a Monthly Calculation Date. An amount equal to the amount borrowed will be transferred from the Investment Accounts to the Borrowed Fund of our general account. Any such transfer is made by canceling Accumulation Units in the Investment Accounts and applying the value of those units to the Borrowed Fund. Unless other specific instructions are received from you, the loan will be taken from the Investment Accounts in proportion to the amount of your then current Account Value in each Investment Account.

**Maximum Loan**

The Maximum Loan amount for this Contract is equal to the Account Value less the sum of the following:

    (a) outstanding loan amount together with unpaid accrued loan interest; and

    (b) the Minimum Net Premium for the current Contract Year; and

    (c) loan interest charges until the next Contract Anniversary.

**Borrowed Fund**

The Borrowed Fund is a portion of our general account reserved for amounts held as collateral for Contract Loans. The initial amount of the Borrowed Fund will be equal to any loan principal. Interest will be credited to the Borrowed Fund at the Borrowed Fund Crediting Rate described below.

Interest credited to the Borrowed Fund will be transferred to the Investment Accounts on each Contract Anniversary. The amount so transferred will be allocated among the Investment Accounts in proportion to the Account Value in each Investment Account.

Amounts of interest charged against the loan principal and unpaid on each Contract Anniversary will be added to the amount of the loan principal in the Borrowed Fund. An amount equal to the unpaid interest will be transferred from the Investment Accounts to the Borrowed Fund on the Contract Anniversary. This amount will be transferred from the Investment Accounts in proportion to the Account Value in each Investment Account.

**Borrowed Fund Crediting Rate**

Interest credited to amounts held in the Borrowed Fund as collateral for loans will be at least equal to the rate stated under "Basis of Computations" in Contract Schedule A. Interest will be credited such that the Borrowed Fund Crediting Rate is always equal to the Loan Interest Rate less the Loan Interest Spread stated in Contract Schedule B. The Borrowed Fund Crediting Rate may not be changed more frequently than annually. Any change in the Borrowed Fund Crediting Rate for this Contract will be effective on a Contract Anniversary. You will be notified of any such change.

**Loan Interest Rate**

The current Loan Interest Rate will be applied to the entire outstanding loan balance. Interest is due annually in arrears. Any unpaid interest on any outstanding loans will be added to the outstanding loan amount as of the Contract Anniversary.

**Repayment of Loan**

All or part of any Contract Loan plus accrued interest may be paid at any time while this Contract is in force.

Any repayment of a Contract Loan will result in the transfer of values equal to the repayment out of the Borrowed Fund and the application of those values to the Investment Account as a Net Premium payment. Unless other specific instructions are received from you, these values will be applied to the Investment Accounts in proportion to the amount of your current Account Value in each Investment Account.

## Part 8. Partial Withdrawals

### Partial Withdrawals

Withdrawals from the Investment Accounts may be made on any Monthly Calculation Date. The withdrawal must be requested by you in a form acceptable to us.

Unless other specific instructions are received from you, the withdrawal will be taken from each Investment Account in proportion to your current Account Value in each Investment Account.

If Death Benefit Option 1 is in effect, the Face Amount and future scheduled Face Amounts will be reduced by the amount withdrawn. In every case, the Death Benefit will change according to the Death Benefit provision on page 10.

### Maximum Withdrawal Amount

The Maximum Withdrawal Amount for this Contract is equal to the Account Value less the sum of the following:

- (a) outstanding loan amount together with unpaid accrued loan interest; and
- (b) the Minimum Net Premium for the current Contract Year; and
- (c) loan interest until the next Contract Anniversary.

However, the Maximum Withdrawal Amount is exceeded whenever such withdrawal would reduce the Face Amount below the Minimum Face Amount stated in Contract Schedule D.

### Minimum Withdrawal Amount

The amount of each withdrawal must be at least equal to the Minimum Withdrawal Amount shown in Contract Schedule A.

## Part 9. Reports to Contract Holder

### Annual Report

Each year within 30 days after the Contract Anniversary, we will mail a report to you. The report will show the Account Value at the beginning of the previous Contract Year and all premiums paid since that time. It will also show the additions to, and deductions from, the Account Value during the Contract Year, and the Account Value, Death Benefit, Net Account Value, outstanding Contract Loans and accrued loan interest as of the current Contract Anniversary. This report will also include any additional information required by applicable law or regulation.

## Part 10. Termination Provisions

### Continuation of Insurance

If premium payments cease, coverage provided under this Contract will continue subject to the Grace Period provision for as long as the Net Account Value is sufficient to cover the Monthly Charges. Any remaining Net Account Value will be payable on the Maturity Date.

### Grace Period

If the Net Account Value is not sufficient to cover the Monthly Charges due on any Monthly Calculation Date, a Grace Period is allowed for payment of the amount of premium needed to increase the Account Value so that the deduction of monthly charges can be made. This Grace Period begins on the date the deduction is due. It ends 61 days from that date or, if later, 61 days after the date we mail a written notice to you at the last known address shown on our records. This notice will state the amount needed to increase the Account Value to cover the Monthly Charges. During the Grace Period, the insurance coverage will continue in effect.

During the Grace Period, to continue the insurance coverage in force, you must make an additional premium payment at least equal to three (3) times the Monthly Charges due when the Grace Period began, plus any Premium Loads.

### Contract Termination

This Contract will terminate on the earliest of the following:

- (1) the end of the Grace Period for this Contract; or
- (2) this Contract is surrendered by you; or
- (3) the Maturity Date of this Contract; or
- (4) when all our obligations under this Contract have been fulfilled.

### Surrender

This Contract may be surrendered for its Net Account Value on any Valuation Date. You must request a Surrender in a form acceptable to us.

## Part 10. Termination Provisions (Continued)

**Reinstatement**

This Contract may be reinstated, prior to the Maturity Date, provided:

    (1)  satisfactory evidence of insurability is provided to us; and

    (2)  this Contract has not been surrendered for cash; and

    (3)  you must request the Reinstatement in a form acceptable to us; and

    (4)  the request must be within five (5) years of the date of Contract termination; and

    (5)  the Reinstatement Premium must be paid at the time of Reinstatement. The Reinstatement Premium must be no less than the amount specified in Part 4, Premium Payments; and

    (6)  the Insured must be alive on the date the Reinstatement becomes effective. The Reinstatement will become effective on the date that it is approved by us.

**Maturity Date**

No insurance coverage will be effective on or after the Maturity Date. If the Insured is living and this Contract is in force on this date the Net Account Value will be paid to you, and of our liability under this Contract will cease.

## Part 11. General Provisions

**Entire Contract**

This Contract is issued in consideration of the Application and the initial premium payment. This Contract and Application, a copy of which is attached, together with any Contract Schedules, any Riders constitute the entire Contract. Any waiver or change of any provision in this Contract must be in writing and signed by an officer of our Company.

**Waiver Not Estoppel**

Our failure to enforce any provision of this Contract will not constitute or be construed as a waiver of such provision or of the right to enforce it at a later time, nor will the waiver of any provision by us on one or more occasions constitute or be construed as a waiver for all occasions and we will not be estopped from enforcing any provision of this Contract except as may be otherwise agreed to in writing by an officer of our Company.

**Right to Amend**

If any provision in this Contract is in conflict with the laws of the state that govern this Contract, the provision will be deemed to be amended to conform with such laws. In addition, this Contract may be amended from time to time by us as may be required to meet the definition of "life insurance" under the Internal Revenue Code, its regulations or published rulings. You will be given the right to reject this change.

**Right to Transfer this Contract**

This Contract may be transferred to the life of a substitute insured. Transfer will be effective on the Transfer Date discussed in the next provision. Transfer will be subject to the following conditions:

    (1)  The substitute insured must not have been under 20 years of age on the birthday nearest the Policy Date of this Contract;

    (2)  The substitute insured must not be over 65 years of age on the birthday nearest the Transfer Date;

    (3)  The substitute insured must consent to be insured;

    (4)  This Contract must be in force on the Transfer Date;

    (5)  You must have an insurable interest in the life of the substitute insured after the transfer;

    (6)  A written application for the transfer must be received by us at our Home Office;

    (7)  Evidence of insurability of the substitute insured, satisfactory to us, will be required.

    (8)  After transfer, the Policy Date will be the same as it was before transfer.

**Contract Holder Covenants**

If any information contained in this Contract, Application or Contract Schedules is inaccurate or untrue on the date it is issued, you agree to promptly notify us and provide corrected information.

**Company Covenants**

We agree that all statements in the Application will be deemed representations and not warranties. We also agree that no statement will be used to void this Contract or be used in defense of a claim for the insurance benefits under this Contract unless contained in the Application signed either by you or by the proposed Insured. A copy of the Application is attached to this Contract at issue.

## Part 11. General Provisions (Continued)

### Misstatement of Age or Sex

If it is found that the amount of any benefit provided by this Contract is incorrect because of misstatement as to the age or sex (if applicable), the amount of the benefit will be adjusted on the basis of the correct facts. The death benefit will be that purchased by the most recent mortality charge at the correct age or sex. We will not adjust the Account Value due to a misstatement of age or sex.

### Incontestability

During but not after the contestable period, we can contest the validity of this policy or deny payment of benefits if there is any material misrepresentation of fact in the application. The contestable period starts when the policy becomes effective and, except for any agreement providing benefits for disability or for accidental death, ends after it has been in force during the lifetime of the Insured for two years from the Policy Date or from the effective date of any change requiring Evidence of Insurability.

### Evidence of Insurability

Evidence of insurability may be required for any transaction that increases the Net Amount At Risk (NAR) of this Contract. Transactions that increase the NAR may include: Payment of Subsequent Premiums, a Change of Face Amount or Death Benefit Option, Partial Withdrawal, Reinstatement, or a substitute of insured.

### Method of Computing Values

A detailed statement of the method used to compute this Contract's benefits and values is filed with the insurance regulatory authority of the Governing Jurisdiction. These benefits and values are not less than those required by the laws of the Governing Jurisdiction.

### Availability of Funds

Cash payments from this Contract for Contract Loans, Partial Withdrawals or Surrender, and Accumulation Units transferred between or among Investment Accounts will usually be effected within seven days after a satisfactory request is received at our Home Office. Payment may be delayed, however, (except when used to pay amounts due under this Contract) during any period that:

(1) the New York Stock Exchange (or its successor or, if the securities in which the assets of the Investment Accounts are invested are not traded on the New York Stock Exchange, any principal exchange on which such securities are traded) is closed; or

(2) the S.E.C. determines that a state of emergency exists that would make the determination of the value of the securities not reasonably practicable; or

(3) the S.E.C. permits by an order the postponement for the protection of Contract Holders.

### Claims of Creditors

The proceeds of this Contract will be free from creditor's claims to the extent allowed by law.

### Notice

Any written notice required by this Contract to be given by us to you will be effective five (5) days after it is mailed by first class mail or fifteen (15) days after it is mailed by third class mail (or when received, if sent by any other means) to you at your last known address as noted on our records. Any written notice required by this Contract to be given by you to us will be effective when received in a form acceptable to us at our Home Office. To be acceptable, a notice must be in written form, in the English language (except where applicable law requires otherwise), must include all pertinent information, and must be signed by you or an individual authorized to act for you and so designated on our records.

### Assignment

Neither this Contract nor any rights of you or the Beneficiary under it may be assigned or transferred without our written permission.

### Trustee

If a trustee is Owner, Beneficiary or Assignee of this policy, our actions will be determined by the terms of this policy and without regard to the provisions of any trust agreement. We will not be responsible for the application or disposal of any money paid to a trustee. Any such payment shall fully discharge our liability for the amount paid.

### Severability

In the event any provision of this Contract is declared illegal or otherwise unenforceable, it will be severed from this Contract and the remainder of this Contract will be valid and enforceable.

### Time Periods

All time periods mentioned in this Contract will begin and end at 12:01 A.M. local time at the owners address on the date in question.

VL-299

# AGL LIFE ASSURANCE COMPANY
## Plymouth Meeting, Pennsylvania

# ENDORSEMENT

This policy is amended by the following.

You have the right to elect an Extended Maturity Date. You may do this during the twelve-month period before the Policy's original Maturity Date. That date is shown in Schedule A. The Extended Maturity Date must be a Policy Anniversary. It may not be later than the anniversary when the Insured is Age 120. If this is a Survivorship Policy, Age 120 of the younger Insured is the maximum Extended Maturity Date. The Account Value must be a positive amount on the original Maturity Date for this election to take effect.

The terms below will apply after the original Maturity Date. They are:

1.  The Death Benefit shall be the Account Value while the Policy continues in effect;

2.  Maturity Date shall mean the Extended Maturity Date;

3.  The maximum monthly Cost of Insurance rates in Schedule E. shall be 0.0833333 for all future years;

4.  Minimum Death Benefit Factors for all ages beyond those shown in Schedule F shall be 1.00;

5.  The Death Benefit Option in Part 2. Insurance Plan shall be Option 1 and it may not be changed;

6.  We may reject any Premium;

7.  The Policy shall not terminate on the original Maturity Date as specified Part 10. Termination Provisions; and

8.  All coverage shall cease at the Extended Maturity Date.

Unless modified here, all other terms and provisions of this Policy will continue in effect. You are responsible for all tax consequences arising from the existence of or exercise of this option. This endorsement is attached to and made a part of this policy effective on the Policy Date unless a later date is shown here:


Secretary                                        President

# AGL LIFE ASSURANCE COMPANY
## PLYMOUTH MEETING, PENNSYLVANIA
## ENDORSEMENT

This policy is amended by deleting the Notice of 10 Day Right to Examine Your Policy (Free Look Period) replacing it with the following provision.

**Notice of 10 Day Right to Examine Your Policy (Free Look Period)**
**This Contract may be canceled at any time within ten (10) days after it is received or within forty five (45) days after the date of the Application, whichever is later. This Contract must be returned to us at our Home Office or to the agent through whom it was purchased. Written notice of cancellation is also needed. If this Contract is canceled, it will be as though this Contract had never been issued. The Account Value plus all charges and fees will be returned to you minus any Death Benefits paid, Partial Withdrawals taken, and any Contract Loans, together with accrued but unpaid interest on such Contract Loans, if allowed by the law of the Governing Jurisdiction.**

It is further understood that Policy provisions stating that the allocation of the Net Premium will be limited to the Money Market Investment Account during the Free Look Period are rescinded.

This endorsement is attached to and made a part of this policy effective on the Policy Date.

Secretary                                             President

END-100

# AGL LIFE ASSURANCE COMPANY
## Plymouth Meeting, PENNSYLVANIA
## ENDORSEMENT

This policy is amended by adding the following.

The provisions of this endorsement are in addition to all other terms and conditions of this policy.

Payment of a Death Benefit, Withdrawal Benefit, or Loan Amount may be delayed if the securities in which the assets of the Investment Accounts are invested are not actively traded. That delay may continue until we determine that it is practical to trade such securities. You and any party to whom payment is due may agree to receive the securities as payment. The value of the securities for purposes of that payment will be determined based upon an appraisal by an independent third party. The value assigned to the securities must be accepted in writing by you, the party to whom payment is due, if other than you, and by us. The cost of any appraisal will be deducted from the payment due.

Payment of any amount due that is in no way related to the value of assets that are not actively traded will not be delayed by this endorsement. Such payments will be made in accord with the provisions specified elsewhere in this policy. (Payment of a death benefit consists of the value of assets and the net amount at risk, face amount less account value. Therefore, the death benefit is related to the value of assets.)

This endorsement is attached to and made a part of this policy effective on the Policy Date unless a later date is shown here:

Secretary                                    President

END-199

**AGL LIFE ASSURANCE COMPANY**
**APPLICATION FOR LIFE INSURANCE–Part I**

| NAME   First   Middle   Last | Birthdate | Age Nearest | State of Birth | ☒ Male ☐ Female |
|---|---|---|---|---|
| *Michael   S.   Rulle* | *7-22-50* | *51* | *NY* | |

| S.S. no. *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* | Occupation(s) *President* | Marital Status *married* | Maiden Name *N/A* |
|---|---|---|---|

Address–Residence ☐ Send Notices to this address; Choose one only
*165 Cherry Lane   Mendham, NJ   07945*          Telephone *973-543-0438*

Address–Business ☐ Send Notices to this address; Choose one only
*Hamilton Partners Ltd.*
*415 Madison Avenue, New York, NY 10017*          Telephone *212-527-8454*

| NAME   First   Middle   Last *The Michael S Rulle Family Dynasty Trust Agreement of acct, dtd 9/27/01* | Relationship to Insured *Trust* | S.S./ Tax ID no. *92-6032257* |
|---|---|---|

Address ☐ Send Notices to this address; Choose one only
*Alaska Trust Company, Resolution Plaza*
*1031 W. Third Avenue, Suite 601 Anchorage, AK 99501-1581*   Telephone *907-278-6775*   Yrs. There

Alternative name/address to Send Notices to; complete only if choice not selected above

| Plan of Insurance – Preferred class (if available) ☐ Yes ☒ No   ☒ Non Smoker ☐ Smoker   *Flexible Premium Variable Life* | Amount $ *17,600,000* | Additional Benefits ☐ Waiver of Premium ☐ Accidental Death ___ Units Family Rider |
|---|---|---|
| Rider Plans   *N/A* | Amount or units | ___ Units Children's Rider ☐ Other ___ |

Is this insurance intended to replace or change any existing insurance or annuities on any proposed insured? ☐ Yes ☒ No

Death Benefit Option (only if Universal Life) ☒ Specify amount only. ☐ Specify amount + cash value.

Premium Mode ☒ Annually ☐ Semi-Annually ☐ Quarterly ☐ Monthly PAC ☐ Other ___

Paid with application $ ___ *0* ___ Planned Premium (only if UL) $ ___ Special Policy Date: ___

| Primary: Name   *The Michael S. Rulle Family Dynasty Trust Agreement of acct, dtd 9/27/01*   Relationship | Contingent: Name   Relationship |
|---|---|

The Beneficiary designation for Family, Spouse or Child Riders is stated in the contract.

Unless otherwise specified, the Owner reserves the right to change the Beneficiary.

| Full Name   *N/A* | Birth Date | Age | Sex | Relationship[1] | Height | Weight | Insurance[2] |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

1) Relationship to Insured; only children under 18 are eligible for family or children's rider.
2) Total insurance in force and/or applied for.

| Company | Policy No. | Year Iss. | Type Plan | Life Amount | ADB Amount |
|---|---|---|---|---|---|
| *Phoenix* | | *1992* | *Life* | *4,000,000* | |
| *Phoenix* | | *1994* | *Life* | *2,000,000* | |
| *Phoenix* | | *1996* | *Life* | *3,000,000* | |
| *Phoenix* | | *1994* | *Surv. Life* | *2,000,000* | |
| *Nationwide* | | *2000* | *Life* | *750,000* | |

## APPLICATION FOR LIFE INSURANCE--Part I (Continued)

| Has any person proposed for insurance: | Yes | No |
|---|---|---|
| (a) Flown in the last 2 years, or do you intend to take flights other than as a fare paying passenger on a scheduled airline? If yes, complete Aviation Supplement. | ☐ | ☒ |
| (b) Engaged in or intend to engage in any hazardous sport such as any type of land, water or air vehicle racing, parachuting, hang/kite gliding or skin/scuba diving? If yes, give details in Section I. | ☐ | ☒ |
| (c) Had a driver's license suspended or revoked or been convicted in the last 3 yrs. of a moving violation, or of driving while impaired or intoxicated? License no. *R52 175 44 520 7502 NJ* | ☒ | ☐ |

| | Yes | No |
|---|---|---|
| (d) Had any military deferment, rejection or discharge due to a physical or mental condition? | ☐ | ☒ |
| (e) In the past three years or intend in the next 12 months, lived, traveled or worked outside of the United States or Canada, or have a temporary or student visa? | ☒ | ☐ |
| (f) Ever requested or received a pension, benefits or payment because of an injury, sickness or disability, or left occupation for more than one month because of health? | ☐ | ☒ |
| (g) Ever been convicted of a felony? | ☐ | ☒ |
| (h) Had any application or policy for life or health insurance declined, rated, restricted, postponed, canceled or reinstatement denied? | ☐ | ☒ |

1. Proposed Insured's Height: ..5.. ft. .10. in., Weight .188. lbs. (Additional Insureds answer under E.)

2. Personal Physician(s) (Full name, address, telephone no. If none, so state.)
*Dr. Scott Campbell    9345 Lamington Road, Ste #104  Bedminster, NJ 07921*

3. Has any Proposed Insured ever had, been treated for, or been told by a member of the medical profession that they had any indication of:

| | Yes | No |
|---|---|---|
| (a) Disorder of eyes, ears, nose or throat? | ☐ | ☒ |
| (b) Dizziness, fainting, convulsions, headache; speech defect, paralysis, stroke or any other disorder of the brain or nervous system; mental or emotional disorder? | ☐ | ☒ |
| (c) Shortness of breath, persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☒ | ☐ |
| (d) Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☒ |
| (e) Cirrhosis, jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, other disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☒ |
| (f) Sugar, albumin, blood or pus in urine; venereal disease; stone or other disorder of the kidney, bladder, prostate? | ☐ | ☒ |
| (g) Diabetes; thyroid or other endocrine disorders? | ☐ | ☒ |
| (h) Neuritis, sciatica, arthritis, gout, or disorder of the muscles or bones, including the spine, back, or joints? | ☐ | ☒ |
| (i) Deformity, lameness or amputation? | ☐ | ☒ |
| (j) Disorder of skin, lymph glands, cyst, tumor, or cancer? | ☐ | ☒ |
| (k) Allergies, anemia, leukemia or other disorder of the blood? | ☐ | ☒ |
| (l) Acquired Immune Deficiency Syndrome (AIDS), "AIDS" Related Complex (ARC); or infection with the "AIDS" (Human T-Cell Lymphotropic, Type III, HTLV-III) virus? | ☐ | ☒ |
| (m) Abnormal menstruation, pregnancy; disease of the uterus, ovaries, breasts, prostate or testicles; other disorder of reproductive organs? | ☐ | ☒ |

4. Does any Proposed Insured use alcohol?  ☒ Yes  ☐ No
How much?    How often?
*0-2 glasses of wine    A night*

5. Has any Proposed Insured :

| | Yes | No |
|---|---|---|
| (a) Ever used alcohol or other drugs to a degree that required treatment or advice from a physician, licensed practitioner, or any organization which helps those who have an alcohol or drug problem? | ☐ | ☒ |
| (b) Ever used marijuana, barbiturates, amphetamines, hallucinogens, heroin, opiates, tranquilizers, Dilaudid, Demerol, codeine, morphine or cocaine? How much?    How often? | ☐ | ☒ |
| (c) Had any change in weight in the past year? | ☐ | ☒ |
| (d) Smoked cigarettes or used tobacco in any form in the last 12 months? Yes, circle those that apply: Cigarettes, Cigars, Pipe, Other Amount Used Daily: | ☐ | ☒ |
| (e) In the past five years, had a checkup, consultation, illness, injury, electrocardiogram, or other diagnostic test or surgery? | ☒ | ☐ |
| (f) In the past five years, been a patient in a hospital, clinic, sanitarium, or other medical facility? | ☐ | ☒ |

6. Is any Proposed Insured now under observation or taking any treatment or medication?  ☒ Yes ☐ No

7. Has any member of any Proposed Insured's immediate family been diagnosed or treated for heart disease; high blood pressure; diabetes; cancer; or mental or nervous disorder?  ☐ Yes ☒ No

8. Family History:

| | Proposed Insured | Add'l Insured |
|---|---|---|
| **Father** | | |
| Age if living or age @ death | 70's | |
| Health if living or cause of death | *Heart Disease* | |
| **Mother** | | |
| Age if living or age @ death | 70's | |
| Health if living or cause of death | *Heart Disease* | |

APPLICATION FOR LIFE INSURANCE - Part I (Continued)

GIVE COMPLETE DETAILS FOR ANY PART OF SECTION G AND FOR SECTION H, QUESTIONS 3, 5, 6 AND 7 ANSWERED "YES".
(Identify person by name)

| Section/Question | Nature of disorder, frequency of attacks and treatment | Date and Duration | Name & address of doctors, practitioner, hospital, medical institution or facility. |
|---|---|---|---|
| G(e) | Sleeping Tablets | 7/17 5 yrs | |
| G(f) | Travel | | Letting Singapore Research Institute contribution per date. Contribution per date |
| 3(f) | Asthma as a child | in remission since age 17 | |
| 5(a) | EKG - normal | 4/01 | Dr. as a normal checkup & prophylactic |
| | Stress echo - normal | 4/01 | Dr. Fern |
| | Routine Annual checkups | | Dr. Campbell |
| | Colonoscopy - negative | | Dr. Bernstein |
| G | Medications | | HPTW |

Home Office Use Only (See K. 3. below)

I/We represent that all answers to the questions in this application and any medical examinations required, are complete and true to the best of my/our knowledge and belief, and I/we agree that:

(1) The answers to these questions, together with this agreement, are the basis for issuing any policy;

(2) Only the President or a Vice President of the Company can make or change any contract or waive any of the Company's rights or requirements;

(3) By accepting any policy issued, I/we ratify any changes made to this application by the Company and set out in the "Additions and Amendments" section (No change will be made as to age, amount, class, plan or benefits unless the Owner agrees in writing.);

(4) Except as provided in the Conditional Receipt, no insurance will take effect until the first modal premium is paid and the policy is delivered to the Owner while there has been no change in the insurability from the date of application of all persons proposed for insurance.

I/We authorize any physician, medical practitioner, hospital, clinic, other medical or medically related facility; Veterans Administration; insurance or reinsurance company; the Medical Information Bureau; consumer reporting agency or other organization, institution, employer, relative, friend or neighbor to disclose to AGL Life Assurance Company and/or its reinsurers, medical and other information pertaining to me/us or any of my/our minor children who are proposed for insurance. The information that may be disclosed includes information about employment, other insurance, physical, mental, drug and/or alcohol conditions, character, habits, avocations, finances, general reputation, credit and other personal characteristics. I/we understand that the information obtained is for the purpose of determining eligibility for insurance and that this information may be reviewed in connection with claims that are later submitted. I/we agree that this authorization will be valid for two and one-half years from the date signed and that a photographic copy of this authorization is as valid as the original. I/we may request a copy of this authorization.

☐ If an investigative consumer report is obtained about me/us, I/we wish to be interviewed.

I/we have read and understand these representations, conditions and authorization and acknowledge receipt of notices regarding disclosure and the underwriting process.

Signed at (City, State) _Anchorage, AK_  on (Month, Day) _Oct. 5_  20 _01_

X _____
Proposed Insured's Signature (Parent or guardian if minor)

X _____
Agent's Signature

X _____  Spouse's Signature (if insured)

X _____  Owner's Signature (if other than Proposed Insured)
(If business is owner, signature & title of company officer)

Signatures of Additional Proposed Insureds, if any

X _____  Trustee

X _____  Trustee

APP-091

## AGENT'S REPORT

1. Has Proposed Insured lived at present address at least 5 years? ☒ Yes ☐ No
If no, give previous address _____

2. What is Proposed Insured's Income? $ _____ Earned, $ _____ Unearned; Net Worth? $ 23,916,913

3. Give name and address of Proposed Insured's employer Hamilton Partners Ltd
415 Madison Ave, New York, NY 10017
Time in occupation? 1½  Describe duties Administration / Investment decisions
Previous employment and address if less than 3 years. CIBC Oppenheimer World Fin. Center NY

4. Do you know or have reason to believe that replacement of insurance is involved? ☐ Yes ☒ No
If yes, explain and complete replacement form where required. _____

5. Have arrangements been made for an examination? ☒ Yes ☐ No
Date 4-12-01  Examiner APPS

6. If Proposed Insured is under age 15, amount of insurance on head of household $ ____ N/A

7. If Proposed Insured is married, insurance on spouse for benefit of Proposed Insured $ _____

8. If Owner is a corporation: State of incorporation? _____. Does the corporation own any other insurance on
the life of the Proposed Insured? ☐ Yes ☐ No; Amount $ _____ Company _____
If Owner is a partnership: Exact name of partnership _____
Current value of business _____
Full names of partners and percentage of business owned:
_____ % _____ %
_____ % _____ %
Are all partners insured or applying for insurance? ☐ Yes ☐ No; If no, explain _____

9. If Owner or Beneficiary is a Trustee, give date of Trust 9/27/01 ; specify in Owner or Beneficiary designation.

10. If this application is on a PAC, bank draft, basis and added to an existing account, give the Insured's name and
policy number _____ N/A

11. What is the primary purpose of this sale? Tax and Estate Planning

12. Other Details

1. Name: Agent Mark Dunn _____ General Agent _____

2. Number: 10044 _____

I represent that: ☒ I have personally seen
☐ I have not personally seen (Explain under A.12. above)
all the persons proposed for insurance. I affirm that I have made a true and accurate record on this application of the
information as supplied to me by the Proposed Insured(s) and/or the Owner/Applicant. To the best of my knowledge and
belief there is nothing adversely affecting the insurability of any person proposed for insurance that has not been
recorded in this application. I have provided all required disclosures and notices as required by law or regulation.

Agent's Signature X Mark Dunn _____ Date (Month, Day) 10-5 , 20 01

Application Supplement for Variable Life Insurance
Issued and Administered
by

# AGL LIFE ASSURANCE COMPANY

Complete this application supplement and mail it along with Application Part I to
AGL Life Assurance Company
510 West Germantown Pike, Suite 460, Plymouth Meeting, PA 19462

## A. Owner's Name

Name
The Michael S. Rulle Family Dynasty Trust Agreement of 2001, dtd 9/27/01

## B. Net Premium Allocation

The Amounts allocated are in percentages or dollars (in whole numbers of not less than 10% or $250).

| Investment Account | Percent | or | Dollar Amount |
|---|---|---|---|
| ☒ American Masters Opportunity Ewi-Fund L.P. Account | 100 % | or | $_____ |
| ☐ _____ | ___ % | or | $_____ |
| ☐ _____ | ___ % | or | $_____ |
| ☐ _____ | ___ % | or | $_____ |
| ☐ _____ | ___ % | or | $_____ |
| ☐ _____ | ___ % | or | $_____ |
| ☐ _____ | ___ % | or | $_____ |
| Total | 100% | or | $_____ |

## C. Please read these sections and sign below.

SUITABILITY
BY SIGNING BELOW, YOU ACKNOWLEDGE RECEIPT OF THE PRIVATE PLACEMENT MEMORANDUM. THE CONTRACT VALUE AND CASH SURRENDER VALUE WHEN BASED ON A SEPARATE ACCOUNT MAY INCREASE OR DECREASE ON ANY DAY DEPENDING UPON THE INVESTMENT RESULTS. NO MINIMUM CASH SURRENDER VALUE IS GUARANTEED. ALL SURRENDER VALUES UNDER THE CONTRACT ARE VARIABLE AND ARE NOT GUARANTEED AS TO FIXED DOLLAR AMOUNTS. THE DEATH BENEFIT MAY BE VARIABLE OR FIXED UNDER SPECIFIED CONDITIONS.

AGREEMENT
I understand the entire portion of any net purchase payment that I allocate to the Variable Account will be invested in the Money Market Subaccount until the end of the Free Look period.

I recognize that AGL Life Assurance Company is not a bank and shares of the subaccounts are not backed or guaranteed by any bank or insured by the FDIC.

ALL PREMIUM CHECKS MUST BE MADE PAYABLE TO AGL LIFE ASSURANCE COMPANY.

DO NOT MAKE THE CHECK PAYABLE TO ANY AGENT. PLEASE DO NOT LEAVE PAYEE BLANK.

Date of Private Placement Memorandum Received ___10/5/01___.

| Signed at City Anchorage | State AK | on (Date) 10/5/01 |
|---|---|---|

Owner X _____

Agent Signature X _____

X _____ Delia R. Rulle, Trustee

X _____ Frank Gelardin, Trustee

VLSP-296

AGL LIFE ASSURANCE COMPANY
APPLICATION FOR LIFE INSURANCE—Part II   APP'S

☑ New Business   ☐ Requalification

## A. PROPOSED INSURED

NAME  First _Michael_   Middle _(illo)_   Last   S.S. no _621 38 4658_

Address _165 Cherry Lane_  Street   City _Mendam_   State _NJ_   Zip Code _07945_

## B. INSURABILITY DATA

1. Personal Physician(s) (Full name, address, and telephone no. If none, so state.)  _2345 Lamington Rd_
   _Scott Campbell, MD   Bedminster NJ_

| | Yes | No |
|---|---|---|
| 2. Has any Proposed Insured ever had, been treated for, or been told by a member of the medical profession that they had any indication of: | | |
| (a) Disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| (b) Dizziness, fainting, convulsions, headache; speech defect, paralysis, stroke or any other disorder of the brain or nervous system; mental or emotional disorder? | ☐ | ☑ |
| (c) Shortness of breath, persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☑ | ☐ |
| (d) Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☑ |
| (e) Cirrhosis, jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, other disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ |
| (f) Sugar, albumin, blood or pus in urine; venereal disease; stone or other disorder of the kidney, bladder, prostate? | ☐ | ☑ |
| (g) Diabetes; thyroid or other endocrine disorders? | ☐ | ☑ |
| (h) Neuritis, sciatica, arthritis, gout, or disorder of the muscles or bones, including the spine, back, or joints? | ☐ | ☑ |
| (i) Deformity, lameness or amputation? | ☐ | ☑ |
| (j) Disorder of skin, lymph glands, cyst, tumor, or cancer? | ☐ | ☑ |
| (k) Allergies, anemia, leukemia or other disorder of the blood? | ☐ | ☑ |
| (l) Abnormal menstruation, pregnancy, disease of uterus, ovaries, breasts, prostate, testicles; other disorder of reproductive organs? | ☐ | ☑ |

| | Yes | No |
|---|---|---|
| 3. Has any Proposed Insured been diagnosed by a member of the medical profession as having Acquired Immune Deficiency Syndrome (AIDS), or an "AIDS" Related Complex (ARC)? | ☐ | ☑ |
| 4. Does the proposed insured use alcohol?  How much?  How often?  _0-2 glasses wine / night_ | ☑ | ☐ |
| 5. Has proposed insured: | | |
| (a) Ever used alcohol or other drugs to a degree that required treatment or advice from a physician, licensed practitioner, or any organization which helps those who have an alcohol or drug problem? | ☐ | ☑ |
| (b) Ever used marijuana, barbiturates, amphetamines, hallucinogens, heroin, opiates, tranquilizers, Dilaudid, Demerol, codeine, morphine or cocaine?  How much?  How often? | ☐ | ☑ |
| (c) Had any change in weight in the past year? | ☐ | ☑ |
| (d) Smoked cigarettes or used tobacco in any form in the last 12 months?  Yes, as follows: Cigarettes, Cigars, Pipe, Other.  Amount Used Daily: | ☐ | ☑ |
| (e) In the past five years, had a checkup, consultation, illness, injury, electrocardiogram, or other diagnostic test or surgery? | ☑ | ☐ |
| (f) In the past five years, been a patient in a hospital, clinic, sanitarium, or other medical facility? | ☐ | ☑ |
| 6. Is Proposed Insured now under observation or taking any treatment or medication? | ☑ | ☐ |
| 7. Has any member of Proposed Insured's immediate family been diagnosed or treated for heart disease; high blood pressure; diabetes; cancer; disorders of the immune system or mental or nervous disorder? | ☐ | ☑ |

## C. DETAILS

GIVE COMPLETE DETAILS FOR ANY PART OF SECTION B QUESTIONS 2, 3, 5, 6 and 7 ANSWERED "YES"

| Question | Nature of disorder, frequency of attacks and treatment | Date and Duration | Name & address of doctors, practitioner, hospital, medical institution or facility. |
|---|---|---|---|
| 2c | Asthma as child — no recurrence since age 17 | | |
| 5e | ECG — normal  Stress Echo — normal | done  last week | done as annual checkup asymptomatic.  Done by Dr. Lawrence Inten  East 70th St  New York City |
| 5e | Previous annual checkups | | Dr. Scott Campbell  name + address above |
| 5e | Colonoscopy | | Dr. Bernstein, New York City, test was negative. |
| 6 | Taking Lipitor for 2 months | | |

## D. REPRESENTATIONS AND AUTHORIZATION

7. Both parents died in 70's of heart disease

I represent that all answers to the questions in this application are complete and true to the best of my knowledge and belief. I understand that (1) this completed application part will be part of my application for insurance and any policy issued; and (2) that any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

I authorize any physician, medical practitioner, hospital, clinic, other medical or medically related facility, Medical Information Bureau or other organization or person to disclose to AGL Life Assurance Company and/or its reinsurers, medical and other information pertaining to me or my minor child proposed for insurance. The information that may be disclosed includes information about employment, other insurance, physical, mental, drug and/or alcohol conditions, character, habits, avocations, finances, general reputation, credit and other personal characteristics. I understand that the information obtained is for the purpose of determining eligibility for insurance and that this information may be reviewed in connection with claims submitted later. I agree that this authorization will be valid for two and one-half years from the date signed and that a photographic copy of this authorization is as valid as the original. I may request a copy of this authorization.

I have read and understand these representations and this authorization.

Signed at (City, State) _____   on (Month, Day) _4/12_   _2001_

Proposed Insured's Signature (parent or guardian if minor)   Witness: Examiner/Underwriting Technician

APPLICATION FOR LIFE INSURANCE--Part II (Continued)

## E. HISTORY

| Place of Birth | Occupation: |
|---|---|
| New York City | Investment Manager |
| Birth Date | Employer: |
| 7/22/50 | Ham Hon Partners |

| Family History | Spouse | Father | | Mother | |
|---|---|---|---|---|---|
| Age if living or age @ death | 44 | 70's | | 70's | |
| Health if living or cause of death | Excellent | heart disease | | heart disease | |
| Brothers/Sisters (Circle B or S) | B Ⓢ | B Ⓢ | B /S | B /S | B /S | B /S |
| Age if living or age @ death | 59 | 38 | | | |
| Health if living or cause of death | A+W | Breast Cancer | | | |

## F. MEDICAL REPORT - TO BE COMPLETED AND SIGNED BY EXAMINER/UNDERWRITING TECHNICIAN

| 1 | Height (in shoes) | Weight (clothed) | Chest (Full inspiration) | Chest (Full Expiration) | Abdomen, at umbilicus |
|---|---|---|---|---|---|
| | ft 5' 10 in. | 188 lbs. | 42½ in. | 40 in. | 37 in. |

| 2 | Blood Pressure (Record ALL readings.) | | At Rest | Immediately Post Exercise |
|---|---|---|---|---|
| | | Systolic | 120 | 130 |
| | | Diastolic, 5th phase | 86 | 78 |

| 3 | Pulse | | At Rest | After Exercise | 3 Minutes Later |
|---|---|---|---|---|---|
| | | Rate | 87 | 150 (Stress) | 102 |
| | | Irregularities per minute | no | no | no |

4. Heart: Is there any   Enlargement? [ ] Yes [✓] No   Dyspnea? [ ] Yes [✓] No
   Murmur(s)? [ ] Yes [✓] No   Edema? [ ] Yes [✓] No
   (Describe below - if more than one, describe separately)

| Location | [ ] [ ] |
|---|---|

|  | | |
|---|---|---|
| Constant | [ ] | [ ] |
| Inconstant | [ ] | [ ] |
| Transmitted | [ ] | [ ] |
| Localized | [ ] | [ ] |
| Systolic | [ ] | [ ] |
| Presystolic | [ ] | [ ] |
| Diastolic | [ ] | [ ] |
| Soft (Gr. 1-2) | [ ] | [ ] |
| Mod. (Gr. 3-4) | [ ] | [ ] |
| Loud (Gr. 5-6) | [ ] | [ ] |
| After exercise: | | |
| Increased | [ ] | [ ] |
| Absent | [ ] | [ ] |
| Unchanged | [ ] | [ ] |
| Decreased | [ ] | [ ] |

Indicate apex by                X
Indicate murmuration by    O
Indicate transmission by   →

Is there on examination any abnormality of the following (circle items that apply and give details):

|  | Yes | No | DETAILS |
|---|---|---|---|
| (a) Eyes, ears, nose, mouth, pharynx? If vision or hearing markedly impaired indicate degree and correction. | [ ] | [✓] | |
| (b) Skin (incl. scars); lymph nodes; varicose veins or peripheral arteries? | [ ] | [✓] | |
| (c) Nervous system (include reflexes, gait, paralysis)? | [ ] | [✓] | |
| (d) Respiratory system? | [ ] | [✓] | |
| (e) Abdomen (include scars)? | [ ] | [✓] | |
| (f) Genitourinary system (include prostate)? | [ ] | [✓] | prostate - declined, had recently ō PMD |
| (g) Endocrine system (incl. thyroid and breasts)? | [ ] | [✓] | |
| (h) Musculoskeletal system (include spine, joints, ampulations, deformities)? | [ ] | [✓] | |
| Are there any:     (a) hernias? | [ ] | [✓] | |
|                          (b) hemorrhoids? | [ ] | [✓] | |

7. Are you aware of additional medical history? [ ] [✓]
   (A confidential report may be sent to the Medical Director.)
8. A home office urine specimen is required as part of this examination. Has it been sent? [✓] Yes [ ] No
9. Classify applicant's general health: Excellent [✓] Average [ ] Poor [ ]
10. NAME OF AGENT REQUESTING EXAMINATION

Examined at Medical Office , Date 4/12/01 Time 12:00 P.M.

Examiner/Underwriting Technician Anthony Iuzzolino, M.D.

Print Name

Address: 33 Overlook Rd. Suite 303 Summit NJ 07901

For Requalification mail to:  Preferred Insured Dept., Box 846, Blue Bell, PA 19422  P.O. Box ___ MAPLEWOOD, NJ ___
For New Business mail to:  New Business Dept., Box 876, Blue Bell, PA 19422

www.mapping.com

# FLEXIBLE PREMIUM VARIABLE
# LIFE INSURANCE CONTRACT

**Variable Life Insurance.**
**Face Amount payable if Insured dies while the policy is in force.**
**Flexible Premiums payable while the Insured is living until the Maturity Date.**
**Non participating, no dividends are payable.**

# AGL Life Assurance Company

**Home Office: 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania 19462**

VL-299