## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL S. RULLE FAMILY DYNASTY TRUST,

      Plaintiff,

      v.

AGL LIFE ASSURANCE COMPANY,

      Defendant

Civil Action No. 2:10-cv-00231-BMS

Hon. Berle M. Schiller

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

William R. Connelly, Esq.
Law Offices of William R. Connelly, LLC
7 West Main Street
Mendham NJ 07945
Phone: (973) 543-5301
Fax: (973) 543-5140

Nicholas Noel, III, Esq.
Noel, Kovacs & McGuire, P.C.
2505 Newburg Road
Easton PA 18045-1963
Phone: (601) 258-0866
Fax: (610) 258-5264

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT.................................................... 1

COUNTER-STATEMENT OF FACTS........................................ 3

    1.  RELATIONSHIP BETWEEN AGL, PHOENIX AND
    PHOENIX EQUITY.......................................................... 5

    2.  AGL'S SOLICITATION OF MICHAEL S. RULLE.................... 6

    3.  THE SELECTION OF THE "FUND-OF-FUNDS" BY
    AGL........................................................................... 9

    4.  VARIABLE LIFE INSURANCE POLICY................................... 10

    5.  AGL PRIVATE PLACEMENT MEMORANDUM....................... 12

    6.  EVENTS LEADING UP TO THE DISCOVERY OF THE
    FRAUDULENT ACTIVITIES............................................... 14

LEGAL ARGUMENT............................................................... 18

    I.  DEFENDANT'S MOTION TO DISMISS SHOULD BE
    DENIED BECAUSE THE COMPLAINT STATES
    PLAUSIBLE CAUSES OF ACTION................................... 19

    II.  PLAINTIFF'S COMPLAINT STATES A CAUSE OF
    ACTION FOR BREACH OF CONTRACT AND SUFFICIENT
    FACTUAL MATTER TO SHOW THE STRONG LIKELIHOOD
    THAT DEFENDANT BREACHED THE CONTRACT, THUS
    EXCEEDING THE REQUIREMENTS UNDER RULE 8.................. 23

        A.  "CAPITAL LOSS" DOES NOT INCLUDE LOSSES
        DUE TO FRAUD OR THEFT................................... 26

        B.  RISK OF INVESTMENT LOSS DOES NOT INCLUDE
        THEFT OR FRAUD................................................ 28

    III.  PLAINTIFF HAS ASSERTED A VIABLE CLAIM UNDER
    THE ANTI-FRAUD PROVISIONS OF SECTION 10(b) AND
    SEC RULE 10b-5............................................................ 36

Page

A. SUFFICIENCY OF PLEADINGS UNDER RULE 9(b)...... 39

B. AMENDED COMPLAINT................................................... 43

IV. PLAINTIFF HAS ASSERTED THE ESSENTIAL ELEMENTS
OF FRAUD UNDER FEDERAL AND STATE SECURITIES
LAWS WHICH SATISFY THE REQUIREMENTS OF SEC
RULE 10-b5.......................................................................................... 45

A. FIDUCIARY DUTY OF AGL TO PLAINTIFF ARISES
UNDER THE 1934 ACT AND CORRESPONDING
FINRA RULES, AND THE INVESTMENT ADVISORS
ACT OF 1940............................................................................ 46

1. DUTY OF SUITABILITY IN RECOMMENDATIONS...... 49

2. DEFENDANTS HAD A DUTY TO CONDUCT DUE
DILIGENCE............................................................................. 51

3. DUTY OF AGL TO COMPLY WITH REGULATION D.... 54

B. MATERIALITY, RELIANCE AND SCIENTER................. 56

V. APPLICABLE STATE SECURITIES STATUTES......................... 59

VI. PLAINTIFF'S COMPLAINT STATES A CAUSE OF ACTION
FOR BREACH OF FIDUCIARY DUTY ARISING OUT OF THE
POLICY CONTRACT; (A) AS AN INSURER; (B) AS AN
INVESTMENT ADVISOR/BROKER-DEALER; AND (C) AS A
PRINCIPAL............................................................................................ 60

VII. PLAINTIFF'S COMPLAINT STATES A CAUSE OF ACTION
FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING........................................................................... 66

VIII. PLAINTIFF'S AMENDED COMPLAINT STATES A
CAUSE OF ACTION FOR PROFESSIONAL NEGLIGENCE, OR,
IN THE ALTERNATIVE, GROSS NEGLIGENCE OR
NEGLIGENCE....................................................................................... 67

IX. PLAINTIFF'S COMPLAINT STATES A CAUSE OF ACTION
FOR NEGLIGENT MISREPRESENTATIONS................................... 70

Page

X.  PLAINTIFF'S COMPLAINT STATES A CAUSE OF ACTION
FOR UNJUST ENRICHMENT.................................................................   74

XI.  DETERMINATION OF CHOICE LAW IS PREMATURE BUT
THE AVAILABLE FACTS AND LAW POINT TO ALASKA AS
THE STATE WITH THE MOST INTEREST IN THE MATTER........   76

CONCLUSION....................................................................................................   82

# TABLE OF AUTHORITIES

**Federal Cases**

Aaron v. SEC, 446 U.S. 680, 696 (1980). ......................................................58

Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491 (E.D.Pa 2008)..................75

Ashcroft v. Iqbal, 129 S.Ct. 1937, 173 L.Ed. 2d 868 (2009)...........................20, 44

Basic Inc. v. Levinson, 485 U.S. 224 (1988)................................................57

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)  ...........................20, 44, 45

Bohler-Uddeholm America, Inc. v. Elwood Group, Inc., 247 F.3d 79
 (3d Cir. 2001)............................................................................65

Burdet v. Miller, 957 F.2d 1375 (7th Cir. 1992). ..........................................63

Charles Hughes &. Co. v. SEC, 139 F.2d 434 (2d Cir. 1943)
, *cert. denied*, 321 U.S. 786 (1944)......................................................64

CNA Ins. Co. v. Lightle, 364 F. Supp. 2d 1068 (D. Alaska 2005)..........................29

Children's Hosp. of Phila. v. Horizon NJ Health, No. 07-5061,
2008 WL 4330311, *7 (E.D. Pa. Sept. 22, 2008)............................................82

Curley v. Allstate Ins. Co., 289 F.Supp.2d 614 (E.D.Pa.2003)............................76

Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
906 F.2d 1206 (8th Cir. 1990)............................................................64

Edwards v. Bromberg, 232 F.2d 107 (5th Cir. 1956).......................................28

Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir.),
 cert. denied, 474 U.S. 946 (1985).......................................................58

Ernst & Ernst v. Hochfelder, 425 U.S. 185, 99 S.Ct. 1375,
 47 L.Ed.2d 668 (1976).................................................... .58

Essex Ins. Co. v. RMJC, Inc., 306 Fed. App'x. 749 (3d Cir. 2009).......................76

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009).....................20

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 376 F.Supp.2d 385
  (S.D.N.Y. 2005)................................................................................38

French v. First Union Securities, Inc., 209 F. Supp.2d 818 (M.D. Tenn. 2002) ....61, 62

Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042 (11th Cir. 1987)...…......47

Godfry v. State Farm Mutual Insurance Co., 2009 WL 56436 (E.D. Pa. 2009)…........82

Hammersmith v. TIG Insurance Co., 480 F.3d 220 (3d Cir. 2007).......................81

Hanly v. SEC, 415 F.2d 589 (2d Cir. 1969)…………………………..……..63

Hefferman v. Bass, 467 F.3d 596 (7th Cir. 2006)..............................................20

Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989 (3d Cir. 1987)..............75

Herskowitz v. Nutri/System, Inc., 857 F.2d 179 (3d Cir. 1988),
  cert. denied, 489 U.S. 1054 (1989)...........................................................58

Hodgson v. Man Fin. Inc., 06-1944, 2006 WL 3861068
  (E.D.Pa. Dec.29, 2006)........................................................................82

IIT v. Cornfeld, 619 F.2d 909 (2d Cir. 1980).................................................58

In re Ames Dept. Stores Inc. Stock Litigation, 991 F.2d 953 (2d Cir. 1993)..............58

In re Leslie Fay Companies, Inc., Securities Litigation, 871 F.Supp. 686
  (S.D.N.Y. 1995).................................................................................58

In re Phar-Mor, Inc. Securities Litigation, 892 F.Supp. 676 (W.D. Pa. 1995)............58

Kahn v. SEC, 297 F.2d 112 (2d Cir. 1961) ...................................................64

Kilpatrick v. Sheet Metal Workers Int'l Ass'n Local Union No. 19,
  1996 WL 635691 (E.D. Pa. Oct 30, 1996)...................................................82

Koresko v. Bleiweis, 2004 WL 3048760 (E.D. Pa.).........................................65

Limestone Dev. Corp. v. Vill. Of Lemont, Ill, 520 F.3d 797
  (7th Cir. 2008)...................................................................................21

McGann v. Ernst & Young, 102 F.3d 390 (9th Cir. 1996)

cert. denied,___ U.S. ___, 1997 US LEXIS 2455 (April 14, 1997)..................... 58

Mihara v. Dean Witter & Co., 619 F.2d 814 (9th Cir. 1980)........................49, 57

Nelson v. Serwold, 576 F.2d 1332 (9th Cir. 1978)................................... ...57

Paine v. Commissioner, 63 T.C. 736 (1975), aff'd in unpublished opinion,
523 F.2d 1053 (5th Cir. 1975). ...........................................................28

Palkovic v. Johnson, 281 Fed. Appx. 63, (2d Cir. 2008)................................45

Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC,
568 F.3d 374 (2d Cir.2009)................................................................45

Petruska v. Gannon University, 462 F.3d 294 (3d Cir. 2006),
cert. denied, 127 S.Ct. 2098, 167 Led. 2d 813 (2007) ................................  19

Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008) .....................20, 21

Press v. Chemical Investment Services Corp., 166 F.3d 529 (2d Cir. 1999). ..........63

Primavera Familienstifung v. Askin, 130 F.Supp.2d 450, 491 (S.D.N.Y. 2001)......38

Rock v. Voshell, 397 F.Supp.2d 616 (E.D.Pa. 2005)...................................70

Rolf v. Blyth Eastman Dillon & Co., 570 F.2d 38 (2d Cir.),
cert. denied, 439 U.S. 1039 (1978)......................................................58

Schirmer v. Principal Life Insurance Co., 2008 WL 478568  (E.D.Pa. 2008).........82

SEC v. Blavin, 557 F.Supp. 1304 (E.D. Mich. 1983), aff'd,
760 F.2d. 706 (6th Cir. 1985) ..........................................................57

SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963)....................46

SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980)........................................54, 57

SEC v. Resch-Cassin & Co., Inc., 362 F.Supp. 964 (S.D.N.Y. 1973)................64

Shivangi v. Dean Witter Reynolds, Inc., 825 F2d 885 (5th Cir. 1987)...............47

Smith v. Lincoln Benefit Life Co., Civ A No 08-01324,
2009 U.S. Dist. LEXUS 24941 at *19 (W.D. Pa , March 23, 2009).............…......77

Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817, 820 (6th Cir. 1981)....64

United States v. Hart, 273 F.3d 363 (3d Cir. 2001) ..................................... .63

United States v. Hussey, 254 F.3d 428 (2d Cir. 2001)................................. .63

Woods v. Era Med LLC, 2009 WL 141854 (E.D. Pa. 2009)....................... .69

## Alaska State Cases

Alaska Sales and Serv., Inc. v. Millet, 735 P.2d 743 (Alaska 1987)..............74, 75

Alyeska Pipeline Serv. Co. v. H.C. Price Co., 694 P.2d 782 (Alaska 1985)... .66,78

Ben Lomond, Inc. v. Schwartz, 915 P.2d 632, 634 (Alaska 1996)............... ....72

Bubbel v. Wien Air Alaska, 682 P.2d 374 (Alaska 1984) ...........................71

Carter v. Hoblit, 755 P.2d 1084 (Alaska 1988)...........................…...…….72

Darling v. Standard Alaska Prod. Co., 818 P.2d 677 (Alaska 1991)................74

D.J. Moore Corp. v. Cook Inlet Region, Inc., S-4272,
1992 WL 12549796 (Alaska May 6, 1992)……………………………………...24

Fairbanks N. Star Borough v. Tundra Tours, Inc., 719 P.2d 1020 (Alaska 1986) .26

Great Western Savings Bank v. George W. Easley Co.,
778 P.2d 569 (Alaska 1989)……………………………………………………24

Guin v. Ha, 591 P.2d 1281, 1291 (Alaska 1979)………………………………..66

Hale v. Fireman's Fund Ins. Co., 731 P.2d 577 (Alaska 1987))................... ..29

Jarvis v. Aetna Cas. & Sur. Co., 633 P.2d 1359 (Alaska 1981)................... .28

John's Heating Service v. Lamb, 46 P.3d 1024 (Alaska 2002).........................68

Johnson & Higgins of Alaska, Inc. v. Blomfield, 907 P.2d 1371 (Alaska 1996)...68

Linck v. Barokas & Martin, 667 P.2d 171 (Alaska 1983)............................68

Martens v. Metzgar, 524 P.2d 666 (Alaska 1974)..................................74

Matthews v. Kincaid, 746 P.2d 470 (Alaska 1987)...................................71

Munn v. Thornton, 956 P.2d 1213 (Alaska 1998) ..............................................61

O.K. Lumber Co. v. Providence Wash. Ins. Co., 759 P.2d 523 (Alaska 1988)...61, 77,78

Padalino v. Standard Fire Ins. Co., 616 F. Supp. 2d 538 (E.D. Pa. 2008)................69

Paskvan v. Mesich, 455 P.2d 229 (Alaska 1969)................................................61

Reeves v. Alyeska Pipeline Serv. Co., 56 P.3d 660 (Alaska 2002).....................71, 74

Starry v. Horace Mann Ins. Co., 649 P.2d 937 (Alaska 1982).............................29

State v. Fairbanks N. Star Borough Sch. Dist., 621 P.2d 1329 (Alaska 1981) ...........26

U.S. Fire Ins. Co. v. Colver, 600 P.2d 1 (Alaska 1979)......................................29

Valdez Fisheries Dvpt. Ass'n Inc. v. Alyeska Pipeline Serv. Co., 45 P.3d 657
(Alaska 2002)...................................................................................26

Whispering Creek Condo. Owner Ass'n v. Alaska Nat. Ins. Co., 774 P.2d 176
(Alaska 1989) ...................................................................................29

**Pennsylvania State Cases**

Basile v. H & R. Block, 761 A.2d 1115 (Pa. 2000)..........................................61

Birth Center v. St. Paul Companies, Inc., 727 A.2d 1144 (Pa.Super.Ct.1999)
, *app. granted in part,* 560 Pa. 633, 747 A.2d 858 (2000) ...............................61

Gedeon v. State Farm Mut. Auto. Ins. Co., 188 A.2d 320 (Pa. 1963)...................61

Miller v. Allstate Ins. Co., 763 A.2d 401 (Pa. Super. 2000).............................78

Mitchell v. Moore, 729 A.2d 1200 (Pa Super. 1999)....................................74

Villoresi v. Femminella, 856 A.2d 78 (Pa. Super. 2004).............................75,76

**Other State Cases**

Barrett v. Ferrell, 550 S.W.2d 138, 143 (Tex.App.1977)...............................75

Wilkinson v. Smith, 31 Wash.App. 1, 639 P.2d 768, 771 (1982).....................72

**Federal Regulations**

17 C.F.R. § 240.10b-5(b)  ......................................22, 37, 38, 45, 54,55, 57-59

**Federal Rules**

Fed. R. Civ. P. 8......................................................3,19, 20,23, 24,36, 61,72

Fed. R. Civ. P 9...........................................................3, 19, 20,23
.
Fed. R. Civ. P 9(b).........................................................39, 43, 46

Fed. R. Civ. P. 12(b)(6).................................................3, 18, 19, 20,36

Fed. R. Civ. P. 56......................................................................23

**Federal Statutes**

Internal Revenue Code, 26 U.S.C.A. §§ 67 and 68......................................28

Internal Revenue Code, 26 U.S.C.A. § 165(a),(c).......................................27

Internal Revenue Code, 26 U.S.C.A. §1211(b) ...........................................27

Investment Advisors Act of 1940, 15 U.S.C. §80b-1, et. seq............................48

Investment Company Act of 1940, 15 U.S.C. §80a-(c)...................................12

Securities and Exchange Act of 1934, 15 U.S.C. §77a, et seq..........................38

Securities and Exchange Act of 1934, 15 U.S.C. §77b(a)(1)).............................38

Securities and Exchange Act of 1934, 15 U.S.C. §78c(a)(4)............................47

Securities and Exchange Act of 1934, 15 U.S.C. §78c(a)(5)............................47

Securities and Exchange Act of 1934, 15 U.S.C. §78f(b)(5)............................47

Securities and Exchange Act of 1934, 15 U.S.C. §78j(b)..............22, 37, 57, 58, 59

## State Statutes

A.S. § 11.46.100 ...............................................................................28

Alaska Securities Act, A.S. 45:55-12(a) et seq....................................................22, 38

Alaska Securities Act, A.S. 45:55-900(a)(7)...............................................46

Alaska Securities Act, A.S. 45.55.990(32)................................................60

Pennsylvania Securities Acts §1-401(b) and 1-501(g) ...........................22, 38, 46

31 Pa. Cons. Stat. §81.2......................................................................60

## Treatises

26 Richard A. Lord, *A Treatise on the Law of Contracts*
*[Williston on Contracts]* § 68:5 (4th ed.2003) .............................................76

James P. George, False Conflicts and Faulty Analyses:
Judicial Misuse of Governmental Interests in the Second Restatement
of Conflict of Laws, 23 Rev. Litig. 489, 521-522 (2004).................................80

Restatement (Second) of Agency § 387 (1958)...........................................62

Restatement (Second) of the Conflict of Laws §145......................................79

Restatement (Second) of Conflict of Laws, §148......................................80-81

Restatement (Second) of Torts § 552(1) (1977))...........................................72

Restatement (Second) of Torts, § 874.....................................................63

W. Keeton, D. Dobbs, R. Keeton & D. Owen,
*Prosser and Keeton on the Law of Torts* § 106, at 738 (5th ed. 1984)...................73

## Other Authorities

Black's Law Dictionary 625 (6th ed. 1991)...............................................63

Black's Law Dictionary 1383 (6th ed. 1990)..............................................67

FINRA - Managing Investment Risk,
http://www.finra.org/Investors/SmartInvesting/AdvancedInvesting/ManagingInvestment
Risk/index.htm                                                          32-35

FINRA Regulatory Notice 10-22………………………………………………………52


In the Matter of D.E. Wine Investments, Inc. Administrative Proceeding
File No. 3-8543 Release No. ID-134, 1999 WL 373279
 (SEC Initial Decision June 9, 1999 ……………………………………….……65

In the Matter of Duker & Duker, 6S.E.C. 388-89,
Sec. Exch. Act. Rel. No. 34-2350, 1939 WL 36426 (SEC Dec. 19, 1939)………. …..65

NASD Manual,  Rule 3010 at 4831 and Rule 2110 at 4111 (Manual 160) (2000)…....48

NASD Notice to Members 00-44 (July 2000……………………………………………..38

Rev. Rul. 2009-9 (March 17, 2009)……………………………………………………27

SEC Release No. 34-56145……………………………………………………………47

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE MICHAEL S. RULLE FAMILY DYNASTY TRUST<br><br>    Plaintiff<br><br>vs.<br><br>AGL LIFE ASSURANCE COMPANY,<br><br>    Defendant | Civil Action No. 2:10-cv-00231-BMS<br>Hon. Berle M. Schiller |

### PLAINTIFF MICHAEL S. RULLE FAMILY DYNASTY TRUST'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Plaintiff Michael S. Rulle Family Dynasty Trust ("Plaintiff" or "the Trust") respectfully submits this memorandum in opposition to Defendant's motion to dismiss, pursuant to Rules 12(b)(6), 8 and 9(b) of the Federal Rules of Civil Procedure.

### PRELIMINARY STATEMENT

Michael Rulle is a sophisticated investor and experienced in many facets of the finance industry, for him, as well as for others.  Over the past thirty years, he has managed funds at some of the most prestigious firms in the industry, overseeing investments and investment managers who select those investments, assessing risk and determining which funds are suitable for a particular purpose, and which are not.

So when it came time for Michael Rulle to plan for his future and that of his loved ones, he knew what he wanted---and what he didn't.  Based on his experience and position as a chief executive of hedge fund, he had learned about variable life insurance policies and how they could be used in conjunction with an investment fund to provide

1

the type of financial security he was seeking for himself and his family. He was approached by John Hillman of AGL, a sophisticated money manager, broker-dealer and insurance executive in his own right. Mr. Hillman proposed various investment vehicles to Rulle, but none of them had the components Rulle was seeking for his particular investment needs: moderate risk and tax deferral. Finally, Mr. Hillman found the investment fund that seemed to be tailored to order: a "fund of funds" that provided the diversification in moderate risk investments that Rulle needed, and in a structure that would provide the tax deferral he also required by leaving all of the investment decisions, management and oversight to others. Mr. Hillman represented to Rulle that AGL had performed all of the due diligence on this investment vehicle—the Flexible Variable Life Insurance Policy—and that it was both reputable and diversified in moderate risk funds. The Policy—and AGL private placement memorandum comprising the investment vehicle—specifically provided that the value of the investment account would be tied solely to the investment performance of the fund. It also listed certain investment risks, all of which Rulle understood as the types of market risks involved in all investments.

In or about December 2008, Rulle received a letter from AGL, advising him that some of his investment had been placed in funds controlled by Bernard Madoff, and because of Madoff's fraudulent Ponzi scheme, the monies had been lost. As a result, a portion of Rulle's account had been wiped out, according to AGL---it was, in AGL's words, an "investment loss." Neither the Policy, PPM nor industry documents identify fraud or theft as an "investment loss."

Even worse, Rulle discovered that, contrary to AGL's assurances and representations, they had not performed due diligence on the fund, the fund was not diversified and they had not monitored it, much less managed it.

As a sophisticated investor, Rulle knew better than to take unreasonable risks. He reasonably relied on the assurances and representations of AGL—an insurance company and an investor adviser—to do what they promised to do, and what they were obligated to do. They failed to do so.

Plaintiff's Complaint, by which cross-motion Plaintiff now seeks to amend by way of an Amended Complaint, states the causes of action that arise out these events. The Complaint—and Amended Complaint—meet the standard under Fed. R. Civ. P. 8 and 9 for all of the claims asserted. Accordingly, it is respectfully submitted that Defendant's motion to dismiss should be denied.

## COUNTER-STATEMENT OF FACTS

Plaintiff hereby incorporates by reference, and respectfully refers Court to, the Affidavit of Michael S. Rulle and the Amended Complaint.[1] For purposes of Plaintiff's opposition to Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), following are the most relevant facts.

This action concerns losses that occurred in funds in connection with the variable life insurance policy issued by the AGL Life Assurance Company ("AGL" or "Defendant") to the Michael S. Rulle Family Dynasty Trust ("Plaintiff"). The funds in

---

[1] This is a motion to dismiss Plaintiff's Complaint. While it is respectfully submitted that Plaintiff's Complaint states plausible and cognizable claims as a matter of law, based on additional information received, Plaintiff now seeks leave to file an Amended Complaint which more fully sets forth the salient facts and includes additional claims. A copy of said proposed pleading is attached to the Affidavit of Counsel as Exhibit "A". Because it provides the most current information known, references are made to it for purposes of setting forth the factual record.

which Plaintiff's premiums were invested were supposed to have been investigated, and assuming their suitability and reliability, then managed and monitored by AGL.  Instead the monies were lost in a fraudulent scheme due to AGL's failure to perform its legal duties.  Amended Complaint, ¶¶1-2.  Rather than compensating Plaintiff for its failures, Defendant seeks to assess these losses against the Policy belonging to Plaintiff, contending that the loss constitutes an "investment loss" within the meaning of "investment performance" under the Policy.  Plaintiff's Complaint alleges causes of action based upon AGL's breach of the Policy and related fiduciary duties and implied covenants arising from the Policy, as well as professional negligence, negligent misrepresentation, unjust enrichment and violation of state and federal securities acts.

Plaintiff, an irrevocable trust created on or about September 21, 2001 under Alaska law and located in Alaska, is a beneficiary and contract holder under the  Flexible Variable Life Insurance Contract  purchased by the Plaintiff from AGL, and issued on or about October 5, 2001 ("the Policy.")  The grantor of the trust is Michael S. Rulle. Amended Complaint, ¶¶1-2.   AGL is an insurance and financial services organization. The sole and exclusive products offered by AGL are private placement variable life insurance products such as the policy sold to the Plaintiff as identified above.  Amended Complaint, ¶3.

Variable universal life insurance policies are designed to allow policy holders to invest a portion of their premiums in optional investment accounts which are offered under the policy.  Because the investments are held under a policy, gains inside the policy are shielded from income taxes, as is the payout upon death.  Policy holders are able to

access their money during their lifetime by withdrawing or borrowing funds, tax free, from the policy.   Amended Complaint, ¶5.  Variable life insurance policies are both life insurance policies and securities under federal and state securities laws.  Thus, they are regulated by both state insurance law and state and federal securities law.

### 1.   Relationship between AGL, Phoenix and Phoenix Equity

AGL is an affiliate company of the Phoenix Companies, Inc.("Phoenix") .    Both AGL and Phoenix are located at the same address in Plymouth Meeting, Pennsylvania. Amended Complaint, ¶¶2-3.  Phoenix Equity Planning Corporation, ("Phoenix Equity"), is also an affiliate of Phoenix and co-located with AGL and Phoenix. Phoenix Equity is a broker-dealer licensed by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, and is a member of the Financial Industry Regulatory Authority. Amended  Complaint, ¶4.

Phoenix Equity is also registered with the Financial Industry Regulatory Authority ("FINRA") and lists among its types of businesses "Broker or Dealer selling variable life insurance or annuities" on its FINRA registration.   AGL and Phoenix Equity are sister companies under common control by the same holding company known as PFG Holdings, Inc. ("PFG"), a closely held company domiciled in Pennsylvania, also located at the same address in Plymouth Meeting, Pennsylvania.  Amended Complaint, ¶5.

On or about January 1, 1996, AGL entered into a Principal Underwriting Agreement with Phoenix Equity for the purpose of permitting AGL to sell its variable life insurance securities products through Phoenix Equity as the licensed broker-dealer.  AGL and Phoenix Equity are licensed to operate in the respective capacities through the fifty

(50) United States, including the State of Alaska where the Plaintiff is domiciled. Amended Complaint, ¶6.

AGL and Phoenix Equity share a commonality in their membership of their Board of Directors and Officers. Both companies list John K. Hillman, Phillip K. Polkinghorn, and Robert Primmer as Directors, and have common Officers. John K. Hillman is also the President and CEO of AGL and Vice President of Phoenix Equities. ("Mr. Hillman") Amended Complaint, ¶8.

### 2.   AGL's Solicitation of Michael S. Rulle

Michael S. Rulle ("Mr. Rulle") , a graduate of Hobart College, holds a Ph.D. in political philosophy from Columbia University and an MBA from Columbia Business School, where he graduated first in his class. He has taught finance as an adjunct professor at the Columbia Business School and has published, and been the subject of, numerous articles in the finance industry. He has also appeared on business shows on television. Affidavit of Michael S. Rulle ("Rulle Aff.) at ¶4. Mr. Rulle currently manages his own proprietary trading firm, MSR Investment LLC, which specializes in quantitative modeling of futures markets. He has more than thirty years in the financial services business, holding several positions in investment banking and investment managing firms, at Lehman Brothers, Hamilton Brothers and Graham Capital Management. He also has specific and extensive experience with hedge funds. Hamilton Partners was the internal "hedge fund" of Stockton. Graham Capital Management is a $7 billion hedge fund. At Graham, he chaired the Investment and Risk Committee, and was directly responsible for the firm's thirty portfolio managers. Rulle Aff., ¶3.

In or about early 2000, while Mr. Rulle was President and CIO of Hamilton Partners, Mr. Hillman began contacting Mr. Rulle to try to convince Mr. Rulle to invest, both personally and on behalf of his clients and colleagues, in four or five different investment products using a life insurance platform. Rulle Aff., ¶7. Their conversations continued over several months.  On nearly every occasion, the products Mr. Hillman proposed presented significant problems for Mr. Rulle in that the investment funds proposed by Mr. Hillman contained too much exposure to governmental rules which prohibited investors' direct control in the investment, potentially depriving the investment of its intended tax advantages.  Mr. Rulle disagreed with Mr. Hillman's analysis of the benefits of utilizing hedge funds.   He advised Mr. Hillman, for Mr. Rulle's purposes personally, that he was interested in an investment vehicle inside a life insurance policy that mimicked a hedge mutual fund in that it was a "fund of funds".  He told Mr. Hillman that if AGL ever offered such a product, he would be interested.  These discussions occurred over the course of several months in the year 2000 and well before August 2000.  Rulle Aff., ¶7.

Mr. Rulle understood "fund of funds" by virtue of his extensive experience in the hedge fund industry.  A "fund of funds" refers to a fund of hedge funds or other investment managers which exists primarily to mitigate risk to the investors, who are either accredited investors or institutional investors and for whom stability of investments is critical to capital reserves and otherwise financial solvency.  Complaint ¶22. He explained to Mr. Hillman that a "fund of funds" would provide an investment strategy of having a portfolio of other investment funds, investing in shares bonds, or other securities.  This type of investment is referred to as a multi-manager investment.  The

7

benefit of investing in a "fund of funds" is that it can achieve greater diversification which serves to reduce the risk of investment volatility while maintaining average returns. The "fund of funds" manager selects the best performing funds (typically mutual funds, hedge funds, private equity or investment trusts) based upon the particular fund's past performance and due diligence inquiry of the investment fund and its operations and strategy. This additional level of selection and scrutiny provides greater stability and reduces the risk related to a single investment manager. It also provides the investor to have "best of breed" money managers for the various parts of the asset allocation. Further, instead of investing in different stocks or other products of mutual funds, and having to keep records of all of them, the investor in a "fund of funds" can more easily invest in and track only one fund which in turn invests in other funds. Rulle Aff., ¶8.

The downside in investing in a "fund of funds" is that management fees are typically higher than those of traditional investment funds because they include part of the management fees charged by underlying funds and also the additional cost of oversight and scrutiny. Also, "fund of funds" typically have a high minimum level of investment amounts compared to investing in traditional investment funds. However, "fund of funds" provide access to the funds invested in at much lower minimums than those funds would typically require from direct investors. Rulle Aff.¶9.

The lack of accessibility by an investor to the investment managers in a "fund of funds" makes it important that (i) a "fund of funds" be professionally managed, (ii) that adequate due diligence be performed in the selection of the "fund of funds" and (iii) that the investment managers or advisors continue to provide oversight of the "fund of funds" activities during the period of the investment. Rulle Aff. ¶9.

### 3.     The Selection of the "Fund of Funds" by AGL

After many discussions over a period of months, in or about the Summer or Fall

of 2001, Mr. Hillman informed Mr. Rulle that Defendants had obtained a "fund of funds"

entitled American Masters Opportunity Insurance Fund, L.P.("American Opportunity

Fund"), later renamed on two occasions and which has been identified herein as the

Tremont Opportunity Fund. Rulle Aff. ¶10.

Mr. Hillman represented to Mr. Rulle that the American Opportunity Fund was

a highly professional and reputable "fund of funds" which had been selected by AGL to

participate in the Flexible Premium Variable Rate Life Insurance Policy of AGL as one

of the two Investment Accounts in which net premiums could be allocated.  Mr. Hillman

also represented that Tremont Opportunity Fund was a highly diversified fund and that, to

satisfy IRS and other requirements, the investor would be as far removed from making

investment decisions as possible.  The latter criteria was important to insure obtaining the

tax advantages of the product.  Rulle Aff. ¶10 .  Prior to Mr. Hillman's call, Mr. Rulle did

not know of nor had he ever heard of either American Masters Opportunity Insurance

Fund, L.P. or Tremont Opportunity Fund III, L.P.  Rulle Aff. ¶10.

When asked to specify the degree of investment management diversity that the

fund would allocate among investment managers, Mr. Hillman stated that there would be

significant diversity consistent with industry standards and in the range of 7% or less of

the funds would be placed with any one manager.  He assured Mr. Rulle on both points.

At the time of these conversations, Mr. Rulle had not yet created the Plaintiff trust but

contemplated doing so and, therefore, was specifically interested in a "fund of funds" for

the purposes of investing the Plaintiff trust assets.  Based upon this, Mr. Rulle decided to

go forward.  Rulle Aff. ¶10.

4.   **Variable Life Insurance Policy**

The Policy has an initial face amount death benefit of $17,600,000.00.  It offered

the same two investment account options (Money Market Account and/or American

Opportunity Fund) and further describes, in pertinent part, how account values were to be

determined.  The Policy states:

> The value of an Investment Account reflects:
>
> - Any amounts transferred to the Investment Account during the
>   current Valuation Period;
>
> - The investment income and realized and unrealized capital gains
>   credited to such assets in the Valuation Period;
>
> - Any amounts transferred from an Investment Account during the
>   current Valuation Period;
>
> - Realized and unrealized capital losses charged against those assets
>   during the Valuation Period;
>
> - Any amount charged or reserved against the Investment Account
>   for taxes;
>
> - Any expenses charged or reserved against the Investment Account
>   for expenses incurred in operating such Investment Account;
>
> - The mortality and expense risk change for the Valuation Period;
>   and
>
> - Any other Monthly Charges deducted from the Investment
>   Account for This Contract.
>
> . . .
>
> The Account Value when the Initial Premium is received is equal to the
> Net Premium invested in the Investment Accounts; less:

(a)     Cost of Insurance Charges (deducted on each monthly
        calculation date); and
(b)     Policy loads; and
(c)     Any Charges for Special Insurance Class Rating;

The Account Value on any subsequent Valuation Day is equal to the
Account Value on the prior Valuation Day plus:

(a)     any new Net Premium invested in the Investment
        Accounts; and
(b)     any increase in value of the Investment Account due to
        investment results (net of Mortality and Expense Risk
        Charges and any Asset Charges; and
(c)     any interest credited to the Borrowed Fund;
less;
(a)     any decrease in value of the Investment Account; and
(b)     Cost of Insurance Charges (deducted only on Monthly
        Calculation Date); and
(c)     any Partial Withdrawals taken; and
(d)     any Rider Charges deducted from the Account Value; and
(e)     any Policy Loads; and
(f)     any Charges for Special Insurance Class Rating; and
(g)     any Other Charges as stated in Contract Schedule B.

Amended Complaint, ¶28.

The Policy further provides that the "Net Account Value is the Account

Value minus any Contract Loan balance and accrued unpaid interest" and

provides for the following charges to be deducted from the Account Value:  Cost

of Insurance, Rider Charges, Policy Loads and Charges for Substandard Insurance

Class Rating.  Amended Complaint, ¶29.

The Policy expressly stated that it was the strategy of the American Opportunity

Fund that funds would be invested "with various portfolio managers believed to be able

to meet the Partnerships objectives".  Nevertheless, the Policy reserved to AGL, inter

alia, "the right to: (1) establish and operate the Variable Account as a managed account or

an account which purchases shares from the portfolios of funds managed by investment

managers retained by us; (2) register or deregister the Variable Account  under the

Investment Company Act of 1947; (3) operate the Investment Accounts as a unit

investment trust registered, or exempt from registration, under the Investment Company

Act of 1940 or any other form permitted by law." Amended Complaint, ¶30.

The Policy additionally reserved to AGL the right to contract with investment

managers or to manage directly the assets held in the Investment Accounts.  The Policy

stated "We may deduct an Asset Charge from the Account Value allocated to Investment

Accounts that are managed directly as well as any costs and expenses arising from such

Investment Accounts.  In either case, investment managers are selected by us in our

discretion". Amended Complaint, ¶31.

### 5.    AGL Private Placement Memorandum

In addition to the Policy, Mr. Hillman, on behalf of the Defendant, provided a

private placement memorandum to Mr. Rulle.  It was entitled "AGL Life Assurance

Company Private Placement Memorandum" and bore private placement memorandum

number 704, dated October 2, 2001 (the "AGL PPM").   Rulle Aff.¶12.

As explained in the AGL PPM, the Policy would offer only two investment

account choices – (1) Money Market Account or (2) American Masters Opportunity

Insurance Fund, L.P. Account.  These accounts are designated as the "Investment

Accounts".  On page 38 of the AGL PPM it is stated, in pertinent part, the following:

> The partnership seeks to (i) achieve long-term capital appreciation and (ii)
> consistently generate positive returns irrespective of stock
> market volatility or direction, while focusing
> on the preservation of capital.  The account is managed by Tremont
> Partners, Inc. ("General  Partner") which will attempt to accomplish
> these investment objectives by investing with various portfolio managers
> (the "Managers") which the General Partner believes are able to meet the
> Partnerships objectives.  The terms "opportunity" and "opportunistic"

refer to a broad range of investment strategies, including but not limited
to:  long-short equity strategies, hedging and arbitrage techniques in the
equity, fixed income and currency markets; index arbitrage; interest rate
arbitrage; convertible bond and warrant hedging; merger arbitrage,
statistical long-short equity strategies; pairs trading and investment in non-
US securities. These sophisticated investment strategies often require the
use of derivative trading vehicles such as stock options and index
options. The use of a multi-manager format, whereby investments are
made through a variety of managers utilizing different and, if possible,
non-correlated investment strategies and trading techniques, it is designed
to provide investors with a diversified investment portfolio, as well as
enable them to obtain above-average returns over a market cycle.

Amended Complaint, ¶33.

As further explained by the AGL PPM, the policy owner was to pay premiums

into an AGL Variable Account, a separate account of AGL established to fund the

offered "Investment Accounts".  The assets of the AGL Variable Account are owned by

AGL and are placed by AGL into one or both of the designated Investment Accounts at

the election of the investor.  Amended Complaint, ¶34.

Under the topic heading "Summary Description of the Policy" of the AGL PPM,

it states the following:

> **The Investment Account**.  The account value
> of the Investment Account selected by the
> investment managers and its sub-advisors will
> increase or decrease depending upon the
> performance of the investments selected by the
> investment managers of these Investment
> Accounts. Accordingly, policy owners bear the
> entire investment risk, including the risk of loss
> of principal for all amounts invested in the
> policy.
>
> **Policy Values**.  Net premium is allocated to
> one or more Investment Accounts.  Depending
> on the investment performance of these
> accounts, the Account Value of the Policy may
> increase or decrease on any Valuation Day.  The
> Policy Owner bears the entire investment risk

> associated with the <u>investments</u> of the Investment
> Accounts, and there is no guaranteed minimum
> Account Value...

Amended Complaint, ¶35, (emphasis added).

The AGL PPM describes the relationship of the investor vis-a-vis American

Opportunity Fund as lacking any privity and in bold type, at page 3 emphasizes that "It is

the company on behalf of its separate account and not the policy owners that will be the

limited partner in the partnership".   The AGL PPM advises policy owners to read "The

attached American Masters Opportunity Insurance Fund, L.P. Private Placement

Memorandum and Limited Partnership Agreement for additional information regarding

this partnership".  Amended Complaint, ¶¶36-37.

The said limited partnership agreement is dated January 1, 2001 and expressly

precludes the General Partner from accepting any communications from any policy

owners concerning the assets held in the insurance company's separate account.

Subsequent private placement memorandums prepared and disseminated by Defendants

and the Tremont Opportunity Fund boldly contain the following advisory:

> **(A)  OWNERS OF A VARIABLE CONTRACT ARE
> RESTRICTED IN THAT THEY SHALL HAVE
> NO CONTACT, EITHER DIRECTLY OR
> INDIRECTLY, WITH THE GENERAL PARTNERS
> REGARDING ANY INVESTMENT MATTERS
> REGARDING THE GENERAL PARTNERS'
> INVESTMENT STRATEGIES AND DECISIONS
> CONCERNING INVESTMENT PARTNERSHIP
> ASSETS.  EACH PARTICIPATING INSURANCE
> COMPANY MUST FULLY DISCLOSE SUCH
> PROHIBITION ON COMMUNICATIONS TO THE
> VARIABLE CONTRACT OWNERS.**

Amended Complaint, ¶37.

**6.**     <u>**Events Leading up to the Discovery of the Fraudulent Activities**</u>

In or about September 27, 2001, Mr. Rulle created the Michael S. Rulle Family Dynasty Trust, under the laws of the State of Alaska, which was funded by Mr. Rulle and became the applicant investor under the Policy.  Plaintiff is identified therein as "Contract Holder" and "Beneficiary".  Amended Complaint, ¶24.

After the Plaintiff trust was created and funded, between October, 2001 and December, 2008, Mr. Rulle periodically requested information from AGL concerning the diversification of the investment.  The last such inquiry occurred in or about September 2008 when he was advised by the AGL's representative, Stanley Geyelin, that the top 10 portfolio holdings allocated by investment managers were as follows:

| | |
|---|---|
| Rye Select Broad Market Prime Fund LP<br>Equity Market Neutral | 10.35% |
| Rye Select Broad Market Prime LP<br>Equity Market Neutral | 6.53% |
| Rye Select Broad Market XL Fund LP<br>Equity Market Neutral | 3.76% |
| Green Light Capital Qualify LP<br>Long/short equity | 3.09% |
| Scoggin Capital Management LP II<br>Event Driven | 2.70% |
| Stark Investments LP<br>Multi-strategy | 2.28% |
| Draw Bridge Special Opportunities Fund LP<br>Event Driven | 2.27% |
| Rye Select Equities Fund<br>Long/short equity | 2.24% |
| High Bridge Asia Opportunities Fund LP<br>Multi-strategy | 2.19% |

> D.B. Zwirn Special Opportunities Fund LP   2.05%
> Event Driven

Rulle Aff., ¶21.

The foregoing was consistent with Mr. Rulle's expectation as to the allocation among the managers, showing diversification and no high concentrations of investments. Rulle Aff., ¶22.

In or about January 2009, AGL advised Mr. Rulle that significant portions of the moneys that he had provided to AGL under the Policy had, in fact, been invested in a number of funds all of which were ultimately managed and controlled by Bernard Madoff. AGL advised that because of the activities of Bernard Madoff stealing the funds through the use of his Ponzi Scheme, the Plaintiff's account was now reduced by the amount of that loss; approximately $1.1 million or more. AGL's position that the theft of those funds by Bernard Madoff and the entities that he controlled and managed constitutes an "investment loss," which AGL sees as being the result of an adverse "investment performance" thus justifying a decrease in the value of Plaintiff's account by the amount of the "investment loss". Rulle Aff., ¶15.

Any considerations of investment performance by a money manager are evaluated in terms of risk factors attendant with the investment. In the AGL Private Placement Memorandum (Defendant's Exhibit 1), as stated on page 14, there are identified risk factors "associated with the investment" of which each policy owner is advised to be aware. In the AGL PPM, the policy owners are advised to be aware of (1) the risk of poor performance or default by one or more issuers of securities that comprise the Investment Accounts assets; (2) the risks of adverse governmental regulations effecting industries and consequently, companies in such industries whose shares are held by the

Investment Accounts; (3) the risks of interest rate fluctuations; (4) the risks of inherent price movements, high portfolio turnover, and related transaction costs for smaller companies; and (5) the risks inherent in securities of non-US issuers who generally will not be registered with the SEC or subject to SEC reporting requirements.  Rulle Aff., ¶16.

In Part II of the AGL PPM, the policy owner is advised to consider risk factors associated with the Tremont Partnership and identifies 24 categories of risk in that section.  No where in any of the private placement documents is there consideration of "risks associated with an investment in the policy" which encompasses or itemizes or contemplates a theft of funds by fraud or otherwise.[2]  AGL by their own definitions contained within the private placement memorandums promulgated by them, does not identify or consider <u>investment risks</u> as encompassing theft of the funds by fraud, Ponzi Scheme or otherwise.  Such losses by theft are not considered by AGL to be <u>investment losses</u> and they are not considered to be the type of losses associated with the term <u>investment loss</u>.  Because of this, they are not investment losses against which AGL can reduce the valuations in the Investment Account as the contract language in the AGL Insurance Contract specifically provides for reduction of the valuations based only upon investment losses, not theft.  Rulle Aff., ¶17.

Under both the AGL Insurance Contract dated October 5, 2001 and the AGL PPM dated October 2, 2001, account values under the policy and the contracts can decrease in value due to <u>investment results</u> only.  See part 6, page 15 of the AGL Insurance Contract and see page 18 of the AGL PPM.  Rulle Aff., ¶18.

---

[2] Also, no where does AGL identify as a risk the fact that although they selected the Tremont Partnership, an investor should not rely upon them that such selection was not the result of their due diligence review or that this selection of the Tremont Partnership carries no weight and should not be relied upon.

## LEGAL ARGUMENT

This is a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Discovery has not yet begun, and based on Defendant's motion, there are significant material facts in dispute. To defeat Defendant's motion, it is not necessary for Plaintiff to show that it will prevail on its claims; nor is it necessary for Plaintiff to provide detailed facts. Plaintiff must merely state plausible causes of action based on the applicable law, and put Defendant on fair notice as to what Plaintiff's claims are.

At the center of this matter is the Flexible Premium Variable Life Insurance Contract ("the Policy") an insurance product that is governed both by insurance law and securities law. As a contract, it also is governed by state contract law. Thus, in construing the allegations of the Complaint, it is necessary to consider the Policy in light of the applicable statutory and regulatory framework that seeks to protect insureds and investors such as Plaintiff.

A further consideration is the various state and federal law that may apply. Plaintiff is an Alaskan Trust. The Policy provides for Alaska law to apply. The beneficiaries are New Jersey residents, the Trust document was created by New Jersey counsel, and Michael Rulle, grantor of the Trust, is a New Jersey resident. Defendant is a Pennsylvania corporation, and thus subject to the laws of Pennsylvania, but required to abide by the laws of the State of Alaska in connection with the Policy. Defendant is also bound by federal securities law. The case is venued in Federal District Court in Pennsylvania because it is the only location that provides complete diversity. Issues of choice of law are typically not determined on a motion to dismiss, particularly where, as here, there are disputed issues of material fact. Nevertheless, Plaintiff respectfully

submits that it states plausible and cognizable claims under the Complaint and the

proposed Amended Complaint, and that therefore, Defendant's motion should be denied.

## I. DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE THE COMPLAINT STATES PLAUSIBLE CAUSES OF ACTION.

Contrary to Defendant's assertions, the Complaint states sufficient factual matter

to state a claim for relief as to each of the individual causes of action, which are each

cognizable under law. As such, the Complaint meets the standards under Fed. R.Civ. P. 8

and 9. Accordingly, Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)

should be denied.

Rule 12(b)(6) motions test the sufficiency of a pleading. Petruska v. Gannon

University, 462 F.3d 294, 302 (3d Cir. 2006), cert. denied, 127 S.Ct. 2098, 167 Led. 2d

813 (2007). As such, it is necessary to look to Rules 8 and 9 to determine whether the

pleading satisfies the standards stated therein. Rule 8 provides, in pertinent part, as

follows:

> (a) Claim for Relief. A pleading that states a claim for relief must contain:
>
> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a). (emphasis added)

In short, to be successful on a motion to dismiss pursuant to Fed. R. Civ. P.

12(b)(6), the movant must show that the pleader has failed to do what he or she was

obligated to do under Rule 8 and Rule 9.  Hefferman v. Bass, 467 F.3d 596, 599-600 (7th

Cir. 2006) (noting that Rule 12(b)(6) "does not stand alone", but implicates Rules 8 and

9.

In explaining the requirement, the Supreme Court, in Bell Atlantic Corp. v.

Twombly, 550 U.S. 544 (2007), noted that Fed. R. Civ. P. 8 "requires a 'showing,' rather

than a blanket assertion, of entitlement to relief." Twombly, supra., 550 U.S. at 576, n. 3.

However, it must be noted that "[w]hile the Supreme Court's emphasis [in Twombly] on

Rule 8's requirement of "showing" is new, the Court also expressly reaffirmed that Rule

8 requires only a short and plain statement of the claim and its grounds." Phillips v.

County of Allegheny, 515 F.3d 224, 232, citing Twombly, 550 U.S. at 576, and noting

that "[e]ven the dissent in Twombly did not believe that the requirement of Rule 8

"showing" by itself, had any other meaning. Id., (Stevens, J., dissenting.) In addition,

"once a claim has been stated adequately, it may be supported by showing any set of facts

consistent with the allegations in the complaint."    Twombly, supra., 550 U.S. at 563.

In Ashcroft v. Iqbal, 129 S.Ct. 1937, 173 L.Ed. 2d 868 (2009), the Supreme Court

most recently stated, citing Twombly:

> Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a
> "short and plain statement of the claim showing that the pleader is entitled
> to relief." "[D]etailed factual allegations" are not required, Twombly, 550
> U.S. at 555, but the Rule does call for sufficient factual matter, accepted as
> true, to "state a claim to relief that is plausible on its face." Id., at 570.

Ashcroft v. Iqbal, supra. 129 S.Ct. at 1949.

As explained by the Third Circuit in Fowler v. UPMC Shadyside, 578 F.3d 203,

210-211 (3d Cir. 2009) a motion to dismiss requires a two-part analysis:

> First, the factual and legal elements of the claim should be separated.  The
> District Court must accept all of the complaints well-pleaded facts as true,

but may disregard any legal conclusions. [citing Iqhal] Second, a District
Court must then determine whether the facts alleged in the complaint are
sufficient to show that the plaintiff has a "plausible claim for relief." Id. at
1950. In other words, a complaint must do more than allege the plaintiff's
entitlement to relief. A complaint has to "show" such an entitlement with
its facts. See Phillips,, supra., 515 F.3d at 234-35.

Id.

Whether a claim is "plausible" depends on the context. In each context, the court

must determine what allegations are necessary to show that recovery is "plausible."

Limestone Dev. Corp. v. Vill. Of Lemont, III, 520 F.3d 797, 803-04 (7th Cir. 2008)

(noting that specific requirements 'will depend on the type of case.')

For each of the individual claims, Plaintiff states adequate allegations giving rise

to a plausible and cognizable claim. These are more fully addressed, infra. By way of

summary, they are as follows:

- **Breach of Contract -** Plaintiff states a cause of action for breach of contract. As
  more fully discussed II, infra Count One of the Complaint alleges that a contract
  was formed, that the contract provided for the method of valuation of the account,
  that Defendant improperly valued the account to zero, that said improper
  valuation constitutes a breach of the contract and that Plaintiff was injured by said
  breach.

- **Breach of Fiduciary Duty.** Plaintiff states a claim for breach of fiduciary duty
  under several theories. First, by law, there is a fiduciary duty between the insurer
  and insured. Second, a fiduciary duty arises out of defendant's status as an
  investment advisor. Third, there is a fiduciary duty by virtue of common law
  principles of agent and principal. All three of these duties arise out of the
  contract. As an insurer, Defendant was obligated to exercise due care and
  diligence in the management of Plaintiff's premiums. As a broker-dealer/
  investment advisor, Defendant was obligated to monitor and maintain Plaintiff's
  account and act in Plaintiff's best interest. Under general principles of principal
  and agent, Defendant voluntarily took on certain fiduciary duties. By failing to
  perform due diligence, monitor and maintain the investments, Defendant breached
  its fiduciary duty, resulting in harm to Plaintiff.

- **Common Law Duty of Good Faith and Fair Dealing.** This arises out of the
  fiduciary duty that is implied in every insurance contract under Alaska law. It
  provides that neither party will do anything to deprive the other of the fruits of the

contract.  The contract provided for Plaintiff's account to be valued in accordance with the investment performance of the premiums Plaintiff invested and further contemplated that the monies would be invested consistent with Plaintiff's investment objectives.  By failing to do so, Defendant deprived Plaintiff of the fruits of the contract, and thus, breached its implied covenant of good faith and fair dealing.

- **Securities Fraud Pursuant to 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)**
- **Violation of the Alaska Securities Act, A.S. 45:55-12(a) et seq. and the Pennsylvania Securities Acts §1-401(b) and 1-501(g)**

    Plaintiff has brought suit under the applicable federal and state securities acts against Defendant for violations of the terms of its own contracts, i.e. the Policy, memorandums and attendant offering materials which required Defendants to engage in meaningful due diligence, professionally monitor the investment funds and to calculate the Policy "fees" based upon real, not illusory, assets and earnings.

- **Professional Negligence, Gross Negligence or Negligence.**  Plaintiff alleges professional negligence under Alaska law based on Defendant's duty of reasonable care as investment managers/insurers with discretionary control over the assets entrusted to it by Plaintiff, and to otherwise act in a prudent and professional manner expected of any reasonable insurance or investment professional, that Defendant breached its duty of reasonable care, resulting in harm to Plaintiff.

- **Negligent Misrepresentation.**  Plaintiff's claim is based on Defendant's representations through its Private Placement Memorandum that no more than 5% to 6% of Plaintiff's monies would be invested in any one account, and that the investments to be made were "equity market neutral," as well as on certain omissions and a failure to disclose material facts, including the fact that approximately 23% of Plaintiff's account had been invested in a single fund, and the fact that Defendant had not performed the requisite due diligence with respect to the investments, and was not monitoring the investments.

- **Unjust Enrichment**.  Plaintiff's unjust enrichment claim is based on the fact that it paid significant management fees to Defendant.  The Policy and PPM did not set forth what Defendant was to do in exchange for the management fees.  Thus, Defendant's receipt of them without providing anything in exchange does not constitute a breach of contract; rather, it constitutes unjust enrichment because, in fact, Defendant received "something for nothing."

Although as stated above and herein, Plaintiff's Complaint states plausible and

cognizable causes of action as required by Rules 8 and 9, based on Defendant's motion

and documents supplied, Plaintiff respectfully seeks leave to file an amended complaint

to more completely state Plaintiff's claims as now known.

## II.   PLAINTIFF'S COMPLAINT STATES A CAUSE OF ACTION FOR BREACH OF CONTRACT AND SUFFICIENT FACTUAL MATTER TO SHOW THE STRONG LIKELIHOOD THAT DEFENDANT BREACHED THE CONTRACT, THUS EXCEEDING THE REQUIREMENTS UNDER RULE 8.

Defendant's challenge of Plaintiff's breach of contract claim does not assert a

contention that the Complaint does not properly allege a claim for breach of contract,

rather, Defendant improperly attacks the underlying facts, contending that there was no

breach of contract and therefore the count should be dismissed.  Defendant's argument is

thus akin to a Rule 56 summary judgment motion, and as such, premature and

inappropriate in a motion to dismiss.  Thus, it is respectfully submitted that Defendant's

motion dismissing the breach of contract claim should be denied.  Moreover, as more

fully discussed infra., not only does Plaintiff state a cause of action for breach of contract,

but Plaintiff also provides ample factual and evidential information indicating that, in

fact, Defendant breached the contract.

The Complaint alleges that the Flexible Premium Variable Life Insurance

Contract ("the Policy") was validly entered into between Plaintiff and Defendant,

providing that Plaintiff's Investment Accounts would be valued in accordance with

investment performance.  It further alleges that Defendant caused the account to be

reduced to zero based on fraudulent activities, which was contrary to the express terms of

the Policy, constituting a breach which caused Plaintiff to suffer damages as a result.

Accordingly, Plaintiff has stated a plausible and cognizable cause of action for breach of

contract.

It is undisputed that Alaska law governs the Policy.  As provided on page 3 of the Policy, Alaska is identified as the "governing jurisdiction" and the "state of issuance." Under Alaska law, to state a cause of action for breach of contract, a plaintiff need only allege facts which indicate that the defendant had a contractual obligation to the plaintiff; that the defendant breached this contractual obligation; and that the plaintiff suffered damage as a result of the breach.  Great Western Savings Bank v. George W. Easley Co., 778 P.2d 569, 577 (Alaska 1989). *See also* D.J. Moore Corp. v. Cook Inlet Region, Inc., S-4272, 1992 WL 12549796 (Alaska May 6, 1992).  Plaintiff has done this.  Accordingly, Plaintiff has met the standard under both Alaska law and Rule 8.

Defendant contends that the Policy must be interpreted by the court, as a matter of law because Defendant contends that there are no facts in dispute, and that the "only reasonable reading of the Policy as to the matters alleged . . . belies Plaintiff's claim." See Defendant's Memorandum of Law In Support of Its Motion to Dismiss the Complaint (Db) at 8.  First, contrary to Defendant's contention, there are material issues of disputed fact as to control of investments and the account, as well as the circumstances surrounding the formation of the contract.  Specifically, Defendant contends that Michael Rulle approached John Hillman, and that Mr. Rulle told Defendant "that he wished to have the American Masters Opportunity Insurance Fund, L.P. . . . .included as his primary investment option under the policy."  Hillman Aff. at ¶ 2.  Nothing could be further from the truth.  In fact, Mr. Hillman sought out Mr. Rulle to "pitch [him] to invest, both personally and on behalf of my clients/colleagues, in four or five different investment products using a life insurance platform."  Rulle Aff. at ¶7.  However none of the investment products proposed were suitable, and Mr. Rulle declined, advising Mr.

Hillman to contact him if he obtained an investment vehicle that met Mr. Rulle's needs. Rulle Aff. at ¶7.   When Mr. Hillman contacted Mr. Rulle again, he advised "that AGL had obtained a fund of funds then entitled American Masters Opportunity Insurance Fund, L.P." and that it "was a highly professional and reputable fund which had been selected by AGL to participate in the flexible premium variable rate life insurance policy of AGL." Rulle Aff. at ¶10.   The American Masters fund was only one of two investment account options, and Mr. Rulle had never heard of it before Mr. Hillman's call. Rulle Aff. at ¶10.   Defendant contends that "the decision to invest in the Tremont Fund was made by Michael Rulle long before the Trust was created, after AGL provided him with information about various investment options for the Policy." Db 26.   In fact, the Trust was created after Mr. Hillman assured Mr. Rulle that "this fund-of-fund" he (AGL) offered satisfied my concerns about the investment funds . . . . It was to be a highly diversified fund and [Mr. Rulle] would be as far removed from making investment decisions as possible." Rulle Aff. at ¶10.   Mr. Rulle was further assured "that no money manager in the fund would control more than 7% of the aggregate funds invested and that AGL would be a limited partner with access to oversight of the general partner of the fund." Rulle Aff. at ¶10.   Thus, Defendant's contention that the parties' operated "at arm's length" and that Plaintiff directed and controlled the investment is highly disputed. As more fully discussed, infra., there is a fundamental dispute as to what constitutes an investment loss within the meaning of the Policy and/or pursuant to law.   In addition, Defendant contends that it had no duty to control and monitor the investment, and Plaintiff contends that it relied upon Defendant's control and management to ensure that the monies were invested in accordance with Defendant's investment objectives.

Accordingly, the matter should not be determined on a motion to dismiss.[3]  Second, even

if there were not material factual issues in dispute, Defendant's contentions that the

Policy allowed the devaluing of Plaintiff's account are without support under the terms

and language of the Policy.

A.     **"Capital Loss" does not include losses due to fraud or theft.**

The Policy provides, in pertinent part, as follows:

The value of an Investment Account reflects:

- Any amounts transferred to the Investment Account during the current Valuation Period;

- The investment income and realized and unrealized capital gains credited to such assets in the Valuation Period;

- Any amounts transferred from an Investment Account during the current Valuation Period;

- Realized and unrealized capital losses charged against those assets during the Valuation Period;

- Any amount charged or reserved against the Investment Account for taxes;

- Any expenses charged or reserved against the Investment Account for expenses incurred in operating such Investment Account;

- The mortality and expense risk change for the Valuation Period; and

- Any other Monthly Charges deducted from the Investment Account for This Contract.

See Policy at Part 5, page 13, attached to the Complaint as Exhibit "A". (emphasis

---

[3] The cases Defendant cites in support of its contentions are distinguishable.  State v. Fairbanks N. Star Borough Sch. Dist., 621 P.2d 1329, 1331 (Alaska 1981) and Fairbanks N. Star Borough v. Tundra Tours. Inc., 719 P.2d 1020, 1024 (Alaska 1986) were both decided on motions for summary judgment, after discovery had been completed and there were no disputed issues of fact.  Valdez Fisheries Dvpt. Ass'n Inc. v. Alyeska Pipeline Serv. Co., 45 P.3d 657, 665 (Alaska 2002) is distinguishable on its facts:  whether a contract had in fact been created was a threshold issue, and the issue was one of law.

added).

Apparently referring to the above, Defendant argues that the only one reasonable interpretation of the policy permits the Defendant to deduct losses that occur due to theft or fraud. See Db at 9 ("Losses that the Tremont Fund experienced because certain funds in which it invested reported losses due to the Madoff fraud is indisputably a capital loss of the Tremont Fund.") (emphasis added.) Notably, however, Defendant provides no legal or factual support for its contention that capital losses include theft or fraud losses. A review of the policy reveals no provision or definition that specifies that "capital losses" should be read to include losses from fraud or theft. Defendant does not even attempt to include this as a "catch-all."[4]

Research also reveals no statute or case that interprets "capital loss" to include losses from fraud or theft. To the contrary, the Internal Revenue Code treats them as separate losses. Specifically, the Internal Revenue Code considers investment losses to be capital losses, deductible only to the extent of $3,000 in excess of the capital gain experienced by the taxpayer for the year in question. See 26 U.S.C.A. §1211(b). Losses that occur due to a fraudulent investment scheme, on the other hand, are considered "theft losses", and are not subject to the same limitations as capital losses. See 26 U.S.C.A. § 165(a),(c). In Rev. Rul. 2009-9 (March 17, 2009), the IRS announced its position that "theft losses" resulting from investments are not subject to the limitations on itemized deductions found in 26 U.S.C.A. §§ 67 and 68.

In addition, the Tax Court has held that account valuation losses arising out of illegal activities constitute theft. Investment loss, on the other hand, are declines that

---

[4] Perhaps the reason AGL did not attempt to utilize such a catch-all that would include "fraud" as a possible loss or risk is because it is clear under securities law that buyers do not anticipate losses due to fraudulent activities and are not in a position to protect themselves from such a risk.

might be attributable to business risks, market decline, poor or derelict management. Paine v. Commissioner, 63 T.C. 736 (1975), aff'd in unpublished opinion, 523 F.2d 1053 (5th Cir. 1975).  Noting that "[t]heft loss deductions have been sustained by this Court in numerous cases in which the theft consisted of false representations made to the petitioner which induced him to part with his money or property [citations omitted]," the court stated that determination of whether an activity constitutes a theft requires application of the law of the state where the loss was sustained. Edwards v. Bromberg, 232 F.2d 107 (5th Cir. 1956).  The types of fraudulent activities at issue here appear to constitute "theft" under Alaska law.[5]

## B.   Risk of Investment Loss Does Not Include Theft or Fraud.

In addition to the foregoing, Defendant contends that "[n]owhere does the contract support Plaintiff's further gloss on that language that an actual loss of investment value which traces down to fraud by a second-tier fund manager is excluded." Db at 9. Defendant is apparently contending that because the Policy did not exclude "fraud" as a possible loss or risk, it therefore must be included.  Defendant's sole support for this contention is "the clear language, as well as logic, of the Policy."  Db at 9.

In Alaska, it is well-settled that insurance contracts are to be regarded as contracts of adhesion. Whispering Creek Condo. Owner Ass'n v. Alaska Nat. Ins. Co., 774 P.2d 176, 177-178 (Alaska 1989), citing  Jarvis v. Aetna Cas. & Sur. Co., 633 P.2d 1359, 1363

---

[5] A person commits theft if
(1) with intent to deprive another of property or to appropriate property of another to oneself or a third person, the person obtains the property of another;
(2) the person commits theft of lost or mislaid property under AS 11.46.160;
(3) the person commits theft by deception under AS 11.46.180;
(4) the person commits theft by receiving under AS 11.46.190;
(5) the person commits theft of services under AS 11.46.200;
(6) the person commits theft by failure to make required disposition of funds received or held under AS 11.46.210.   A.S. § 11.46.100 (West)

(Alaska 1981); U.S. Fire Ins. Co. v. Colver, 600 P.2d 1, 3 (Alaska 1979).  Interpreting an

insurance policy "is a matter for the court, unless its interpretation is dependent upon the

resolution of controverted facts." CNA Ins. Co. v. Lightle, 364 F. Supp. 2d 1068, 1072-

1073 (D. Alaska 2005), citing  Whispering Creek v. Alaska Nat. Ins. Co., 774 P.2d 176,

177 (Alaska 1989) (quoting Hale v. Fireman's Fund Ins. Co., 731 P.2d 577, 579 (Alaska

1987)).

> The Alaska Supreme Court noted that when interpreting an insurance policy:
>
> [T]he court's goal is to enforce the "objectively reasonable expectations of
> ... intended beneficiaries regarding the [policy's] terms ...." Those
> expectations are determined by "looking to (1) the language of the
> disputed provisions in the policy, (2) other provisions in the policy, (3)
> extrinsic evidence, and (4) case law interpreting similar provisions." If the
> policy contains ambiguous terms, they are construed against the insurer.
> Terms are ambiguous  if they are "reasonably subject to differing
> interpretations."

CNA Ins. Co., supra., 364 F. Supp. 2d at 1072-1073 (citations omitted).

In considering "reasonable expectations", the terms are to be construed  "so as to

provide that coverage which a layperson would have reasonably expected from a lay

interpretation of the policy terms." U.S. Fire Ins. Co., 600 P.2d at 3. See also Starry v.

Horace Mann Ins. Co., 649 P.2d 937, 939 (Alaska 1982).  In particular, insurance

provisions that favor the insured are to be broadly construed while language that limits

the policy is to be interpreted narrowly. Starry, 649 P.2d at 939.

Here, the Grantor of the Rulle Trust had certain expectations.  Among these

expectations were that the Policy would be invested in diversified investments, and that

said investments were safe and of moderate risk.  Rulle Aff. at ¶10.  The expectation was

that the account would be valued in accordance with the investment performance of those

investments, and a plain reading of the Policy supports that reasonable expectation.

Specifically, the Policy provides for the Account Value to be determined based on the following:

> The Account Value when the Initial Premium is received is equal to the Net Premium invested in the Investment Accounts; less:
>
> > (d)    Cost of Insurance Charges (deducted on each monthly calculation date); and
> > (e)    Policy loads; and
> > (f)    Any Charges for Special Insurance Class Rating;
>
> . . .
>
> The Account Value on any subsequent Valuation Day is equal to the Account Value on the prior Valuation Day plus:
>
> > (d)    any new Net Premium invested in the Investment Accounts; and
> > (e)    <u>any increase in value of the Investment Account due to investment results (net of Mortality and Expense Risk Charges and any Asset Charges</u>; and
> > (f)    any interest credited to the Borrowed Fund;
> > less;
> > (h)    <u>any decrease in value of the Investment Account</u>; and
> > (i)    Cost of Insurance Charges (deducted only on Monthly Calculation Date); and
> > (j)    any Partial Withdrawals taken; and
> > (k)    any Rider Charges deducted from the Account Value; and
> > (l)    any Policy Loads; and
> > (m)    any Charges for Special Insurance Class Rating; and
> > (n)    any Other Charges as stated in Contract Schedule B.

<u>See</u> Policy, attached to the Rulle Aff. as **Exhibit "A".**

Defendant apparently contends that the foregoing language-- "any decrease in value of the Investment account"-- includes loss due to theft and fraud. However, such an interpretation is clearly contrary to the reasonable expectations of Plaintiff, as evidenced by the risks enumerated in the AGL PPM, incorporated by reference into the Policy and setting forth the types of risks to be assumed by Plaintiff.

Specifically, the identified risk factors "associated with the investment" on page 14 of the AGL PPM include: (1) the risk of poor performance or default by one or more

insurers of securities that comprise the Investment Accounts assets; (2) the risks of

adverse governmental regulations effecting industries and consequently, companies in

such industries whose shares are held by the Investment Accounts; (3) the risks of interest

rate fluctuations; (4) the risks inherent price movements, high portfolio turnover, and

related transaction costs for smaller companies; and (5) the risks inherent in securities of

non-U.S. issuers who generally will not be registered with the SEC or subject to SEC

reporting requirements.  Rulle Aff. ¶16.

Similarly, in Part II of the AGL PPM, the policy owner is advised to consider risk

factors associated with the Tremont Partnership and identifies 24 categories of risk in that

section.  Significantly, no where in any of the private placement documents is there

consideration of "risks associated with an investment in the policy" which encompasses

or itemizes or contemplates a theft of funds by fraud or otherwise.  Rulle Aff. ¶17.

Moreover, in defining "investment risks", AGL  does not identify or consider investment

risks as encompassing theft of the funds by fraud, Ponzi Scheme or otherwise.  Under

both the AGL Insurance Policy dated October 5, 2001 and the AGL PPM dated October

2, 2001, account values under the policy and the contracts can decrease in value due to

investment results only.  Rulle Aff. ¶¶17-18.  Investment results, whether interpreted by

the Policy and AGL PPM or general industry standards, do not include risks associated

with fraud or theft.

Specifically, in addressing "investment risk", the Financial Industry Regulatory

Authority ("FINRA")[6] notably does not include "fraud" or "theft" as one of the risks that

investors should be expected to manage.  See FINRA - Managing Investment Risk,

---

[6] According to its website, FINRA "is the largest independent regulator for all securities firms doing business in the United States ... oversee[ing] nearly 4,750 brokerage firms, about 167,000 branch offices

http://www.finra.org/Investors/SmartInvesting/AdvancedInvesting/ManagingInvestment

Risk/index.htm.

FINRA describes the two types of investment risk:  systemic and non-systemic, as

well as a catch-all, "other."  Notably, none of these include risks from theft or fraud:

> **Types of Investment Risk**
> There are many different types of investment risk. The two general types
> of risk are:
> * Losing money, which you can identify as investment risk
> * Losing buying power, which is inflation risk
>   It probably comes as no surprise that there are several different ways you
>   might lose money on an investment. To manage these risks, you need to
>   know what they are.
>
> Most investment risk is described as either systematic or nonsystematic.
> While those terms seem intimidating, what they refer to is actually
> straightforward.

Id.

FINRA describes "systemic risk" as "market risk . . . relate[d] to factors that

affect the overall economy or securities market." Id.  Specifically:

> Systematic risk affects all companies, regardless of the company's
> financial condition, management, or capital structure, and, depending on
> the investment, can involve international as well as domestic factors. Here
> are some of the most common systematic risks:
>
> * **Interest-rate risk** describes the risk that the value of a security will go
>   down because of changes in interest rates. For example, when interest
>   rates overall increase, bond issuers must offer higher coupon rates on new
>   bonds in order to attract investors. The consequence is that the prices of
>   existing bonds drop because investors prefer the newer bonds paying the
>   higher rate. On the other hand, there's also interest-rate risk when rates fall
>   because maturing bonds or bonds that are paid off before maturity must be
>   reinvested at a lower yield.

---

and approximately 634,000 registered securities representatives."  It was "[c]reated in July 2007 through
the consolidation of NASD and the member regulation, enforcement and arbitration functions of the New
York Stock Exchange, [and] is dedicated to investor protection and market integrity through effective and
efficient regulation and complementary compliance and technology-based services."

- **Inflation risk** describes the risk that increases in the prices of goods and services, and therefore the cost of living, reduce your purchasing power. Let's say a can of soda increases from $1 to $2. In the past, $2 would have bought two cans of soda, but now $2 can buy only one can, resulting in a decline in the value of your money.

  Inflation risk and interest rate risk are closely tied, as interest rates generally rise with inflation. Because of this, inflation risk can also reduce the value of your investments. For example, to keep pace with inflation and compensate for the loss of purchasing power, lenders will demand increased interest rates. This can lead to existing bonds losing value because, as mentioned above, newly issued bonds will offer higher interest rates. Inflation can go in cycles, however. When interest rates are low, new bonds will likely offer lower interest rates.

- **Currency risk** occurs because many world currencies float against each other. If money needs to be converted to a different currency to make an investment, any change in the exchange rate between that currency and yours can increase or reduce your investment return. You are usually only impacted by currency risk if you invest in international securities or funds that invest in international securities.

  . . .

  As with most risks, currency risk can be managed to a certain extent by allocating only a limited portion of your portfolio to international investments and diversifying this portion across various countries and regions.

- **Liquidity risk** is the risk that you might not be able to buy or sell investments quickly for a price that is close to the true underlying value of the asset. Sometimes you may not be able to sell the investment at all if there are no buyers for it. Liquidity risk is usually higher in over-the-counter markets and small-capitalization stocks. Foreign investments can pose liquidity risks as well. The size of foreign markets, the number of companies listed, and hours of trading may limit your ability to buy or sell a foreign investment.

- **Sociopolitical risk** is the possibility that instability or unrest in one or more regions of the world will affect investment markets. Terrorist attacks, war, and pandemics are just examples of events, whether actual or anticipated, that impact investor attitudes toward the market in general and result in system-wide fluctuations in stock prices. Some events, such as the September 11, 2001, attacks on the World Trade Center and the Pentagon, can lead to wide-scale disruptions of financial markets, further exposing investments to risks. Similarly, if you are investing overseas, problems there may undermine those markets, or a new government in a

particular country may restrict investment by non-citizens or nationalize
businesses. . . .

Id.

"Non-systemic Risk", on the other hand, is described as that which "affects a
much smaller number of companies or investments and is associated with investing in a
particular product, company, or industry sector." Id. FINRA provides examples of "non-
systemic risk":

- **Management risk**, also known as company risk, refers to the impact that
  bad management decisions, other internal missteps, or even external
  situations can have on a company's performance and, as a consequence, on
  the value of investments in that company. Even if you research a company
  carefully before investing and it appears to have solid management, there
  is probably no way to know that a competitor is about to bring a superior
  product to market. Nor is it easy to anticipate a financial or personal
  scandal that undermines a company's image, its stock price, or the rating
  of its bonds.

- **Credit risk**, also called default risk, is the possibility that a bond issuer
  won't pay interest as scheduled or repay the principal at maturity. Credit
  risk may also be a problem with insurance companies that sell annuity
  contracts, where your ability to collect the interest and income you expect
  is dependent on the claims-paying ability of the issuer.
  One way to manage nonsystematic risk is to spread your investment
  dollars around, diversifying your portfolio holdings within each major
  asset class—stock, bonds, and cash—either by owning individual
  securities or mutual funds that invest in those securities. While you're
  likely to feel the impact of a company that crashes and burns, it should be
  much less traumatic if that company's stock is just one among several you
  own.

Id.

Finally, FINRA describes "other investment risks." These are "investment
decisions [an investor makes] –and sometimes those [an investor] avoid[s] making—that
can expose [an investor] to certain risks that can impede [an investor's] progress toward
meeting [his or her] investment goals." Id.

For example, buying and selling investments in your accounts too
frequently, perhaps in an attempt to take advantage of short-term gains or
avoid short-term losses, can increase your trading costs. The money you
spend on trading reduces the balance in your account or eats into the
amount you have to invest. If you decide to invest in something that's
receiving a lot of media attention, you may be increasing the possibility
that you're buying at the market peak, setting yourself up for future losses.
Or, if you sell in a sudden market downturn, it can mean not only locking
in your losses but also missing out on future gains.

You can also increase your investment risk if you don't monitor the
performance of your portfolio and make appropriate changes. For
example, you should be aware of investments that have failed to live up to
your expectations, and shed them when you determine that they are
unlikely to improve, using the money from that sale for another
investment.

Id.

Significantly, in identifying investment risk—whether systemic, non-systemic or

"other, FINRA does not include any consideration of theft or loss as risk to be identified

as "investment risk." Id. Accordingly, the allegation that the Policy provided that

Plaintiff's Investment Accounts would be valued in accordance with investment

performance, and that Defendant's actions in valuing the account to zero based on

fraudulent activities was contrary to the provisions of the Policy is a plausible reading of

the Policy and therefore, states a claim for breach of contract within the requirements of

Fed. R. Civ. P. 12b(6) and 8.

Defendant also argues that, to the extent Plaintiff seeks to include a breach of

contract claim based upon AGL's investment of "Plaintiff's premiums with Tremont,

thereby causing some of that money to be invested by Tremont in funds or accounts

ultimately victimized by Madoff," said claim must fail. Db at 9. Defendant contends

that by "the most cursory reading of the Policy", providing for "Net Premiums [to] be

allocated to or among Investment Accounts in accordance with [the Rulle Trust's]

35

instructions", AGL was contractually obligated to invest the monies as directed.  Db at 9.

Defendant bases its contention on the assertion that "[p]laintiff elected to invest 100% of

its Policy premiums with Tremont."

In fact, the AGL PPM #704, dated October 2, 2001 attached to the defendant's

exhibits as Exhibit 1, offered only two investment account choices – (1) money market

account or (2) American Masters Opportunity Insurance Fund, L.P. account.  Moreover,

at all times, Plaintiff's expectation—and AGL's representation—was that the investment

was to be diversified.    Rulle Aff. at ¶10

Defendant further argues that "there is no allegation anywhere that AGL even

knew what managers Tremont was investing with, let alone that AGL was aware that one

of those managers was Madoff." Db10  It is Plaintiff's contention that it was AGL's

obligation to know this information, and the failure to perform due diligence and inquiry

as to the investment was a breach of AGL's obligation under the Policy and as a matter of

law.

III.    **PLAINTIFF HAS ASSERTED A VIABLE CLAIM UNDER THE ANTI-**
        **FRAUD PROVISIONS OF SECTION 10(b) and SEC RULE 10b-5**

Plaintiff has alleged violations of Federal and State Securities anti-fraud

provisions in Counts IV and V of its Complaint and Amended Complaint, specifically

pursuant to Section 10(b) of the 1934 Securities and Exchange Act as amended, codified

at 15 U.S.C. §78j(b and) SEC Rule 10b-5 codified at 17 C.F.R. §240.10b-5(b) (Count IV)

and AS 45:55-12(a) et seq. of the Alaska Statutes and §1-401(b) and 1-501(g) of the

Pennsylvania Securities Act. (Count V)

Count IV of the Complaint and Amended Complaint asserts that Defendant is in violation of Section 10(b) of the Securities Exchange Act of 1934 as amended ("Exchange Act") at 15 U.S.C. §78j(b) and SEC Rule 10b-5 at 17 C.F.R. §240.10b-5(b). These Acts state, in pertinent part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange...
>
> (b) To use or employ, in connection with the purchase and sale of any security registered on a national securities exchange or any security not so registered...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §78j(b).

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5(b).

The variable life insurance policy issued by AGL (the "Policy") is a security as defined under both Acts.[7] Variable life insurance and variable annuity contracts *are securities*, and their distribution is also subject to FINRA rules. See NASD Notice to Members 00-44 (July 2000)[8] (Emphasis supplied).

Similarly, Alaska at AS 45:55-12(a) et seq. and Pennsylvania at §1-401(b) and 1-501(g) of the Pennsylvania Securities Act have analogous anti-fraud statutes which have adopted the Federal language in this context and are alleged in Count V.

Accordingly, the Plaintiff as a purchaser of the Policy is entitled to the protections of these Federal and State Acts.

Plaintiff has brought suit under the applicable Federal and State Securities acts against Defendant for violations of the terms of its own contracts, i.e. the Policy, memorandums and attendant offering materials which required Defendants to engage in meaningful due diligence, professionally monitor the investment funds and to calculate the Policy "fees" based upon real, not illusory, assets and earnings. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 376 F.Supp.2d 385, 407-08 (S.D.N.Y. 2005); Primavera Familienstifung v. Askin, 130 F.Supp.2d 450, 491 (S.D.N.Y. 2001) (recognizing that private placement memoranda may serve as "contracts" establishing the relationship on which investors may sue). Arising out of the Policy and memorandums are Plaintiff's claims of false and misleading statements and omissions, including with respect to the false statements of the value of the Policy assets contained in the monthly statements and periodic reports issued by AGL which serve as a basis for Plaintiff's fraud and deceptive practices claims.  Plaintiff has also sued for AGL's breach of its fiduciary

---

[7] Securities Act of 1934 as amended, 15 U.S.C. §77a et seq. ("Security" defined at §77b(a)(1)).
[8] As applied to all FINRA members pursuant to the FINRA Consolidated Rules.

relationship owed to Plaintiff as its investment advisor which arose from the relationship articulated in the AGL PPM and for which AGL charged Plaintiff fees. See AGL PPM, "Charges Against the Variable Account," p. 25.[9]

A. **Sufficiency of Pleadings Under Rule 9(b)**

In AGL Life Assurance Company's Memorandum of Law in Support of its Motion to Dismiss, Defendant argues that Plaintiff's Federal and State Securities fraud (Counts IV and V of the Complaint) claims do not satisfy Rule 9(b) in that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Additionally, Defendant asserts violations of PSLRA (Private Securities Litigation Reform Act) for essentially the same reasons. For purposes of this response, Plaintiff will address the 9(b) challenge; however, PSLRA does not apply to this action because Plaintiff does not anticipate a "class" as contemplated by the PSLRA.

AGL contends that the pleading does not place the Defendant on sufficient notice to enable it to prepare a meaningful response to the allegations made in Counts IV and V of the Complaint.  See Defendant's Brief p. 11.  Similarly, Defendant argues that the allegations made in these Counts fail to state with sufficient particularity the facts giving rise to the cause of action.  Specifically, Defendant complains that "it is difficult to even determine from the Complaint what statements or omissions form the basis of Plaintiff's claim."  Defendant's brief at p. 11.

To point the Defendant to those paragraphs in the initial filed Complaint from which it can gain the requisite clarity as to the facts from which the Federal Securities law violations emanate, Plaintiff highlights the following paragraphs of its Complaint:

---

[9] "The value of the net assets of each Investment Account will reflect a deduction for  the investment advisory fee and other expenses incurred by that Investment Account (the "Asset Charge").

Paragraph 6.  Rather than investing the premiums in accordance with the terms of the policy agreement and their representations to Plaintiff, Defendant caused the monies to be transferred to investment funds that were ultimately managed or sub-managed by Bernard L. Madoff and/or Madoff Investment Securities LLC (hereafter collectively referred to as "Madoff"), where they were never invested, but rather taken by Madoff.

Paragraph 9.  Among other things, Defendant knowingly and/or recklessly allowed Plaintiff's monies to become placed in certain "investment accounts" held by Rye Select Broad Market Prime Fund L.P., Rye Select Broad Market Fund L.P., Rye Select Broad Market XL Fund, L.P., and Rye Select Equities Fund, all of which were controlled by Madoff, without taking a comprehensive and proper due diligence review to assess the risks involved, given Madoff's connection with these funds and the warning signs present.  As a direct result of Defendant's actions, Plaintiff has suffered damages and/or sustained substantial losses.

Paragraph 25.  To achieve that objective, AGL offered a policy "investment strategy to invest with various portfolio managers believed to be able to meet the Partnership's objective".  The investment was targeted to insurance companies' high net worth clients.

Paragraph 27.  The Private Placement Memorandum described the offering of limited partnership interests in the Tremont Opportunity Fund to insurance companies, and others which interests are designated to be an investment option under the insurance contract sold by the insurance companies.  Although the interests were exempt from registration under the Securities Act of 1933, as amended, pursuant to Regulation D, the interests still constitute securities and were, and are, subject to federal and state securities laws to the extent applicable.

Paragraph 29.  AGL knew, or should have known, how important it was to analyze and evaluate any prospective manager of the investments of the Partnership as each manager chosen by the general partner was to be granted full discretion over all matters relating to the manner, method and timing of

investment and trading transaction with respect to the partnership assets allocated to the manager, subject to the investment objectives, policies and restrictions related to the Partnership or as "otherwise communicated to the manager by the general partner".

Paragraph 30.  AGL represented, through the Private Placement Memorandum, that "[t]he general partner believes... that given its alternative investment market experience, it should be able to obtain sufficient information about potential managers or investment vehicles to select them effectively".  As expressly provided in the Private Placement Memorandum, the general partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in the handling of the partnership's affairs.

Paragraph 31.  AGL, by issuing the Private Placement Memorandum and the partnership agreement of the Tremont Opportunity Fund to Plaintiff and publishing to Plaintiff the statements made therein, mislead Plaintiff because the investments made by it of Plaintiff's funds were not ultimately invested pursuant to the investment strategy outlined as set forth above. The Partnership deposited its funds in Rye Select, and ultimately, in Madoff, as managers of the funds and these funds were subject to Madoff's Ponzi scheme where the funds were not invested but held by Madoff and ultimately lost.

Paragraph 32.  AGL conveyed the false impression that it conducted a thorough investigation and due diligence review of the managers of the funds in which Plaintiff's premiums were to be invested. In reality, AGL did not conduct a comprehensive due diligence review and ignored the warnings that would have alerted it to Madoff's Ponzi scheme.

Paragraph 46.  Specifically, Defendant failed to conduct adequate and comprehensive due diligence reviews on the investment accounts and investment managers that it offered to Plaintiff.  As a result, Defendant ignored numerous warning signs that would have warned it of the fraudulent scheme perpetrated by Madoff. Defendant further caused the dissemination of false and misleading statements and omissions alleged herein.

Paragraph 56.  Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 55 and incorporates the same herein by reference.

Paragraph 57.  Pursuant to the Policy/Contract, Plaintiff

41

elected to invest its monies in an investment account option entitled "American Masters Opportunity Insurance Fund, L.P. Account", later named Tremont Opportunity Fund. As stated in the Policy/Contract, the objective of such account option was to achieve long-term capital appreciation and consistently generate positive returns irrespective of stock market volatility or direction while focusing on the preservation of capital.

Paragraph 58. Defendant represented that Plaintiff's investment would be placed in such accounts, consistent with Plaintiff's investment objectives and the terms of the Policy/Contract and Prospectus provided to Plaintiff by Defendant.

Paragraph 59. Rather than investing the premiums in accordance with the terms of the Policy/Contract, Defendant caused a portion of Plaintiff's monies to be transferred to investment funds that were controlled, taken and lost by Madoff in a fraudulent scheme.

Paragraph 62. Defendant failed to disclose to Plaintiff that the premiums entrusted to Defendant would be invested in fund groups controlled by Madoff.

Paragraph 63. Defendant's misrepresentations and/or omissions were material to Plaintiff, based both on Plaintiff's investment objectives, expectations under the terms of the Policy/Contract/Contract and as a matter of sound and prudent investment principles.

Paragraph 64. Defendant's misrepresentations and/or omissions were material and misleading at the time they were made (or failed to be made) and were made knowingly, with reckless disregard for their truth or falsity and/or without a genuine belief that the information disclosed was accurate and complete in all material respects.

Paragraph 65. Defendant's misrepresentations and/or omissions were made in connection with the purchase or sale of a security pursuant to the prospectus furnished to Plaintiff by Defendant, upon which Plaintiff relied in entering into the Policy/Contract with Defendant.

Paragraph 66. But for Defendant's misrepresentations and/or

omissions, Plaintiff would not have placed the premium monies with Defendant for investment.

## B. **Amended Complaint**

It is respectfully submitted that the foregoing factual statements meet the standards of particularity of Fed. R. Civ. P. 9(b). Nevertheless, having received the benefit of the Defendants' exhibits supplied in its motion to dismiss, and based upon the Affidavit of Michael Rulle submitted herewith in opposition to Defendant's motion, Plaintiff has elected to seek leave to file an Amended Complaint further specifying the factual basis upon which Plaintiff's securities violations arise.

The Amended Complaint specifies the following additional facts:

> 58. AGL had a contractual and fiduciary obligation to the Plaintiff to invest the funds in accordance with the terms of the Policy and the AGL PPM. Such duties also arise under various state and federal statutes in connection with the provision of the Policy.

> 59. As set forth under the AGL PPM, the Policy, and in accordance with the representations of Hillman, the investment strategy for Investment Account #2 (American Opportunity Fund) was to invest the money among diverse and separate investment managers thus insuring a wide diversification of the investment and a significant reduction in the risk of loss.

> 61. Although the reportings of AGL regarding the diversification of the funds appeared to indicate an allocation among managers which were diversified and for which there was no high concentration in any one manager, in fact, the designated Rye Select Fund managers were not separate managers as represented by AGL but instead were all funds that were directly transferred to Madoff. Of the top ten

43

funds identified by AGL as having separate managers as of September 30, 2008, in fact, four of them were not separate managers at all but instead were direct feeds to Madoff resulting in some 23% of the investment funds ultimately being controlled by a single individual, Bernard Madoff.

62. Contrary to the representations that had been made by AGL, and as required by the AGL PPM, the allocations of 23% of the funds were not consistent with those representations and are not consistent with the proper allocation of diversified fund of funds as expected pursuant to usual industry practices or the Plaintiff's stated investment objective and were therefore unsuitable.

Based upon the information available at this early stage in the litigation, and given that discovery has not been obtained, Plaintiff's pleadings, as amended, set forth plausible claims for relief in order to survive a motion to dismiss at this juncture of the case. (See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). (Plausibility in this context, the Court has cautioned, "is not akin to a probability requirement.") As the Supreme Court has instructed, on a motion to dismiss, "we do not require heightened fact pleadings of specifics, but only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The challenged complaint need only make a "showing" of the plaintiff's "entitlement to relief". Id. at 555 n.3. The Complaint and Amended Complaint here plainly do so.

Determining whether a complaint makes out a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its own judicial experience and common sense". Ashcroft at 1950. In making that determination, a court "construe[s] the complaint liberally, accepting all factual allegations in the complaint as

44

true, and drawing all reasonable inferences in Plaintiff's favor." Pension Comm. of the
Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC, 568 F.3d 374, 381 (2d Cir.
2009). Ultimately, the inquiry is not whether a plaintiff is likely to prevail on its claims,
but whether it is entitled under the circumstances to develop and offer evidence to
support those claims. See Palkovic v. Johnson, 281 Fed. Appx. 63, (2d Cir. 2008).

Thus, the Complaint, as amended, more than adequately details the factual basis
for the claims asserted against the Defendants. Plaintiff submits that the facts and
circumstances detailed in the Amended Complaint have "nudged their claims across the
line from conceivable to plausible." Twombly at 570. Thus for the reasons set forth
below, Plaintiff respectfully requests that the Court deny the Defendant's motion in its
entirety and direct that discovery proceed forthwith.

## IV.   PLAINTIFF HAS ASSERTED THE ESSENTIAL ELEMENTS OF FRAUD UNDER FEDERAL AND STATE SECURITIES LAWS WHICH SATISFY THE REQUIREMENTS OF SEC RULE 10-b5

In addition to attacking the Plaintiff's Complaint under Fed. R. Civ. P. 9(b)
Defendant seeks dismissal of Count IV (Federal Securities violations) and Count V (State
Securities violations) as failing to provide the "essential elements" of Rule 10-b(5) and
the analogous state counterparts §1-401(b) and 1-501(g) of the Pennsylvania Securities
Act (and AS 45 chapter 55 §900(a)(7) of the Alaska Securities Act relative to the
Amended Complaint). Defendant's Motion Brief asserts that the above-mentioned
Federal and State claims fail to state a cause of action because (1) AGL had no duty to
notify Plaintiff that Madoff was involved in funds in which the Tremont Fund was
invested, (2) that the failure to so notify Plaintiff was not material and (3) that Plaintiff
has failed to adequately allege scienter.

Plaintiff has alleged various claims of Defendants' breach of fiduciary duty arising under both Federal and State Securities laws based upon its unique relationship with AGL as one of fiduciary duty arising from material representations made in the various documents prepared, issued, disseminated by and/or approved by AGL which bound AGL to Plaintiff as a fiduciary.

Defendant has claimed that Plaintiff's case rests upon an alleged duty of AGL to notify the Plaintiff of Madoff's involvement in the underlying transaction. However, as pled in the Complaint and the Amended Complaint, Plaintiff asserts that there were a myriad of actions which the Defendant was duty-bound by law to take arising out of Federal and State Securities acts as enumerated herein.

## A. Fiduciary Duty of AGL to Plaintiff Arises Under the '34 Act and Corresponding FINRA Rules[10], and the Investment Advisors Act of 1940.

The '34 Act regulates both "brokers" and "dealers." A "broker" is defined as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. §78c(a)(4) (2000). A "dealer" is defined as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise." 15 U.S.C. §78c(a)(5) (2000).

Investment managers and advisors are fiduciaries of their investor-clients. SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963). As such, they are charged with a duty of care and due diligence to act as a "prudent person" by (1) conducting an independent investigation of the merits of a particular investment before making or

---

[10] FINRA refers to the Financial Industry Regulatory Authority. FINRA was formed by a consolidation of the enforcement arm of the New York Stock Exchange, NYSE Regulation, Inc., and the NASD. The merger was approved by the United States Securities and Exchange Commission (SEC) on July 26, 2007. See SEC Release No. 34-56145

recommending an investment to their clients, and (2) engaging in post-investment monitoring of the investment. <u>Gochnauer v. A.G. Edwards & Sons, Inc.</u>, 810 F.2d 1042, 1049-50 (11th Cir. 1987).

Defendant AGL through its association with Phoenix Equity distributed securities to Plaintiff pursuant to the Policy and the AGL PPM. Accordingly, the conduct of both AGL and Phoenix Equity is regulated by FINRA, the SRO member organization. In addition, since all of the persons permitted to sell the AGL Policy were FINRA licensed brokers or broker-dealers, their collective conduct is regulated by FINRA rules, including the minimum standards for professional conduct. 15 U.S.C. §78f(b)(5) (2000).

FINRA registration requirements mandate "professionalism" which is fundamentally focused upon the protection of the customer and investor rights.[11] In addition, a broker-dealer must maintain internal compliance manuals which require "high standards of conduct" and "commercial honor" in its business practices; "just and equitable principles of trade;" and "industry standards that correlate to fiduciary duties of care, loyalty and disclosure." <u>NASD Manual</u>, Rule 3010 at 4831 and Rule 2110 at 4111 (Manual 160) (2000).

In addition, the Investment Advisors Act of 1940 codified at <u>15 U.S.C. § 80b-1</u> through <u>15 U.S.C. § 80b-21</u>, is a <u>United States federal law</u> that was created to regulate the actions of <u>investment advisers</u> ("advisors") as defined by the law. The law provides in part:

> Upon the basis of facts disclosed by the record and report of the <u>Securities and Exchange Commission</u> made pursuant to section 79z–4 of this title, and facts otherwise disclosed and ascertained, it is found that investment advisers are of national concern, in that, among other things—

---

[11] "A securities professional is presumed to know industry standards." <u>Shivangi v. Dean Witter Reynolds, Inc.</u>, 825 F2d 885, 888 n.6 (5th Cir. 1987).

(1) their advice, counsel, publications, writings, analyses, and reports are furnished and distributed, and their contracts, subscription agreements, and other arrangements with clients are negotiated and performed, by the use of the mails and means and instrumentalities of interstate commerce;

(2) their advice, counsel, publications, writings, analyses, and reports customarily relate to the purchase and sale of securities traded on national securities exchanges and in interstate over-the-counter markets, securities issued by companies engaged in business in interstate commerce, and securities issued by national banks and member banks of the Federal Reserve System; and

(3) the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy. 15 U.S.C. § 80b-1 Further definitions under the law provide as follows:

**Investment Adviser**

(11) "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include (A) a bank, or any bank holding company as defined in the Bank Holding Company Act of 1956 which is not an investment company; (B) any lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession; (C) any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor; (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation; (E) any person whose advice, analyses, or reports relate to no securities other than securities which are direct obligations of or obligations guaranteed as to principal or interest by the United States, or securities issued or guaranteed by corporations in which the United States has a direct or indirect interest which shall have been designated by the Secretary of the Treasury, pursuant to section 3(a)(12) of the Securities Exchange Act of 1934, as exempted securities for the purposes of that Act; or (F) such other persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order.

**Investment Company, Affiliated Person, Insurance Company, Control**

(12) "Investment company," "affiliated person," and "insurance company" have the same meanings as in the Investment Company Act of 1940. "Control" means the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company.

**Investment Supervisory Services**

(13) "Investment supervisory services" means the giving of continuous advice as to the investment of funds on the basis of the individual needs of each client.

Thus, at a minimum, the fiduciary relationship between Defendant and Plaintiff is both recognized and clearly defined in the industry in which Defendant is licensed to operate and cannot be waived or disclaimed at will.

**1.      Duty of "Suitability" in Recommendations**

A broker has an affirmative duty to take "reasonable efforts" to assure that a recommendation (such as that made by Hillman) is in accordance with a customer's objectives and financial status. <u>Mihara v. Dean Witter & Co.</u>, 619 F.2d 814, 822 (9th Cir. 1980). The Mihara Court went on to say:

> The Court ... instructed the jury that a broker has a duty to investigate stocks he recommends to his client. Clearly, ***a broker has the responsibility to know what he is recommending to his client. Without such investigation, he cannot be assured that he is recommending a security suitable to his client's investment objectives.*** <u>Id.</u> (Emphasis supplied)

As stated in the Affidavit of Michael Rulle, it was John Hillman, President and CEO of AGL who brought forth and presented the Tremont Fund to him as one that met his (Rulle's) stated investment objective as being "diversified." (See Rulle Affidavit, p. 3)

Rulle stated that Hillman's description of the Tremont Fund (at that time f/k/a American Masters Opportunity Insurance Fund) was that it was a "fund of funds." Fund of hedge funds or "fund of funds" as they are called, are a common entry point for either institutional investors or other accredited investors seeking an alternative investment such as hedge funds because they provide diversity within that investment class. For this reason, it is not uncommon for institutions such as insurance companies to be among the typical clients of a "fund of fund." The product was especially attractive to Rulle because the structure of the Tremont Fund as described by Hillman, and subsequently the offering

materials, led Rulle to believe that Tremont had multiple managers of a variety of hedge

funds that operated independently of one another and therefore had an inherent quality of

protection against complete failure due to the poor management (or mismanagement) of

any one particular manager therein. In addition, it is common knowledge in the industry,

especially by those sophisticated investors familiar with the procedures in the industry

such as Rulle, that any institution offering a product to an investor has researched the

product and done the appropriate due diligence on the security offered within the product

prior to offering it to any one of its customers.

Rulle's Affidavit also states that Hillman made representations to him that the

Tremont Fund would not place more than 7% of the Plaintiff Trust funds in and/or with

any one manager. Thus, Rulle and Plaintiff had complete confidence in choosing the

Tremont fund based upon the verbal representations of Hillman in addition to the written

documents that were prepared and/or approved by AGL that the Tremont Fund met

Plaintiff's stated objective of diversity.

However, AGL ultimately disclosed subsequent to the exposure of the Madoff

scandal, that in fact approximately 23% of the Trust assets had been placed with Madoff,

contrary to the AGL PPM and other reports produced, prepared and published by AGL

(the "Reports") that the Trust assets were invested through the Tremont Fund with

multiple managers, none of whom were listed as Madoff.

In addition, the Reports gave the misleading and deceitful impression that all of

the "Rye Select Funds" were separate and distinct funds that were operated independently

while in reality, they were actually all the same entity collecting funds to "feed" Madoff.

This defeated the purpose of a "diversified" fund, obviously, and was completely contrary to Plaintiff's stated objectives and did not meet the requisite suitability needs.

## 2.     Defendant had a Duty to Conduct Due Diligence

Pursuant to Federal and State law requirements, AGL had a duty to conduct due diligence with respect to securities products being offered and/or issued by and/or through its private placement offerings such as the subject offering purchase by Plaintiff.

In a FINRA Guidance Notice dated April 22, 2010 broker-dealers were reminded of their due diligence and suitability obligations in private placement offerings as follows:

> The Securities and Exchange Commission (SEC) and federal courts have long held that a broker-dealer firm that recommends a security is under a duty to conduct a reasonable investigation concerning that security and the issuer's representations.
>
> In recommending the security, the broker-dealer represents to the customer "that a reasonable investigation has been made and that its recommendation rests on the conclusions based on such investigation."
>
> Failure to comply with this duty can constitute a violation of the antifraud provisions of the federal securities laws including Rule 10b-5 and can also subject the broker-dealer to claims of violation of FINRA Rule 2010, requiring adherence to just and equitable principles of trade. FINRA Regulatory Notice 10-22.

By now it has been fully disclosed in the media and in Madoff related actions that Madoff refused to provide investors any access to his records or accounts and refused any attempts by investors and others to allow them to conduct an adequate due diligence review of his funds.

In furtherance of presenting its argument, the Defendant has, in essence, misstated Defendant's due diligence failure alleged against it by stating that it had no duty to disclose or identify that Madoff was involved in the Tremont Opportunity Fund. In fact, Plaintiff's claim is that Defendant failed to identify that Tremont Partners was involved in a feeder fund to Madoff, that AGL initially failed to conduct an adequate due diligence investigation which led to AGL selecting the Tremont Opportunity Fund as a fund to offer its clients in the first place[12]. Thereafter, AGL's due diligence failure continued as it failed to verify the Tremont Opportunity Fund (and the Tremont Partners under the Limited Partnership Agreement[13]) reports or monitor Tremont Partner's actions in any way.

As a matter of fact, in its own language AGL clearly represents that it is acting as an investment advisor in a paragraph if the Memorandum entitled "Charges Against the Variable Account" wherein it states in relevant part as follows:

> The value of the net assets of each Investment Account will reflect the *investment advisory fee* and other expenses incurred by that Investment Account (the "Asset Charge"). (Emphasis supplied)

Obviously if AGL is charging an "investment advisory fee" it is for the purpose of covering the cost associated with the investment advisor's role in researching the investments that it is "advising."

Although Plaintiff had the option of choosing one of two investment accounts into which it would ultimately place the Trust assets, it, just like any investor, was entitled to

---

[12] See Part 5 of the Policy at page 13, attached hereto as Exhibit A, as follows: **"Investment of the Accounts: We may contract with investment managers to manage directly the assets held in the Investment Accounts. We may deduct as an Asset Charge from the Account Value allocated to Investment Accounts that are managed directly as well as any costs and expenses arising from such Investment Accounts. In either case, *investment managers are selected in our discretion.* (Emphasis supplied).**

[13] AGL Exhibit 3

rely upon the fact that any product offered by AGL was approved by AGL for offer to its potential clients. In order for AGL to determine which industry products it offered to its clients, there had to be an internal process by which some funds were acceptable and some were not. That process necessarily presumes due diligence. However, in this case, AGL was in complete disregard for any of the normal, appropriate and acceptable standards of due diligence in connection with the Policy contract of Plaintiff.

In addition, since Plaintiff was not permitted to contact any of the investment managers directly, it was completely reliant upon AGL to monitor the Tremont Opportunity Fund for performance, appropriate diversification and valuation.

Part II of the AGL PPM talks at length about the Tremont Opportunity Fund and the Tremont Partnership, its investment objectives, multi-manager concept, and in fact the managers themselves. In order for AGL to publish and disseminate any of the information contained in the AGL PPM (and in fact any of the offering materials as the attachments thereto were referred to as "part of" the AGL PPM), it was under a duty to verify the statements contained therein, knowing fully that the investor to whom the AGL PPM was given would rely on the statements, representations and contractual obligations contained therein.

The entire purpose of publishing an offering memorandum, in this instance one of a private placement, is to give the potential investor enough information with which to make an informed decision about an investment. It is even more critical in a private placement, which is exempt from registration than in a public offering, where there is ample public information available to the investor, because there is no other public information for the investor to obtain on its own. Therefore, Plaintiff completely relied

upon AGL and that AGL conducted its own due diligence in its choosing of the Tremont Opportunity Fund as the fund within the Policy.

### 3.    Duty of AGL to Comply with Regulation D

As for AGL's assertion that it had no duty to conduct a due diligence investigation of Tremont Opportunity Fund, under the Regulation D rules of issuer exemptions, AGL clearly had such a duty. Pursuant to the rules of a §4(2) Regulation D Offering under the Securities Act of '33 codified at 17 C.F.R. §230.501 et seq. ("Reg. D" or "private offering") AGL had a duty to disseminate accurate and truthful information with respect to the Policy and the Tremont Opportunity Fund, specifically Tremont's financial condition and performance, growth, operations, financial statements, business, markets, management and earnings, and to correct any previously issued statements that had become materially misleading or untrue so that the value of the Tremont Opportunity Fund and its Partnership shares would be based upon truthful and accurate information. The misrepresentations and omissions by AGL during the relevant time period violated these specific requirements and obligations. SEC v. Murphy, 626 F.2d 633, 647 (9th Cir. 1980).

Reg D offerings are exempt from certain of the registration requirements normally required of an issuer in a securities transaction when certain criteria are met in accordance with the rules promulgated thereunder, Rules 501-506.  However, the antifraud provisions still apply to all transactions, and therefore Reg. D does not do away with the necessity for disclosure.[14] In addition, Reg. D in no way relieves issuers of their obligation to furnish to investors whatever material information may be needed to make any required disclosures not misleading.

---

[14] Rule 504 of Reg D. See also SEC v. Murphy, 626 F.2d 633,647 (9th Cir. 1980).

AGL issued the AGL PPM, (Defendant AGL Exhibit 1), American Masters

Opportunity Insurance Fund, L.P. Confidential private Placement Memorandum, dated

January 1, 2001 (Defendant AGL Exhibit 2), Limited Partnership Agreement of the

American Masters Opportunity Insurance Fund, L.P. dated January 1, 2001(Defendant

AGL Exhibit 3), various investor reports, account statements and other communications

complained of herein, of which the misstatements contained therein and omissions

therefrom, were recklessly and/or negligently disregarded by AGL as more fully set forth

herein.

In each of the aforementioned documents, memoranda, partnership agreements,

reports, account statements and other communications, AGL issued the documents and

knew that the investor specifically Plaintiff was relying on such information; in fact,

these documents were prepared expressly for the purpose of the investor's intended

reliance.

The Defendant is liable as a participant in a course of business that operated as a

fraud or deceit on the Plaintiff by disseminating materially false and misleading

statements and/or concealing material adverse facts. The scheme caused Plaintiff to

purchase and ultimately lose in excess of one million dollars ($1,000,000.00).

During all relevant times the Defendant carried out a course of conduct which was

intended to and did (i) deceive Plaintiff regarding the Policy, the Tremont Opportunity

Fund, and each of their business, operations, management and the intrinsic value and

performance of the Tremont Opportunity Fund and the Rye Select Funds; and (ii) cause

Plaintiff to invest in the Tremont Opportunity Fund where it would otherwise not have

had Plaintiff known the truth about the lack of diversification of the Tremont Opportunity Fund and the lack of due diligence by AGL of the Tremont Opportunity Fund.

AGL's violations under federal and state securities law do not end with its due diligence failures. The express provisions of the AGL PPM state that the monies invested with AGL would be highly diversified among various separate and independent investment managers.

In fact, that diversification did not occur. On the contrary, Plaintiff's money was placed with related entities such that, rather than diversification among investment managers, the funds were concentrated.

## B. Materiality, Reliance and Scienter

Turning to Defendant's assertion that there were no omitted material facts which have altered the "mix" of information made available to a reasonable investor, consider the following omissions that have been pled in Plaintiff's Amended Complaint:

- The omission to disclose that AGL had not vetted either Tremont Opportunity Fund or Tremont Partners through adequate due diligence.

- That over four of the so-called investment managers were in fact managed by the same principals (i.e. Rye Select Funds).

Rulle stated that he would not have chosen the Tremont Fund had he known that the material representations made to him were misleading and false, and in fact induced him to "invest" the Plaintiff Trust funds in the Tremont Opportunity Fund offered by Defendant AGL.

Section 10(b) of the Exchange Act and Rule 10b-5 proscribe, among other things, misstatements and omissions of material fact made in connection with the

purchase or sale of securities.  Information is material if there is a substantial likelihood

that its disclosure would be viewed by a reasonable investor as having significantly

altered the" total mix of information" available.  <u>Basic Inc. v. Levinson</u>, 485 U.S. 224,

231-32 (1988).  Information concerning the financial condition of a company is

presumptively material.  <u>SEC v. Murphy</u>, 626 F.2d 633, 653 (9th Cir. 1980); <u>SEC v.</u>

<u>Blavin</u>, 557 F.Supp. 1304, 1313 (E.D. Mich. 1983), aff'd, 760 F.2d. 706 (6th Cir. 1985)

(materiality of information relating to financial condition, solvency and profitability not

subject to serious challenge).

     Finally, contrary to Defendant's assertion, the allegations of scienter have been

pled in Plaintiffs' Complaint and Amended Complaint with sufficient particularity.  The

standard is set forth in Mihara:

> The third requisite element of a 10b-5 violation scienter has
> also been established. The manner in which Mihara's
> account was handled reflects, at best, <u>a reckless disregard</u>
> <u>for the client's investment concerns</u>, and, at worst, an
> outright scheme to defraud plaintiff. Perhaps in recognition
> of this, appellants have constructed a curious argument as
> to the scienter element. They suggest that plaintiff must
> establish an intent to defraud as to each trade executed by
> the broker. This assertion is entirely without merit. The
> churning of a client's account is, in itself, a scheme or
> artifice to defraud within the meaning of Rule 10b-5. <u>With</u>
> <u>regard to the definition of scienter, this circuit has held that</u>
> <u>reckless conduct constitutes scienter</u> within the meaning of
> Ernst & Ernst v. Hochfelder, <u>425 U.S. 185</u>, 99 S.Ct. 1375,
> 47 L.Ed.2d 668 (1976). See Nelson v. Serwold, <u>576 F.2d</u>
> <u>1332</u>, 1337 (9th Cir., 1978). The evidence in the present
> case reflects, at the very minimum, a reckless disregard for
> the client's stated interests. <u>Mihara</u>, *supra.* at ___.
> (Emphasis supplied)

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 require a showing of scienter. Aaron v. SEC, 446 U.S. 680, 696 (1980). The Supreme Court has defined scienter as the "intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). Reckless conduct also satisfies the scienter requirement of Section 10(b) of the Exchange Act and Rule 10b-5. IIT v. Cornfeld, 619 F.2d 909, 923 (2d Cir. 1980); Rolf v. Blyth Eastman Dillon & Co., 570 F.2d 38, 46 (2d Cir.), cert. denied, 439 U.S. 1039 (1978). False and misleading information in annual reports filed with the Commission satisfies the "in connection with" requirement of Section 10(b) of the Exchange Act and Rule 10b-5. See In re Ames Dept. Stores Inc. Stock Litigation, 991 F.2d 953, 962 (2d Cir. 1993); In re Leslie Fay Companies, Inc., Securities Litigation, 871 F.Supp. 686, 699 (S.D.N.Y. 1995). Accord McGann v. Ernst & Young, 102 F.3d 390 (9th Cir. 1996) cert. denied,___ U.S. ___, 1997 US LEXIS 2455 (April 14, 1997).

Auditors violate Section 10(b) of the Exchange Act and Rule 10b-5 when they prepare and certify fraudulent financial statements included in public filings. Auditors can also violate Section 10(b) of the Exchange Act and Rule 10b-5 by issuing opinions with no genuine belief in, or no basis for, statements made in the opinions. See Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.), cert. denied, 474 U.S. 946 (1985). See also Herskowitz v. Nutri/System, Inc., 857 F.2d 179, 184 (3d Cir. 1988), cert. denied, 489 U.S. 1054 (1989). An audit which is "so flimsy as to lead to the conclusion that there was no genuine belief" to support an auditor's opinion is proof of reckless conduct. In re Phar-Mor, Inc. Securities Litigation, 892 F.Supp. 676, 686 (W.D. Pa. 1995).

By analogy, the memoranda published by AGL contained multiple false and misleading statements as well as omitted material information that should have been contained therein as to constitute a reckless state of mind in the dissemination of such materials. The false and misleading statements contained in the AGL PPM are as follows:

- the Tremont Opportunity Fund had a "multi-manager concept" which implied diversification;

- gave multiple standards for valuation of the investment which implied that it was actually tracking the value of the investment;

- failed to state that AGL had not done any due diligence on the Tremont Opportunity Fund, either prior to offering or during the time of the Policy; and

- failed to state that almost 23% of the entire investment pool would be in the hands of one manager, thereby effectively eliminating or greatly reducing the concept of diversification.

Such conduct as described is reckless and materially misleading and violates both Federal and applicable State securities laws.

## V.    APPLICABLE STATE SECURITIES STATUTES

Both Pennsylvania and Alaska State Securities statutes, as applicable, are alleged in Plaintiff's Complaint and/or Amended Complaint in Count V. However, Defendant asserts in its Motion Brief that Pennsylvania Securities law violations are not viable causes of action because the State of Pennsylvania does not recognize a "variable life insurance contract" as a "security."

In fact, under the Pennsylvania Securities Act Sections 31 Pa. Cons. Stat. §81 et seq., a variable life insurance policy such as the Policy issued by AGL is a "security" as defined therein.

Similarly, under Alaska Securities Act at AS 45 Chapter 55 §900(a)(7) et seq., a variable life insurance policy such as the Policy issued by AGL is a "security" as defined therein.

Therefore, Defendant's argument that the applicable State Securities anti-fraud provisions do not apply to the matter herein are unfounded and without merit.

## VI.    PLAINTIFF'S COMPLAINT STATES A CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY ARISING OUT OF THE POLICY CONTRACT:  (A)  AS AN INSURER; (B) AS AN INVESTMENT ADVISER/BROKER-DEALER; AND (C) AS A PRINCIPAL.

The Complaint alleges that Defendant had a fiduciary duty to Plaintiff as a matter of law, arising out the insurance contract, and based on the fact that Defendant had recommended this particular form of variable life insurance product, whereby valuation of Defendant's account would be tied to investment performance of the investment account, had represented that it was a moderate investment risk, and diversified in terms of both management and investment, and because Defendant maintained control, while Plaintiff did not have control over the investments, or access to the investment managers. By failing to exercise due care and diligence in connection with its fiduciary duties, Defendant caused Plaintiff to be harmed.   Plaintiff's Complaint thus alleges the requisites of a breach of a fiduciary duty as required by Rule 8.

It is undisputed that the Policy is governed by Alaska law.  Alaska has "determined that a 'fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith

and with due regard to the interests of the one imposing the confidence.'" <u>Munn v.</u>

<u>Thornton,</u> 956 P.2d 1213, 1220 (Alaska 1998), citing <u>Paskvan v. Mesich,</u> 455 P.2d 229,

232 (Alaska 1969).  Under Alaska law, every insurance policy gives rise to a fiduciary

duty. [15] <u>O.K. Lumber Co. v. Providence Wash. Ins. Co.,</u> 759 P.2d 523, 525 (Alaska

1988).  Thus, as a matter of law, Defendant had a fiduciary duty to Plaintiff by virtue of

the insurance Policy.[16]

In addition, however, Defendant also had a fiduciary duty to Plaintiff arising out

of the Policy, based on the investment advisory/broker dealer role Defendant played, and

its assumption of duties as a principal.  <u>French v. First Union Securities, Inc.,</u> 209 F.

Supp.2d 818, 825 (M.D. Tenn. 2002) ("the investor-stockbroker relationship is an

inherently fiduciary relationship") (applying Tennessee law).  <u>See</u> Restatement (Second)

of Agency § 387 (1958) ["An agency relationship is a fiduciary one, and the agent is

subject to a duty of loyalty to act only for the principal's benefit."].  <u>See also</u> <u>Basile v. H</u>

<u>& R. Block,</u> 761 A.2d 1115 (Pa. 2000).

Defendant contends that only "a narrow set of cases involving parties in special

relationships of trust" will give rise to a fiduciary duty and that Plaintiff's status as "a

---

[15] Defendant argues that Alaska law applies only to Plaintiff's contract claims and that for all non-contract claims, a choice of law analysis is required.  Choice of law is addressed infra, at VIII.  However, for purposes of breach of fiduciary duty, the point is moot inasmuch as under Alaska contract and insurance law, every insurance Policy gives rise to a fiduciary duty.  Accordingly, the duty arises out of the contract and is indisputably a matter of Alaska law.  Pennsylvania law is in accord that a fiduciary duty is a duty that "flows from the insurance contract." *Birth Center v. St. Paul Companies, Inc.,* 727 A.2d 1144, 1155 (Pa.Super.Ct.1999), *app. granted in part,* 560 Pa. 633, 747 A.2d 858 (2000) (citing *Gedeon,* 410 Pa. at 59, 1888 A.2d at 322).[ The insurer's fiduciary duty or duty to act in good faith "is said not to arise under the terms of the contract, but because of the contract, and to flow from the contract."]

[16]Defendant contends that the fiduciary duty under insurance contracts is inapplicable "because it applies only to insurer's handling of insurance coverage claims", citing <u>O.K. Lumber Co., Inc.,</u> <u>supra.</u>  Defendant provides no legal support for its contention that a fiduciary duty under insurance contracts applies only to coverage claims.  The fact that <u>O.K. Lumber</u> may have involved coverage claims does not preclude its application to other insurance contexts.  Moreover, the fact that the insurance product here also has investment components only heightens the likelihood that Alaska would recognize a fiduciary duty.

wealthy and sophisticated investment manager" who entered into "an arm's length relationship" does not give rise to a fiduciary relationship. Db26-27. Defendant cites commercial cases in support of its contention. These cases are distinguishable on their facts. None of the cases involve insurer/broker-dealers, nor do they factually resemble the case *sub judice.* Moreover, Plaintiff disputes Defendant's characterization of the transaction as an "arm's length" commercial agreement. Rather, the facts alleged in the Complaint clearly states that Defendant had approached Plaintiff and recommended the insurance product and further represented that it would meet Plaintiff's investment needs. The fact that Plaintiff is "wealthy" and "sophisticated" does not preclude a fiduciary relationship; indeed, Plaintiff knew the type of investments that would meet his needs, and relied on the representations of Defendant that the insurance product proffered was consistent with Plaintiff's needs.

While it is true that fiduciary relationships are generally defined by a level of trust beyond that in ordinary business relationships,  see *Black's Law Dictionary* 625 (6th ed. 1991), whether a fiduciary duty exists depends on the relationship. As noted in the Restatement (Second) of Torts, § 874 Violation of Fiduciary Duty:

> A fiduciary duty exists between two persons when one of them is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation.

Id. In particular, fiduciary duties are routinely recognized in the context of broker-dealer/investment advisors.

In the case of the broker-dealer, a fiduciary duty arises because the brokerage relationship is an agency relationship which is fiduciary in nature. French, supra.,209 F.Supp.2d at 825.However, the actual duties depend on the particular broker-customer

relationship and the functions performed by the broker.  Press v. Chemical Investment Services Corp., 166 F.3d 529 (2d Cir. 1999).

Contrary to Defendant's assertions, AGL recommended the subject variable life insurance product to Plaintiff, and represented that it would be valued based on diversified, moderate risk investments.  By its recommendations and representations, AGL not only implied, but in fact represented that that it had conducted due diligence in connection with the investments, and that it would exercise due care in its management and oversight of Plaintiff's premiums.  Thus, it was more than a reasonable implication because AGL selected the managers and used their discretion in doing so.  See Policy at 5.

When a broker recommends securities or transactions, heightened duties apply. Representing oneself to have investment and advisory expertise will give rise to fiduciary obligations.  Burdet v. Miller, 957 F.2d 1375, 1381 (7th Cir. 1992).  Specifically, when a broker makes investment recommendations to a customer, the broker is acting in a position of trust vis-à-vis the customer, and as such, is acting as a fiduciary.  United States v. Hart, 273 F.3d 363, 376 (3d Cir. 2001), relying on United States v. Hussey, 254 F.3d 428 (2d Cir. 2001).  Since a broker occupies a special position of trust and confidence with respect to his or her customer, any recommendation of a security carries with it an implicit representation that the broker has an adequate basis for the recommendation.  Hanly v. SEC, 415 F.2d 589, 596 (2d Cir. 1969) ("A securities dealer occupies a special relationship to a buyer of securities in that by his position he implicitly represents that he has an adequate basis for the opinions he renders.")  Indeed, failure to have such a reasonable basis for a recommendation can result in a violation of the

securities laws' antifraud proscriptions.  Kahn v. SEC, 297 F.2d 112, 115 (2d Cir. 1961)

("If the salesman makes statements, knowing they had no adequate basis, or if he is

'grossly careless or indifferent to the existence of an adequate basis' for his statements,

then he has violated the antifraud provisions of the securities laws.")

Accordingly, the SEC has referred to the "basic principle" that by holding itself

out as a  broker-dealer, a firm is representing that it will act in the customer's best

interests.  In the Matter of D.E. Wine Investments, Inc. Administrative Proceeding File

No. 3-8543 Release No. ID-134, 1999 WL 373279 (SEC Initial Decision June 9, 1999),

relying on Charles Hughes &. Co. v. SEC, 139 F.2d 434, 436-437 (2d Cir. 1943), *cert.*

*denied*, 321 U.S. 786 (1944); SEC v. Resch-Cassin & Co., Inc., 362 F.Supp. 964, 978

(S.D.N.Y. 1973); In the Matter of Duker & Duker, 6S.E.C. 388-89, Sec. Exch. Act. Rel.

No. 34-2350, 1939 WL 36426 (SEC Dec. 19, 1939). See also Davis v. Merrill Lynch,

Pierce, Fenner & Smith, Inc., 906 F.2d 1206, 1215 (8th Cir. 1990).

This is particularly the case where the broker has discretion over an account.

Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817, 820 (6th Cir. 1981).

Here, AGL had discretion over the account, and Plaintiff had no access to the

investment managers.[17]  AGL both expressly and by implication represented that the

investments would meet Plaintiff's specific, conservative needs, and that AGL would

maintain control and oversight.  By failing to insure that Plaintiff's premiums were

properly invested, and failing to monitor Plaintiff's premiums, Defendant breached its

fiduciary duty to Plaintiff, resulting in harm to Plaintiff.

---

[17] Defendant's contention that "the purpose of prohibiting contact . . . was to protect the Contract Owners' tax-favored position" is correct; however, Defendant misconstrues Plaintiff's point.  Db28 Plaintiff was not suggesting that Defendant should have permitted Plaintiff to have access; rather, Plaintiff's contention is that by virtue of this arrangement, Defendant's fiduciary obligations to Plaintiff were even more essential.

Defendant contends that Pennsylvania's "gist of the action" doctrine bars Plaintiff's fiduciary duty claims, claiming that "the entire relationship between the parties is governed by the Policy, which expressly details the rights and obligations each party agreed to assume with respect to the other." Db30.  Aside from a slip opinion that addresses an employment dispute, Defendant provides no legal support for this contention.  In addition, as more fully discussed infra. at XI., the applicable law is Alaska, not Pennsylvania.  Alaska does not recognize a "gist of the action" doctrine. Even if Alaska did, however, the "gist of the action" here is a hybrid of contractual and fiduciary duties arising out of an insurance policy that was both a life insurance policy and a security within the meaning of federal and state securities law.  Thus, while the fiduciary duties arise from the contract, they are separate and distinct from the contractual duties and obligations contained therein.  The fiduciary duty claim also involves a broader social policy beyond the contours of the Policy.  Thus, the fact that there is a contract is not dispositive; the inquiry is "whether the defendant's conduct violates some additional duty that is distinct from the obligations the defendant accepted by entering into the contract." Koresko v. Bleiweis. 2004 WL 3048760 (E.D. Pa.), citing Bohler-Uddeholm America, Inc. v. Elwood Group, Inc., 247 F.3d 79, 105 ((3d Cir. 2001) ("This duty imposed obligations on [the defendant] that went well beyond the particular obligations contained in the [a]greement itself.")   As noted by the Third Circuit in Bohler-Uddeholm. where, as here, the "duty is 'imposed as a matter of social policy' rather than 'by mutual consensus', the gist of Plaintiff's ....claim lies in tort rather than contract law." Id., at 105.  Accordingly, Plaintiff's complaint states a plausible and cognizable claim for breach of fiduciary duty.

## VII.   PLAINTIFF'S COMPLAINT STATES A CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

The Complaint alleges that an implied covenant of good faith and fair dealing is implied in every contract, which provides that neither party will do anything to deprive the other of the fruits of the contract; that as a matter of law, the fiduciary duty arising out of every insurance contract gives rise to an implied covenant of good faith and fair dealing as a matter of law; that the contract provided for Plaintiff's account to be valued in accordance with the investment performance of the premiums Plaintiff invested and further contemplated that the monies would be invested consistent with Plaintiff's investment objectives.  However, Defendant failed to ensure that Plaintiff's premiums were properly invested, and when the monies were lost due to fraud, Defendant took the position that it was a capital loss or investment risk that Plaintiff had assumed.  Such actions and inactions were a breach of Defendant's implied covenant of good faith and fair dealing, depriving Plaintiff of the fruits of the contract, as well as causing additional financial harm.   Accordingly, Plaintiff states a plausible and cognizable claim for breach of the implied covenant of good faith and fair dealing.

It is undisputed that Alaska law governs the Policy.  As noted in VI, supra., a fiduciary duty is inherent in every insurance contract.   It is further settled that "[t]he fiduciary relationship inherent in every insurance contract gives rise to an implied covenant of good faith and fair dealing." Alyeska Pipeline Serv. Co. v. H.C. Price Co., 694 P.2d 782, 788 (Alaska 1985); Guin v. Ha, 591 P.2d 1281, 1291 (Alaska 1979).  As such, the implied duty arises, as a matter of law, out of the contract, and thus, is also governed by Alaska law, which gives rise to it.

Therefore, Defendant's contention that Pennsylvania law applies is misplaced. Db31. The claim clearly arises from Alaska's law on contracts and it is undisputed that Alaska law governs the Policy.  Defendant's contention that the claim should not be recognized based on its assertion that "there is no basis for alleging that AGL did not fulfill its obligations under the Policy" is also without merit.  Db31  To satisfy the pleading standard under Rule 8, Plaintiff must only provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Plaintiff has done so. Accordingly, Defendant's motion to dismiss as to the claim for breach of the implied duty of good faith and fair dealing should be denied.

## VIII.   PLAINTIFF'S AMENDED COMPLAINT STATES A CAUSE OF ACTION FOR PROFESSIONAL NEGLIGENCE, OR, IN THE ALTERNATIVE, GROSS NEGLIGENCE OR NEGLIGENCE.

The Amended Complaint alleges that Defendant had a duty of reasonable care as investment managers/insurers with discretionary control over the assets entrusted to it by Plaintiff, that the duty owed  required that Defendant manage and monitor the investments of Plaintiff with reasonable care, and that by failing to take all reasonable steps to ensure that the investment of the assets of Plaintiff were made and maintained in a prudent and professional manner, to preserve the value of Plaintiff's investments, and to perform all necessary and adequate due diligence, Defendant failed to exercise generally the degree of prudence, caution and good business practice that would be expected of any reasonable investment professional and thus, breached its duty of care, causing damage to Plaintiff.  As such, Plaintiff has satisfied the pleading requirements of Rule 8.

The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence, and diligence as other members of

the profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate

causal connection between the negligent conduct and the resulting injury; and (4) actual

loss or damage resulting from the professional's negligence. Linck v. Barokas & Martin,

667 P.2d 171, 174 (Alaska 1983) (citations omitted).

A claim that a provider of skilled services committed negligence states a cause of

action for professional negligence under Alaska law. John's Heating Service v. Lamb, 46

P.3d 1024 (Alaska 2002).  In particular, professional negligence is recognized in the

context of an insurer to an insured. See Johnson & Higgins of Alaska, Inc. v. Blomfield,

907 P.2d 1371 (Alaska 1996).

Thus, Plaintiff has alleged a recognized duty, a breach of that duty, proximate

cause and actual damage or loss resulting from the professional's negligence.

Accordingly, Plaintiff has met the requisite standard under Rule 8.

In the alternative, Plaintiff has also stated claims for gross negligence, or at a

minimum, negligence.

Simple negligence is defined as the "failure to exercise for protection of others

that degree of care and caution that would, under prevailing circumstances, be exercised

by ordinarily prudent person." Black's Law Dictionary 1383 (6th ed. 1990). Gross

negligence is defined as the "intentional failure to perform a manifest duty in reckless

disregard of the consequences as affecting the life or property of another." Id. at 1033.

Defendant apparently does not dispute that Plaintiff has stated a claim for

negligence, only that the duty expressed is the same as a fiduciary duty and that there is

no basis for the finding of a fiduciary duty. Db31-32.

Defendant misunderstands the law of negligence.  Here, Plaintiff and Defendant had indisputably entered into a contractual relationship giving rise to certain duties on the part of Defendant, not merely to perform under the terms of the contract, but to discharge its professional duties with due care.

The fact that some of the same allegations may also give rise to a different cause of action does not preclude the claim for negligence.  Moreover, as more fully discussed, supra., at VI., there is in fact a fiduciary duty arising out of the Policy between Plaintiff and Defendant.  Accordingly, Plaintiff has met the requirement for pleading a plausible and cognizable cause of action for negligence.

Defendant's further contention that the claim for negligence is nevertheless barred by Pennsylvania's economic loss and gist of the action doctrines is also without merit.  As more fully discussed, infra. at XI., there is no basis for applying Pennsylvania law to this action, which has virtually no contacts with Pennsylvania, and where the parties have expressly sought to apply Alaska law.   Thus, Pennsylvania's economic loss and gist of the action doctrines are of no applicability.

Even under Pennsylvania law, courts are reluctant to dismiss tort claims at the early stages of litigation under either the gist of the action doctrine or economic loss doctrine.  See Woods v. Era Med LLC, 2009 WL 141854, citing Padalino v. Standard Fire Ins. Co., 616 F. Supp. 2d 538, 550 (E.D. Pa. 2008) ("[C]ourts are reluctant to classify the gist of plaintiffs' suit at an early stage in the proceedings and generally wait until discovery to determine 'whether one claim is completely redundant to the other claim.'" Citations omitted.)

Further, the matter at bar is distinguishable from the authority cited by Defendant in support of its contention.  Specifically, Defendant cites <u>Rock v. Voshell</u>, 397 F.Supp.2d 616, 627 (E.D.Pa. 2005) for the proposition that negligence is precluded by the economic loss doctrine and gist of the action doctrine because "courts have held that the economic loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract,' and under the "gist of the action" doctrine, "a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts and not the larger social policies embodied in the law of torts." Db 32, citing <u>Rock, supra.</u>, 397 F. Supp.2d at 627.  However, Plaintiff's negligence claim is not limited to the terms of the contract and does involve larger social policies—specifically, the duty of insurers and investment advisors/broker-dealers to discharge their professional duty of care with such "skill, prudence and diligence as other members of the profession commonly possess and exercise."  Thus, contrary to Defendant's asserts at Db 32-33, Plaintiff's claim of negligence is not "merely another way of stating its breach of contract claim." Db 33.

## IX.    PLAINTIFF'S COMPLAINT STATES A CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION.

The Complaint alleges that, <u>inter alia</u>, Defendant made representations through its Private Placement Memorandum that no more than 5% to 6% of Plaintiff's monies would be invested in any one account, and that the investments to be made were "equity market neutral."  The Complaint further alleges that Defendant omitted certain material facts, or failed to disclose certain material facts, specifically, the fact that approximately 23% of Plaintiff's account had been invested in a single fund, and the fact that Defendant had not

performed the requisite due diligence with respect to the investments, and was not monitoring the investments.

"To prevail in an action for fraudulent...misrepresentation, the plaintiff must prove the existence of either an affirmative misrepresentation or an omission where there is a duty to disclose." Matthews v. Kincaid, 746 P.2d 470, 471 (Alaska 1987). Plaintiff has alleged both affirmative misrepresentations as well as omissions and failure to disclose.

In addition, the following elements are required to establish negligent misrepresentation: (1) "the party accused of the misrepresentation must have made the statement 'in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest,' " (2) "the representation must supply 'false information,' " (3) "there must be 'justifiable reliance' on the false information supplied," and (4) "the accused party must have failed 'to exercise reasonable care or competence in obtaining or communicating the information.' " Reeves v. Alyeska Pipeline Serv. Co., 56 P.3d 660, 675 (Alaska 2002), citing Bubbel v. Wien Air Alaska, 682 P.2d 374, 380 (Alaska 1984) (quoting Restatement (Second) of Torts § 552(1) (1977)).

The Complaint alleges that the statements were made in the Private Placement Memorandum, and that the omissions and failure to disclose were all in connection with the transaction at issue. The Complaint further alleges that the information was false, and that Plaintiff justifiably relied on the information. The Complaint alleges that Defendant owed Plaintiff a duty to act with a reasonable care in connection with the assets entrusted to it by Plaintiff and to conduct due diligence to determine the accuracy and preparation

of information contained in the policy statements, the Private Memorandum, and the

partnership agreements executed by Plaintiff in reference thereto, and that Defendant

breached its duties knowingly, wantonly, recklessly, or at least negligently, by including

untrue statements of material facts and/or omitting to state material facts necessary in

order to make the statements made reflecting the value of the monies and/or policies, in

light of the circumstances under which they were made, not misleading. Finally, the

Complaint alleges that Plaintiff was injured as a result of the negligent

misrepresentations. Thus, Plaintiff states a cause of action for negligent

misrepresentation pursuant to Rule 8.

In addition, however, Plaintiff's claim also sounds in fraud, arising out of the

fiduciary relationship between Plaintiff and Defendant. Specifically:

> Fraud can be established by silence or non-disclosure when a fiduciary relationship exists between the parties. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 106, at 738 (5th ed. 1984). . . .The fiduciary has a duty to fully disclose information which might affect the other person's rights and influence his action. *E.g.,* *Wilkinson v. Smith,* 31 Wash.App. 1, 639 P.2d 768, 771 (1982).

Carter v. Hoblit, 755 P.2d 1084, 1086 (Alaska 1988)

As noted by the Alaska Supreme Court in Ben Lomond, Inc. v. Schwartz, 915

P.2d 632, 634 (Alaska 1996):

> The concepts of fraud and breach of fiduciary duty are closely related. This court has held that "[f]raud can be established by silence or non-disclosure when a fiduciary relationship exists between parties.... The fiduciary has a duty to fully disclose information which might affect the other person's rights and influence his action." *Carter v. Hoblit,* 755 P.2d 1084, 1086 (Alaska 1988) (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 106, at 738-39 (5th ed.1984); *Wilkinson v. Smith,* 31 Wash.App. 1, 639 P.2d 768, 771-72 (1982)). The existence of a fiduciary duty allows a finding of fraud even where the fraud is committed by silence or non-disclosure . . . . Fraud can thus be a type of breach of fiduciary duty.

Id.

Defendant's contentions are based in part on Pennsylvania law (which Plaintiff respectfully contends does not apply), and assumption of facts that Plaintiff disputes. Specifically, Defendant contends that the allegations are contrary to the express provisions of the PPM. However, Defendant is relying upon a revised version of the PPM that was not in effect at the time Plaintiff entered into the Policy with Defendant. Thus, it is not applicable. Second, Defendant contends that Plaintiff elected to invest 100% of its policy in the Tremont Fund and thus the 5-6% cap was both inconsistent with that "fact" and the provisions of the PPM. First, Plaintiff relied upon Defendant's representation that the "fund" would be diversified, with no more than 5% or 6% with any individual manager. Second, Plaintiff had very little choice in the matter. Defendant presented the variable insurance product to Plaintiff as a fait accompli, with no meaningful choice. At all times, Plaintiff was relying upon Defendant's representations that the fund of fund was a moderate risk, and diversified. This was not the case.

Defendant claims that the negligent misrepresentation count is barred by the economic loss/gist of the action doctrines. First, these doctrines are not cognizable under Alaska law, which Plaintiff respectfully submits applies. Second, this is a determination that is not typically made on a motion to dismiss. Finally, as with negligence, Plaintiff's claim for negligent misrepresentation is separate and apart from Plaintiff's breach of contract claim and further, involves matters of policy. Accordingly, it is submitted that Defendant's motion to dismiss, as to this count, should be denied.

## X.    PLAINTIFF'S COMPLAINT STATES A CAUSE OF ACTION FOR UNJUST ENRICHMENT.

The Amended Complaint alleges that (1)  Plaintiff paid management fees to Defendant; (2) Defendant financially benefited from the payment of management fees; (3) it would be inequitable to Defendant to retain these management fees because Defendant did not in fact provide value in exchange for them, and therefore (4) Defendant should make restitution by returning the management fees.

Under both Alaska and Pennsylvania law[18], unjust enrichment is shown by alleging that defendant received a benefit from the plaintiff; that defendant appreciated the benefit, and that it would be inequitable for defendant to retain the benefit. See Reeves v. Alyeska Pipeline Service Co., 56 P.3d 660 (Alaska 2002); Mitchell v. Moore, 729 A.2d 1200 (Pa Super. 1999).

Unjust enrichment differs from an implied-in-fact contract in that in the case of the latter:

> It arises where the court finds from the surrounding facts and circumstances that the parties intended to make a contract but failed to articulate their promises and the court merely implies what it feels the parties really intended. . . .
> An 'implied in law' contract, on the other hand, is a fiction of the law which is based on the maxim that one who is unjustly enriched at the expense of another is required to make restitution to the other.

Martens v. Metzgar, 524 P.2d 666, 672 (Alaska 1974) (citations omitted).

Thus, unjust enrichment does not depend on any actual contract, or any "agreement between the parties, objective or subjective." Darling v. Standard Alaska Prod. Co., 818 P.2d 677, 679-680 (Alaska 1991), citing Alaska Sales and Serv., Inc. v.

---

[18] Once again, it is respectfully submitted that, to the extent choice of law can and should be determined at this time, Alaska law should apply to the common law and Alaska statutory claims.

Millet, 735 P.2d 743, 746 (Alaska 1987). As stated by the Alaska Supreme Court in

Darling:

> In Alaska Sales, we noted that "unjust enrichment is not in and of itself a theory of recovery. Rather, it is a prerequisite for the enforcement of restitution; that is, if there is no unjust enrichment, there is no basis for restitution."

Darling, supra., citing Alaska Sales.

In explaining the meaning of "unjust", the court in Alaska Sales stated:

> The courts are in accord in stressing that the most significant requirement for recovery in quasi-contract is that the enrichment to the defendant must be unjust; that is, the defendant must receive a true windfall or "something for nothing." E.g., Barrett v. Ferrell, 550 S.W.2d 138, 143 (Tex.App.1977). Where a defendant has given fair consideration or value to a third party in exchange for the benefits conferred by the plaintiff, there is no windfall and no recovery will lie.

Alaska Sales & Serv., Inc. v. Millet, 735 P.2d 743, 746 (Alaska 1987)

Here, Plaintiff paid significant management fees to Defendant. The Policy and PPM did not set forth what Defendant was to do in exchange for the management fees. Thus, Defendant's receipt of them without providing anything in exchange does not constitute a breach of contract; rather, it constitutes unjust enrichment because, in fact, Defendant received "something for nothing" --- "a true windfall." Accordingly, Plaintiff has stated a plausible and cognizable cause of action for unjust enrichment.

Defendant argues that Plaintiff's claim should be dismissed because it is precluded by the existence of an express contract. Db38  Defendant relies on Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 507 (E.D.Pa 2008), citing Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987) and Villoresi v. Femminella, 856 A.2d 78, 84 (Pa. Super. 2004) for that proposition.   However, as more recently explained by the Third Circuit in Essex Ins. Co. v. RMJC, Inc., 306 Fed. App'x.

749, 753-754 (3d Cir. 2009), where the express contract is silent on a particular question

of payment, a claim for unjust enrichment is not precluded.  Specifically:

> A plaintiff is not foreclosed from seeking restitution by the mere existence
> of a contract with the defendant, but only where the plaintiff has an
> "*alternative right* on an enforceable contract." 26 Richard A. Lord, *A
> Treatise on the Law of Contracts [Williston on Contracts]* § 68:5 (4th
> ed.2003) (emphasis added). For example, "[w]hen [a] non-breaching party
> elects to sue on [a] contract, ordinary contract rules limit compensatory
> damages to his expectancy interest, even if this measure of relief fails to
> disgorge the breacher's profits." *Curley v. Allstate Ins. Co.,* 289 F.Supp.2d
> 614, 621 (E.D.Pa.2003); *see also Hershey Foods Corp. v. Ralph Chapek,
> Inc.,* 828 F.2d 989, 999 (3d Cir.1987) ("[W]here the contract 'fixes the
> value of the services involved,' there can be no recovery under a *quantum
> meruit* theory."). <u>But where, as here, the terms of the contract do not
> address the compensation owed to a plaintiff for a particular benefit
> conferred on the defendant, the plaintiff may obtain restitution if the
> defendant would be unjustly enriched by retaining that benefit.</u>.

<u>Essex Ins. Co., supra.</u>, 306 Fed. App'x. at 753-754 (3d Cir. 2009).

The <u>Villoresi</u> court is consistent with the foregoing, noting that:

> Where an express contract already exists to define the parameters of the
> parties' respective duties, the parties may avail themselves of contract
> remedies and an equitable remedy for unjust enrichment cannot be deemed
> to exist. *See Mitchell,* 729 A.2d at 1203.

<u>Villoresi v. Femminella</u>, 2004 PA Super 256, 856 A.2d 78, 84 (Pa. Super. Ct. 2004).

Thus, by implication and extension, where, as here the express contract does <u>not</u>

fully define a particular issue or parameter, unjust enrichment can be sought because it is

not already addressed by the express contract.  Accordingly, even under Pennsylvania

law, Plaintiff has stated a plausible, and cognizable claim for unjust enrichment.

## XI.   DETERMINATION OF CHOICE OF LAW IS PREMATURE, BUT THE AVAILABLE FACTS AND LAW POINT TO ALASKA AS THE STATE WITH THE MOST INTEREST IN THE MATTER.

Alaska state law expressly governs the Policy between the parties and thus, all

causes of action arising out of the contract.  As to other causes of action, a choice of law

determination is premature on a motion to dismiss because it involves a fact-specific analysis, and thus, should await full discovery on all claims.  To the extent a choice of law determination is made at this juncture, Alaska is the state with the most significant contacts.

Defendant concedes that the insurance policy expressly provides for Alaska law to govern.  Defendant argues, however, that Alaska law does not necessarily govern the non-contractual claims because the choice of law provision in the contract is narrowly drafted to cover only the contract.  Db18.  Thus, Defendant contends that, based on the provision, it is necessary to conduct a choice of law analysis to determine which state has "the most significant contacts with the controversy."  Db21, citing Smith v. Lincoln Benefit Life Co., Civ A No 08-01324, 2009 U.S. Dist. LEXUS 24941 at *19 (W.D. Pa , March 23, 2009).

The first step in a choice of law analysis is to determine whether the laws of the two jurisdictions differ. Db20.  Defendant contends that there is "no relevant difference" between the two jurisdictions as to breach of fiduciary duty (except for insurer-specific fiduciary duty), negligence and unjust enrichment.  Thus, for purposes of this motion, Plaintiff will only address those claims that Defendant contends present a conflict between the two states: (a) breach of insurer fiduciary duty; (b) breach of the implied covenant of good faith and fair dealing; and (c) negligent misrepresentation.

As noted in III and IV, infra, it is respectfully submitted that insurer fiduciary duty and the implied covenant of good faith and fair dealing exist in every insurance contract as a matter of Alaska law governing insurance contracts and thus, are covered by the choice of law provision of the insurance policy.  See O.K. Lumber, supra., 759 P.2d

523, 525 (Alaska 1988) (fiduciary duty); <u>Alyeska Pipeline Serv. Co. v. H.C. Price Co.,</u>

694 P.2d 782, 788 (Alaska 1985) (implied covenant of good faith and fair dealing).   The

fact that these duties sound in tort does not negate the fact that they are expressly

provided for by the applicable Alaska law that governs insurance contracts and which is

indisputably provided for by the insurance contract at issue here.   Thus, it is respectfully

submitted, that these claims are governed by Alaska law. <u>See</u> <u>Miller v. Allstate Ins. Co.,</u>

763 A.2d 401, 403 (Pa. Super. 2000) (under Pennsylvania choice of law rules, a choice of

law provision in an insurance contract will be given effect.)

      As to each of the three claims, Defendant contends that the most significant

contacts test favors Pennsylvania as the state with the most significant contacts. Db24.

Defendant cites the test under §145 of the Restatement (Second) of the Conflict of Laws

as the basis for its contention. Db24.   Section 145 is the general provision on the tort

section of the Restatement.  However, other sections of the Restatement apply, thereby

making the analysis of "most significant contacts" not only complicated, but also very

fact-intensive and fact-specific.  For example, as noted by one legal commentator:

> Briefly described, the Second Restatement works through three related
> functions, described here in the reverse order of their best use. First is
> section 6--often identified per se with the most-significant-relationship
> test--with two components. Section 6(1) gives dispositive priority to the
> forum's statutory choice-of-law rules. If none apply, section 6(2) lists
> seven nonexclusive policies that may identify the state having the most
> significant relationship to the dispute:
> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests
> of those states in the determination of the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.
>  The second functional component is a set of three general principles for
> torts, contracts, and property. The general principles for torts and contracts
> list contacts "to be taken into account in applying the principles of § 6." .. .

For example, the tort general principle lists four contacts: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. [Section 145] The black-letter language following this list states that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." That is, the court has discretion to analyze these territorial contacts on a case-by-case basis; although precedents acquired over time will erode that discretion. . . .

The Second Restatement's third functional component is a number of sections focused on specific claims and issues. For torts, these issues are further broken down into particular torts (for example, personal injury, property damage, fraud, defamation, and others), and then into particular issues (for example, standard of care, legal causation, duty or privilege to act, imputed negligence, and others). Further tort sections address wrongful death and workers compensation. Apart from torts, contracts, and property, the Second Restatement has further specific issues for procedure, trusts, status, agency and partnership, business corporations, and administration of estates.

James P. George, <u>False Conflicts and Faulty Analyses: Judicial Misuse of Governmental Interests in the Second Restatement of Conflict of Laws</u>, 23 Rev. Litig. 489, 521-522 (2004).

Thus, as noted by the foregoing, "[f]or most choice-of-law questions, more than one section will apply." <u>Id.</u>   The commentator presents the following as the procedure to be followed to minimize "[t]he confusion of multi-section analysis":

First, does the forum have a choice-of-law statute on point? If so, it is applied pursuant to section 6(1). Second, is the choice-of-law question limited to a specific issue...? If so, [the section addressing that issue applies] applies, which points to [the general section for the particular category, such as] section 145 (the general tort principle), listing four territorial contacts to be considered along with the policy factors in section 6. Other specific issues are, of course, governed by other sections. Third, if the governing law for an entire claim is at issue, does a specific Second Restatement section address it...? If so, [the specific section addressing that claim applies] . . . Fourth, if no specific sections governing claims or issues apply, begin the analysis with one of the three general principles for tort, contract, or property, as appropriate, and consider those contacts along with the policy factors in section 6. Fifth, if the claim is not one of

> tort, contract, or property, and also has no other specific section (such as
> business associations), then use section 6 to choose the appropriate law.

Id. at 522 (2004).

Thus, for example, in the case of negligent misrepresentation, not only would the

general principal for torts apply (as set forth by Defendant), but also the factors under

section 6, and the factors under §148, applying to fraud and misrepresentation:

> (1) When the plaintiff has suffered pecuniary harm on account of his
> reliance on the defendant's false representations and when the plaintiff's
> action in reliance took place in the state where the false representations
> were made and received, the local law of this state determines the rights
> and liabilities of the parties unless, with respect to the particular issue,
> some other state has a more significant relationship under the principles
> stated in § 6 to the occurrence and the parties, in which event the local law
> of the other state will be applied.
> (2) When the plaintiff's action in reliance took place in whole or in part in
> a state other than that where the false representations were made, the
> forum will consider such of the following contacts, among others, as may
> be present in the particular case in determining the state which, with
> respect to the particular issue, has the most significant relationship to the
> occurrence and the parties:
> (a) the place, or places, where the plaintiff acted in reliance upon the
> defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicile, residence, nationality, place of incorporation and place of
> business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction
> between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract
> which he has been induced to enter by the false representations of the
> defendant.

Restatement (Second) of Conflict of Laws, §148.

Based on the foregoing, it is clear that Defendant does not address all of the

sections and factors to be addressed in making a choice of law determination.  In

addition, Defendant's contentions as to specific factors are either debatable, or, in many

cases, disputed by Plaintiff.  For example, Defendant contends that the "injury" occurred

in Pennsylvania because of the "legal situs" of the Investment Account and the place of administration of the Policy. Db 25. However, the Policy was delivered in Alaska, and Alaska insurance and securities statutes apply for purposes of its administration. Thus, the place of "injury", is at least debatable, and certainly disputed by Plaintiff.

Contending that Alaska contacts are minimal, Defendant asserts that "the decision to invest in the Tremont Fund was made by Michael Rulle long before the Trust was created . .." Db 25. Plaintiff disputes this assertion, contending instead that he never made the decision to invest in the Tremont Fund and at all times contemplated establishing the Trust under Alaska law. Rulle Affidavit, ¶1. Finally, rather than making a case for the application of Pennsylvania law, Defendant cites more contacts with New Jersey, noting that Michael Rulle and his wife were residents of New Jersey, the Trust was prepared by New Jersey counsel, and the beneficiaries of the Trust reside in New Jersey. Db25. In fact, that only "true" contact to Pennsylvania is the address of Defendant. Inasmuch as Defendant was doing business in Alaska in connection with the Policy, and thus bound by Alaska law as to insurance policies and securities, as well as specifically selecting Alaska law as a matter of governing the parties under the policy, Defendant's domicile would seem to be of little import. Indeed, even in Hammersmith v. TIG Insurance Co., 480 F.3d 220, 235 (3d Cir. 2007), upon which Defendant relies, the Third Circuit found that where one state had "the most significant relationship to the insurance contract, and the greatest governmental interest in seeing its laws enforced, we will apply [that state's] law on the remaining issues to this dispute." Id. Similarly here, it is undisputed that Alaska has the most significant relationship to the insurance Policy. The variable life insurance policy at issue here not only implicates private contract law,

but insurance and securities statutory law as well, both of which are premised on strong

public policy principles. Under that analysis, clearly, Alaska has the greatest

governmental interest in seeing its laws enforced.

It is for the foregoing reasons that courts are hesitant to make choice of law

determinations on a motion to dismiss. "By declining to consider a choice of law

challenge at an early stage in the litigation, courts properly avoid a fact-specific inquiry

prior to the parties conducting discovery and fully briefing the choice of law issue."

Godfry v. State Farm Mutual Insurance Co., 2009 WL 56436 (E.D. Pa. 2009).  See also

Children's Hosp. of Phila. v. Horizon NJ Health, No. 07-5061, 2008 WL 4330311, *7

(E.D. Pa. Sept. 22, 2008) ("a motion to dismiss does not present an appropriate forum for

a choice of law …determination."); Hodgson v. Man Fin. Inc., 06-1944, 2006 WL

3861068 at *1 (E.D.Pa. Dec.29, 2006) (withholding choice of law determination until

conclusion of discovery.); Schirmer v. Principal Life Insurance Co., 2008 WL 478568 ,

*6 (E.D.Pa. 2008) ("Pennsylvania's choice of law analysis involves a fact-intensive

inquiry that can be more properly addressed at the summary judgment stage of the

proceedings once the record has been more fully developed through discovery."), citing

Kilpatrick v. Sheet Metal Workers Int'l Ass'n Local Union No. 19, 1996 WL 635691 , *4

(E.D. Pa. Oct 30, 1996).   Thus, where, as here, discovery has not been conducted, and

there are significant factual issues, choice of law should properly await the conclusion of

discovery. Hodgson, supra.

## CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that Defendant's

Motion to Dismiss should be denied, and Plaintiff's Cross-Motion for Leave to File an

Amended Complaint should be granted.

Dated:  April 30, 2010                          Respectfully submitted,

                                                _____
                                                William R. Connelly, Esq.
                                                Law Offices of William R. Connelly, LLC
                                                7 West Main Street
                                                Mendham NJ 07945
                                                Phone:  (973) 543-5301
                                                Fax:  (973) 543-5140

                                                Nicholas Noel, III, Esq.
                                                Noel, Kovacs & McGuire, P.C.
                                                2505 Newburg Road
                                                Easton PA 18045-1963
                                                Phone:  (601) 258-0866
                                                Fax:  (610) 258-5264

## CERTIFICATION OF SERVICE

I, William R. Connelly, hereby certify that a true and correct copy of the

foregoing Plaintiff's Opposition to Defendant's Motion to Dismiss and Cross-Motion to

Amend Plaintiff's Complaint was electronically filed on April 30, 2010 using CM/ECF

which will send notification of such filing to the following counsel of record:

Matthieu J. Shapiro, Esq.

_____
William R. Connelly