## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL S. RULLE FAMILY DYNASTY TRUST,

       Plaintiff,

       v.

AGL LIFE ASSURANCE COMPANY,

       Defendant

Civil Action No. 2:10-cv-00231-BMS

Hon. Berle M. Schiller

## AFFIDAVIT OF MICHAEL S. RULLE

STATE OF NEW JERSEY:
                :SS
COUNTY OF MORRIS  :

     I, Michael S. Rulle, hereby declare under the penalties of perjury, pursuant to 28 U.S.C. §1746, that:

     1.      I am the grantor of the Michael S. Rulle Family Dynasty Trust, the named plaintiff in this matter (hereafter "The Dynasty Trust"). The Dynasty Trust is a family trust established by me for the benefit of my wife and children and was established in Alaska pursuant to the laws of the State of Alaska. I am fully familiar with the facts hereafter stated.

     2.      This Affidavit is submitted in opposition to the motion to dismiss filed by the defendant, AGL Life Assurance Company (hereafter "AGL"). I have reviewed the moving papers submitted by AGL and, in particular, the Affidavit of John Hillman, President and Chief Executive Officer of AGL. That affidavit is inaccurate in its recitation of the facts stated therein, and moreover, it is misleading in that it omits material facts which Mr. Hillman has chosen to ignore and avoid disclosing in his statement.

## MY EMPLOYMENT BACKGROUND

3.      I have worked in the financial services business for over 30 years.  Currently, I

manage my own proprietary trading firm, MSR Investment LLC, that specializes in quantitative

modeling of futures markets.  Prior to that, I have held several positions in investment banking

and investment management.  Among them, I created and ran the derivatives business at Lehman

Brothers and rose to become an Executive Committee Member of Lehman Brothers (July 1979

through June 1994).  After Lehman, I became CEO of CIBC World Markets Inc. which was

primarily responsible for global derivatives, securitization, and the company's loan business.  At

CIBC, I co-chaired the CIBC World Markets Global Risk Committee and was a member of the

Global Bank's Credit Committee (June 1994 through September 1999).

Following CIBC, I joined the Bermuda Reinsurance Company, Stockton, Inc.

("Stockton"), as President and CIO of their US broker dealer, Hamilton Partners.  Hamilton

Partners was the internal "hedge fund" of Stockton (September 1999 through February 2002).

From February 2002 until November 2007, I served as President of Graham Capital

Management, a $7 billion hedge fund where I chaired the Investment and Risk Committee, and

was directly responsible for the firm's 30 portfolio managers.

## MY EDUCATION BACKGROUND

4.      My educational background includes a BA from Hobart & William Smith

College, graduate studies at the College of William & Mary, Ph.D. studies at Columbia

University in political philosophy, and an MBA at Columbia Business School where I graduated

first in my class (1979).  Following business school and for a period of time, I taught finance as

an Adjunct Associate Professor and as an Adjunct Professor at the Columbia Business School.  I

have published works in a variety of texts and have been the subject of many articles in the finance industry and have appeared on several business shows.

### FUND-OF-FUNDS

5.      I will be the first to admit that I am knowledgeable about the finance and investment business and that I have experience with a wide variety of investment programs and vehicles, including the operation and purposes of so-called "fund-of-funds". It was a fund-of-funds, identified by AGL in plaintiff's brief as the "Tremont Opportunity Fund", that AGL made available to me under their variable life insurance policy for purposes of the investment under that policy.

6.      In his affidavit, Mr. Hillman has created the impression – wrongly – that the initial contact between myself and AGL occurred in August 2000 through the representation of my insurance broker, Mark Dunn. Hillman claims that Dunn initiated discussions with him about structuring a variable life insurance policy for me. In fact, this is far from what occurred.

7.      What took place was that Mr. Hillman, on behalf of AGL, spoke to me in or before August 2000 date to pitch me to invest, both personally and on behalf of my clients/colleagues, in approximately 4 different investment products using a life insurance platform. Mr. Hillman represented to me that he was a licensed investment advisor and that AGL had significant professional expertise as an investment advisor with solid investment products tied to insurance platforms for maximum tax advantages. I spoke to him on numerous occasions about those proposed investment products, and in nearly each occasion advised him that I saw significant defects in the proposed products that we discussed. Most of the defects that I saw centered around the fact that the investment schemes proposed by Mr. Hillman contained too much exposure to governmental rules which prohibited investors' direct control in the

investment. Not that this is prohibited per se, but that the structure would result in possible adverse rulings depriving the investment of its intended tax advantages. I respectfully disagreed with Mr. Hillman's analysis and declined his entreaties. However, I advised him that if he offered an investment vehicle inside the insurance policy that tracked the structure used by insurance companies in other offerings, I would be interested. In particular, I referred to diversified equity funds insurance companies market in their variable universal life products. In these instances, insurance companies create "clones" of mutual funds managed by mutual fund companies. I told Mr. Hillman that when he created a product that was a diversified "fund-of-funds" I would see this as a workable investment in which I would be interested. These discussions occurred over the course of several months.

8.     As discussed between myself and to Mr. Hillman, a "fund-of-funds" would provide an investment strategy of having a portfolio of other investment funds, obtained other than by way of direct investment, investing in shares, bonds, or other securities. This type of investment is referred to as a multi-manager investment. The benefit of investing in a fund-of-funds is that it can achieve greater diversification which serves to reduce the risk of investment volatility while maintaining average returns. The fund-of-funds manager will select a very broad and diversified set of managers specializing in different markets and trading styles. Included in the selection process is an in-depth due diligence inquiry of the investment fund and its operations and strategy. This additional level of selection and scrutiny provides greater stability and reduces the risk related to a single investment manager. The fund-of-funds invests in the scheme of combined strategies of multiple investment managers thus providing a greater degree of diversification as well as the opportunity to have the "best of breed" money managers for the various parts of the asset allocation. Further, instead of investing in different stocks or other

4

products of mutual funds, and having to keep records of all of them, the investor in a fund-of-funds can more easily invest in and track only one fund which in turn invests in other funds.

9.     The downside in investing in a fund-of-funds is that management fees are typically higher than those of traditional investment funds because they include part of the management fees charged by the fund-of-funds' manager in addition to the fees of the underlying managers.  Also, fund-of-funds typically have a high minimum level of investment amounts compared to investing in traditional investment funds.  The lack of accessibility by an investor in a fund-of-funds to the investment managers makes it important that (i) a fund-of-funds be professionally managed, (ii) that adequate due diligence be performed in the selection of the fund-of-funds and (iii) that continued oversight of the fund-of-funds activities during the period of the investment be ensured.

**AGL SELECTED THE FUND**

10.     In or around the spring of 2001, I received a telephone call from Mr. Hillman advising me that AGL had obtained a fund-of-funds then entitled American Masters Opportunity Insurance Fund, L.P. (which later became named "The Tremont Opportunity Fund III, L.P.").  Mr. Hillman represented that this fund was a highly professionally managed and reputable fund which had been selected by AGL to participate in the flexible premium variable  life insurance policy of AGL as an investment account in which my net premium could be allocated.  Prior to Hillman's call, I did not know of nor had I ever heard of either American Masters Opportunity Insurance Fund, L.P. or Tremont Opportunity Fund III, L.P.  Hillman explained that this fund-of-funds satisfied my concerns about the investment options previously discussed.  It was a highly diversified fund and that I would be as far removed from making investment decisions as possible.  The latter criteria was important to insure my obtaining the tax advantages of the

product. Hillman assured me on both points and explained that the investment would be highly diversified in keeping with usual industry standards in the range of typically no more than 5% to 7% being managed by any one investment manager and that AGL would be a limited partner with access to oversight of the general partner of the fund. Based upon this, I felt that I wanted to go forward.

11.    I started work with my attorney to create The Dynasty Trust which ultimately became the applicant on the AGL flexible premium variable life insurance contract, a true copy of which is attached hereto as Exhibit A ("the AGL Insurance Contract"). It is my best recollection that around this time, and after my conversation with Mr. Hillman, I asked Mark Dunn, my insurance broker, who also was an insurance broker for Phoenix, obtain the necessary documentation (insurance applications, prospectus, etc.). I recollect reading the private placement memorandum (a copy of which is attached to Defendant's Exhibits as Exhibit "1") provided to me from AGL (either through Mark Dunn or directly) at some point in time. During this time, I was advised by Mr. Hillman or others that my ability to proceed with a purchase of a life insurance policy would be dependent upon the results of my physical examination. That exam would also affect what the cost of the coverage would be. Therefore, it made sense to submit to a physical examination as a threshold step to any further discussions about buying life insurance and participating in any of the AGL life insurance based products. That medical examination was conducted by AGL's physician Anthony Iuzzolino, M.D. in April 2001. Thereafter, on or about October 5, 2001, the AGL Insurance Contract was executed. The Dynasty Trust bears a date of September 27, 2001 and the AGL Insurance Contract is dated October 5, 2001.

## INVESTMENT PERFORMANCE

12.     The AGL Private Placement Memorandum #704, dated October 2, 2001 attached

to the defendant's exhibits as Exhibit 1, offers only two investment account choices – (1) money

market account or (2) American Masters Opportunity Insurance Fund, L.P. account.   Under the

AGL Private Placement Memorandum these accounts are designated as "the Investment

Accounts".  As explained by that private placement memorandum, the policy owner pays

premiums into an AGL variable account, a separate account of AGL established to fund the

offered "Investment Accounts".  The assets of the AGL variable account are owned by AGL and

are placed by AGL into one or both of the designated Investment Accounts.

13.     Under the topic heading "Summary Description of the Policy", at page 11 and 12

of the AGL Private Placement Memorandum, it states the following:

> **The Investment Account**.   The account value
> of the Investment Account selected by the
> investment managers and its sub-advisors will
> increase or decrease depending upon the
> performance of the investments selected by the
> investment managers of these Investment
> Accounts.  Accordingly, policy owners bear the
> entire investment risk, including the risk of loss
> of principal for all amounts invested in the
> policy.
>
> **Policy Values**.  Net premium is allocated to
> one or more Investment Accounts.  Depending
> on the investment performance of these
> accounts, the Account Value of the Policy may
> increase or decrease on any Valuation Day.  The
> Policy Owner bears the entire investment risk
> associated with the investments of the Investment
> Accounts, and there is no guaranteed minimum
> Account Value...

14.     As a person involved in managing and making financial investments over many

years at my profession, I have always understood, and it is the common understanding in the

industry, that the usage of the term "investment performance" means the return on an investment or, in other words "the results produced by the investment manager". The term "investment performance" is undefined in the AGL Life Insurance Policy (plaintiff's Exhibit A) attached hereto and is undefined in the AGL Private Placement Memorandum (defendant's Exhibit 1). Nevertheless, this term is known by investment managers as encompassing gains or losses resulting from investment activities such as market gains or losses reflected in stock values as of a date certain. The understanding of the term "investment activities" does not encompass the stealing of funds through fraud or other means. There is no "investment performance" to be measured by someone engaged in theft. The common understanding of the term "investment performance" and more importantly, the common usage in the investment business community of that term, does not encompass the activity of stealing funds.

## MADOFF'S THEFT IS NOT AN INVESTMENT ACTIVITY

15.     In or about January 2009, AGL advised that significant portions of the moneys that had been provided to AGL under the subject AGL Insurance Policy had, in fact, been invested in a number of funds all of which were ultimately managed and controlled by Bernard Madoff, the notorious convicted Ponzi Scheme crook. AGL advised that because of the activities of Bernard Madoff stealing the funds through the use of his Ponzi scheme, the account was now reduced by the amount of that loss which I have calculated somewhere in the range of $1.1 million dollars in known losses and possibly $900,000.00 additional losses. It appears to be AGL's position that having taken the moneys and given it to the Tremont Opportunity Fund (formerly named American Masters Opportunity Insurance Fund, L.P.), a fund they selected (which it also turns out was directed by Tremont Partners, a feeder fund for Bernard Madoff), and the Tremont Opportunity Fund, thereafter, having allocated those moneys to various Rye

8

Select Funds, which were also Madoff managed funds, that the theft of those funds by Bernard Madoff and the entities that he controls and manages constitutes an "investment loss" rather than simply stealing of those moneys.   However, AGL sees this loss being the result of an adverse "investment performance" thus justifying a decrease in the value of my account by the amount of the "investment loss".  The moneys were not invested but were stolen.

16.     Any considerations of investment performance by a money manager are evaluated in terms of risk factors attendant with the investment.  In the AGL Private Placement Memorandum (Defendant's Exhibit 1), as stated on page 14, there are identified risk factors "associated with the investment" which each policy owner is advised to be aware of.  In the AGL Private Placement Memorandum, the policy owners are advised to be aware of (1) the risk of poor performance or default by one or more issuers of securities that comprise the Investment Accounts assets; (2) the risks of adverse governmental regulations effecting industries and consequently, companies in such industries whose shares are held by the Investment Accounts; (3) the risks of interest rate fluctuations; (4) the risks inherent in price movements, high portfolio turnover, and related transaction costs for smaller companies; and (5) the risks inherent in securities of non-US issuers who generally will not be registered with the SEC or subject to SEC reporting requirements.

17.     In Part II of the AGL Private Placement Memorandum, the policy owner is advised to consider risk factors associated with the Tremont Partnership and identifies 24 categories of risk in that section.  Nowhere in any of the private placement documents is there consideration of "risks associated with an investment in the policy" which encompasses or itemizes or contemplates a theft of funds by fraud or otherwise.  Also, nowhere does AGL identify as a risk the fact that although they selected the Tremont Partnership, an investor should

not rely upon them that such selection was not the result of their due diligence review or that this selection of the Tremont Partnership carries no weight and should not be relied upon.

AGL, by its own definitions contained within the private placement memorandums promulgated by it, does not identify or consider <u>investment risks</u> as encompassing theft of the funds by fraud, Ponzi Scheme or otherwise. Such losses by theft are not considered by AGL to be <u>investment losses</u> and they are not considered to be the type of losses associated with the term <u>investment</u> loss. Because of this, they are not investment losses against which AGL can reduce the valuations in the account as  the contract language in the AGL Insurance Contract specifically provides for reduction of the valuations based  only upon investment losses, not theft.

18.     Under both the AGL Insurance Policy dated October 5, 2001 and the AGL Private Placement Memorandum dated October 2, 2001, account values under the policy and the contracts can decrease in value due to <u>investment</u> results only. See part 6, page 15 of the AGL Insurance Policy (Exhibit "A") and see page 18 of the AGL Private Placement Memorandum (Defendants' Exhibit 1).

## AGL DUTY TO PROTECT OUR MONEY

19.     The AGL Private Placement Memorandum, at page 26, advises policy owners to read "the attached American Masters Opportunity Insurance Fund, L.P. Private Placement Memorandum and Limited Partnership Agreement for additional information regarding this partnership". However, AGL then emphasizes that the rights of the policy owner are governed by the terms of the AGL Life Assurance Company Private Placement Memorandum and any supplement thereto as well as the AGL policy contract "and not by the Partnership Private Placement Memorandum or the Limited Partnership Account". AGL's Private Placement

Memorandum then goes on to describe the American Masters Opportunity Insurance Fund, L.P. ("the Partnership") and in bold type on page 36 emphasizes that "it is the company on behalf of its separate account and not the policy owners that will be the limited partner in the partnership". This of course means that Plaintiff was not in privity of contract with the general partner of the partnership and was not a member of that partnership but instead its interests in the partnership were represented by AGL, the limited partner.  Accordingly, the Plaintiff looked to AGL, as a limited partnership participant in the partnership to protect its moneys which they have placed in that partnership.

20.     In fact, the prohibition on communication with the general partner and the partnership appears in the restrictions set forth in paragraph 4 of the American Masters Opportunity Insurance, L.P. Confidential Private Placement Memorandum dated January 1, 2001 (defendant's Exhibit 2).  In any event, as a policy owner, the Plaintiff was precluded from having any contact with the general partner Tremont Partners, and, thus, had to rely exclusively on AGL to monitor and confirm that the general partner was acting in compliance with the partnership agreement and the private placement memorandum.

### AGL FAILED TO ENSURE DIVERSIFICATION OF THE FUNDS

21.     After Mr. Hillman notified me that AGL had selected a fund-of-funds which would be tied to the variable rate life insurance platform for investment purposes, I arranged for the Dynasty Trust to be established and I funded the trust and executed the applications for the investment.  Thereafter, from the period October 2001 through December 2008, serving as a representative of the Trustees of the Dynasty Trust and on their authorization, I periodically requested information from AGL concerning the diversification of the investment.  The last such inquiry by me occurred in or about December 2008 when I was advised by the AGL's

representative, Stanley Geyelin, that the top 10 portfolio holdings as of September 2008

allocated by investment managers were as follows:

| | |
|---|---|
| Rye Select Broad Market Prime Fund LP<br>Equity Market Neutral | 10.35% |
| Rye Select Broad Market Prime LP<br>Equity Market Neutral | 6.53% |
| Rye Select Broad Market XL Fund LP<br>Equity Market Neutral | 3.76% |
| Green Light Capital Qualify LP<br>Long/short equity | 3.09% |
| Scoggin Capital Management LP II<br>Event Driven | 2.70% |
| Stark Investments LP<br>Multi-strategy | 2.28% |
| Draw Bridge Special Opportunities Fund LP<br>Event Driven | 2.27% |
| Rye Select Equities Fund<br>Long/short equity | 2.24% |
| High Bridge Asia Opportunities Fund LP<br>Multi-strategy | 2.19% |
| D.B. Zwirn Special Opportunities Fund LP<br>Event Driven | 2.05% |

22.    The above listings were essentially consistent with what I had expected in that the

allocation among the managers was diversified and there was no high concentration shown.  In

fact, what has emerged based upon AGL and Tremont's subsequent correspondence to me as a

representative of the Trustees concerning the allocation of funds is that each of the Rye Select

managers were not separate managers as represented by AGL but instead were all funds

managed by Bernard Madoff.  In short, of the top ten managers identified by AGL as separate

managers as of September 30, 2008, in fact four of them were not separate managers at all but instead were managed by or sub-managed by Bernard Madoff resulting in some 23% of the investment funds being managed by one single manager – Bernard Madoff.

23.   This is contrary to the representations that had been made to me both verbally and in writing from AGL and is also contrary to the initial private placement memorandums which called for the investment funds to be allocated in a highly diversified manner among different money managers.  Whether it was Bernard Madoff or somebody else, to allocate 23% of the funds is not consistent with what was represented to me and not consistent with proper allocation of diversified fund-of-funds as expected pursuant to usual industry practices.

24.   I note that the August 2008 Tremont Private Placement Memorandum provided in defendant's exhibits at Exhibit 4 shows that the Tremont Private Placement Memorandum was modified to allow for a 30% allocation to any money manager.  This was a provision not included in the prior private placement memorandums provided to me and, in fact, I have no recollection of receiving the Tremont 2008 Private Placement Memorandum.  It is highly suspicious that Tremont modified their private placement memorandums in late 2008 to reflect a higher allocation among property managers in an amount consistent with the amount allocated to the Rye Select Funds.  Somebody was attempting to correct the documents to cover for the fact that the Rye Select Funds were in fact managed by the same manager and that the allocations of as much as 30% would be allowable.  Such conduct is unacceptable and directly misleading and AGL not only failed to inform Plaintiff that this was occurring but this is directly contradictory to my discussions with Mr. Hillman and my understandings of what was going to happen with the fund in terms of the intensity of diversification with the managers.

## SUMMARY

25.     In summary, and contrary to the statements and implications set forth in Mr.
Hillman's affidavit, AGL selected the Tremont Fund as the fund-of-funds and brought that fund-
of-fund to me with the representation that the Tremont Fund had satisfied AGL's selection
criteria and was a reliable and professional fund.  I did not select the Tremont Fund to be AGL's
fund-of-funds for purposes of the life insurance policy contract and investment.  As far as I was
concerned, whether it was Tremont or some other fund-of-funds, as long as it was a fund-of-
funds which was selected and vetted by AGL (as I expected it should have been) that was fine
with me.

26.     Also, contrary to Hillman's statements, it is hard to believe that AGL produced a
private placement memorandum specifically including the Tremont Fund just for purposes of _my_
inquiry and my investment.  The 2001 private placement memorandum of AGL bears the
number "704" which in my understanding of private placement memorandums means that I
received the 704th copy of the private placement memorandum.  It is my understanding that when
private placement memorandums are distributed, a record or log of the persons who received the
private placement memorandum are recorded by the distributor of the private placement
memorandum and that each private placement memorandum is given a number for each person
to whom it is distributed.  If that is the case, then the mere fact that the private placement
memorandum (produced as Exhibit 1 of the defendant's exhibits) bears the number 704 belies
the statements made by Mr. Hillman.

27.     I never expected that AGL, as a limited partner of Tremont Partnership, would not
have vetted the partnership in the first instance to determine its viability and in the second
instance, as a limited partner would not have monitored the actions of the general partner, in

particular with respect to the diversity or lack of diversity of the allocations among fund managers and, thirdly that AGL would have unilaterally decided that a theft loss was the equivalent of an investment loss given the definitions under its policy, its private placement memorandums, and the associated risk factors listed thereunder.

28.     For these reasons and the arguments expressed in our accompanying brief, Plaintiff respectfully request that the defendant's motion to dismiss be denied.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

_____
Michael S. Rulle

Sworn to before me this
30th day of April, 2010

_____

MARCELLA POTOCZAK
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 5/13/2014

Exhibit "A"

# AGL Life Assurance Company

## FLEXIBLE PREMIUM VARIABLE
## LIFE INSURANCE CONTRACT

### Provision of Benefits

AGL Life Assurance Company promises to provide the benefits described in this Contract. This promise is subject to the terms of this Contract. It is made in return for your Application and payment of the required premiums. This is a legal contract between you and us. PLEASE READ THIS CONTRACT CAREFULLY. The words "we," "us," "our," and "company" refer to AGL Life Assurance Company.

This Contract takes effect on the Policy Date. It continues in force as long as the Net Account Value is sufficient to pay the Monthly Charges, as described herein.

### Notice of 10 Day Right to Examine Your Policy (Free Look Period)

**This Contract may be canceled at any time within ten (10) days after it is received or within forty five (45) days after the date of the Application, whichever is later. This Contract must be returned to us at our Home Office or to the agent through whom it was purchased. Written notice of cancellation is also needed. If this Contract is canceled, it will be as though this Contract had never been issued. Any premium paid will be returned to you minus any Death Benefits paid, Partial Withdrawals taken, and any Contract Loans, together with accrued but unpaid interest on such Contract Loans, if allowed by the law of the Governing Jurisdiction.**

This Contract is issued by a stock company and is governed by the laws of the Governing Jurisdiction (See Contract Schedule A).

This policy may only be sold to an accredited investor as defined by law or in an offer and sale which otherwise satisfies all conditions applicable to offers and sales made under Regulation D. Its ownership may not be transferred without our permission. It may only be transferred to another accredited investor or in an offer and sale which otherwise satisfies all the conditions otherwise applicable to offers and sales made under Regulation D. If you cease to be an accredited investor or if all the conditions applicable to offers and sales made under Regulation D are no longer satisfied, then we may exchange this policy for another policy that is exempt from registration or is registered as required by law. If you do not accept such change, you must notify us in writing within thirty (30) days of receipt of the new policy. We also reserve the right to prevent an exchange of this policy in accordance with Internal Revenue Code Section 1035 in a situation where such exchange would violate the investor control requirements of the Internal Revenue Code.

**ALL VALUES OR PAYMENTS PROVIDED BY THIS CONTRACT WHEN BASED ON THE EXPERIENCE OF A VARIABLE ACCOUNT MAY INCREASE OR DECREASE AND ARE NOT GUARANTEED AS TO DOLLAR AMOUNT. THE AMOUNT AND DURATION OF THE DEATH BENEFIT MAY BE VARIABLE OR FIXED UNDER CERTAIN CONDITIONS (SEE PART 2, INSURANCE PLAN).**

Signed at Plymouth Meeting, Pennsylvania, on the Policy Date.

SECRETARY                                                      PRESIDENT

**Variable Life Insurance.**
**Face Amount payable if Insured dies while the policy is in force.**
**Flexible Premiums payable while the Insured is living until the Maturity Date.**
**Non participating, no dividends are payable.**

**Home Office: 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania 19462**

VL-299

# TABLE OF CONTENTS

| Section | Policy Provisions | Page |
|---|---|---|
| Schedule A. | General Contract and Insured Information | 3 |
| Schedule B. | Contract Charges and Fees | 4 |
| Schedule C. | The Investment Accounts | 5 |
| Schedule D. | Face Amount | 6 |
| Schedule E. | Cost of Insurance | 7 |
| Schedule F. | Death Benefit Computation | 8 |
| Part 1. | Definitions | 9 |
| Part 2. | Insurance Plan | 10 |
| Part 3. | Variable Life Insurance Coverage | 11 |
| Part 4. | Premium Payments | 11 |
| Part 5. | The Investment Accounts | 13 |
| Part 6. | Account Value | 15 |
| Part 7. | Contract Loans | 16 |
| Part 8. | Partial Withdrawals | 17 |
| Part 9. | Reports to Contract Holder | 17 |
| Part 10. | Termination Provisions | 17 |
| Part 11. | General Provisions | 18 |

VL-299

# CONTRACT SCHEDULE A

## GENERAL CONTRACT AND INSURED INFORMATION

| | |
|---|---|
| Contract Number: | VL300222 |
| Contract Holder: | The Michael S. Rulle Family Dynasty Trust Agreement of 2001, dtd 9/27/01 |
| Contract Year: | October 5 through October 4 |
| Policy Date: | October 5, 2001 |
| Maturity Date: | October 5, 2049 |
| Beneficiary: | The Michael S. Rulle Family Dynasty Trust Agreement of 2001, dtd 9/27/01 |

Depending on the premium paid, coverage may not continue to the Maturity Date. If coverage continues to the Maturity Date, the net account value to be paid may be zero or small.

## INSURED INFORMATION

| | |
|---|---|
| Insured: | Michael S. Rulle |
| Date of Birth: | 7/22/50 |
| Issue Age: | 51 |
| Sex: | Male |
| Underwriting Class: | Advantage |
| Smoker Status: | Non-smoker |
| Social Security Number: | 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 |
| Residence: | 165 Cherry Lane |
| | Mendham, NJ  07945 |

## BASIC CONTRACT INFORMATION

| | |
|---|---|
| Plan: | Flexible Premium Variable Life Insurance |
| Death Benefit Option: | Option 1 |
| Riders: | None |
| Governing Jurisdiction: | AK |
| State of Issuance: | AK |
| Initial Face Amount: | $17,600,000.00 |
| Initial Premium: | $1,200,000.00 |
| Initial Net Premium: | $1,160,200.00 |
| Maximum Premium: | n.a. |
| Minimum Premium: | $250,000.00 |

## NET PREMIUM ALLOCATION LIMITATIONS

You may direct the allocation of the Net Premium to any Investment Account as described in Contract Schedule C.

During the Free Look Period, however, the allocation of the Net Premium will be limited to the Money Market Investment Account.

No Net Premium may be allocated by you to our General Account.

PARTIAL WITHDRAWALS

| | |
|---|---|
| Minimum withdrawal Amount: | $10,000.00 |

## BASIS OF COMPUTATIONS

| | |
|---|---|
| Mortality Table: | 1980 Commissioners Standard Ordinary Table, Age Nearest Birthday |
| Interest Rate: | 4.00% per year |
| | 0.327374% monthly equivalent |

## CONTRACT SCHEDULE B

### CONTRACT CHARGES AND FEES

Charges displayed in this schedule are the maximum charges under this Contract. Current charges may be lower than those shown.

### PREMIUM LOADS

Premium Loads are deducted from each premium payment.

| | |
|---|---|
| Distribution Charge: | 3.50% of Initial Premium |
| | 3.50% of Subsequent Premium |
| Premium Tax Charge: | A charge calculated to approximate the aggregate of taxes based on premiums received imposed on us by the jurisdiction in which you reside. |

### MONTHLY CHARGES

Monthly Charges are deducted from the Account Value.

| | |
|---|---|
| Asset Charges: | Asset Charges are deducted by us on a daily basis from each Investment Account managed directly by one or more investment managers. The Asset Charges for the Investment Accounts are shown in Contract Schedule C. |
| Mortality and Expense Risk Charge: | 0.103575% monthly (equivalent to 1.25% annually) |
| Cost of Insurance: | See Contract Schedule E. |

### ANNUAL CHARGES

Annual Loan Charges are added to the Loan Amount.

| | |
|---|---|
| Loan Interest: | 4.60% annually in arrears. |
| Loan Interest Spread: | 0.60% |

### POLICY LOAD

A policy load is deducted on the policy date and on the effective date of any increase in Face Amount.

| | |
|---|---|
| Policy Load: | The smaller of the following: |
| | (i) $700.00; or |
| | (ii) Larger of $200.00 or $0.10 per $1,000 of face amount. |

### OTHER CHARGES

We reserve the right to deduct from this Contract's Account Value an amount equivalent to any federal, state, or local taxes or other governmental charge that we determine to be properly attributable to this Contract.

# CONTRACT SCHEDULE C

## VARIABLE ACCOUNT

The Variable Account for this policy is the Life Variable Portfolio. The assets of the Variable Account shall be available to cover the liabilities of the general account only to the extent that the assets of the Variable Account exceed the liabilities of the Variable Account arising under the policies supported by the Variable Account. The assets of the Variable Account shall be valued as often as policy benefits vary but at least monthly. See the Valuation Period provision on page 13 for more details.

## THE INVESTMENT ACCOUNTS

Each of the Investment Accounts invests in securities authorized by Pennsylvania law.

This Schedule may be amended from time to time to add or delete Investment Accounts. The investment policy of an Investment Account may not be changed without the approval of the Pennsylvania insurance commissioner. The approval process is on file with the commissioner.

## LIMITATION ON TRANSFER

The maximum number of transfers allowed among Investment Accounts per Contract Year is four (4)

### Investment Account 1 – Money Market Account*

| | |
|---|---|
| Objective: | To achieve high current income consistent with preservation of capital and maintenance of liquidity. |
| Strategy: | Investing primarily in investment grade securities with an average maturity of 91 days or less. |

Asset Charges: 0.20%[†] (annual equivalent)

### Investment Account 2 – American Masters Opportunity Insurance Fund, L.P. Account

| | |
|---|---|
| Objective: | To (i) achieve long-term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on the preservation of capital. |
| Strategy: | Investment strategy is to invest with various portfolio managers believed to be able to meet the Partnership's objectives. |

Asset Charges: 1.00%[†] (annual equivalent) for net assets up to $25,000,000;

0.75%[†] (annual equivalent) for net assets over $25,000,000.

[†]   Amounts shown are in addition to fees directly charged as a result of investments.
[*]   This account is designated the Money Market Investment Account.

## CONTRACT SCHEDULE D

### FACE AMOUNT

Minimum Face Amount:   $50,000

Maximum Face Amount:   Subject to underwriting.

Increases in Face Amount will require evidence of insurability. Increases will be subject to a policy load as shown in Contract Schedule B.

| Contract Years | Table of Selected Face Amounts |
|:---:|:---:|
| All | $17,600,000 |

We reserve the right to reduce the Death Benefit of this policy by requiring one or more partial withdrawals. The function of these partial withdrawals shall be to limit the Net Amount at Risk to an amount not greater than Maximum Net Amount at Risk shown below. Failure to require any partial withdrawal under this provision shall not be deemed to waive our right to require future withdrawals permitted by this endorsement.

Maximum Net Amount at Risk:  The smaller of (1) $17,600,000 and (2) the reduced Face Amount should you choose to reduce the Face Amount at a later date.

# CONTRACT SCHEDULE E

## COST OF INSURANCE

The maximum monthly Cost of Insurance rates are for each $1,000 of Net Amount at Risk (NAR). Current charges may be lower than those shown. The applicable monthly rates for this policy are the amounts shown below.

| Attained Age | Male | Female | Attained Age | Male | Female | Attained Age | Male | Female |
|---|---|---|---|---|---|---|---|---|
| 0 | 0.349002 | 0.241153 | 35 | 0.176004 | 0.137604 | 70 | 3.353673 | 1.861440 |
| 1 | 0.089210 | 0.072529 | 36 | 0.186859 | 0.146785 | 71 | 3.681990 | 2.041944 |
| 2 | 0.082538 | 0.067525 | 37 | 0.200220 | 0.157637 | 72 | 4.060290 | 2.267226 |
| 3 | 0.081703 | 0.065857 | 38 | 0.215255 | 0.170159 | 73 | 4.496204 | 2.544475 |
| 4 | 0.079201 | 0.064189 | 39 | 0.232798 | 0.185189 | 74 | 4.983518 | 2.872449 |
| 5 | 0.075031 | 0.063355 | 40 | 0.252016 | 0.201891 | 75 | 5.513314 | 3.243922 |
| 6 | 0.071695 | 0.060854 | 41 | 0.274581 | 0.220267 | 76 | 6.076525 | 3.653355 |
| 7 | 0.066691 | 0.060020 | 42 | 0.297152 | 0.239482 | 77 | 6.665690 | 4.094284 |
| 8 | 0.063355 | 0.058352 | 43 | 0.323074 | 0.257865 | 78 | 7.275881 | 4.567162 |
| 9 | 0.061688 | 0.057518 | 44 | 0.349839 | 0.277089 | 79 | 7.923872 | 5.085703 |
| 10 | 0.060854 | 0.056684 | 45 | 0.379960 | 0.297152 | 80 | 8.635205 | 5.672859 |
| 11 | 0.064189 | 0.057518 | 46 | 0.410928 | 0.317220 | 81 | 9.430778 | 6.350514 |
| 12 | 0.070861 | 0.060020 | 47 | 0.444418 | 0.338128 | 82 | 10.338952 | 7.140527 |
| 13 | 0.082538 | 0.062522 | 48 | 0.479596 | 0.361551 | 83 | 11.373499 | 8.058585 |
| 14 | 0.095884 | 0.066691 | 49 | 0.518979 | 0.386655 | 84 | 12.513845 | 9.091985 |
| 15 | 0.110901 | 0.070861 | 50 | 0.560894 | 0.414276 | 85 | 13.737727 | 10.231576 |
| 16 | 0.125921 | 0.075031 | 51 | 0.610378 | 0.443581 | 86 | 15.021846 | 11.470894 |
| 17 | 0.139273 | 0.079201 | 52 | 0.665766 | 0.476246 | 87 | 16.356613 | 12.808170 |
| 18 | 0.148455 | 0.081703 | 53 | 0.728747 | 0.513950 | 88 | 17.737983 | 14.246631 |
| 19 | 0.155132 | 0.085040 | 54 | 0.800179 | 0.552509 | 89 | 19.171986 | 15.797873 |
| 20 | 0.158471 | 0.087542 | 55 | 0.876715 | 0.592762 | 90 | 20.677655 | 17.482656 |
| 21 | 0.159306 | 0.089210 | 56 | 0.960053 | 0.633033 | 91 | 22.287142 | 19.335048 |
| 22 | 0.157637 | 0.090879 | 57 | 1.046840 | 0.671642 | 92 | 24.063468 | 21.418993 |
| 23 | 0.155132 | 0.092547 | 58 | 1.139616 | 0.708588 | 93 | 26.119928 | 23.852379 |
| 24 | 0.151793 | 0.095050 | 59 | 1.239245 | 0.748070 | 94 | 28.812997 | 26.926360 |
| 25 | 0.147620 | 0.096718 | 60 | 1.349979 | 0.792613 | 95 | 32.817580 | 31.310115 |
| 26 | 0.144281 | 0.099221 | 61 | 1.473551 | 0.848112 | 96 | 39.642945 | 38.504789 |
| 27 | 0.142612 | 0.101724 | 62 | 1.613407 | 0.917954 | 97 | 53.066045 | 52.275714 |
| 28 | 0.141777 | 0.105061 | 63 | 1.772172 | 1.007228 | 98 | 83.333333 | 83.333333 |
| 29 | 0.142612 | 0.108398 | 64 | 1.949093 | 1.110930 | | | |
| 30 | 0.144281 | 0.112570 | 65 | 2.143422 | 1.224040 | | | |
| 31 | 0.148455 | 0.116742 | 66 | 2.350996 | 1.343212 | | | |
| 32 | 0.152628 | 0.120914 | 67 | 2.572761 | 1.464235 | | | |
| 33 | 0.159306 | 0.125086 | 68 | 2.808822 | 1.583722 | | | |
| 34 | 0.166820 | 0.131762 | 69 | 3.065321 | 1.712709 | | | |

# CONTRACT SCHEDULE F

## DEATH BENEFIT COMPUTATION

### TABLE OF MINIMUM DEATH BENEFIT FACTORS

| Attained Age | Factor | Attained Age | Factor |
|---|---|---|---|
| 0-40 | 2.50 | 60 | 1.30 |
| 41 | 2.43 | 61 | 1.28 |
| 42 | 2.36 | 62 | 1.26 |
| 43 | 2.29 | 63 | 1.24 |
| 44 | 2.22 | 64 | 1.22 |
| 45 | 2.15 | 65 | 1.20 |
| 46 | 2.09 | 66 | 1.19 |
| 47 | 2.03 | 67 | 1.18 |
| 48 | 1.97 | 68 | 1.17 |
| 49 | 1.91 | 69 | 1.16 |
| 50 | 1.85 | 70 | 1.15 |
| 51 | 1.78 | 71 | 1.13 |
| 52 | 1.71 | 72 | 1.11 |
| 53 | 1.64 | 73 | 1.09 |
| 54 | 1.57 | 74 | 1.07 |
| 55 | 1.50 | 75-90 | 1.05 |
| 56 | 1.46 | 91 | 1.04 |
| 57 | 1.42 | 92 | 1.03 |
| 58 | 1.38 | 93 | 1.02 |
| 59 | 1.34 | 94 | 1.01 |
|  |  | 95-98 | 1.00 |

## Part 1. Definitions

The following terms have special meaning as they are used in this policy. That meaning is explained here. Other terms that have special meaning are explained in the policy.

**Accumulation Units.** Accumulation Units are used to measure the Account Value allocated to each Investment Account.

**Age.** The Issue Age plus the number of completed Contract Years. Issue Age is the Attained Age of the Insured on the birthday nearest the Policy Date. Issue Age is shown in Schedule A.

**Beneficiary.** Any person or entity named in our records to receive the insurance proceeds after the Insured dies.

**Borrowed Fund.** An account established for any amounts transferred from the Investment Accounts as a result of loans. The account is credited with interest and is not based on the experience of any Investment Account.

**Contract Anniversary.** The day that marks the start of a new Contract Year.

**Contract Holder.** Referred to as You or Your. The owner of this Contract, as shown in our records. All of the rights and benefits of this Contract belong to you, unless otherwise stated herein.

**Contract Year.** Each successive twelve month period starting on the Policy Date.

**Face Amount.** The amount of insurance under this Contract. The Initial Face Amount is shown in Contract Schedule A. Thereafter, it may change in accordance with the terms of the provisions of Part 2, Insurance Plan, Part 8, Partial Withdrawals and Contract Schedule D.

**Governing Jurisdiction.** The state or jurisdiction in which this Contract is delivered and whose laws govern its terms.

**Investment Account.** Each of the Investment Accounts collectively comprise the Variable Account. The assets of each Investment account are invested separately.

**Policy Date.** The date used to begin calculating Monthly Charges and Annual Charges. The Policy Date is shown in Contract Schedule A. Computation of Contract Months starts with the Policy Date.

**Monthly Calculation Date.** This date determines the day for calculating Monthly Charges under this Contract. The day Monthly Charges are deducted from the Account Value. It is the same day of each succeeding month as the Policy Date except that whenever the Monthly Calculation Date falls on a day other than a Valuation Day it is deemed to be the next Valuation Day. If any Monthly Calculation Date would be the 29th, 30th, or 31st of a month that does not have that number of days, then the Monthly Calculation Date will be the last day of that month. If the Initial Premium is received after the Policy Date, the Monthly Charges are still calculated beginning on the Policy Date and deducted on the on the date the Initial Premium is received.

**Net Amount At Risk (NAR).** The Net Amount At Risk is calculated on any Monthly Calculation Date by subtracting the Account Value from the Death Benefit discounted to such Monthly Calculation Date at the interest rate specified in Contract Schedule A, under Basis of Computations.

**Net Investment Factor.** The Net Investment Factor is an index that measures the investment performance of an Investment Account from one Valuation Day to the next.

**NonSmoker.** A person who does not currently use and has not in the twelve months before the application is signed smoked any cigarettes.

**S.E.C.** The United States Securities and Exchange Commission.

**Smoker.** A person who is not a NonSmoker as defined above.

**Valuation Day.** Valuation will occur periodically at such intervals as we may reasonably determine. It will be at least as often as policy benefits vary but at least monthly. The day a valuation takes place will be called Valuation Day. Each Valuation Day ends at the Valuation Time.

**Valuation Time.** The Valuation Time is the close of trading on the New York Stock Exchange (or any successor exchange) or, if the securities in which the assets of an Investment Account are invested are not traded on the New York Stock Exchange, the close of trading on any exchange on which such securities are traded, except when the S.E.C. determines that an emergency exists that would make the determination of the value of the securities not reasonably practicable.

**Variable Account.** The Variable Account has been established under Pennsylvania Law. The Variable Account is not part of our General Account.

## Part 2. Insurance Plan

This Contract provides insurance coverage on the life of the Insured. The Insured is named in Contract Schedule A.

### Death Benefit

If the Insured dies while this Contract is in force, a Death Benefit is payable to the Beneficiary when we receive due proof of death. The amount of Death Benefit depends on the Death Benefit Option selected by you and shown in Contract Schedule A and Contract Schedule D, if any. The amount of the Death Benefit payable is also adjusted as follows:

    (1) by deducting the amount of any unpaid Monthly Charges against the Account Value to the date of death; and

    (2) by deducting the amount of any Contract Loans outstanding against the Account Value on the date of death plus interest accrued but unpaid on such Contract Loans on the date of death; and

    (3) by deducting the amount of any unpaid charges for benefits provided by Rider, if any.

### Death Benefit Options

There are two Death Benefit Options, described below. The Death Benefit Option for this Contract on the Policy Date is shown in Contract Schedule A.

Option 1: The greater of:

    (a) the Face Amount in effect on the date of death; and

    (b) the Account Value on the date of death multiplied by the Minimum Death Benefit Factor shown in Contract Schedule F.

Option 2: The greater of:

    (a) the Face Amount plus the Account Value on the date of death; and

    (b) the Account Value on the date of death multiplied by the Minimum Death Benefit Factor shown in Contract Schedule F.

### Face Amount

Unless otherwise agreed, the Face Amount for this Contract may not be greater than that determined according to Contract Schedule D. The Face Amount on the Policy Date is shown in Contract Schedule A. The table of Selected Face Amounts is shown in Contract Schedule D.

### Minimum Death Benefit Factor

A table of Minimum Death Benefit Factors is included in Contract Schedule F. To ensure that the Contract will qualify as life insurance under the Internal Revenue Code, the Death Benefit will never be less than the Account Value multiplied by the appropriate Minimum Death Benefit Factor.

### Changing the Face Amount

You may, subject to our approval, change the Face Amount or the Table of Selected Face Amounts. You must request the change by notifying us in writing. If we approve the change, it will take effect on the next Contract Anniversary that is at least thirty (30) days after all the required information has been provided to us. Any limitations on the number and/or amount of such changes are shown in Contract Schedule D. Cost of Insurance amounts charged to the Account Value will be adjusted to provide for the change. No such change will be effective if the Insured dies before the date of such change.

### Changing the Death Benefit Option

The Death Benefit Option for this Contract may be changed while this Contract is in effect. You must request the change by notifying us in writing. If we approve the change, it will take effect on the next Contract Anniversary that is at least thirty (30) days after all the required information has been provided to us. The Cost of Insurance amounts will be adjusted to provide for the change. No such change will be effective if the Insured dies before the date of change.

**If the Death Benefit is changed from Option 1 to Option 2, the Face Amount after the change will equal the Face Amount immediately prior to the change less the Account Value at the time of the change.**

**If the Death Benefit is changed from Option 2 to Option 1, the Face Amount after the change will equal the Death Benefit immediately prior to the change.**

VL-299

**Part 3. Variable Life Insurance Coverage**

### Time of Payment of Death Benefit

A Death Benefit will usually be paid within seven (7) days of the date due proof of the Insured's death is received by us at our Home Office and any other requirements are satisfied. Payment of any amount of Death Benefit based upon an Investment Account may be delayed if:

(1) the New York Stock Exchange (or its successor or, if the securities in which the assets of the Investment Accounts are invested are not traded on the New York Stock Exchange, any principal exchange on which such securities are traded) is closed; or

(2) the S.E.C. determines that an emergency exists that would make the disposal of securities held in the Investment Account or the determination of their value not reasonably practicable.

Settlement of any amounts not based upon an Investment Account will be made not more than six (6) months after due proof of death is received.

### Interest on Death Benefits

Interest on Death Benefits will be credited as prescribed by law.

### Beneficiary

You may name or change a Beneficiary by sending written notice to us. A Beneficiary may be revocable or irrevocable. An irrevocable Beneficiary may not be changed without his or her consent. Also an Irrevocable Beneficiary must consent to the exercise of certain other rights by you. There may be different classes of Beneficiaries, such as primary and secondary. These classes set the order of payments. There may be more than one Beneficiary in a class. The Beneficiary designation in effect on the Policy Date is stated in the Application for this Contract.

### Suicide Exclusion

If the Insured or substitute insured commits suicide, while sane or insane, within two years from the date coverage becomes effective on such person under this Contract, only a limited Death Benefit will be payable. In such case, the amount of the Death Benefit will be equal to the amount of the Net Premiums less any Partial Withdrawals and Contract Loans and any loan interest accrued but unpaid.

Furthermore, if the Insured commits suicide within two years from the date of receipt of any Subsequent Premium Payment which increases the amount of the Death Benefit, or any change of Face Amount or change of Death Benefit Option which increases the amount of the Death Benefit, the amount of the increase in the Death Benefit will be limited to a refund of the Cost of Insurance charges made for such increase.

## Part 4. Premium Payments

### A. Premium Payments Generally

You may make premium payments at any time, subject to limitations described in this Contract. However, we have the right to promptly refund any amount of premium paid (1) in order to keep this Contract in compliance with state and federal laws and (2) if the premium increases the Net Amount at Risk and requested evidence of insurability is not provided or does not satisfy current underwriting requirements. All funds received by us will be credited to this Contract as a premium payment unless clearly marked otherwise.

### Where to Pay Premiums

All premiums are payable to us at our Home Office.

### Premium Loads

Any Premium Loads shown in Contract Schedule B are deducted from premiums received by us prior to allocation to the Investment Accounts. Premium Loads include charges for sales and distribution expenses as well as premium taxes.

### Net Premiums

A Net Premium is any premium we receive minus any Premium Load.

### Initial Premium

The Initial Premium is the first premium received and accepted by us.

### Initial Net Premium

The Initial Net Premium for this Contract is stated in Contract Schedule A.

## Part 4. Premium Payments (Continued)

**Minimum Net Premium**
The Minimum Net Premium at any time is equal to twelve (12) times the first Monthly Charges for the current Contract Year.

**Minimum Premium**
The Minimum Premium at any time is equal to the Minimum Net Premium plus the Premium Loads.

**Maximum Premium**
The largest amount of premium which can be paid in any policy year is an amount such that the sum of the premiums paid under the policy will not, at any time, exceed the guideline premium limitation referred to in Section 7702 of the Internal Revenue Code of 1986, as amended, or as set forth in any applicable successor provision thereto. This limit is in addition to all other limitations stated in the policy.

**Subsequent Premiums**
Each premium payment made after the Initial Premium has been paid is known as a Subsequent Premium payment. Subsequent Premium payments may be made on any Valuation Day and in any amount, subject to certain limitations. The premium may not be less than the minimum premium stated in Schedule A. If the premium increases the Net Amount at Risk, evidence of insurability may be required.

**Premium Payment to Prevent Lapse**
Whenever this Contract is in danger of lapsing because the Net Account Value is insufficient to pay the Monthly Charges, the amount of premium required to prevent lapse is equal to three (3) times the Monthly Charges then due plus any applicable Premium Loads.

**Premium Payments to Reinstate Insurance Coverage**
When insurance coverage has lapsed due to insufficient Net Account Value, the amount of premium required to reinstate the insurance coverage is equal to three (3) times the Monthly Charges due on the Monthly Calculation Date immediately preceding the effective date of Reinstatement, plus any applicable Premium Loads. Evidence of insurability satisfactory to us is required to reinstate.

**Premium Notices**
Notices of any premium payments necessary to prevent lapse of insurance coverage or to reinstate insurance coverage will be sent to you.

## B.  Allocation of Net Premiums to or among the Investment Accounts

Net Premiums are allocated to or among the Investment Accounts in accordance with your instructions, subject to the Net Premium Allocation Limitations stated in Contract Schedule A, and further subject to any limitations stated in Contract Schedule C. If no instructions are received from you with a premium payment, such Net Premiums will be allocated to the Investment Accounts in the same proportions as stated in the most recent recorded instructions received from you.

**Timing**
Net Premiums received prior to the Valuation Time on any Valuation Day will be allocated as of the date they are received. Net Premiums received after such time will be allocated on the next Valuation Day.

**During Free Look Period**
Any Net Premiums received prior to the end of the Free Look Period will be allocated to the Money Market Investment Account. At the end of such period, the Net Account Value will be allocated to any Investment Accounts then available according to your instructions for allocation of Net Premiums. No allocation instructions received from you during the Free Look Period will be acted upon.

## Part 5. The Investment Accounts

Subject to the conditions set forth in this Part, you have the right to allocate and re-allocate the Account Value of this Contract among the Investment Accounts on any Valuation Day.

### The Investment Accounts

The assets in each Investment Account are kept segregated from our General Account and from any other of our Investment Accounts. We own the assets of the Investment Accounts. Those assets will only be used to support our variable products and for any other purposes permitted by applicable laws and regulations. The portion of the assets of an Investment Account equal to the reserves and other Contract liabilities with respect to such Investment Account will not be charged with liabilities that arise from any other business we may conduct. We may, however, transfer from an Investment Account to our General Account assets that exceed the reserves and other Contract liabilities with respect to such Investment Account. Income, gains, and losses, whether or not realized, from each Investment Account are credited to or charged against that Investment Account and without regard to the income, gains, or losses of any other Investment Account and without regard to any of our other income, gains, or losses.

With respect to the assets required to be maintained in the Investment Account for the benefit of you, the term "reserves" will in no event be less than an amount equal to the sum of the Net Account Value, pursuant to part 6-Account Value.

We reserve the right to: (1) establish and operate the Variable Account as a managed account or an account which purchases shares from the portfolios of funds managed by investment managers retained by us; (2) register or deregister the Variable Account under the Investment Company Act of 1940; (3) operate the Investment Accounts as unit investment trust registered, or exempt from registration, under the Investment Company Act of 1940 or any other form permitted by law

### Transfers

Transfers between or among Investment Accounts may be made on any Valuation Day (see, however, Availability of Funds, in Part 11). Transfers must be requested by you in a form acceptable to us. We reserve the right to limit the amount of any transfer. The maximum number of transfers per Contract Year is shown in Contract Schedule C. Written confirmation of each transfer will be sent to you.

### Investments of the Accounts

We may contract with investment managers to manage directly the assets held in the Investment Accounts. We may deduct an Asset Charge from the Account Value allocated to Investment Accounts that are managed directly as well as any costs and expenses arising from such Investment Accounts. In either case, investment managers are selected by us in our discretion.

### Changes in the Investment Accounts

We have the right to establish additional Investment Accounts, and to establish other investment options, from time to time. For any Investment Account, we have the right to substitute a new portfolio for the portfolio in which the Investment Account invests, to substitute new Investment Accounts, to combine two or more Investment Accounts, and to eliminate any existing Investment Accounts or any other investment option. Subject to any required regulatory approvals, we reserve the right to transfer assets of an Investment Account to another Investment Account that we determine to be associated with the class of contracts to which the Contract belongs.

### Valuation Period

The Valuation Period is the period of time between Valuation Times. The Valuation Period begins as of the end of the previous Valuation Day.

The value of an Investment Account reflects:

- Any amounts transferred to the Investment Account during the current Valuation Period;
- The investment income and realized and unrealized capital gains credited to such assets in the Valuation Period;
- Any amounts transferred from an Investment Account during the current Valuation Period;
- Realized and unrealized capital losses charged against those assets during the Valuation Period;
- Any amount charged or reserved against the Investment Account for taxes;
- Any expenses charged or reserved against the Investment Account for expenses incurred in operating such Investment Account;
- The mortality and expense risk charge for the Valuation Period; and
- Any other Monthly Charges deducted from the Investment Account for This Contract.

## Part 5. The Investment Accounts (Continued)

The Account Value will increase or decrease in accordance with the increases and decreases in the value of the Investment Accounts in which the Account Value is invested.

### Accumulation Units

Accumulation Units are used to measure the Account Value allocated to each Investment Account. The value of a unit is determined as of the Valuation Time on each Valuation Day. The value of any unit will vary from Valuation Day to Valuation Day to reflect the investment performance of the Investment Account applicable to that unit.

Amounts allocated to the Investment Accounts are applied to provide Accumulation Units in each Investment Account. The number of Accumulation Units credited to each Investment Account is determined by dividing the amount allocated to an Investment Account by the dollar value of one Accumulation Unit for such Investment Account.

We reserve the right to split or consolidate the number of Accumulation Units credited to this Contract with a corresponding increase or decrease in the unit values. We may exercise this right whenever we consider an adjustment of units to be desirable. No adjustment will have any material effect on the benefits, provisions or investment return of this Contract, or on you, the Insured, any Beneficiary, any assignee or other person, or on us.

### Accumulation Unit Value

The Value of an Accumulation Unit in each Investment Account is $1.00 on the first Valuation Day for that Investment Account. The value of any Accumulation Unit on any subsequent Valuation Day is equal to its value on the preceding Valuation Day multiplied by the Net Investment Factor for that Investment Account for the Valuation Period.

### Gross Investment Rate

The Gross Investment Rate of an Investment Account for any Valuation Period is equal to the net earnings of that Investment Account during the Valuation Period divided by the value of the total assets of that Investment Account at the beginning of the Valuation Period.

### Net Earnings

The Net Earnings of each Investment Account is equal to the accrued investment income and capital gains and losses (realized and unrealized) of that Investment Account, reduced by any amount charged against that Investment Account for taxes paid or reserved by us.

The Gross Investment Rate and Net Earnings of each Investment Account will be determined by us in accordance with generally accepted accounting principles and applicable laws, rules, and regulations.

### Mortality and Expense Risk Charge

The Mortality and Expense Risk Charge is deducted daily from each Investment Account. The maximum charge is stated in Contract Schedule B.

### Asset Charge

An Asset Charge may be deducted daily from each Investment Account managed directly by one or more investment managers. It consists of the money management fees, any custodial fees and other investment related expenses. Any Asset Charges applicable to such Investment Accounts are shown in Contract Schedule C.

### Net Investment Factor

The Net Investment Factor is determined for each Investment Account for each Valuation Period. The Net Investment Factor equals the Gross Investment Rate for such period plus one (1.0) and minus the Mortality and Expense Risk Charge and any Asset Charge.

### Crediting and Canceling Accumulation Units

Transactions that require the crediting and canceling of Accumulation Units will be made as of the Valuation Time on the Valuation Day in which the transaction is effected. Premium payments and requests for loans, withdrawals, transfers, etc. received after the Valuation Time will be effective on the next Valuation Day.

## Part 6. Account Value

### A.  Contract Values

**Account Value**

The Account Value of this Contract on any date is the value of the Investment Accounts plus the value of the Borrowed Fund.

The Account Value when the Initial Premium is received is equal to the Net Premium invested in the Investment Accounts, less:

    (a)  Cost of Insurance Charges (deducted on each monthly calculation date) ; and

    (b)  Policy Loads; and

    (c)  any Charges for Special Insurance Class Rating.

The Account Value on any subsequent Valuation Day is equal to the Account Value on the prior Valuation Day plus:

    (a)  any new Net Premium invested in the Investment Accounts; and

    (b)  any increase in value of the Investment Account due to investment results (net of Mortality and Expense Risk Charges and any Asset Charges); and

    (c)  any interest credited to the Borrowed Fund;

less;

    (a)  any decrease in value of the Investment Account due to investment results (net of Mortality and Expense Risk Charges and any Asset Charges); and

    (b)  Cost of Insurance Charges (deducted only on Monthly Calculation Date); and

    (c)  any Partial Withdrawals taken; and

    (d)  any Rider Charges deducted from the Account Value; and

    (e)  any Policy Loads; and

    (f)  any Charges for Special Insurance Class Rating; and

    (g)  any Other Charges as stated in Contract Schedule B.

Contract Values are not less than required by the state in which the policy is delivered.

**Net Account Value**

Net Account Value is the Account Value minus any Contract Loan balance and accrued unpaid interest.

### B.  Charges Deducted from the Account Value

The following charges may be deducted from the Account Value that is invested in the Investment Accounts. These charges are deducted pro-rata from each Investment Account.

**Cost of Insurance**

Cost of Insurance (COI) Charges are deducted from the Account Value on each Monthly Calculation Date. Guaranteed Cost of Insurance Charges are determined by multiplying the applicable COI rates from the table or tables in Contract Schedule E times the Net Amount At Risk (NAR) calculated as of the last day of the prior Contract Month, divided by 1,000. Current COI charges may be lower.

**Rider Charges**

Charges for Riders, if any, deducted from the Account Value are shown in the Contract Schedules for such Riders.

**Policy Loads**

Policy Loads may apply at issue and upon increases in Face Amount and changes in Death Benefit Option. These charges are deducted at issue or at the time of the increase in Face Amount or change in Death Benefit Option. Any Policy Loads are shown in Contract Schedule B.

**Charges for Substandard Insurance Class Rating**

If the Insured has a Substandard Insurance Class Rating, charges applicable to such Ratings may apply. These charges are deducted from the Account Value on each Monthly Calculation Date. If any charges apply, they are shown in Contract Schedule B.

## Part 7. Contract Loans

### Contract Loans

You may request a loan against this Contract. This Contract must be assigned to us as sole security for the loans. A loan may take place only on a Monthly Calculation Date. An amount equal to the amount borrowed will be transferred from the Investment Accounts to the Borrowed Fund of our general account. Any such transfer is made by canceling Accumulation Units in the Investment Accounts and applying the value of those units to the Borrowed Fund. Unless other specific instructions are received from you, the loan will be taken from the Investment Accounts in proportion to the amount of your then current Account Value in each Investment Account.

### Maximum Loan

The Maximum Loan amount for this Contract is equal to the Account Value less the sum of the following:

    (a)  outstanding loan amount together with unpaid accrued loan interest; and

    (b)  the Minimum Net Premium for the current Contract Year; and

    (c)  loan interest charges until the next Contract Anniversary.

### Borrowed Fund

The Borrowed Fund is a portion of our general account reserved for amounts held as collateral for Contract Loans. The initial amount of the Borrowed Fund will be equal to any loan principal. Interest will be credited to the Borrowed Fund at the Borrowed Fund Crediting Rate described below.

Interest credited to the Borrowed Fund will be transferred to the Investment Accounts on each Contract Anniversary. The amount so transferred will be allocated among the Investment Accounts in proportion to the Account Value in each Investment Account.

Amounts of interest charged against the loan principal and unpaid on each Contract Anniversary will be added to the amount of the loan principal in the Borrowed Fund. An amount equal to the unpaid interest will be transferred from the Investment Accounts to the Borrowed Fund on the Contract Anniversary. This amount will be transferred from the Investment Accounts in proportion to the Account Value in each Investment Account.

### Borrowed Fund Crediting Rate

Interest credited to amounts held in the Borrowed Fund as collateral for loans will be at least equal to the rate stated under "Basis of Computations" in Contract Schedule A. Interest will be credited such that the Borrowed Fund Crediting Rate is always equal to the Loan Interest Rate less the Loan Interest Spread stated in Contract Schedule B. The Borrowed Fund Crediting Rate may not be changed more frequently than annually. Any change in the Borrowed Fund Crediting Rate for this Contract will be effective on a Contract Anniversary. You will be notified of any such change.

### Loan Interest Rate

The current Loan Interest Rate will be applied to the entire outstanding loan balance. Interest is due annually in arrears. Any unpaid interest on any outstanding loans will be added to the outstanding loan amount as of the Contract Anniversary.

### Repayment of Loan

All or part of any Contract Loan plus accrued interest may be paid at any time while this Contract is in force.

Any repayment of a Contract Loan will result in the transfer of values equal to the repayment out of the Borrowed Fund and the application of those values to the Investment Account as a Net Premium payment. Unless other specific instructions are received from you, these values will be applied to the Investment Accounts in proportion to the amount of your current Account Value in each Investment Account.

## Part 8. Partial Withdrawals

### Partial Withdrawals

Withdrawals from the Investment Accounts may be made on any Monthly Calculation Date. The withdrawal must be requested by you in a form acceptable to us.

Unless other specific instructions are received from you, the withdrawal will be taken from each Investment Account in proportion to your current Account Value in each Investment Account.

If Death Benefit Option 1 is in effect, the Face Amount and future scheduled Face Amounts will be reduced by the amount withdrawn. In every case, the Death Benefit will change according to the Death Benefit provision on page 10.

### Maximum Withdrawal Amount

The Maximum Withdrawal Amount for this Contract is equal to the Account Value less the sum of the following:

    (a) outstanding loan amount together with unpaid accrued loan interest; and

    (b) the Minimum Net Premium for the current Contract Year; and

    (c) loan interest until the next Contract Anniversary.

However, the Maximum Withdrawal Amount is exceeded whenever such withdrawal would reduce the Face Amount below the Minimum Face Amount stated in Contract Schedule D.

### Minimum Withdrawal Amount

The amount of each withdrawal must be at least equal to the Minimum Withdrawal Amount shown in Contract Schedule A.

## Part 9. Reports to Contract Holder

### Annual Report

Each year within 30 days after the Contract Anniversary, we will mail a report to you. The report will show the Account Value at the beginning of the previous Contract Year and all premiums paid since that time. It will also show the additions to, and deductions from, the Account Value during the Contract Year, and the Account Value, Death Benefit, Net Account Value, outstanding Contract Loans and accrued loan interest as of the current Contract Anniversary. This report will also include any additional information required by applicable law or regulation.

## Part 10. Termination Provisions

### Continuation of Insurance

If premium payments cease, coverage provided under this Contract will continue subject to the Grace Period provision for as long as the Net Account Value is sufficient to cover the Monthly Charges. Any remaining Net Account Value will be payable on the Maturity Date.

### Grace Period

If the Net Account Value is not sufficient to cover the Monthly Charges due on any Monthly Calculation Date, a Grace Period is allowed for payment of the amount of premium needed to increase the Account Value so that the deduction of monthly charges can be made. This Grace Period begins on the date the deduction is due. It ends 61 days from that date or, if later, 61 days after the date we mail a written notice to you at the last known address shown on our records. This notice will state the amount needed to increase the Account Value to cover the Monthly Charges. During the Grace Period, the insurance coverage will continue in effect.

During the Grace Period, to continue the insurance coverage in force, you must make an additional premium payment at least equal to three (3) times the Monthly Charges due when the Grace Period began, plus any Premium Loads.

### Contract Termination

This Contract will terminate on the earliest of the following:

    (1) the end of the Grace Period for this Contract; or

    (2) this Contract is surrendered by you; or

    (3) the Maturity Date of this Contract; or

    (4) when all our obligations under this Contract have been fulfilled.

### Surrender

This Contract may be surrendered for its Net Account Value on any Valuation Date. You must request a Surrender in a form acceptable to us.

VL-299

## Part 10. Termination Provisions (Continued)

### Reinstatement

This Contract may be reinstated, prior to the Maturity Date, provided:

    (1) satisfactory evidence of insurability is provided to us; and

    (2) this Contract has not been surrendered for cash; and

    (3) you must request the Reinstatement in a form acceptable to us; and

    (4) the request must be within five (5) years of the date of Contract termination; and

    (5) the Reinstatement Premium must be paid at the time of Reinstatement. The Reinstatement Premium must be no less than the amount specified in Part 4, Premium Payments; and

    (6) the Insured must be alive on the date the Reinstatement becomes effective. The Reinstatement will become effective on the date that it is approved by us.

### Maturity Date

No insurance coverage will be effective on or after the Maturity Date. If the Insured is living and this Contract is in force on this date the Net Account Value will be paid to you, and of our liability under this Contract will cease.

## Part 11. General Provisions

### Entire Contract

This Contract is issued in consideration of the Application and the initial premium payment. This Contract and Application, a copy of which is attached, together with any Contract Schedules, any Riders constitute the entire Contract. Any waiver or change of any provision in this Contract must be in writing and signed by an officer of our Company.

### Waiver Not Estoppel

Our failure to enforce any provision of this Contract will not constitute or be construed as a waiver of such provision or of the right to enforce it at a later time, nor will the waiver of any provision by us on one or more occasions constitute or be construed as a waiver for all occasions and we will not be estopped from enforcing any provision of this Contract except as may be otherwise agreed to in writing by an officer of our Company.

### Right to Amend

If any provision in this Contract is in conflict with the laws of the state that govern this Contract, the provision will be deemed to be amended to conform with such laws. In addition, this Contract may be amended from time to time by us as may be required to meet the definition of "life insurance" under the Internal Revenue Code, its regulations or published rulings. You will be given the right to reject this change.

### Right to Transfer this Contract

This Contract may be transferred to the life of a substitute insured. Transfer will be effective on the Transfer Date discussed in the next provision. Transfer will be subject to the following conditions:

    (1) The substitute insured must not have been under 20 years of age on the birthday nearest the Policy Date of this Contract;

    (2) The substitute insured must not be over 65 years of age on the birthday nearest the Transfer Date;

    (3) The substitute insured must consent to be insured;

    (4) This Contract must be in force on the Transfer Date;

    (5) You must have an insurable interest in the life of the substitute insured after the transfer;

    (6) A written application for the transfer must be received by us at our Home Office;

    (7) Evidence of insurability of the substitute insured, satisfactory to us, will be required.

    (8) After transfer, the Policy Date will be the same as it was before transfer.

### Contract Holder Covenants

If any information contained in this Contract, Application or Contract Schedules is inaccurate or untrue on the date it is issued, you agree to promptly notify us and provide corrected information.

### Company Covenants

We agree that all statements in the Application will be deemed representations and not warranties. We also agree that no statement will be used to void this Contract or be used in defense of a claim for the insurance benefits under this Contract unless contained in the Application signed either by you or by the proposed Insured. A copy of the Application is attached to this Contract at issue.

## Part 11. General Provisions (Continued)

**Misstatement of Age or Sex**

If it is found that the amount of any benefit provided by this Contract is incorrect because of misstatement as to the age or sex (if applicable), the amount of the benefit will be adjusted on the basis of the correct facts. The death benefit will be that purchased by the most recent mortality charge at the correct age or sex. We will not adjust the Account Value due to a misstatement of age or sex.

**Incontestability**

During but not after the contestable period, we can contest the validity of this policy or deny payment of benefits if there is any material misrepresentation of fact in the application. The contestable period starts when the policy becomes effective and, except for any agreement providing benefits for disability or for accidental death, ends after it has been in force during the lifetime of the Insured for two years from the Policy Date or from the effective date of any change requiring Evidence of Insurability.

**Evidence of Insurability**

Evidence of insurability may be required for any transaction that increases the Net Amount At Risk (NAR) of this Contract. Transactions that increase the NAR may include: Payment of Subsequent Premiums, a Change of Face Amount or Death Benefit Option, Partial Withdrawal, Reinstatement, or a substitute of insured.

**Method of Computing Values**

A detailed statement of the method used to compute this Contract's benefits and values is filed with the insurance regulatory authority of the Governing Jurisdiction. These benefits and values are not less than those required by the laws of the Governing Jurisdiction.

**Availability of Funds**

Cash payments from this Contract for Contract Loans, Partial Withdrawals or Surrender, and Accumulation Units transferred between or among Investment Accounts will usually be effected within seven days after a satisfactory request is received at our Home Office. Payment may be delayed, however, (except when used to pay amounts due under this Contract) during any period that:

(1) the New York Stock Exchange (or its successor or, if the securities in which the assets of the Investment Accounts are invested are not traded on the New York Stock Exchange, any principal exchange on which such securities are traded) is closed; or

(2) the S.E.C. determines that a state of emergency exists that would make the determination of the value of the securities not reasonably practicable; or

(3) the S.E.C. permits by an order the postponement for the protection of Contract Holders.

**Claims of Creditors**

The proceeds of this Contract will be free from creditor's claims to the extent allowed by law.

**Notice**

Any written notice required by this Contract to be given by us to you will be effective five (5) days after it is mailed by first class mail or fifteen (15) days after it is mailed by third class mail (or when received, if sent by any other means) to you at your last known address as noted on our records. Any written notice required by this Contract to be given by you to us will be effective when received in a form acceptable to us at our Home Office. To be acceptable, a notice must be in written form, in the English language (except where applicable law requires otherwise), must include all pertinent information, and must be signed by you or an individual authorized to act for you and so designated on our records.

**Assignment**

Neither this Contract nor any rights of you or the Beneficiary under it may be assigned or transferred without our written permission.

**Trustee**

If a trustee is Owner, Beneficiary or Assignee of this policy, our actions will be determined by the terms of this policy and without regard to the provisions of any trust agreement. We will not be responsible for the application or disposal of any money paid to a trustee. Any such payment shall fully discharge our liability for the amount paid.

**Severability**

In the event any provision of this Contract is declared illegal or otherwise unenforceable, it will be severed from this Contract and the remainder of this Contract will be valid and enforceable.

**Time Periods**

All time periods mentioned in this Contract will begin and end at 12:01 A.M. local time at the owners address on the date in question.

VL-299

# AGL LIFE ASSURANCE COMPANY
## Plymouth Meeting, Pennsylvania
## ENDORSEMENT

This policy is amended by the following.

You have the right to elect an Extended Maturity Date. You may do this during the twelve-month period before the Policy's original Maturity Date. That date is shown in Schedule A. The Extended Maturity Date must be a Policy Anniversary. It may not be later than the anniversary when the Insured is Age 120. If this is a Survivorship Policy, Age 120 of the younger Insured is the maximum Extended Maturity Date. The Account Value must be a positive amount on the original Maturity Date for this election to take effect.

The terms below will apply after the original Maturity Date. They are:

1. The Death Benefit shall be the Account Value while the Policy continues in effect;

2. Maturity Date shall mean the Extended Maturity Date;

3. The maximum monthly Cost of Insurance rates in Schedule E. shall be 0.0833333 for all future years;

4. Minimum Death Benefit Factors for all ages beyond those shown in Schedule F shall be 1.00;

5. The Death Benefit Option in Part 2. Insurance Plan shall be Option 1 and it may not be changed;

6. We may reject any Premium;

7. The Policy shall not terminate on the original Maturity Date as specified Part 10. Termination Provisions; and

8. All coverage shall cease at the Extended Maturity Date.

Unless modified here, all other terms and provisions of this Policy will continue in effect. You are responsible for all tax consequences arising from the existence of or exercise of this option. This endorsement is attached to and made a part of this policy effective on the Policy Date unless a later date is shown here:


Secretary                                    President


END-0001

# AGL LIFE ASSURANCE COMPANY
## PLYMOUTH MEETING, PENNSYLVANIA
## ENDORSEMENT

This policy is amended by deleting the Notice of 10 Day Right to Examine Your Policy (Free Look Period) replacing it with the following provision.

**Notice of 10 Day Right to Examine Your Policy (Free Look Period)**
**This Contract may be canceled at any time within ten (10) days after it is received or within forty five (45) days after the date of the Application, whichever is later. This Contract must be returned to us at our Home Office or to the agent through whom it was purchased. Written notice of cancellation is also needed. If this Contract is canceled, it will be as though this Contract had never been issued. The Account Value plus all charges and fees will be returned to you minus any Death Benefits paid, Partial Withdrawals taken, and any Contract Loans, together with accrued but unpaid interest on such Contract Loans, if allowed by the law of the Governing Jurisdiction.**

It is further understood that Policy provisions stating that the allocation of the Net Premium will be limited to the Money Market Investment Account during the Free Look Period are rescinded.

This endorsement is attached to and made a part of this policy effective on the Policy Date.


_____                    _____
Secretary                                  President


END-100

# AGL LIFE ASSURANCE COMPANY
## Plymouth Meeting, PENNSYLVANIA
## ENDORSEMENT

This policy is amended by adding the following.

The provisions of this endorsement are in addition to all other terms and conditions of this policy.

Payment of a Death Benefit, Withdrawal Benefit, or Loan Amount may be delayed if the securities in which the assets of the Investment Accounts are invested are not actively traded. That delay may continue until we determine that it is practical to trade such securities. You and any party to whom payment is due may agree to receive the securities as payment. The value of the securities for purposes of that payment will be determined based upon an appraisal by an independent third party. The value assigned to the securities must be accepted in writing by you, the party to whom payment is due, if other than you, and by us. The cost of any appraisal will be deducted from the payment due.

Payment of any amount due that is in no way related to the value of assets that are not actively traded will not be delayed by this endorsement. Such payments will be made in accord with the provisions specified elsewhere in this policy. (Payment of a death benefit consists of the value of assets and the net amount at risk, face amount less account value. Therefore, the death benefit is related to the value of assets.)

This endorsement is attached to and made a part of this policy effective on the Policy Date unless a later date is shown here:

Secretary                                        President

END-199

## AGL LIFE ASSURANCE COMPANY
### APPLICATION FOR LIFE INSURANCE–Part I

| NAME   First   Middle   Last | Birthdate | Age Nearest | State of Birth | ☒ Male |
|---|---|---|---|---|
| *Michael  S.  Rulle* | *7-22-50* | *51* | *NY* | ☐ Female |

| S.S. no. | Occupation(s) | Marital Status | Maiden Name |
|---|---|---|---|
| *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* | *President* | *Married* | *N/A* |

Address--Residence ☐ Send Notices to this address; Choose one only     Telephone
*165 Cherry Lane  Mendham, NJ 07945*     *973-543-0438*

Address--Business ☐ Send Notices to this address; Choose one only     Telephone
*Hamilton Partners Ltd.*     -*212-527-8454*
*415 Madison Avenue, New York, NY 10017*

| NAME   First   Middle   Last | Relationship to Insured | S.S./Tax ID no. |
|---|---|---|
| *The Michael S Rulle Family Dynasty Trust Agreement of 2001, dtd 9/27/01* | *Trust* | *92-6032251* |

Address ☐ Send Notices to this address; Choose one only     Telephone     Yrs. There
*Alaska Trust Company, Resolution Plaza*     *907-278-6775*
*1029 W. Third Avenue, Suite 601 Anchorage, AK 99501-1581*

Alternative name/address to Send Notices to; complete only if choice not selected above

Plan of Insurance – Preferred class (if available) ☐ Yes ☒ No
☒ Non Smoker ☐ Smoker

Amount
$ *17,600,000*

Additional Benefits
☐ Waiver of Premium
☐ Accidental Death
___ Units Family Rider
___ Units Children's Rider
☐ Other ___

Plan of Insurance: *Flexible Premium Variable Life*
Amount or units

Rider Plans     *N/A*

Is this insurance intended to replace or change any existing insurance or annuities on any proposed insured? ☐ Yes ☒ No

Death Benefit Option (only if Universal Life) ☒ Specify amount only. ☐ Specify amount + cash value.

Premium Mode ☒ Annually ☐ Semi-Annually ☐ Quarterly ☐ Monthly PAC ☐ Other ___

Paid with application $ ____0____ Planned Premium (only if UL) $ _____ Special Policy Date: _____

Primary: Name     Relationship     Contingent: Name     Relationship
*The Michael S. Rulle Family Dynasty Trust*
*Agreement of 2001, dtd 9/27/01*

The Beneficiary designation for Family, Spouse or Child Riders is stated in the contract.
Unless otherwise specified, the Owner reserves the right to change the Beneficiary.

| Full Name | Birth Date | Age | Sex | Relationship[1] | Height | Weight | Insurance[2] |
|---|---|---|---|---|---|---|---|
| *N/A* | | | | | | | |

1) Relationship to Insured; only children under 18 are eligible for family or children's rider.
2) Total insurance in force and/or applied for.

| Company | Policy No. | Year Iss. | Type Plan | Life Amount | ADB Amount |
|---|---|---|---|---|---|
| *Phoenix* | | *1992* | *Life* | *4,000,000* | |
| *Phoenix* | | *1944* | *Life* | *2,000,000* | |
| *Phoenix* | | *1990* | *Life* | *3,000,000* | |
| *Phoenix* | | *1994* | *Surv. Life* | *2,000,000* | |
| *Nationwide* | | *2000* | *Life* | *750,000* | |

## APPLICATION FOR LIFE INSURANCE—Part I (Continued)

| Has any person proposed for insurance: | Yes | No |
|---|---|---|
| (a) Flown in the last 2 years, or do you intend to take flights other than as a fare paying passenger on a scheduled airline?  If yes, complete Aviation Supplement. | ☐ | ☒ |
| (b) Engaged in or intend to engage in any hazardous sport such as any type of land, water or air vehicle racing, parachuting, hang/kite gliding or skin/scuba diving?  If yes, give details in Section I. | ☐ | ☒ |
| (c) Had a driver's license suspended or revoked or been convicted in the last 3 yrs. of a moving violation, or of driving while impaired or intoxicated?  License no. R52 175 44 320 7502 NJ | ☒ | ☐ |

| | Yes | No |
|---|---|---|
| (d) Had any military deferment, rejection or discharge due to a physical or mental condition? | ☐ | ☒ |
| (e) In the past three years or intend in the next 12 months, lived, traveled or worked outside of the United States or Canada, or have a temporary or student visa? | ☒ | ☐ |
| (f) Ever requested or received a pension, benefits or payment because of an injury, sickness or disability, or left occupation for more than one month because of health? | ☐ | ☒ |
| (g) Ever been convicted of a felony? | ☐ | ☒ |
| (h) Had any application or policy for life or health insurance declined, rated, restricted, postponed, canceled or reinstatement denied? | ☐ | ☒ |

1. Proposed Insured's   Height:  5  ft.  10  in.,  Weight  188  lbs.  (Additional Insureds answer under E.)

2. Personal Physician(s) (Full name, address, telephone no. If none, so state.)
Dr. Scott Campbell   2345 Lamington Road, Ste #104   Bedminster, NJ 07921

| 3. Has any Proposed Insured ever had, been treated for, or been told by a member of the medical profession that they had any indication of: | Yes | No |
|---|---|---|
| (a) Disorder of eyes, ears, nose or throat? | ☐ | ☒ |
| (b) Dizziness, fainting, convulsions, headache; speech defect, paralysis, stroke or any other disorder of the brain or nervous system; mental or emotional disorder? | ☐ | ☒ |
| (c) Shortness of breath, persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☒ | ☐ |
| (d) Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☒ |
| (e) Cirrhosis, jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, other disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☒ |
| (f) Sugar, albumin, blood or pus in urine; venereal disease; stone or other disorder of the kidney, bladder, prostate? | ☐ | ☒ |
| (g) Diabetes; thyroid or other endocrine disorders? | ☐ | ☒ |
| (h) Neuritis, sciatica, arthritis, gout, or disorder of the muscles or bones, including the spine, back, or joints? | ☐ | ☒ |
| (i) Deformity, lameness or amputation? | ☐ | ☒ |
| (j) Disorder of skin, lymph glands, cyst, tumor, or cancer? | ☐ | ☒ |
| (k) Allergies, anemia, leukemia or other disorder of the blood? | ☐ | ☒ |
| (l) Acquired Immune Deficiency Syndrome (AIDS), "AIDS" Related Complex (ARC); or infection with the "AIDS" (Human T-Cell Lymphotropic, Type III, HTLV-III) virus? | ☐ | ☒ |
| (m) Abnormal menstruation, pregnancy; disease of the uterus, ovaries, breasts, prostate or testicles; other disorder of reproductive organs? | ☐ | ☒ |

| 4. Does any Proposed Insured use alcohol? | ☒ | ☐ |
|---|---|---|

How much?     How often?
0-2 glasses of wine     A night

| 5. Has any Proposed Insured : | Yes | No |
|---|---|---|
| (a) Ever used alcohol or other drugs to a degree that required treatment or advice from a physician, licensed practitioner, or any organization which helps those who have an alcohol or drug problem? | ☐ | ☒ |
| (b) Ever used marijuana, barbiturates, amphetamines, hallucinogens, heroin, opiates, tranquilizers, Dilaudid, Demerol, codeine, morphine or cocaine?   How much?   How often? | ☐ | ☒ |
| (c) Had any change in weight in the past year? | ☐ | ☒ |
| (d) Smoked cigarettes or used tobacco in any form in the last 12 months?  Yes, circle those that apply:  Cigarettes, Cigars, Pipe, Other   Amount Used Daily: | ☐ | ☒ |
| (e) In the past five years, had a checkup, consultation, illness, injury, electrocardiogram, or other diagnostic test or surgery? | ☒ | ☐ |
| (f) In the past five years, been a patient in a hospital, clinic, sanitarium, or other medical facility? | ☐ | ☒ |

| 6. Is any Proposed Insured now under observation or taking any treatment or medication? | ☒ | ☐ |
|---|---|---|

| 7. Has any member of any Proposed Insured's immediate family been diagnosed or treated for heart disease; high blood pressure; diabetes; cancer; or mental or nervous disorder? | ☐ | ☒ |
|---|---|---|

8. Family History:

| | Proposed Insured | Add'l Insured |
|---|---|---|
| **Father** | | |
| Age if living or age @ death | 70's | |
| Health if living or cause of death | Heart Disease | |
| **Mother** | | |
| Age if living or age @ death | 70's | |
| Health if living or cause of death | Heart Disease | |

## APPLICATION FOR LIFE INSURANCE - Part I (Continued)

GIVE COMPLETE DETAILS FOR ANY PART OF SECTION G AND FOR SECTION H, QUESTIONS 3, 5, 6 AND 7 ANSWERED "YES".
(Identify person by name)

| Section Question | Nature of disorder, frequency of attacks and treatment | Date and Duration | Name & address of doctors, practitioner, hospital, medical institution or facility. |
|---|---|---|---|
| 6(e) | Spending Tablets | | |
| 6(f) | Travel | | Lots of Singapore, Bermuda, Mexico Caribbean, Canadian, Italy |
| 6() | Asthma as a child | | no recurrence since age 17 |
| 5(a) | EKG - abnormal | 4/01 | done as a result of annual stress + symptoms |
| | Stress Echo - normal | 4/01 | Dr. Ferro |
| | Physical Annual checkups | | Dr. Campbell |
| | Colonoscopy - negative | | Dr. Bernstein |
| | | | |
| G | Meditation | | lipitor |

Home Office Use Only (See K. 3. below)

I/We represent that all answers to the questions in this application and any medical examinations required, are complete and true to the best of my/our knowledge and belief, and I/we agree that:

  (1) The answers to these questions, together with this agreement, are the basis for issuing any policy;
  (2) Only the President or a Vice President of the Company can make or change any contract or waive any of the Company's rights or requirements;
  (3) By accepting any policy issued, I/we ratify any changes made to this application by the Company and set out in the "Additions and Amendments" section (No change will be made as to age, amount, class, plan or benefits unless the Owner agrees in writing.);
  (4) Except as provided in the Conditional Receipt, no insurance will take effect until the first modal premium is paid and the policy is delivered to the Owner while there has been no change in the insurability from the date of application of all persons proposed for insurance.

I/We authorize any physician, medical practitioner, hospital, clinic, other medical or medically related facility, Veterans Administration, insurance or reinsurance company, the Medical Information Bureau, consumer reporting agency or other organization, institution, employer, relative, friend or neighbor to disclose to AGL Life Assurance Company and/or its reinsurers, medical and other information pertaining to me/us or any of my/our minor children who are proposed for insurance. The information that may be disclosed includes information about employment, other insurance, physical, mental, drug and/or alcohol conditions, character, habits, avocations, finances, general reputation, credit and other personal characteristics. I/we understand that the information obtained is for the purpose of determining eligibility for insurance and that this information may be reviewed in connection with claims that are later submitted. I/we agree that this authorization will be valid for two and one-half years from the date signed and that a photographic copy of this authorization is as valid as the original. I/we may request a copy of this authorization.

☐ If an investigative consumer report is obtained about me/us, I/we wish to be interviewed.

I/we have read and understand these representations, conditions and authorization and acknowledge receipt of notices regarding disclosure and the underwriting process.

Signed at (City, State) Anchorage, AK    on (Month, Day) Oct. 5    20 01

X _____    X _____ Administrator
Proposed Insured's Signature (parent or guardian if minor)    Spouse's Signature (if insured)

Agent's Signature    Owner's Signature (if other than Proposed Insured)
                     (if business is owner, signature & title of company officer)

Signatures of Additional Proposed Insureds, if any

X _____    X _____
Celia L. Bullo, Trustee      Frank Colurcio, Trustee

APP-051

## AGENT'S REPORT

1.  Has Proposed Insured lived at present address at least 5 years? ☒ Yes ☐ No
    If no, give previous address_____

2.  What is Proposed Insured's Income? $_____ Earned, $_____ Unearned; Net Worth? $23,916,913

3.  Give name and address of Proposed Insured's employer _Hamilton Partners Ltd_
    _415 Madison Ave., New York, NY 10017_
    Time in occupation? _1 1/2_ Describe duties _Administration / Investment decisions_
    Previous employment and address if less than 3 years. _CIBC Oppenheimer, World Fin. Center NY_

4.  Do you know or have reason to believe that replacement of insurance is involved? ☐ Yes ☒ No
    If yes, explain and complete replacement form where required. _____

5.  Have arrangements been made for an examination? ☒ Yes ☐ No
    Date _4-12-01_ Examiner _APPS_

6.  If Proposed Insured is under age 15, amount of insurance on head of household $ _N/A_

7.  If Proposed Insured is married, insurance on spouse for benefit of Proposed Insured $ _____

8.  If Owner is a corporation: State of incorporation?_____. Does the corporation own any other insurance on
    the life of the Proposed Insured? ☐ Yes ☐ No; Amount $_____ Company _____
    If Owner is a partnership: Exact name of partnership _____
    Current value of business _____
    Full names of partners and percentage of business owned:
    _____ % _____ %
    _____ % _____ %
    Are all partners insured or applying for insurance? ☐ Yes ☐ No; If no, explain _____

9.  If Owner or Beneficiary is a Trustee, give date of Trust _9/27/01_; specify in Owner or Beneficiary designation.

10. If this application is on a PAC, bank draft, basis and added to an existing account, give the Insured's name and
    policy number _N/A_

11. What is the primary purpose of this sale? _Tax and Estate Planning_
    _____

12. Other Details


1.  Name:   Agent_Mark Dunn_          General Agent_____

2.  Number:        _10044_            _____

I represent that: ☒ have personally seen
                  ☐ I have not personally seen (Explain under A.12. above)
all the persons proposed for insurance. I affirm that I have made a true and accurate record on this application of the
information as supplied to me by the Proposed Insured(s) and/or the Owner/Applicant. To the best of my knowledge and
belief there is nothing adversely affecting the insurability of any person proposed for insurance that has not been
recorded in this application. I have provided all required disclosures and notices as required by law or regulation.

Agent's Signature _X Mark Dunn_ Date (Month, Day) _10-5_, 20_01_

Application Supplement for Variable Life Insurance
Issued and Administered
by

# AGL LIFE ASSURANCE COMPANY

Complete this application supplement and mail it along with Application Part I to
AGL Life Assurance Company
510 West Germantown Pike, Suite 460, Plymouth Meeting, PA 19462

## A. Owner's Name

Name
The Michael S. Fulle Family Dynasty Trust Agreement of 2001, dtd 9/27/01

## B. Net Premium Allocation

The Amounts allocated are in percentages or dollars (in whole numbers of not less than 10% or $250).

| Investment Account | Percent | or | Dollar Amount |
|---|---|---|---|
| ☒ American Masters Opportunity Fnx Fund L.P. Account | 100 % | or | $_____ |
| ☐ _____ | ____ % | or | $_____ |
| ☐ _____ | ____ % | or | $_____ |
| ☐ _____ | ____ % | or | $_____ |
| ☐ _____ | ____ % | or | $_____ |
| ☐ _____ | ____ % | or | $_____ |
| ☐ _____ | ____ % | or | $_____ |
| Total | 100% | or | $_____ |

## C. Please read these sections and sign below.

**SUITABILITY**

BY SIGNING BELOW, YOU ACKNOWLEDGE RECEIPT OF THE PRIVATE PLACEMENT MEMORANDUM. THE CONTRACT VALUE AND CASH SURRENDER VALUE WHEN BASED ON A SEPARATE ACCOUNT MAY INCREASE OR DECREASE ON ANY DAY DEPENDING UPON THE INVESTMENT RESULTS. NO MINIMUM CASH SURRENDER VALUE IS GUARANTEED. ALL SURRENDER VALUES UNDER THE CONTRACT ARE VARIABLE AND ARE NOT GUARANTEED AS TO FIXED DOLLAR AMOUNTS. THE DEATH BENEFIT MAY BE VARIABLE OR FIXED UNDER SPECIFIED CONDITIONS.

**AGREEMENT**

I understand the entire portion of any net purchase payment that I allocate to the Variable Account will be invested in the Money Market Subaccount until the end of the Free Look period.

I recognize that AGL Life Assurance Company is not a bank and shares of the subaccounts are not backed or guaranteed by any bank or insured by the FDIC.

ALL PREMIUM CHECKS MUST BE MADE PAYABLE TO AGL LIFE ASSURANCE COMPANY.

DO NOT MAKE THE CHECK PAYABLE TO ANY AGENT. PLEASE DO NOT LEAVE PAYEE BLANK.

Date of Private Placement Memorandum Received   10/5/01

Signed at

City   Anchorage          State   AK          on (Date) 10/5/01

Owner                              Agent Signature
X _____                     X _____

X _____                     X _____
Celia R. Fulle, Trustee            Frank Galardin, Trustee

VLSP-296

APP__ATION FOR LIFE INSURANCE–Part II

NJ Forms
APPS

☑ New Business ☐ Requalification

## A. PROPOSED INSURED

NAME First _Michael_ Middle _(Willie)_ Last _____ S.S. no. _121 38 4658_

Address _165 Cherry Lane_ Street _____ City _Mendam_ State _NJ_ Zip Code _07945_

## B. INSURABILITY DATA

1. Personal Physician(s) (Full name, address, and telephone no  If none, so state.)  _2345 Lanington Rd_
   _Scott Campbell, MD, Bedminster NJ_

| | | Yes | No | | | Yes | No |
|---|---|---|---|---|---|---|---|
| 2. | Has any Proposed Insured ever had, been treated for, or been told by a member of the medical profession that they had any indication of: | | | 3. | Has any Proposed Insured been diagnosed by a member of the medical profession as having Acquired Immune Deficiency Syndrome (AIDS), or an "AIDS" Related Complex (ARC)? | ☐ | ☑ |
| (a) | Disorder of eyes, ears, nose or throat? | ☐ | ☑ | 4. | Does the proposed insured use alcohol? How much?   How often? _0–2 glasses wine / night_ | ☑ | ☐ |
| (b) | Dizziness, fainting, convulsions, headache; speech defect, paralysis, stroke or any other disorder of the brain or nervous system; mental or emotional disorder? | ☐ | ☑ | 5. | Has proposed insured : | | |
| (c) | Shortness of breath, persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☑ | ☐ | (a) | Ever used alcohol or other drugs to a degree that required treatment or advice from a physician, licensed practitioner, or any organization which helps those who have an alcohol or drug problem? | ☐ | ☑ |
| (d) | Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☑ | (b) | Ever used marijuana, barbiturates, amphetamines, hallucinogens, heroin, opiates, tranquilizers, Dilaudid, Demerol, codeine, morphine or cocaine? How much?   How often? | ☐ | ☑ |
| (e) | Cirrhosis, jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, other disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☑ | (c) | Had any change in weight in the past year? | ☐ | ☑ |
| (f) | Sugar, albumin, blood or pus in urine; venereal disease; stone or other disorder of the kidney, bladder, prostate? | ☐ | ☑ | (d) | Smoked cigarettes or used tobacco in any form in the last 12 months? Yes, as follows: Cigarettes, Cigars, Pipe, Other. Amount Used Daily: | ☐ | ☑ |
| (g) | Diabetes; thyroid or other endocrine disorders? | ☐ | ☑ | (e) | In the past five years, had a checkup, consultation, illness, injury, electrocardiogram, or other diagnostic test or surgery? | ☑ | ☐ |
| (h) | Neuritis, sciatica, arthritis, gout, or disorder of the muscles or bones, including the spine, back, or joints? | ☐ | ☑ | (f) | In the past five years, been a patient in a hospital, clinic, sanitarium, or other medical facility? | ☐ | ☑ |
| (i) | Deformity, lameness or amputation? | ☐ | ☑ | | | | |
| (j) | Disorder of skin, lymph glands, cyst, tumor, or cancer? | ☐ | ☑ | 6. | Is Proposed Insured now under observation or taking any treatment or medication? | ☑ | ☐ |
| (k) | Allergies, anemia, leukemia or other disorder of the blood? | ☐ | ☑ | 7. | Has any member of Proposed Insured's immediate family been diagnosed or treated for heart disease; high blood pressure; diabetes; cancer; disorders of the immune system or mental or nervous disorder? | ☐ | ☑ |
| (l) | Abnormal menstruation, pregnancy; disease of uterus, ovaries, breasts, prostate, testicles; other disorder of reproductive organs? | ☐ | ☑ | | | | |

## C. DETAILS

GIVE COMPLETE DETAILS FOR ANY PART OF SECTION B QUESTIONS 2, 3, 5, 6 and 7 ANSWERED "YES"

| Question | Nature of disorder, frequency of attacks and treatment | Date and Duration | Name & address of doctors, practitioner, hospital, medical institution or facility. |
|---|---|---|---|
| 2c | Asthma as child – no recurring | since age 17 | |
| 5e | ECG – normal | done | done as annual checkup as asymptomatic |
| | Stress Echo – normal | last week | Done by Dr Lawrence Incen East 70th St New York City |
| 5e | Previous annual checkups | Dr Scott Campbell | none of address due |
| 5e | Colonoscopy | Dr Bernstein, New York City | test was negative |

## D. REPRESENTATIONS AND AUTHORIZATION

6. Taking Lipitor for 2 months

I represent that all answers to the questions in this application are complete and true to the best of my knowledge and belief. I understand that (1) this completed application part will be part of my application for insurance and any policy issued; and (2) that any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.   7 Both parents died in 70's of heart disease   mother age ? / father age ?

I authorize any physician, medical practitioner, hospital, clinic, other medical or medically related facility, Medical Information Bureau or other organization or person to disclose to AGL Life Assurance Company and/or its reinsurers, medical and other information pertaining to me or my minor child proposed for insurance. The information that may be disclosed includes information about employment, other insurance, physical, mental, drug and/or alcohol conditions, character, habits, avocations, finances, general reputation, credit and other personal characteristics. I understand that the information obtained is for the purpose of determining eligibility for insurance and that this information may be reviewed in connection with claims submitted later. I agree that this authorization will be valid for two and one-half years from the date signed and that a photographic copy of this authorization is as valid as the original. I may request a copy of this authorization.

I have read and understand these representations and this authorization.

Signed at (City, State) _____ on (Month, Day) ___4/12___ 19 _2001_

_____ _____
Proposed Insured's Signature (parent or guardian if minor)   Witness: Examiner/Underwriting Technician

APPLICATION FOR LIFE INSURANCE--Part II (Continued)

### E. HISTORY

| Place of Birth: New York City | Occupation: Investment Manager |
|---|---|
| Birth Date 7/22/50 | Employer: Hamilton Partners |

| Family History | Spouse | | Father | | Mother | |
|---|---|---|---|---|---|---|
| Age if living or age @ death | 44 | | 70's | | 70's | |
| Health if living or cause of death | Excellent | | heart disease | | heart disease | |
| Brothers/Sisters (Circle B or S) | B (S) | B (S) | B /S | B /S | B /S | B /S |
| Age if living or age @ death | 59 | 38 | | | | |
| Health if living or cause of death | A+W | Breast Cancer | | | | |

### F. MEDICAL REPORT - TO BE COMPLETED AND SIGNED BY EXAMINER/UNDERWRITING TECHNICIAN

| 1 | Height (in shoes) ft 5'10 in. | Weight (clothed) 188 lbs. | Chest (Full Inspiration) 42½ in. | Chest (Full Expiration) 40 in. | Abdomen, at umbilicus 37 in. |
|---|---|---|---|---|---|

| 2 | Blood Pressure (Record ALL readings.) | | At Rest | Immediately Post Exercise |
|---|---|---|---|---|
| | | Systolic | 120 | 130 |
| | | Diastolic, 5th phase | 86 | 78 |

| 3 | Pulse | | At Rest | After Exercise | 3 Minutes Later |
|---|---|---|---|---|---|
| | | Rate | 87 | 150 (Ni ms) | 102 |
| | | Irregularities per minute | NO | NO | NO |

4. Heart: Is there any   Enlargement? [ ] Yes [✓] No    Dyspnea? [ ] Yes [✓] No
Murmur(s)? [ ] Yes [✓] No    Edema? [ ] Yes [✓] No
(Describe below - if more than one, describe separately)

Location

| | | |
|---|---|---|
| Constant | [ ] | [ ] |
| Inconstant | [ ] | [ ] |
| Transmitted | [ ] | [ ] |
| Localized | [ ] | [ ] |
| Systolic | [ ] | [ ] |
| Presystolic | [ ] | [ ] |
| Diastolic | [ ] | [ ] |
| Soft (Gr. 1-2) | [ ] | [ ] |
| Mod. (Gr. 3-4) | [ ] | [ ] |
| Loud (Gr. 5-6) | [ ] | [ ] |
| After exercise: | | |
| Increased | [ ] | [ ] |
| Absent | [ ] | [ ] |
| Unchanged | [ ] | [ ] |
| Decreased | [ ] | [ ] |

Indicate apex by        X
Indicate murmur area by  O
Indicate transmission by →

Is there on examination any abnormality of the following (circle items that apply and give details):
                                                                    Yes  No        DETAILS
(a) Eyes, ears, nose, mouth, pharynx?                                [ ] [✓]
    If vision or hearing markedly impaired indicate
    degree and correction.
(b) Skin (incl scars); lymph nodes; varicose veins                   [ ] [✓]
    or peripheral arteries?
(c) Nervous system (include reflexes, gait,                          [ ] [✓]
    paralysis)?
(d) Respiratory system?                                              [ ] [✓]
(e) Abdomen (include scars?)                                         [ ] [✓] prostate
(f) Genitourinary system (include prostate)?                         [ ] [✓] declined, had recently a PMD
(g) Endocrine system (incl. thyroid and breasts)?                    [ ] [✓]
(h) Musculoskeletal system (include spine, joints,                   [ ] [✓]
    amputations, deformities)?
6. Are there any:      (a) hernias?                                   [ ] [✓]
                       (b) hemorrhoids?                               [ ] [✓]
7. Are you aware of additional medical history?                      [ ] [✓]
    (A confidential report may be sent to the Medical Director)
8. A home office urine specimen is required as                       [✓] [ ]
    part of this examination. Has it been sent?
9. Classify applicant's general health: Excellent [✓] Average [ ] Poor [ ]
10. NAME OF AGENT REQUESTING EXAMINATION.

Examined at Medical Office            Date 4/12/01 2001  Time 12:00 P.M.

Examiner/Underwriting Technician Anthony Iuzzolino, M.D.
                                 Print Name
Address: 33 Overlook Rd. Suite 303 Summit NJ 07901

For Requalification mail to: Preferred Insured Dept., Box 846, Blue Bell, PA 19422   P.O. Box...
For New Business mail to: New Business Dept., Box 876, Blue Bell, PA 19422 MAPLEWOOD, NJ ...

www.wapper.com

# FLEXIBLE PREMIUM VARIABLE LIFE INSURANCE CONTRACT

Variable Life Insurance.
Face Amount payable if Insured dies while the policy is in force.
Flexible Premiums payable while the Insured is living until the Maturity Date.
Non participating, no dividends are payable.

# AGL Life Assurance Company

Home Office: 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania 19462

VL-299