# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE MICHAEL S. RULLE FAMILY DYNASTY TRUST<br><br>Plaintiff<br><br>vs.<br><br>AGL LIFE ASSURANCE COMPANY<br><br>Defendant | Civil Action No. 2:10-cv-00231-BMS<br><br>Hon. Berle M. Schiller<br><br>AMENDED COMPLAINT |

FILED

MAY 03 2010

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## THE PARTIES

1. This is an action filed by the Michael S. Rulle Family Dynasty Trust, an irrevocable trust created on or about September 21, 2001 ("Plaintiff"), having an address c/o Alaska Trust Company, Resolution Plaza, 1029 W. Third Ave., Ste 400, Anchorage, AK 99501-1981. The grantor of the trust is Michael S. Rulle ("Rulle").

2. Plaintiff is a beneficiary and contract holder under a variable life insurance policy known as the Flexible Premium Variable Life Insurance Contract, policy number VL30022, issued on or about October 5, 2001 (the "Policy") (see **Exhibit A**) by Defendant AGL Life Assurance Company ("AGL"). AGL is an affiliate company of the Phoenix Companies, Inc... The Phoenix Companies, Inc. have a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania.

3. AGL is an insurance and financial services organization having a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania. The sole and exclusive products offered by AGL are private placement variable insurance products such as the policy sold to the Plaintiff as identified above.

1

4.   Phoenix Equity Planning Corporation, formerly named PFG Distribution Company, having a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania (hereafter "Phoenix Equity") is a broker-dealer licensed by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, and is a member of the National Association of Securities Dealers, Inc. ("NASD"). Phoenix Equity is also an affiliate of the Phoenix Companies, Inc.

5.   Phoenix Equity is also registered with the Financial Industry Regulatory Association ("FINRA") and lists among its types of businesses "Broker or Dealer selling variable life insurance or annuities" on its FINRA registration. Both Defendants AGL and Phoenix Equity are sister companies under common control by the same holding company known as PFG Holdings, Inc. ("PFG"), a closely held company domiciled in Pennsylvania having a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania.

6.   AGL entered into a Principal Underwriting Agreement with Phoenix Equity on or about January 1, 1996 for the purpose of permitting AGL to sell its variable life insurance securities products through Phoenix Equity as the licensed broker-dealer. Therefore, Phoenix Equity is, in association with AGL, actually a seller and distributor of products such as that sold to the Plaintiff.

7.   AGL and Phoenix Equity are licensed to operate in the respective capacities through the fifty (50) United States, including the State of Alaska where the Plaintiff is domiciled.

8.   Both AGL and Phoenix Equity share a commonality in their membership of their Board of Directors and Officers. Both companies list John K. Hillman, Phillip K.

Polkinghorn, and Robert Primmer as Directors. Both companies list the following persons as Officers:

> John H. Beers, Vice President and Assistant Secretary
> Joseph A. Fillip, Jr., Vice President, General Counsel and Assistant Secretary
> John T. Fischer, Vice President
> John K. Hillman, President and CEO or Vice President
> Karen A. Jones, Vice President
> Kent C. Keim, Vice President and Treasurer
> Marlene E. Luebeck, Assistant Vice President and Assistant Treasurer
> Maryanne C. McKinney, Underwriting Officer/Assistant Compliance Officer
> Todd R. Miller, Vice President and Controller/Chief Financial Officer
> James J. Nolan, Second Vice President and Assistant Treasurer
> Susan M. Oberlies, Vice President, General Counsel and Secretary
> Tracy R. Rich, Vice President and Assistant Secretary
> Murray F. Ridyard, Counsel and Assistant Secretary

9. By virtue of their common directorship, ownership and offices, and by virtue of the Principal Underwriting Agreement, AGL and Phoenix are joint actors and alter egos of each other.

10. John K. Hillman, Director, President and Chief Executive Officer of AGL, and Director and Vice President of Phoenix Equities, is a FINRA licensed broker and is approved by FINRA as a licensed Investment Company and Variable Contracts Representative (Series 6) and an Investment Company Variable Contracts Principal (Series 26).

11. Susan M. Oberlies, Vice-President, General Counsel, and Secretary of AGL and of Phoenix Equities, is a FINRA licensed broker and is also approved by FINRA as a licensed Investment Company and Variable Contracts Representative (Series 6) and an Investment Company Variable Contracts Principal (Series 26). Both John K. Hillman and Susan M. Oberlies executed the Policy that was issued to the Plaintiff.

3

12. Pursuant to the variable universal life insurance policy, Plaintiff entrusted certain monies to AGL which were invested in what was then identified under the policy as "Investment Account 2 – American Masters Opportunity Insurance Fund, L.P. Account" ("American Opportunity Fund"). American Opportunity Fund was subsequently renamed Tremont Opportunity Insurance Funds, L.P. and thereafter was re-named Tremont Opportunity Fund III, L.P. (collectively this fund is hereafter referred to as ("Tremont Opportunity Fund").

13. Tremont Opportunity Fund is a Delaware partnership. At all times material and relevant, the Tremont Opportunity Fund was managed by Tremont Partners, Inc.

14. The Rye Select Broad Market Prime, L.P., Rye Select Broad Market Prime, L.P., Rye Select Board Market XL Fund, L.P., and the Rye Select Equities Fund (collectively the "Rye Select Funds") are hedge funds in which the Plaintiff's monies were placed by Tremont as the general partner of the Tremont Opportunity Fund. The day-to-day operations and the investment management of the Rye Select Funds were conducted by its general partner, Tremont Partners, Inc. ("Tremont Partners"), now famous as one of the largest "feeder funds" associated with the Madoff Ponzi Scheme exposed on or about December of 2008. Tremont Partners selected Madoff or his company as the exclusive manager of the Rye Select Funds.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332 as complete diversity exists between Plaintiff and Defendant and the amount in controversy exceeds the jurisdictional minimum of this Court.

16. Venue is proper in this district because Defendant maintains its place of business in the district and/or conducts substantial business in the district.

## DEFENDANT SOLICITED PLAINTIFF

17. This action arises out of losses attributed to the Plaintiff by the Defendant, AGL, in connection with the policy purchased by the Plaintiff from AGL and distributed through Phoenix Equities. The Defendant failed to conduct adequate and necessary due diligence with respect to the moneys invested under the Policy, it failed to insure that the moneys were properly diversified as required under the Policy and accompanying private placement memorandums, and it improperly allocated certain theft and fraud losses to the account valuations under the Policy which served to decrease Plaintiff's account values by the amount of such theft and fraud loss.

18. The initial contacts between Defendant and the Plaintiff were made by John Hillman, Director, President and CEO of AGL and Director and Vice President of Phoenix Equities ("Hillman"), who solicited Rulle, a resident of New Jersey, for purposes of convincing Rulle to purchase certain insurance investment products offered by AGL and distributed through Phoenix Equities.

19. After many discussions over a period of months, in or about the spring 2001, Hillman informed Rulle that Defendants had obtained a "fund of funds" entitled American Masters Opportunity Insurance Fund, L.P.("American Opportunity Fund"), later renamed on two occasions and which has been identified herein as the Tremont Opportunity Fund.

20. Hillman represented to Rulle that the American Opportunity Fund was a highly professional and reputable "fund of funds" which had been selected by AGL to

participate in the Flexible Premium Variable Rate Life Insurance Policy of AGL as one of the two Investment Accounts in which net premiums could be allocated. Hillman also represented that Tremont Opportunity Fund was a highly diversified fund and that, to satisfy IRS and other requirements, the investor would be as far removed from making investment decisions as possible.

21. At the time of these conversations, Rulle had not yet created the Plaintiff trust but contemplated doing so and, therefore, was specifically interested in a fund of funds for the purposes of investing the Plaintiff trust assets. A "fund of funds" refers to a fund of hedge funds or other investment managers which exists primarily to mitigate risk to the investors, who are either accredited investors or institutional investors and for whom stability investments is critical to capital reserves and otherwise financial solvency.

22. When asked to specify the degree of investment management diversity that the fund would allocate among investment managers, Hillman stated that there would significant diversity consistent with industry standards and in the range of 7% or less of the funds would be placed with any one manager.

## THE POLICY

23. In or about September 27, 2001, Rulle created the Michael S. Rulle Family Dynasty Trust (the "Plaintiff" or the "Trust") which was established pursuant to the laws of the State of Alaska for the benefit of Rulle and his family. The Trust was funded by Rulle, as the grantor, and became the applicant investor under the Policy. Plaintiff is identified therein as "Contract Holder" and "Beneficiary".

Case 2:10-cv-00231-BMS   Document 18-1   Filed 04/30/10   Page 10 of 66

24. AGL offered variable universal life insurance policies, which are a form of life insurance also known as cash value insurance policies. Variable universal life insurance policies are designed to allow policy holders to invest a portion of their premiums in optional investment accounts which are offered under the policy. Because the investments are held under a policy, gains inside the policy are shielded from income taxes, as is the payout upon death. Policy holders are able to access their money during their lifetime by withdrawing or borrowing funds, tax free, from the Policy.

25. The Policy provides that its "Governing Jurisdiction" is the state of Alaska and that its "State of Issuance" is the state of Alaska.

26. The Policy has an initial face amount death benefit of $17,600,000.00.

27. The policy offered the same two investment account options (Money Market Account and/or American Opportunity Fund) and further describes, in pertinent part, how account values were to be determined. The Policy states:

> The value of an Investment Account reflects:
> 
> - Any amounts transferred to the Investment Account during the current Valuation Period;
> 
> - The investment income and realized and unrealized capital gains credited to such assets in the Valuation Period;
> 
> - Any amounts transferred from an Investment Account during the current Valuation Period;
> 
> - Realized and unrealized capital losses charged against those assets during the Valuation Period;
> 
> - Any amount charged or reserved against the Investment Account for taxes;
> 
> - Any expenses charged or reserved against the Investment Account for expenses incurred in operating such Investment Account;

- The mortality and expense risk change for the Valuation Period; and

- Any other Monthly Charges deducted from the Investment Account for This Contract.

. . .

The Account Value when the Initial Premium is received is equal to the Net Premium invested in the Investment Accounts; less:

(a) Cost of Insurance Charges (deducted on each monthly calculation date); and
(b) Policy loads; and
(c) Any Charges for Special Insurance Class Rating;

The Account Value on any subsequent Valuation Day is equal to the Account Value on the prior Valuation Day plus:

(a) any new Net Premium invested in the Investment Accounts; and
(b) any increase in value of the Investment Account due to investment results (net of Mortality and Expense Risk Charges and any Asset Charges; and
(c) any interest credited to the Borrowed Fund;

less;

(a) any decrease in value of the Investment Account; and
(b) Cost of Insurance Charges (deducted only on Monthly Calculation Date); and
(c) any Partial Withdrawals taken; and
(d) any Rider Charges deducted from the Account Value; and
(e) any Policy Loads; and
(f) any Charges for Special Insurance Class Rating; and
(g) any Other Charges as stated in Contract Schedule B.

28. The Policy further provides that the "Net Account Value is the Account Value minus any Contract Loan balance and accrued unpaid interest" and provides for the following charges to be deducted from the Account Value: Cost of Insurance, Rider Charges, Policy Loads and Charges for Substandard Insurance Class Rating.

29. The Policy expressly stated that it was the strategy of the American Opportunity Fund that funds would be invested "with various portfolio managers

believed to be able to meet the Partnerships objectives". Nevertheless, the Policy reserved to AGL :

> ...the right to: (1) establish and operate the Variable Account as a managed account or an account which purchases shares from the portfolios of funds managed by investment managers retained by us; (2) register or deregister the Variable Account under the Investment Company Act of 1947; (3) operate the Investment Accounts as unit investment trust registered, or exempt from registration, under the Investment Company Act of 1940 or any other form permitted by law.

30. The Policy additionally reserved to AGL the right to contract with investment managers or managed directly the assets held in the Investment Accounts. It stated "We may deduct an Asset Charge from the Account Value allocated to Investment Accounts that are managed directly as well as any costs and expenses arising from such Investment Accounts. In either case, investment managers are selected by us in our discretion".( **Emphasis added**).

## AGL PRIVATE PLACEMENT MEMORANDUM

31. Hillman, on behalf of the Defendant, provided to Rulle a private placement memorandum entitled "AGL Life Assurance Company Private Placement Memorandum" bearing private placement memorandum number 704, dated October 2, 2001 (the "AGL PPM").

32. As explained in the AGL PPM, the insurance contract would offer only two investment account choices – (1) Money Market Account or (2) American Masters Opportunity Insurance Fund, L.P. Account. These accounts are designated as the "investment accounts". On page 38 of the AGL PPM it is stated, in pertinent part, the following:

9

> The partnership seeks to (i) achieve long-term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on the preservation of capital. The account is managed by Tremont Partners, Inc. ("General Partner") which will attempt to accomplish these investment objectives by investing with various portfolio managers (the "Managers") which the General Partner believes are able to meet the Partnerships objectives. The terms "opportunity" and "opportunistic" refer to a broad range of investment strategies, including but not limited to: long-short equity strategies, hedging and arbitrage techniques in the equity, fixed income and currency markets; index arbitrage; interest rate arbitrage; convertible bond and warrant hedging; merger arbitrage, statistical long-short equity strategies; pairs trading and investment in non-US securities. These sophisticated investment strategies often require the use of derivative trading vehicles such as stock options and index options.
>
> The use of a multi-manager format, whereby investments are made through a variety of managers utilizing different and, if possible, non-correlated investment strategies and trading techniques, it is designed to provide investors with a diversified investment portfolio, as well as enable them to obtain above-average returns over a market cycle.

33. As further explained by the AGL PPM, the policy owner pays premiums into an AGL Variable Account, a separate account of AGL established to fund the offered "Investment Accounts". The assets of the AGL Variable Account are owned by AGL and are placed by AGL into one or both of the designated Investment Accounts at the election of the investor.

34. Under the topic heading "Summary Description of the Policy" of the AGL PPM, it states the following:

> **The Investment Account.** The account value of the Investment Account selected by the investment managers and its sub-advisors will increase or decrease depending <u>upon the performance of the investments</u> selected by the investment managers of these Investment Accounts. Accordingly, policy owners bear the entire <u>investment</u> risk, including the risk of loss of principal for all amounts invested in the policy.
>
> **Policy Values.** Net premium is allocated to one or more Investment Accounts. Depending on the <u>investment performance</u> of these accounts, the Account Value of the Policy may increase or decrease on any Valuation Day. The Policy Owner bears the entire <u>investment</u> risk associated with the <u>investments</u> of the Investment Accounts, and there is no guaranteed minimum Account Value...

**(Underline added).**

35. The AGL PPM describes the relationship of the investor vis-a-vis American Opportunity Fund as lacking any privity and in bold type, at page 3 emphasizes that "It is the company on behalf of its separate account and not the policy owners that will be the limited partner in the partnership".

36. The AGL PPM advises policy owners to read "The attached American Masters Opportunity Insurance Fund, L.P. Private Placement Memorandum and Limited Partnership Agreement for additional information regarding this partnership". The said limited partnership agreement is dated January 1, 2001 and expressly precludes the General Partner from accepting any communications from any policy owners concerning the assets held in the insurance company's separate account. Subsequent private

11

placement memorandums prepared and disseminated by Defendants and the Tremont Opportunity Fund boldly contain the following advisory:

> **OWNERS OF VARIABLE CONTRACT ARE RESTRICTED IN THAT THEY SHALL HAVE NO CONTACT, EITHER DIRECTLY OR INDIRECTLY, WITH THE GENERAL PARTNERS REGARDING ANY INVESTMENT MATTERS REGARDING THE GENERAL PARTNERS' INVESTMENT STRATEGIES AND DECISIONS CONCERNING INVESTMENT PARTNERSHIP ASSETS. EACH PARTICIPATING INSURANCE COMPANY MUST FULLY DISCLOSE SUCH PROHIBITION ON COMMUNICATIONS TO THE VARIABLE CONTRACT OWNERS.**

## DIMINISHMENT OF PLAINTIFF'S ACCOUNT VALUE

37. The AGL PPM does not define the term "investment performance" as encompassing moneys lost by fraud or theft, nor did the Plaintiff intend for that to be the case.

38. The Policy does not define the term "investment results" as encompassing moneys lost by fraud or theft, nor did the Plaintiff intend for that to be the case.

39. The American Masters Opportunity Insurance Fund, L.P. Private Placement Memorandum and the Limited Partnership Agreement issued and distributed by the Defendant, do not define the terms of any investment performance, investment result, or investment loss as encompassing moneys lost by fraud or theft nor did Plaintiff intend for that to be the case.

40. In reliance upon the statements made to Rulle by Hillman, the AGL PPM and the policy and other related documents, and in accordance with Defendants'

representations to Plaintiff, Plaintiff purchased the variable rate life insurance product and transferred premium funds to AGL for investment under the policy.

41. The initial premium of $1,200,000.00 was paid by Plaintiff on or about October 2001, and additional premiums of $1,200,000.00, $1,000,000.00 and $250,000.00 were paid yearly in 2002, 2003, and 2004 on subsequent anniversary dates.

42. Rather than investing the premiums in accordance with the terms of the policy agreement and their representations to Plaintiff, AGL caused the monies to be transferred to investment funds that were ultimately managed or sub-managed by Bernard L. Madoff and/or Madoff Investment Securities LLC ("hereafter collectively referred to as "Madoff"), where they were never invested, but rather taken by Madoff. Specifically, Madoff was arrested by the Federal Bureau of Investigation on or about December 11, 2008 on criminal charges of securities fraud. Madoff's business was in fact "a giant Ponzi scheme" and the estimated losses pursuant to his Ponzi scheme fraudulent action are reported to be in excess of $50 billion. On or about March 12, 2009, Madoff pled guilty to charges of having defrauded investors with this "Ponzi" scheme and admitted to the fact that he never implemented his strategy of investment. Thus, all losses associated with Madoff were not due to losses in securities or funds, but directly tied to Madoff's theft of the monies deposited with funds he controlled.

43. Upon learning of the fraudulent scheme of Madoff, AGL improperly advised Plaintiff that the value of the portion of Plaintiff's account that had been transferred to funds controlled by Madoff (believed to be approximately 23% of Plaintiff's total account) was zero, due to the fraudulent actions of Madoff. AGL's

actions in connection with the diminished valuation of Plaintiff's variable life insurance account constitute a breach of contract.

44. By the express terms of the Policy, only "income, gains and losses ... from each Investment Account" were to be charged against that account, "without regard to the income, gains or losses of any other Investment Account <u>and without regard to any of our other income, gains or losses</u>." Thus, by the express terms of the Policy, as well as a matter of law, absent legitimate investment losses, Plaintiff's account value should have been the amount determined by the provisions set forth above, <u>i.e.</u>, the amounts deposited minus certain charges. Accordingly, AGL's actions were improper and constitute a breach of contract.

## FAILURE OF DUE DILIGENCE

45. Pursuant to the Policy, Plaintiff was allowed to choose among two investment accounts for investment of the Policy premiums. It allocated the annual net premium payment ($1,160,200 per year for 2001 and for 2002) to an investment account option entitled "American Masters Opportunity Insurance Fund, L.P. Account."("American Opportunity Fund"). American Opportunity Fund later changed its name to Tremont Opportunity Fund. As stated in the Policy, the objective of such account option was to achieve long-term capital appreciation and consistently generate positive returns irrespective of stock market volatility or direction while focusing on the preservation of capital.

46. To achieve that objective, AGL offered American Opportunity Fund as an investment account promoting an "investment strategy to invest with various portfolio

14

managers believed to be able to meet the Partnership's objective". The investment was targeted to insurance companies' high net worth clients.

47. The AGL PPM described the offering of limited partnership interests in the Tremont Opportunity Fund to insurance companies, and others which interests are designated to be an investment option under the Policy sold and distributed by the Defendants. Although the interests were exempt from registration under the Securities Act of 1933, as amended, pursuant to Regulation D, the interests still constitute securities and were, and are, subject to federal and state securities laws to the extent applicable.

48. Among other things, Defendant knowingly and/or recklessly allowed Plaintiff's moneys to become placed in certain "investment accounts" held by Rye Select Broad Market Prime Fund L.P., Rye Select Broad Market Fund L.P., Rye Select Broad Market XL Fund L.P., and Rye Select Equities Fund (the "Rye Select Funds"), all of which were controlled by a single manager, Madoff, without taking a comprehensive and proper due diligence review to assess the Tremont Opportunity Fund or the investment accounts, given Madoff's connection with Tremont Partners, the general partner of the Rye Select Funds, and Tremont Partners selection of Madoff as its sole investment manager.

49. Defendant AGL knowingly, recklessly, and/or negligently ignored numerous warning signs that could have alerted them to the fact that Madoff was running an illegitimate and illegal Ponzi scheme. Such warning signs included the following:

> (a) The fact that Madoff offered consistent investment returns, beyond a reasonable investment bench marks, in both up and down markets.
>
> (b) The fact that there was a discrepancy between the trading activity in which Madoff claimed to be buying and

selling puts and calls and the open interest of index option contracts.

(c) The fact that Madoff was audited by a small operation owned by Madoff's brother-in-law only.

(d) The fact that Madoff did not employ any third party administrators or custodians but instead ran his own "back office" operations.

(e) The fact that Madoff lacked transparency and limited access to his books and records thereby maintaining a false appearance of exclusivity and

(f) The fact that Madoff admitted to illegally manipulating his accounting records by personally subsidizing returns in slow quarters in order to minimize risk and to maximize reported performance.

50. AGL and its officers and staff held themselves out to Rulle and others as professional, informed and knowledgeable investment advisors

51. Despite such representations by AGL, AGL either failed to discover Madoff's involvement with the Tremont Partnership and the Rye Select Funds, or it chose to ignore such involvement despite available public skepticism concerning Madoff and his lack of transparency.

52. Among the many examples of such public skepticism were the May 2001 published article entitled " Madoff Tops Charts; Skeptics Ask How" in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry, which reported that Madoff had reported positive returns for the last 11-plus years for Fairfield Sentry and other feeder funds, but that current and former traders, other money managers, consultants, quantitative analysts and fund -of- fund executives, many of whom were familiar with the so-called split-strike conversion strategy used by Madoff, questioned the consistency of the returns. These professionals noted that others using the strategy had

16

nowhere near the same degree of success, and that Gateway, a publicly traded mutual fund, which also used the same strategy purported employed by Madoff, had experienced far greater volatility and lower returns than Madoff.

53. Another example of such public skepticism was the May 27, 2001 *Barron's* published article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." As reported in *Barron's*, Madoff's accounts have produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year. When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.' Nor were the firms that market Madoff's fund forthcoming.

The article reported that some on Wall Street, including three option strategists for major investment banks, were skeptical about how Madoff achieved his double-digit returns using options alone, and told Barron's they couldn't understand how "Madoff churns out such numbers using this strategy." The article further reported that "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy…"As further reported in the article, one investment manager who took over a pool of assets that included an investment in a Madoff fund stated that ' When he couldn't explain to my satisfaction how they were up or down in a particular month, I pulled out.'

54. These warning signs were in fact recognized by various other investment advisors in the industry and as a result of these warning signs, they chose not to invest

with Madoff or any of his affiliated funds. By contrast, Defendant failed to conduct basic due diligence review that would have alerted them to Madoff's fraudulent scheme.

55. Ignoring the red flags, AGL and Phoenix Equity acted as a "feeder fund", to Madoff by investing in or permitting Plaintiff's moneys and/or policies to be invested in Tremont Opportunity Fund and the investment funds which were controlled by Madoff

56. Moreover, Defendants profited generously from this arrangement by unjustly receiving significant management fees for entrusting and/or depositing their funds with sub-managers such as Madoff. This conduct caused Plaintiff to suffer losses.

57. The actions of Defendant have caused damage to Plaintiff. Plaintiff seeks to recover damages as well as other fees in amounts paid to Defendant. Additionally, management fees and investment monies paid by Plaintiff should be returned to Plaintiff. Such losses were suffered as a direct result of Defendant's breach of contract, breach of fiduciary duty, violations of state and federal insurance, trade practices, and securities law, negligence, gross negligence, negligent misrepresentation, and unjust enrichment.

## AGL FAILED TO INSURE DIVERSIFICATION OF THE FUNDS

58. AGL had a contractual and fiduciary obligation to the Plaintiff to invest the funds in accordance with the terms of the Policy and the AGL PPM. Such duties also arise under various state and federal statutes in connection with the provision of the Policy.

59. As set forth under the AGL PPM, the Policy, and in accordance with the representations of Hillman, the investment strategy for Investment Account #2 (American Opportunity Fund) was to invest the money among diverse and separate investment