## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL S. RULLE FAMILY DYNASTY TRUST,

      Plaintiff,

      v.

AGL LIFE ASSURANCE COMPANY,

      Defendant

Civil Action No. 2:10-cv-00231-BMS

Hon. Berle M. Schiller

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

William R. Connelly, Esq.
Law Offices of William R. Connelly, LLC
7 West Main Street
Mendham NJ 07945
Phone:  (973) 543-5301
Fax:  (973) 543-5140

Nicholas Noel, III, Esq.
Noel, Kovacs & McGuire, P.C.
2505 Newburg Road
Easton PA 18045-1963
Phone:  (601) 258-0866
Fax:  (610) 258-5264

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT.................................................... 1

COUNTER-STATEMENT OF FACTS........................................ 3

    1. RELATIONSHIP BETWEEN AGL, PHOENIX AND
PHOENIX EQUITY........................................................... 4

    2. AGL'S SOLICITATION OF MICHAEL S. RULLE.................... 4

    3. THE SELECTION OF THE "FUND-OF-FUNDS" BY
AGL................................................................................ 5

    4. VARIABLE LIFE INSURANCE POLICY.................................... 6

    5. AGL PRIVATE PLACEMENT MEMORANDUM....................... 7

    6. EVENTS LEADING UP TO THE DISCOVERY OF THE
FRAUDULENT ACTIVITIES.............................................. 8

LEGAL ARGUMENT................................................................... 8

    I.  PLAINTIFF NOT ONLY STATES A CLAIM FOR BREACH
OF CONTRACT, BUT ALSO SHOWS A STRONG
LIKELIHOOD OF BREACH, THUS EXCEEDING THE
    REQUIREMENTS UNDER RULE 8........................................ 9

        A.     PLAINTIFF MEETS THE REQUIREMENTS FOR A
BREACH OF CONTRACT CLAIM ........................ 9

        B.     RATHER THAN SUPPORTING DEFENDANT'S
ARGUMENT FOR DISMISSAL, THE FACTS AND LAW
SHOW THAT THERE IS A GREATER THAN PLAUSIBLE
BASIS FOR A BREACH OF CONTRACT CLAIM

            1. There Are Disputed Issues of Fact ........................ 10
            2. Interpretation of the Policy Supports Plaintiff's Claim 11

                a. "Capital Loss" does not include fraud ............. 12
                b. "Investment Loss" does not include fraud ........ 13
                c.  Diversification has a common industry meaning 14

II.    PLAINTIFF HAS ASSERTED THE ESSENTIAL ELEMENTS
OF FRAUD UNDER FEDERAL AND STATE SECURITIES LAWS
WHICH SATISFY THE REQUIREMENTS OF RULE 9(B),
SEC RULE 10B5 AND THE ANTI-FRAUD PROVISIONS OF
SECTION 10(b) ...................................................................  15


       A.    FIDUCIARY DUTY OF AGL UNDER THE 1934
             ACT, THE INVESTMENT ADVISERS ACT OF 1940
             AND THE FINRA RULES.................................  17

             1.  Duty of "Suitability" in Recommendations.............  19
             2.  Defendant had a Duty to Conduct Due Diligence......  20
             3.  Duty of AGL to Comply with Regulation D ...........  21

III.   THE POLICY IS A SECURITY UNDER BOTH ALASKA
AND PENNSYLVANIA LAW..............................................  24

IV.    DETERMINATION OF CHOICE LAW IS PREMATURE
BUT THE AVAILABLE FACTS AND LAW POINT TO ALASKA
AS THE STATE WITH THE MOST INTEREST IN THE MATTER....24

V.     PLAINTIFF STATES A CAUSE OF ACTION
FOR BREACH OF FIDUCIARY DUTY ARISING OUT OF THE
POLICY: (A) AS AN INSURER; (B) AS AN INVESTMENT
ADVISER/BROKER-DEALER; AND (C) AS A PRINCIPAL. ............ 27

VI.    PLAINTIFF STATES A CAUSE OF ACTION FOR
 BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING........................................................  29

VII.   PLAINTIFF STATES A CAUSE OF ACTION FOR
PROFESSIONAL NEGLIGENCE, OR, IN THE ALTERNATIVE,
GROSS NEGLIGENCE OR  NEGLIGENCE......................................  30

VIII.  PLAINTIFF STATES A CAUSE OF ACTION
FOR NEGLIGENT MISREPRESENTATIONS.................................. 32

IX .  PLAINTIFF STATES A CAUSE OF ACTION
FOR UNJUST ENRICHMENT............................................... 33


CONCLUSION................................................................ 34

## TABLE OF AUTHORITIES

**Federal Cases**

Basic Inc. v. Levinson, 485 U.S. 224 (1988)..............................................23

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ..........................9

Bohler-Uddeholm America, Inc. v. Elwood Group, Inc., 247 F.3d 79
  (3d Cir. 2001)................................................................................295

Burdet v. Miller, 957 F.2d 1375 (7th Cir. 1992). ...............................18

CNA Ins. Co. v. Lightle, 364 F. Supp. 2d 1068 (D. Alaska 2005).....................11

Ernst & Ernst v. Hochfelder, 425 U.S. 185, 99 S.Ct. 1375,
  47 L.Ed.2d 668 (1976)................................................................. .23

Essex Ins. Co. v. RMJC, Inc., 306 Fed. App'x. 749 (3d Cir. 2009).....................34

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009)....................90

French v. First Union Securities, Inc., 209 F. Supp.2d 818 (M.D. Tenn. 2002) ....18, 28

Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042 (11th Cir. 1987)..............17

Godfry v. State Farm Mutual Insurance Co., 2009 WL 56436 (E.D. Pa. 2009)..........27

Hammersmith v. TIG Insurance Co., 480 F.3d 220 (3d Cir. 2007).....................27

Hanly v. SEC, 415 F.2d 589 (2d Cir. 1969)....................................18

Hefferman v. Bass, 467 F.3d 596 (7th Cir. 2006)...............................8

Hults v. Allstate Septic Sys., 2007 WL 2253509 (M.D. Pa)........................31

IIT v. Cornfeld, 619 F.2d 909 (2d Cir. 1980)....................................23

In re Ames Dept. Stores Inc. Stock Litigation, 991 F.2d 953 (2d Cir. 1993).............23

Kahn v. SEC, 297 F.2d 112 (2d Cir. 1961) ....................................18

i

Koresko v. Bleiweis, 2004 WL 3048760 (E.D. Pa.)..........................................29

Limestone Dev. Corp. v. Vill. Of Lemont, III, 520 F.3d 797
(7th Cir. 2008)...............................................................................9

Mihara v. Dean Witter & Co., 619 F.2d 814 (9th Cir. 1980).........................19, 23

Padalino v. Standard Fire Ins., Co., 616 F. Supp 2d 538 (E.D. Pa 2008)...............32-33

Paine v. Commissioner, 63 T.C. 736 (1975), aff'd in unpublished opinion,
523 F.2d 1053 (5th Cir. 1975). .............................................................13

Petruska v. Gannon University, 462 F.3d 294 (3d Cir. 2006),
cert. denied, 127 S.Ct. 2098, 167 Led. 2d 813 (2007) .....................................8

Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008) ...........................9

Press v. Chemical Investment Services Corp., 166 F.3d 529 (2d Cir. 1999). ...........18

Rolf v. Blyth Eastman Dillon & Co., 570 F.2d 38 (2d Cir.),
cert. denied, 439 U.S. 1039 (1978)........................................................23
Schirmer v. Principal Life Insurance Co., 2008 WL 478568  (E.D.Pa. 2008)..........27

SEC v. Blavin, 557 F.Supp. 1304 (E.D. Mich. 1983), aff'd,
760 F.2d. 706 (6th Cir. 1985) ...........................................................23

SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963).....................17

SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980).......................................22, 23

United States v. Hart, 273 F.3d 363 (3d Cir. 2001) ...................................18

**Alaska State Cases**

Alaska Diversified Contractors, Inc. v. Lower Kuskokwim School
Dist., 778 P2d 581, 583 (Alaska 1989).......................................................15

Alaska Sales and Serv., Inc. v. Millet, 735 P.2d 743 (Alaska 1987)....................34

Alyeska Pipeline Serv. Co. v. H.C. Price Co., 694 P.2d 782 (Alaska 1985)... ....15,25

Alyseska Pipeline Service Co. v. O'Kelley, 645 P.2d 865 (Alaska 1991).................30

Carter v. Hoblit, 755 P.2d 1084 (Alaska 1988)...........................................33

Darling v. Standard Alaska Prod. Co., 818 P.2d 677 (Alaska 1991).................34

Diagnostic Imaging Ctr. Associates v. H&P, 815 P.2d 865 (Alaska 1991)............15

Great Western Savings Bank v. George W. Easley Co.,
  778 P.2d 569 (Alaska 1989)..................................................................9

John's Heating Service v. Lamb, 46 P.3d 1024 (Alaska 2002).......................30

Johnson & Higgins of Alaska, Inc. v. Blomfield, 907 P.2d 1371 (Alaska 1996)....30

Linck v. Barokas & Martin, 667 P.2d 171 (Alaska 1983).............................30

Matthews v. Kincaid, 746 P.2d 470 (Alaska 1987).....................................32

Munn v. Thornton, 956 P.2d 1213 (Alaska 1998) .....................................28

O.K. Lumber Co. v. Providence Wash. Ins. Co., 759 P.2d 523 (Alaska 1988)....25, 28

Reeves v. Alyeska Pipeline Serv. Co., 56 P.3d 660 (Alaska 2002).................32, 34

Starry v. Horace Mann Ins. Co., 649 P.2d 937 (Alaska 1982)..........................12

U.S. Fire Ins. Co. v. Colver, 600 P.2d 1 (Alaska 1979)...................................12

Whispering Creek Condo. Owner Ass'n v. Alaska Nat. Ins. Co., 774 P.2d 176
  (Alaska 1989) ..................................................................................12

**Pennsylvania State Cases**

Basile v. H & R. Block, 761 A.2d 1115 (Pa. 2000)........................................28

Birth Center v. St. Paul Companies, Inc., 727 A.2d 1144 (Pa.Super.Ct.1999)
, *app. granted in part*, 560 Pa. 633, 747 A.2d 858 (2000) ...............................28

Gedeon v. State Farm Mut. Auto. Ins. Co., 188 A.2d 320 (Pa. 1963)..................28

Miller v. Allstate Ins. Co., 763 A.2d 401 (Pa. Super. 2000).............................25

Mitchell v. Moore, 729 A.2d 1200 (Pa Super. 1999).....................................34

**Federal Regulations**

17 C.F.R. § 230,501....................................................................21, 22

17 C.F.R. § 240.10b-5(b) ..................................................................22

**Federal Rules**

Fed. R. Civ. P. 8.................................................................................8

Fed. R. Civ. P 9.................................................................................

Fed. R. Civ. P 9(b)...........................................................................16

Fed. R. Civ. P. 12(b)(6)................................................................3, 8, 9

Fed. R. Civ. P. 56............................................................................10


**Federal Statutes**

Internal Revenue Code, 26 U.S.C.A. § 165(a),(c)..........................................137

Internal Revenue Code, 26 U.S.C.A. §1211(b) ..............................................13

Investment Advisers Act of 1940, 15 U.S.C. §80b-1, et. seq...............................17

Securities and Exchange Act of 1934, 15 U.S.C. §77a, et seq.............................24

Securities and Exchange Act of 1934, 15 U.S.C. §77b(a)(1))..............................24

Securities and Exchange Act of 1934, 15 U.S.C. §78c(a)(4)...............................17

Securities and Exchange Act of 1934, 15 U.S.C. §78c(a)(5)...............................17

Securities and Exchange Act of 1934, 15 U.S.C. §78f(b)(5)............................18, 22

**State Statutes**

Alaska Securities Act, A.S. 45:55-12(a) et seq............................................24

Alaska Securities Act, A.S. 45:55-900(a)(7)..............................................24

Pennsylvania Securities Acts §1-401(b) and 1-501(g) .....................................24

**Treatises**

James P. George, False Conflicts and Faulty Analyses:
Judicial Misuse of Governmental Interests in the Second Restatement
of Conflict of Laws, 23 Rev. Litig. 489, 521-522 (2004)..................................26

Restatement (Second) of Agency § 387 (1958)...............................…..….......28

Restatement (Second) of the Conflict of Laws §145......................…...…..…25

**Other Authorities**

FINRA - Managing Investment Risk,
http://www.finra.org/Investors/SmartInvesting/AdvancedInvesting/ManagingInvestment
Risk/index.htm                                                                        14
FINRA Regulatory Notice 10-22.......................................................…..20


In the Matter of D.E. Wine Investments, Inc. Administrative Proceeding
File No. 3-8543 Release No. ID-134, 1999 WL 373279
 (SEC Initial Decision June 9, 1999 ......................................................…......18

NASD Manual,  Rule 3010 at 4831 and Rule 2110 at 4111 (Manual 160) (2000)..…...19

NASD Notice to Members 00-44 (July 2000...............................................…..24

SEC Release No. 34-56145................................................................…...17

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE MICHAEL S. RULLE FAMILY DYNASTY TRUST<br><br>    Plaintiff<br><br>vs.<br><br>AGL LIFE ASSURANCE COMPANY,<br><br>    Defendant | Civil Action No. 2:10-cv-00231-BMS<br>Hon. Berle M. Schiller |

### PLAINTIFF MICHAEL S. RULLE FAMILY DYNASTY TRUST'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

Plaintiff Michael S. Rulle Family Dynasty Trust ("Plaintiff" or "the Trust") respectfully submits this memorandum and the Supplemental Certification of Michael S. Rulle ("Supp. Rulle Certif.")  in opposition to Defendant's motion to dismiss, pursuant to Rules 12(b)(6), 8 and 9(b) of the Federal Rules of Civil Procedure. [1]

### PRELIMINARY STATEMENT

Michael Rulle ("Rulle") is a sophisticated investor and experienced in many facets of the finance industry, for him, as well as for others.  Over the past thirty years, he had learned about variable life insurance policies and how they could be used in conjunction with an investment fund to provide the type of financial security he was seeking for himself and his family.  He was approached by John Hillman ("Hillman") of AGL, a sophisticated money manager, broker-dealer and insurance executive, who proposed various investment vehicles to Rulle, none of which had the components Rulle

---

[1] Plaintiff also relies upon the Affidavit of Michael S. Rulle ("Rulle Certif."), Amended Complaint and Memorandum of Law In Opposition to Defendant's Motion to Dismiss the Complaint, on file with the Court.

was seeking for his particular investment needs:  moderate risk and tax deferral.  Finally,

Hillman found the investment fund that seemed to be made to order:  a "fund of funds"

that provided the diversification in moderate risk investments that Rulle needed, and in a

structure that would provide the tax deferral he also required by leaving all of the

investment decisions, management and oversight to others.  Hillman represented to Rulle

that AGL had performed all of the due diligence on this investment vehicle—the Flexible

Variable Life Insurance Policy—and that it was both reputable and diversified in

moderate risk funds.  The Policy—and AGL private placement memorandum comprising

the investment vehicle—specifically  provided that the value of the investment account

would be tied solely to the investment performance of the fund.  It also listed certain

investment risks, all of which Rulle understood as the types of market risks involved in

all investments.  In or about December 2008, Rulle received a letter from AGL, advising

him that some of his investment had been placed in funds controlled by Bernard Madoff,

and because of Madoff's fraudulent Ponzi scheme, the monies had been lost.  Tt was, in

AGL's words, an "investment loss." Neither the Policy, PPM nor industry documents

identify fraud or theft as an "investment loss." Rulle further discovered that, contrary to

AGL's assurances and representations, they had not performed due diligence on the fund,

the fund was not diversified and they had not monitored it, much less managed it.

As a sophisticated investor, Rulle knew better than to take unreasonable risks.  He

reasonably relied on the assurances and representations of AGL—an insurance company

and an investor adviser—to do what they promised to do, and what they were obligated to

do.  They failed to do so.

## COUNTER-STATEMENT OF FACTS

Plaintiff incorporates by reference, and respectfully refers Court to, the Affidavit of Michael S. Rulle, the Supplemental Affidavit of Michael S. Rulle, and the Amended Complaint.   For purposes of Plaintiff's opposition to Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), following are additional relevant facts.

This action concerns losses that occurred in funds in connection with the variable life insurance policy issued by the AGL Life Assurance Company ("AGL" or "Defendant") to the Michael S. Rulle Family Dynasty Trust ("Plaintiff").  Plaintiff's Amended Complaint alleges causes of action based upon AGL's breach of the Policy and related fiduciary duties and implied covenants arising from the Policy, as well as professional negligence, negligent misrepresentation, unjust enrichment and violation of state and federal securities acts.

Plaintiff, an irrevocable trust created on or about September 21, 2001 under Alaska law and located in Alaska, is a beneficiary and contract holder under the  Flexible Variable Life Insurance Contract  purchased by the Plaintiff from AGL, and issued on or about October 5, 2001 ("the Policy.")  The grantor of the trust is Michael S. Rulle. Amended Complaint, ¶¶1-2.   AGL is an insurance and financial services organization. The sole and exclusive products offered by AGL are private placement variable life insurance products such as the policy sold to the Plaintiff as identified above.  Amended Complaint, ¶3.

Variable universal life insurance policies are designed to allow policy holders to invest a portion of their premiums in optional investment accounts which are offered

under the policy.  Because the investments are held under a policy, gains inside the policy

are shielded from income taxes, as is the payout upon death.  Policy holders are able to

access their money during their lifetime by withdrawing or borrowing funds, tax free,

from the policy.    Amended Complaint, ¶5.  Variable life insurance policies are both life

insurance policies and securities under federal and state securities laws.  Thus, they are

regulated by both state insurance law and state and federal securities law.

### 1.      Relationship between AGL, Phoenix and Phoenix Equity

 AGL and Phoenix Equity Planning Corporation ("Phoenix Equity") are both

affiliate companies of the Phoenix Companies, Inc.("Phoenix") .

Phoenix Equity is a broker-dealer licensed by the Securities and Exchange

Commission under the Securities Exchange Act of 1934, as amended, and is a member of

the Financial Industry Regulatory Authority ("FINRA").[2] Amended  Complaint, ¶4.

As a FINRA member, Phoenix Equity lists among its types of businesses "Broker or

Dealer selling variable life insurance or annuities" on its FINRA registration.

On or about January 1, 1996, AGL entered into a Principal Underwriting

Agreement with Phoenix Equity for the purpose of permitting AGL to sell its variable life

insurance securities products through Phoenix Equity as the licensed broker-dealer.  AGL

and Phoenix Equity are licensed to operate in <u>inter alia,</u> the State of Alaska where the

Plaintiff is domiciled.  Amended Complaint, ¶6.

### 2.      AGL's Solicitation of Michael S. Rulle

In or about early 2000, while Rulle was President and CIO of Hamilton Partners,

Hillman began contacting Rulle to convince him to invest in investment products using a

---

[2] According to its website, FINRA "is the largest independent regulator for all securities firms doing business in the United States...oversee[ing] nearly 4,750 brokerage firms, about 167,000 branch offices and approximately 634,000 registered securities representatives."

life insurance platform. Rulle Aff. at ¶7. Their conversations continued over several

months.  Rulle advised Hillman, that he was interested in an investment vehicle inside a

life insurance policy that mimicked a hedge mutual fund in that it was a "fund of funds".

He told Hillman that if AGL ever offered such a product, he would be interested.  These

discussions occurred over the course of several months in the year 2000 and well before

August 2000.  Rulle Aff., ¶7.

Rulle understood "fund of funds" by virtue of his extensive experience in the

hedge fund industry.   Diversification, a hallmark of "fund of funds", has a common

industry standard  for that investment vehicle. Suppl. Rulle  Aff. ¶4. Specifically,

diversification in that context means very small percentages—generally no more than 5

percent—are invested in any one fund, the purpose being to minimize risk  Id.

### 3.      The Selection of the "Fund of Funds" by AGL

After many discussions over a period of months, Hillman informed Rulle that

Defendants had obtained a "fund of funds" entitled American Masters Opportunity

Insurance Fund, L.P.("American Opportunity Fund"), Rulle Aff. ¶10.   Hillman

represented to Rulle that the American Opportunity Fund was a highly professional and

reputable "fund of funds" which had been selected by AGL to participate in the Flexible

Premium Variable Rate Life Insurance Policy of AGL as one of the two Investment

Accounts in which net premiums could be allocated.  Hillman also represented that

Tremont Opportunity Fund was a highly diversified fund and that, to satisfy IRS and

other requirements, the investor would be as far removed from making investment

decisions as possible.  The latter criteria was important to insure obtaining the tax

advantages of the product.  Prior to Hillman's call, Rulle did not know of nor had he ever

heard of either American Masters Opportunity Insurance Fund, L.P. or Tremont

Opportunity Fund III, L.P.  Rulle Aff. ¶10.

Hillman stated that there would be significant diversity consistent with industry

standards and in the range of 7% or less of the funds would be placed with any one

manager.  Rulle Supp. Aff. ¶4.  At the time, Rulle had not yet created the Plaintiff trust.

Based upon this, Rulle decided to go forward.  Rulle Aff. ¶10.

### 4.   Variable Life Insurance Policy

The Policy has an initial face amount death benefit of $17,600,000.00.  It offered

the same two investment account options (Money Market Account and/or American

Opportunity Fund) and further describes, in pertinent part, how account values were to be

determined.  See Amended Complaint, ¶28.

The Policy expressly states that it was the strategy of the American Opportunity

Fund that funds would be invested "with various portfolio managers believed to be able

to meet the Partnerships objectives".  Nevertheless, the Policy reserved to AGL, inter

alia, "the right to: (1) establish and operate the Variable Account as a managed account or

an account which purchases shares from the portfolios of funds managed by investment

managers retained by us; (2) register or deregister the Variable Account  under the

Investment Company Act of 1947; (3) operate the Investment Accounts as a unit

investment trust registered, or exempt from registration, under the Investment Company

Act of 1940 or any other form permitted by law."  Amended Complaint, ¶30.

The Policy additionally reserved to AGL the right to contract with investment

managers or to manage directly the assets held in the Investment Accounts, including the

selection of investment managers at AGL's discretion.  Amended Complaint, ¶31.

5.      **AGL Private Placement Memorandum**

In addition to the Policy, Hillman, on behalf of the Defendant, provided a

private placement memorandum to Rulle, entitled "AGL Life Assurance Company

Private Placement Memorandum" and bore private placement memorandum number 704,

dated October 2, 2001 (the "AGL PPM").   Rulle Aff.¶12.  As explained in the AGL

PPM, the Policy would offer only two investment account choices – (1) Money Market

Account or (2) American Masters Opportunity Insurance Fund, L.P. Account.  These

accounts are designated as the "Investment Accounts".  Amended Complaint, ¶33.

Under the topic heading "Summary Description of the Policy" of the AGL PPM,

it states the following:

> **The Investment Account**.   The account value of the Investment Account
> selected by  the  investment managers and its sub-advisors will increase or
> decrease depending upon the performance of the investments selected by
> the investment managers of these InvestmentAccounts.  Accordingly,
> policy owners bear the entire investment risk, including the risk of loss of
> principal for all amounts invested in the policy.

> **Policy Values**.  Net premium is allocated to  one or more Investment
> Accounts.  Depending on the investment performance of these accounts,
> the Account Value of the Policy may increase or decrease on any
> Valuation Day.  The Policy Owner bears the entire  investment risk
> associated with the investments of the Investment Accounts, and there is
> no guaranteed minimum Account Value...

Amended Complaint, ¶35, (emphasis added).

The AGL PPM describes the relationship of the investor vis-a-vis American

Opportunity Fund as lacking any privity and in bold type emphasizes that "It is the

company on behalf of its separate account and not the policy owners that will be the

limited partner in the partnership". Amended Complaint, ¶¶36-37. It expressly precludes

the General Partner from accepting any communications from any policy owners.
Amended Complaint, ¶37.

### 6.   Events Leading up to the Discovery of the Fraudulent Activities

In or about September 27, 2001, Rulle created the Michael S. Rulle Family

Dynasty Trust, under the laws of the State of Alaska, which was funded by Rulle and

became the applicant investor under the Policy.  Plaintiff is identified therein as "Contract

Holder" and "Beneficiary".  Amended Complaint, ¶24.

Thereafter, Rulle periodically requested information from AGL concerning the

diversification of the investment.  In or about September 2008, when AGL's

representative last advised Rulle of the top ten portfolio holdings, the listing was

consistent with Rulle's expectation of diversification.  Rulle Aff., ¶¶21-22.

In or about January 2009, AGL advised Rulle that significant portions of the

moneys that he had provided to AGL under the Policy had, in fact, been invested in a

number of funds all of which were ultimately managed and controlled by Bernard

Madoff.   As a result, AGL advised, the Plaintiff's account was now reduced by the

amount of that loss; approximately $1.1 million or more.

### LEGAL ARGUMENT

Rule 12(b)(6) motions test the sufficiency of a pleading. Petruska v. Gannon

University, 462 F.3d 294, 302 (3d Cir. 2006), cert. denied, 127 S.Ct. 2098, 167 L. Ed. 2d

813 (2007).  To be successful on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6),

the movant must show that the pleader has failed to do what he or she was obligated to do

under Rule 8 and Rule 9.  Hefferman v. Bass, 467 F.3d 596, 599-600 (7th Cir. 2006)

While Fed. R. Civ. P. 8 "requires a 'showing,' rather than a blanket assertion, of

entitlement to relief, " (Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 576, n.3 (2007))

it must be noted "that Rule 8 requires only a short and plain statement of the claim and

its grounds." Phillips v. County of Allegheny, 515 F.3d 224, 232, citing Twombly, 550

U.S. at 576.  Thus, "once a claim has been stated adequately, it may be supported by

showing any set of facts consistent with the allegations in the complaint."   Twombly,

supra., 550 U.S. at 563. ("Detailed factual allegations" are not required.)

A motion to dismiss requires a two-part analysis:  (1) well-plead facts must be

accepted as true; and (2) it must then be determined whether the facts in the complaint are

sufficient to show that the plaintiff has a "plausible claim for relief."  Fowler v. UPMC

Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009) Whether a claim is "plausible" depends

on the context.  Limestone Dev. Corp. v. Vill. Of Lemont, III, 520 F.3d 797, 803-04 (7th

Cir. 2008)  As more fully addressed, infra., Plaintiff states adequate allegations giving

rise to a plausible and cognizable claim for each of the individual claims of the Amended

Complaint.  Accordingly, Defendant's motion to dismiss pursuant to Fed. R. Civ. P.

12(b)(6) should be denied.

# I.     PLAINTIFF NOT ONLY STATES A CLAIM FOR BREACH OF CONTRACT, BUT ALSO SHOWS A STRONG LIKELIHOOD OF BREACH, THUS EXCEEDING THE REQUIREMENTS UNDER RULE 8.

## A.     Plaintiff Meets the Requirements for A Breach of Contract Claim.

It is undisputed that Alaska law governs the Policy.  See  Policy at 3.   Under

Alaska law, a plaintiff need only allege facts which indicate that the defendant had a

contractual obligation to the plaintiff; that the defendant breached this contractual

obligation; and that the plaintiff suffered damage as a result of the breach.  Great Western

Savings Bank v. George W. Easley Co., 778 P.2d 569, 577 (Alaska 1989).

The Amended Complaint states facts consistent with the foregoing and thus states a cause of action for breach of contract. See Amended Complaint, ¶¶66-69 . However, Defendant does not dispute this;  rather, Defendant attacks the underlying facts, contending that there was no breach of contract and therefore the count should be dismissed.  Defendant thus (1) apparently concedes that the count is well-plead and (2) bases its argument on a Rule 56 summary judgment motion standard, and as such, is improper, as well as premature.  Accordingly, Defendant's motion as to this count should be denied.  Moreover, for the reasons discussed infra, the arguments are without legal and factual support.

**B.      Rather Than Supporting Defendant's Argument for Dismissal, the Facts and Law Show That There Is A Greater than Plausible Basis for a Breach of Contract Claim.**

Defendant contends that, because there are no facts in dispute, the Policy must be interpreted by the court, as a matter of law, and that the "only reasonable reading of the Policy as to the matters alleged . . . belies Plaintiff's claim," and thus, it should be dismissed.  See Defendant's Memorandum of Law In Support of Its Motion to Dismiss the Amended Complaint (Db) at 5.

**1.      There are disputed issues of fact.**

Contrary to Defendant's contention, there are material issues of disputed fact. Specifically, Defendant contends that Michael Rulle approached John Hillman, and that Rulle told Defendant "that he wished to have the American Masters Opportunity Insurance Fund, L.P. . . . .included as his primary investment option under the policy." Hillman Aff. at ¶ 2.   In fact, Hillman sought out Rulle to "pitch [him] to invest, both personally and on behalf of [his] clients/colleagues, in four or five different investment

products using a life insurance platform." Rulle Aff. at ¶7.  In addition, initially, none of

the investment products proposed were suitable, so Hillman was advised to contact Rulle

when he obtained an investment vehicle that met Rulle's needs.  Rulle Aff. at ¶7.

Defendant further contends that "the decision to invest in the Tremont Fund was made by

Michael Rulle long before the Trust was created, after AGL provided him with

information about various investment options for the Policy." Db 26.  In fact, the Trust

was created after Hillman assured Rulle that "this fund-of-fund" he (AGL) offered

satisfied my concerns about the investment funds . . . . It was to be a highly diversified

fund and [Rulle] would be as far removed from making investment decisions as

possible." Rulle Aff. at ¶10.  Rulle was further assured "that no money manager in the

fund would control more than 7% of the aggregate funds invested and that AGL would be

a limited partner with access to oversight of the general partner of the fund." Rulle Aff.

at ¶10.  Thus, Defendant's contention that the parties' operated "at arm's length" and

that Plaintiff directed and controlled the investment is highly disputed.  Defendant's

contentions also are not supported by the terms and language of the Policy.

## 2.  Interpretation of the Policy Supports Plaintiff's Claim.

In Alaska, it is well-settled that insurance contracts are to be regarded as contracts

of adhesion. Whispering Creek Condo. Owner Ass'n v. Alaska Nat. Ins. Co., 774 P.2d

176, 177-178 (Alaska 1989.  Insurance policies are interpreted to favor the insured"s

"reasonable expectations." See  CNA Ins. Co. V. Lightle,, 364 F. Supp. 2d  1068, 1072-

1073 (D. Alaska 2005). ([T]he court's goal is to enforce the "objectively reasonable

expectations of ... intended beneficiaries regarding the [policy's] terms ....")  The court

looks to: (1) the language of the disputed provisions in the policy, (2) other provisions in

the policy, (3) extrinsic evidence, and (4) case law interpreting similar provisions." If the policy contains ambiguous terms, they are construed against the insurer. Terms are ambiguous if they are "reasonably subject to differing interpretations." Id.

In considering "reasonable expectations", the terms are to be construed "so as to provide that coverage which a layperson would have reasonably expected from a lay interpretation of the policy terms." U.S. Fire Ins. Co. v. Colver,600 P.2d 1, 3 . See also Starry v. Horace Mann Ins. Co., 649 P.2d 937, 939 (Alaska 1982). ("'[P]rovisions of coverage should be construed broadly while exclusions are interpreted narrowly against the insured.'… Ambiguities are resolved against the insurer." (citations omitted.)

Here, the Grantor of the Rulle Trust had certain expectations. The expectation was that the account would be valued based on the investment performance of those investments, and a plain reading of the Policy supports that reasonable expectation. Defendant's contention that "any decrease in value of the Investment account" includes loss due to fraud is contrary to the reasonable expectations of Plaintiff, as evidenced by the risks enumerated in the AGL PPM, other courts' interpretations of loss and investment industry and regulatory standards, as more fully discussed herein.

    a.    *"Capital Loss" does not include fraud.*

Defendant argues that the only one reasonable interpretation of the policy permits the Defendant to deduct losses that occur due to theft or fraud, based on its interpretation of "capital loss". See Db at 6 Defendant provides no legal or factual support. Defendant's argument is based solely on the fact that, following the fraud by Madoff, the Rye Select Funds reported a loss to Tremont. Based on this, Defendant reasons, "[t]he

Tremont Fund accordingly reported that its value had commensurately declined and, consequently, Plaintiff's policy account lost value." Db6

There is <u>no basis</u> in the Policy, or in law, for Defendant's argument. Specifically, the Internal Revenue Code treats such losses separately, considering <u>investment losses</u> to be capital losses. <u>See</u> 26 U.S.C.A. §1211(b). Losses that occur <u>due to a fraudulent investment scheme</u>, on the other hand, are considered "<u>theft losses</u>". <u>See</u> 26 U.S.C.A. § 165(a),(c).[3] In addition, the Tax Court has held that account valuation losses arising out of illegal activities constitute theft. Investment loss, on the other hand, are declines that might be attributable to business risks, market decline, poor or derelict management. <u>Paine v. Commissioner,</u> 63 T.C. 736 (1975), <u>aff'd</u> in <u>unpublished opinion</u>, 523 F.2d 1053 (5th Cir. 1975). Thus, Plaintiff's interpretation and expectation is supported by law.

      **b.**    *Investment Loss Does Not Include Fraud.*

In addition to the foregoing, Defendant contends that "[n]owhere does the contract support Plaintiff's gloss that a loss of investment value which traces down to fraud by a second-tier fund manager is excluded from the value of the Policy account." Db at 7. Defendant provides no legal support for its contention that "fraud" is included because it is not specifically excluded by the Policy, and authority is to the contrary.

Among the nearly 30 risk factors "associated with the investment" listed in the AGL PPM, nowhere is there consideration of risks which encompasses or itemizes or contemplates a theft of funds by fraud or otherwise. Rulle Aff. ¶17. Under both the AGL Insurance Policy dated October 5, 2001 and the AGL PPM dated October 2, 2001,

---

[3] In Rev. Rul. 2009-9 (March 17, 2009), the IRS announced its position that "theft losses" resulting from investments are not subject to the limitations on itemized deductions found in 26 U.S.C.A. §§ 67 and 68.

account values under the policy and the contracts can decrease in value due to investment results only.  Rulle Aff. ¶¶17-18.

Moreover, in addressing "investment risk", the Financial Industry Regulatory Authority ("FINRA")[4] notably does not include "fraud" or "theft" as one of the risks that investors should be expected to manage.  See FINRA - Managing Investment Risk, http://www.finra.org/Investors/SmartInvesting/AdvancedInvesting/ManagingInvestment Risk/index.htm, attached as Exhibit H to Counsel Certif.

FINRA describes the two types of investment risk:  systemic and non-systemic, as well as a catch-all, "other."  Notably, none of these include risks from theft or fraud.  For example, FINRA describes "systemic risk" as "market risk . . . relate[d] to factors that affect the overall economy or securities market." Id.  Examples are interest-rate risk, inflation risk, currency risk, liquidity risk and sociopolitical risk.

"Non-systemic Risk" is described as that which "affects a much smaller number of companies or investments and is associated with investing in a particular product, company, or industry sector."  Id.  FINRA describes "other investment risks" as "investment decisions [an investor makes] –and sometimes those [an investor] avoid[s] making—that can expose [an investor] to certain risks that can impede [an investor's] progress toward meeting [his or her] investment goals."  Id.  None include fraud or theft.

c.    *Diversification has a common industry meaning*

In addition to its reasonable expectation that the account would be properly valued, the Grantor had the expectation that the account would be diversified according

---

[4] According to its website, FINRA was "[c]reated in July 2007 through the consolidation of NASD and the member regulation, enforcement and arbitration functions of the New York Stock Exchange, [and] is dedicated to investor protection and market integrity through effective and efficient regulation and complementary compliance and technology-based services."

to the industry standard of diversification in such investment vehicles.  See Rulle Supp.

Aff. ¶4.  Hillman's representation that the investment would be highly diversified, with

no more than 5%-7% in any fund is consistent with this standard.  Rulle Supp. Aff. ¶3-4.

Defendant's reliance on caselaw indicating that the parol evidence rule bars reliance on

Hillman's representation is misplaced.  Db8   The Parol evidence rule does not apply

where, as here, misrepresentation and fraud are alleged.   See Diagnostic Imaging Ctr.

Associates v. H & P, 815 P.2d 865, 867 (Alaska 1991)  Even in the absence of fraud, it is

well-settled that extrinsic evidence may be used to show the meaning of a contract term

and the intent of the parties. Alyeska Pipeline Service Co. v. O'Kelley, 645 P.2d 767

(Alaska 1982). Here, the meaning of diversification requires a consideration of the prior

representation.  However, before applying the rule, it must be determined that the

contract is integrated, what the contract means and whether the prior agreement conflicts.

Alaska Diversified Contractors, Inc. v. Lower Kuskokwim School Dist., 778 P.2d 581,

583 (Alaska 1989).  This is usually determined after discovery.  Here, discovery has not

taken place, precluding a proper application of the rule.  Even if factual determinations

could be made, the prior representation does not conflict with the language of the

contract.  Thus, there is no conflict and the parol evidence rule does not apply.  Plaintiff's

reasonable expectations are thus supported by the facts and law, leading to a more than

plausible basis for breach.

## II.      PLAINTIFF HAS ASSERTED THE ESSENTIAL ELEMENTS OF FRAUD UNDER FEDERAL AND STATE SECURITIES LAWS WHICH SATISFY THE REQUIREMENTS OF RULE 9(b), SEC RULE 10-b5, AND THE ANTI-FRAUD PROVISIONS OF SECTION 10(b).

Defendant argues that Plaintiff's federal and state securities fraud claims do not

satisfy Rule 9(b) in that "a party must state with particularity the circumstances

constituting fraud." Fed. R. Civ. P. 9(b).  Db9-10. Additionally, Defendant asserts

violations of PSLRA (Private Securities Litigation Reform Act) for essentially the same

reasons.[5]

In addition to attacking the Plaintiff's Amended Complaint under Fed. R. Civ. P.

9(b) Defendant seeks dismissal of Count IV (Federal Securities violations) and Count V

(State Securities violations) as failing to provide the "essential elements" of Rule 10-b(5)

and the analogous state counterparts.  Defendant's asserts that these claims fail to state a

cause of action because (1) the alleged misrepresentations were not false; (2) the

omissions did not render any statement materially misleading; and (3) that Plaintiff has

failed to adequately allege scienter.

Contrary to Defendant's claim, the memoranda published by AGL contained

multiple false and misleading statements as well as omissions of material information that

constitute a reckless state of mind in the dissemination of such materials. The false and

misleading statements contained in the AGL PPM are as follows:

- the Tremont Opportunity Fund had a "multi-manager concept" which implied
  diversification;

- gave multiple standards for valuation of the investment which implied that it was
  actually tracking the value of the investment;

- failed to state that AGL had not done any due diligence on the Tremont
  Opportunity Fund, either prior to offering or during the time of the Policy; and

---

[5] Plaintiff will address the 9(b) challenge; however, PSLRA does not apply to this action because Plaintiff
does not anticipate a "class" as contemplated by the PSLRA.

- failed to state that almost 23% of the entire investment pool would be in the hands of one manager, thereby effectively eliminating or greatly reducing the concept of diversification.

Such conduct as revealed by the issues of misrepresentation, omission and scienter must be considered as part of the entire securities law regulatory scheme, and Defendant's duties under the law and to Plaintiff. It is against this backdrop that the misrepresentations and omissions give rise to liability on the part of Defendant.

### A.   Fiduciary Duty of AGL to Plaintiff under the 1934 Act, the Investment Advisers Act of 1940 and the FINRA Rules[6].

Defendant's status as an investment adviser, broker, dealer and FINRA member gives rise to a myriad of duties under federal law. See the Investment Advisers Act of 1940, 15 U.S.C. §80b-1 through 15 U.S.C. § 21, and the 1934 Securities and Exchange Act. 15 U.S.C. §78c(a)(4) (2000), 15 U.S.C. §78c(a)(5) (2000),

Investment managers and advisors are fiduciaries of their investor-clients. SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963). As such, they are charged with a duty of care and due diligence to act as a "prudent person" by (1) conducting an independent investigation of the merits of a particular investment before making or recommending an investment to their clients, and (2) engaging in post-investment monitoring of the investment. Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042, 1049-50 (11th Cir. 1987).

AGL, through its association with Phoenix Equity, distributed securities to Plaintiff pursuant to the Policy and the AGL PPM. AGL and Phoenix Equity are

---

[6] FINRA refers to the Financial Industry Regulatory Authority. FINRA was formed by a consolidation of the enforcement arm of the New York Stock Exchange, NYSE Regulation, Inc., and the NASD. The merger was approved by the United States Securities and Exchange Commission (SEC) on July 26, 2007. See SEC Release No. 34-56145

therefore both regulated by FINRA, the SRO member organization. In addition, since the

person who sold the AGL Policy (John Hillman) is a FINRA licensed brokers or broker-

dealers, Defendant is subject to a fiduciary duty as a broker-dealer.

Broker-dealers' fiduciary duty is based on the fact that the brokerage relationship

is an agency relationship which is fiduciary in nature. French v. First Union Securities,

Inc., 209 F. Supp.2d 818, 825 (M.D. Tenn. 2002). The duties depend on the particular

broker-customer relationship. Press v. Chemical Investment Services Corp., 166 F.3d

529 (2d Cir. 1999).   When a broker recommends securities or transactions, heightened

duties apply.   Representing oneself to have investment and advisory expertise will give

rise to fiduciary obligations.   Burdet v. Miller, 957 F.2d 1375, 1381 (7th Cir. 1992).   See

United States v. Hart, 273 F.3d 363, 376 (3d Cir. 2001).   Since a broker occupies a

special position of trust and confidence with respect to his or her customer, any

recommendation of a security carries with it an implicit representation that the broker has

an adequate basis for the recommendation.   Hanly v. SEC, 415 F.2d 589, 596 (2d Cir.

1969)  Indeed, failure to have such a reasonable basis for a recommendation can result in

a violation of the securities laws' antifraud proscriptions.   Kahn v. SEC, 297 F.2d 112,

115 (2d Cir. 1961)  The SEC has referred to the "basic principle" that by holding itself

out as a  broker-dealer, a firm is representing that it will act in the customer's best

interests.   In the Matter of D.E. Wine Investments, Inc. Administrative Proceeding File

No. 3-8543 Release No. ID-134, 1999 WL 373279 (SEC Initial Decision June 9, 1999),.

Accordingly, Defendant's conduct is regulated by FINRA rules, including the

minimum standards for professional conduct. 15 U.S.C. §78f(b)(5) (2000). FINRA

membership requirements (Hillman is a registered member of FINRA) mandate

"professionalism" which is fundamentally focused upon the protection of the customer

and investor rights.[7] In addition, a broker-dealer must maintain internal compliance

manuals which require "high standards of conduct" and "commercial honor" in its

business practices; "just and equitable principles of trade;" and "industry standards that

correlate to fiduciary duties of care, loyalty and disclosure." NASD Manual, Rule 3010

at 4831 and Rule 2110 at 4111 (Manual 160) (2000).

### 1.    Duty of "Suitability" in Recommendations

A broker has an affirmative duty to take "reasonable efforts" to assure that a

recommendation (such as that made by Hillman) is in accordance with a customer's

objectives and financial status. Mihara v. Dean Witter & Co., 619 F.2d 814, 822 (9th Cir.

1980). "[A] broker has the responsibility to know what he is recommending to his client.

Without such investigation, he cannot be assured that he is recommending a security

suitable to his client's investment objectives.")

John Hillman, President and CEO of AGL brought forth and presented the

Tremont Fund to him as one that met his (Rulle's) stated investment objective as being

"diversified." See Rulle Aff. ¶3; Supp. Rulle Aff., ¶¶2-5. Hillman, and subsequently the

offering materials, led Rulle to believe that Tremont had multiple managers of a variety

of hedge funds that operated independently of one another and, therefore, had an inherent

quality of protection against complete failure due to the poor management (or

mismanagement) of any one particular manager therein. In addition, it is common

knowledge in the industry, that any institution offering a product to an investor has

researched the product and done the appropriate due diligence on the security offered

---

[7] "A securities professional is presumed to know industry standards." Shivangi v. Dean Witter Reynolds, Inc., 825 F2d 885, 888 n.6 (5th Cir. 1987).

within the product prior to offering it to any one of its customers. Hillman additionally

made representations to Rulle that the Tremont Fund would not place more than 7% of

the Plaintiff Trust funds in and/or with any one manager. Thus, Rulle and Plaintiff had

complete confidence in choosing the Tremont fund based upon the verbal representations

of Hillman in addition to the written documents that were prepared and/or approved by

AGL that the Tremont Fund met Plaintiff's stated objective of diversity.

The reports produced, prepared and issued by AGL PPM represented that the

Trust assets were invested through the Tremont Fund with multiple managers, none of

whom were listed as Madoff. Rather than the the misleading and deceitful impression that

all of the "Rye Select Funds" were separate and distinct funds that were operated

independently,  they were actually all the same entity collecting funds to "feed" Madoff.

This defeated the purpose of a "diversified" fund, contrary to Plaintiff's stated objectives.

### 2.     Defendant had a Duty to Conduct Due Diligence

Defendant failed to conduct due diligence as required by law:

> The Securities and Exchange Commission (SEC) and
> federal courts have long held that a broker-dealer firm that
> recommends a security is under a duty to conduct a
> reasonable investigation concerning that security and the
> issuer's representations.

> In recommending the security, the broker-dealer represents
> to the customer "that a reasonable investigation has been
> made and that its recommendation rests on the conclusions
> based on such investigation."

> Failure to comply with this duty can constitute a violation
> of the antifraud provisions of the federal securities laws
> including Rule 10b-5 and can also subject the broker-dealer
> to claims of violation of FINRA Rule 2010, requiring
> adherence to just and equitable principles of trade. FINRA
> Regulatory Notice 10-22.

Defendant failed, <u>inter alia,</u> to conduct an adequate due diligence investigation.[8] Thereafter, AGL failed to verify the Tremont Opportunity Fund (and the Tremont Partners under the Limited Partnership Agreement[9]) reports or monitor Tremont Partner's actions in any way.  As an investment adviser, Defendant had the duty to research the investments that it was advising.  <u>See</u> Memorandum entitled "Charges Against the Variable Account" wherein it indicates that an "investment advisory fee" will be assessed against Plaintiff's Investment Account.  In addition, Plaintiff was not permitted to contact any of the investment managers directly, and thus had to rely completely upon AGL to monitor the Tremont Opportunity Fund for performance, appropriate diversification and valuation.

### 3.     Duty of AGL to Comply with Regulation D

Under the Regulation D rules of issuer exemptions, AGL clearly had a duty to conduct a due diligence investigation of Tremont Opportunity Fund.  Pursuant to the rules of a §4(2) Regulation D Offering under the Securities Act of 1933 codified at 17 C.F.R. §230.501 et seq. ("Reg. D" or "private offering") AGL had a duty to disseminate accurate and truthful information with respect to the Policy and the Tremont Opportunity Fund, specifically Tremont's financial condition and performance, growth, operations, financial statements, business, markets, management and earnings, and to correct any previously issued statements that had become materially misleading or untrue so that the value of the Tremont Opportunity Fund and its Partnership shares would be based upon

---

[8] See Part 5 of the Policy at page 13, attached hereto as Exhibit A, as follows: "Investment of the Accounts: We may contract with investment managers to manage directly the assets held in the Investment Accounts. We may deduct as an Asset Charge from the Account Value allocated to Investment Accounts that are managed directly as well as any costs and expenses arising from such Investment Accounts. In either case, *investment managers are selected in our discretion.* "(Emphasis supplied).
[9] AGL Exhibit 3

truthful and accurate information. The misrepresentations and omissions by AGL during the relevant time period violated these specific requirements and obligations. SEC v. Murphy, 626 F.2d 633, 647 (9th Cir. 1980).

Reg D offerings are exempt from certain of the registration requirements normally required of an issuer in a securities transaction when certain criteria are met in accordance with the rules promulgated thereunder, Rules 501-506.  However, the antifraud provisions still apply to all transactions.[10] In addition, Reg. D in no way relieves issuers of their obligation to furnish to investors whatever material information may be needed to make any required disclosures not misleading.

Defendant asserts  that there were no omitted material facts which have altered the "mix" of information made available to a reasonable investor. The Amended Complaint is to the contrary.  It clearly pleads that:

- AGL omitted  to disclose that it had not vetted either Tremont Opportunity Fund or Tremont Partners through adequate due diligence.

- AGL omitted to disclose that more than four of the so-called investment managers were in fact managed by the same principals (i.e. Rye Select Funds).

Rulle would not have chosen the Tremont Fund had he known that the material representations made to him were misleading and false, and in fact induced him to "invest" the Plaintiff Trust funds in the Tremont Opportunity Fund offered by Defendant AGL.

Section 10(b) of the Exchange Act and Rule 10b-5 proscribe, among other things, misstatements and omissions of material fact made in connection with the purchase or sale of securities.  Information is material if there is a substantial likelihood

---

[10] Rule 504 of Reg D. See also SEC v. Murphy, 626 F.2d 633,647 (9th Cir. 1980).

that its disclosure would be viewed by a reasonable investor as having significantly altered the" total mix of information" available. Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Information concerning the financial condition of a company is presumptively material. SEC v. Murphy, 626 F.2d 633, 653 (9th Cir. 1980); SEC v. Blavin, 557 F.Supp. 1304, 1313 (E.D. Mich. 1983), aff'd, 760 F.2d. 706 (6th Cir. 1985) (materiality of information relating to financial condition, solvency and profitability not subject to serious challenge).

The Amended Complaint alleges sufficient factual matter to sustain a claim for material misrepresentations and omissions, particularly when viewed in light of Defendant's duties and obligations under law. Defendant's conduct also gives rise to a showing of scienter, as defined by federal law and courts construing the requirement.

The Supreme Court has defined scienter as the "intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). However, reckless conduct also satisfies the scienter requirement of Section 10(b) of the Exchange Act and Rule 10b-5. IIT v. Cornfeld, 619 F.2d 909, 923 (2d Cir. 1980); Rolf v. Blyth Eastman Dillon & Co., 570 F.2d 38, 46 (2d Cir.), cert. denied, 439 U.S. 1039 (1978). False and misleading information in annual reports filed with the Commission satisfies the "in connection with" requirement of Section 10(b) of the Exchange Act and Rule 10b-5. See In re Ames Dept. Stores Inc. Stock Litigation, 991 F.2d 953, 962 (2d Cir. 1993).

Contrary to Defendant's assertion, the allegations of scienter have been pled in Plaintiffs' Amended Complaint with sufficient particularity. Scienter is sufficient if there is a showing of "reckless disregard for the client's investment concerns." Mihara. At a minimum, Plaintiff has alleged conduct sufficient to rise to the level of reckless

disregard.   Accordingly, Plaintiff has stated causes of action under both federal and state

securities law.

## III.    THE POLICY IS A SECURITY UNDER BOTH ALASKA AND PENNSYLVANIA LAW

The Policy issued by AGL is a security as defined under both federal law and

state law.[11]   The Pennsylvania Securities Act Sections 31 Pa. Cons. Stat. §81 et seq.,

specifically defines a variable life insurance policy such as the Policy issued by AGL is a

"security."   Similarly, under Alaska Securities Act at AS 45 Chapter 55 §900(a)(7) et

seq., a variable life insurance policy such as the Policy issued by AGL is a "security."

Thus, variable life insurance and variable annuity contracts are securities, and their

distribution is also subject to FINRA rules. See NASD Notice to Members 00-44 (July

2000)[12] (Emphasis supplied).  Moreover, Alaska at AS 45:55-12(a) et seq. and

Pennsylvania at §1-401(b) and 1-501(g) have analogous anti-fraud statutes which have

adopted the federal language in this context and are alleged in Count V.Accordingly,

Plaintiff is entitled to the protections of these federal and state acts.

## IV.    DETERMINATION OF CHOICE OF LAW IS PREMATURE, BUT THE AVAILABLE FACTS AND LAW POINT TO ALASKA AS THE STATE WITH THE MOST INTEREST IN THE MATTER.

Alaska state law expressly governs the Policy between the parties and therefore,

all causes of action arising out of the contract.  As to other causes of action, a choice of

law determination is premature on a motion to dismiss because it involves a fact-specific

analysis, and thus, should await full discovery on all claims.  To the extent a choice of

law determination is made at this juncture, Alaska is the state with the most significant

contacts.

---

[11] Securities Act of 1934 as amended, 15 U.S.C. §77a et seq. ("Security" defined at §77b(a)(1)).
[12] As applied to all FINRA members pursuant to the FINRA Consolidated Rules.

Defendant argues that Alaska law does not necessarily govern the non-contractual claims because the choice of law provision in the contract is narrowly drafted to cover only the contract.   Db18.   Defendant contends it is necessary to conduct a choice of law analysis to determine which state has the greatest interest and most significant relationship.   Db18.   The first step in a choice of law analysis is to determine whether the laws of the two jurisdictions differ. Db18-19.   As noted in VI and VII, infra, it is respectfully submitted that insurer fiduciary duty and the implied covenant of good faith and fair dealing exist in every insurance contract as a matter of Alaska law governing insurance contracts and thus, are covered by the choice of law provision of the insurance policy.   See O.K. Lumber v. Providence Wash. Ins. Co., 759 P.2d 523, 525 (Alaska 1988) (fiduciary duty); Alyeska Pipeline Serv. Co. v. H.C. Price Co., 694 P.2d 782, 788 (Alaska 1985) (implied covenant of good faith and fair dealing).   The fact that these duties sound in tort does not negate the fact that they are expressly provided for by the applicable Alaska law that governs insurance contracts, and provided for here.   Thus, these claims are governed by Alaska law. See Miller v. Allstate Ins. Co., 763 A.2d 401, 403 (Pa. Super. 2000) (under Pennsylvania choice of law rules, a choice of law provision in an insurance contract will be given effect.)

Defendant cites the test under §145 of the Restatement (Second) of the Conflict of Laws as the basis for its contention. Db20.   However, other sections of the Restatement apply, making the analysis of "most significant contacts" not only complicated, but also very fact-intensive and fact-specific.   As noted by one legal commentator, the process of determining choice of law is further complicated by the fact that , "[f]or most choice-of-law questions, more than one section [of the Restatement]

will apply." James P. George, <u>False Conflicts and Faulty Analyses: Judicial Misuse of Governmental Interests in the Second Restatement of Conflict of Laws</u>, 23 Rev. Litig. 489, 521-522 (2004).   The commentator presents a detailed, five-point procedure to be followed to minimize "[t]he confusion of multi-section analysis." <u>Id.</u> at 522 (2004).

Defendant has not addressed all of the sections and factors to be addressed in making a choice of law determination.   In addition, Defendant's contentions are either debatable, or disputed by Plaintiff.   For example, Defendant contends that the "injury" occurred in Pennsylvania because of the "situs" of the Investment Account and the place of administration of the Policy.   Db 20.   However, the Policy was delivered in Alaska, and Alaska insurance and securities statutes apply for purposes of its administration.   Thus, the place of "injury" is at issue.

Contending that Alaska contacts are minimal, Defendant asserts that the decision to invest in the Tremont Fund was made by Michael Rulle long before the Trust was created.   Db 21.   Plaintiff disputes this assertion, contending that he never made the decision to invest in the Tremont Fund and at all times contemplated establishing the Trust under Alaska law.   Rulle Affidavit, ¶1.   Finally, rather than making a case for the application of Pennsylvania law, Defendant cites more contacts with New Jersey, noting that Michael Rulle and his wife were residents of New Jersey, the Trust was prepared by New Jersey counsel, and the beneficiaries of the Trust reside in New Jersey.   Db21.   In fact, that only "true" contact to Pennsylvania is the address of Defendant.   Since Defendant was doing business in Alaska in connection with the Policy, and thus bound by Alaska law as to insurance policies and securities, as well as specifically selecting Alaska law as a matter of governing the parties under the policy, Defendant's domicile

would seem to be of little import.  Indeed, even in <u>Hammersmith v. TIG Insurance Co.</u>,

480 F.3d 220, 235 (3d Cir. 2007), upon which Defendant relies, the Third Circuit found

that where one state had "the most significant relationship to the insurance contract, and

the greatest governmental interest in seeing its laws enforced, we will apply [that state's]

law on the remaining issues to this dispute." <u>Id.</u>  Similarly here, it is undisputed that

Alaska has the most significant relationship to the Policy.  The policy at issue here also

implicates insurance and securities statutory law, both of which are premised on strong

public policy principles. Under that analysis, clearly, Alaska has the greatest

governmental interest in seeing its laws enforced.

It is for the foregoing reasons that courts are hesitant to make choice of law

determinations on a motion to dismiss.  <u>See,</u>  <u>Schirmer v. Principal Life Insurance Co.</u>,

2008 WL 478568 , *6 (E.D.Pa. 2008) ("Pennsylvania's choice of law analysis involves a

fact-intensive inquiry that can be more properly addressed at the summary judgment

stage of the proceedings once the record has been more fully developed through

discovery."); Godfry <u>v. State Farm Mutual Insurance Co.</u>, 2009 WL 56436 (E.D. Pa.

2009).  Thus, where, as here, discovery has not been conducted, and there are significant

factual issues, choice of law should properly await the conclusion of discovery.

## V.     PLAINTIFF STATES A CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY ARISING OUT OF THE POLICY:  (A)  AS AN INSURER; (B) AS AN INVESTMENT ADVISER/BROKER-DEALER; AND (C) AS A PRINCIPAL.

It is undisputed that the Policy is governed by Alaska law.  Alaska has

"determined that a 'fiduciary relationship exists when one imposes a special confidence

in another, so that the latter, in equity and good conscience, is bound to act in good faith

and with due regard to the interests of the one imposing the confidence.'" <u>Munn v.</u>

Thornton, 956 P.2d 1213, 1220 (Alaska 1998), citing Paskvan v. Mesich, 455 P.2d 229, 232 (Alaska 1969).   Under Alaska law, every insurance policy gives rise to a fiduciary duty. [13]  O.K. Lumber Co., supra., 759 P.2d at 525.  Thus, as a matter of law, Defendant had a fiduciary duty to Plaintiff by virtue of the insurance Policy. [14]

In addition, however, Defendant also had a fiduciary duty to Plaintiff arising out of the Policy, based on the investment advisory/broker dealer role Defendant played, and its assumption of duties as a principal.  French, supra., 209 F. Supp.2d at 825 ("the investor-stockbroker relationship is an inherently fiduciary relationship") (applying Tennessee law).  See Restatement (Second) of Agency § 387 (1958) ["An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit."].  See also Basile v. H & R. Block, 761 A.2d 1115 (Pa. 2000). See III. A., supra. for further discussion.

Defendant cites commercial cases  for its contention that this is an arm's length transaction, precluding a duty.  Db21-22.  These cases are distinguishable on their facts. Moreover,  the facts alleged in the Complaint show that Defendant had approached Plaintiff and recommended the insurance product and further represented that it would meet Plaintiff's investment needs.  Whether a fiduciary duty exists depends on the relationship.  In particular, fiduciary duties are routinely recognized in the context of broker-dealer/investment advisors.   See II. A., supra.

---

[13] Pennsylvania law is in accord that a fiduciary duty is a duty that "flows from the insurance contract." *Birth Center v. St. Paul Companies, Inc.,* 727 A.2d 1144, 1155 (Pa.Super.Ct.1999), *app. granted in part,* 560 Pa. 633, 747 A.2d 858 (2000) (citing *Gedeon,* 410 Pa. at 59, 1888 A.2d at 322).[ The insurer's fiduciary duty or duty to act in good faith "is said not to arise under the terms of the contract, but because of the contract, and to flow from the contract."]

[14] The fact that O.K. Lumber may have involved coverage claims does not preclude its application to other insurance contexts.  Moreover, the fact that the insurance product here also has investment components only heightens the likelihood that Alaska would recognize a fiduciary duty.

Defendant contends that Pennsylvania's "gist of the action" doctrine bars Plaintiff's fiduciary duty claims. Db27.  Defendant provides no relevant legal support for this contention.  In addition, Alaska, does not recognize a "gist of the action" doctrine.  Even if it did, the "gist of the action" here is a hybrid of contractual and fiduciary duties arising out of an insurance policy that was both a life insurance policy and a security within the meaning of federal and state securities law.  Thus, while the fiduciary duties arise from the contract, they are separate and distinct from the contractual duties and obligations contained therein.  The fiduciary duty claim also involves a broader social policy beyond the contours of the Policy.  Thus, the inquiry is "whether the defendant's conduct violates some additional duty that is distinct from the obligations the defendant accepted by entering into the contract." Koresko v. Bleiweis, 2004 WL 3048760 (E.D. Pa.), citing Bohler-Uddeholm America, Inc. v. Elwood Group, Inc., 247 F.3d 79, 105 ((3d Cir. 2001) ("This duty imposed obligations on [the defendant] that went well beyond the particular obligations contained in the [a]greement itself.")  Where, as here, the "duty is 'imposed as a matter of social policy' rather than 'by mutual consensus', the gist of Plaintiff's ....claim lies in tort rather than contract law." Id., at 105.  Accordingly, Plaintiff's complaint states a plausible and cognizable claim for breach of fiduciary duty.

## VI.   PLAINTIFF STATES A CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

The Amended Complaint states a cause of action for breach of the implied covenant of good faith and fair dealing.  See Amended Complaint, ¶¶81-86. Defendant apparently does not dispute that the claim is properly plead; only that Pennsylvania law should apply.  It is undisputed that Alaska law governs the Policy.  As noted in VI, supra., a fiduciary duty is inherent in every insurance contract.  It is further

settled that "[t]he fiduciary relationship inherent in every insurance contract gives rise to an implied covenant of good faith and fair dealing." Alyeska Pipeline Serv. Co. v. H.C. Price Co., 694 P.2d 782, 788 (Alaska 1985)  As such, the implied duty arises, as a matter of law, out of the contract, and thus, is also governed by Alaska law, which gives rise to it.  Thus, Defendant's contention is without merit.

Defendant's contention that "there is no basis for alleging that AGL did not fulfill its obligations under the Policy" is also without merit. Db31  To satisfy the pleading standard under Rule 8, Plaintiff must only provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Plaintiff has done so.

## VII.   PLAINTIFF STATES A CAUSE OF ACTION FOR PROFESSIONAL NEGLIGENCE, OR, IN THE ALTERNATIVE, GROSS NEGLIGENCE OR NEGLIGENCE.

The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. Linck v. Barokas & Martin, 667 P.2d 171, 174 (Alaska 1983) (citations omitted).

A claim that a provider of skilled services committed negligence states a cause of action for professional negligence under Alaska law.  John's Heating Service v. Lamb, 46 P.3d 1024 (Alaska 2002).  In particular, professional negligence is recognized in the context of an insurer to an insured.  See Johnson & Higgins of Alaska, Inc. v. Blomfield, 907 P.2d 1371 (Alaska 1996).  Defendant's contention that Pennsylvania does not recognize professional negligence is without merit because Alaska law applies and there

is at least some indication that the statute Defendant cites is not an exclusive list of professions subject to the claim. Db30. See Hults v. Allstate Septic Sys., Civ. A. No. 4:06-0541, 2007 WL 2253509, at *6 (M.D. Pa. Aug. 3, 2007). Thus, Plaintiff has alleged a recognized duty, a breach of that duty, proximate cause and actual damage or loss resulting from the professional's negligence. Accordingly, Plaintiff has met the requisite standard under Rule 8.

Defendant apparently does not dispute that Plaintiff has stated a claim for negligence, only that the duty expressed is the same as a fiduciary duty and that there is no basis for the finding of a fiduciary duty. Db29. The Policy gave rise to certain duties on the part of Defendant to discharge its professional duties with due care. The fact that some of the same allegations may also give rise to a different cause of action does not preclude the claim for negligence. Defendant contention that the claim for negligence is barred by Pennsylvania's economic loss and gist of the action doctrines is also without merit. As more fully discussed, supra. at IV, there is no basis for applying Pennsylvania law to this action, which has virtually no contacts with Pennsylvania, and where the parties have expressly sought to apply Alaska law. Thus, Pennsylvania's economic loss and gist of the action doctrines are of no applicability.

Even under Pennsylvania law, courts are reluctant to dismiss tort claims at the early stages of litigation under either the gist of the action doctrine or economic loss doctrine. See Padalino v. Standard Fire Ins. Co., 616 F. Supp. 2d 538, 550 (E.D. Pa. 2008) ("[C]ourts . . . generally wait until discovery to determine 'whether one claim is completely redundant to the other claim.'" Citations omitted.) Further, the matter at bar is distinguishable from the authority cited by Defendant in support of its contention.

Db32.   Plaintiff's negligence claim is not limited to the terms of the contract and does involve larger social policies—specifically, the duty of insurers and investment advisors/broker-dealers to discharge their professional duty of care with such "skill, prudence and diligence as other members of the profession commonly possess and exercise." Thus, Plaintiff's claim of negligence is not barred.

## VIII.   PLAINTIFF STATES A CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION.

To establish negligent misrepresentation, Plaintiff must allege: (1) either an affirmative misrepresentation or omission when there is a duty to speak; (2) that "the party accused of the misrepresentation ... made the statement 'in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest;' " (3) that  "the representation ... [supplied] 'false information;' " (3) that "there [was] 'justifiable reliance' on the false information supplied," and (4) that "the accused party ... failed 'to exercise reasonable care or competence in obtaining or communicating  the information.'" Matthews v. Kincaid, 746 P.2d 470, 471 (Alaska 1987); Reeves v. Alyeska Pipeline Serv. Co., 56 P.3d 660, 675 (Alaska 2002).  Plaintiff has done this.  See Amended Complaint; ¶¶110-117.

Contrary to Defendant's contentions, Plaintiff's allegations are not limited to two alleged misrepresentations.  Db31.  See Amended Complaint, ¶¶110-117.  In addition, Plaintiff sufficiently pleads the allegation that Defendant misrepresented that the investment was equity market neutral.  See, eg., Amended Complaint, ¶¶60-64; 115.  As to Defendant's claim that the parol evidence rule bars Hillman's prior misrepresentation (Db31), see, I.B.2.c., supra.

Defendant's arguments for dismissal are also based in part on Pennsylvania law and disputed facts. Defendant is relying upon a revised version of the PPM that was not in effect at the time Plaintiff entered into the Policy with Defendant, and is thus inapplicable. Db 33. Defendant also contends that Plaintiff elected to invest 100% of its policy in the Tremont Fund. Plaintiff relied upon Defendant's representation that the "fund" would be diversified, with no more than 6% or 7% with any individual manager. Defendant presented the variable insurance product to Plaintiff as a fait accompli, with no meaningful choice. As previously discussed, the economic loss/gist of the action doctrines do not apply. See VI, supra. These doctrines are not cognizable under Alaska law, this is a determination not typically made on a motion to dismiss, and the claim for negligent misrepresentation is separate and apart from Plaintiff's breach of contract claim and further, involves matters of policy.

Plaintiff's claim also sounds in fraud, arising out of the fiduciary relationship between Plaintiff and Defendant. See  Carter v. Hoblit, 755 P.2d 1084, 1086 (Alaska 1988) (" Fraud can be established by silence or non-disclosure when a fiduciary relationship exists between the parties.") Plaintiff has thus stated plausible claims for negligent misrepresentation.

## IX.     PLAINTIFF STATES A CLAIM FOR UNJUST ENRICHMENT.

Under both Alaska and Pennsylvania law[15], unjust enrichment is shown by alleging that defendant received a benefit from the plaintiff; that defendant appreciated the benefit, and that it would be inequitable for defendant to retain the benefit. See

---

[15] Once again, it is respectfully submitted that, to the extent choice of law can and should be determined at this time, Alaska law should apply to the common law and Alaska statutory claims.

Reeves v. Alyeska Pipeline Service Co., 56 P.3d 660 (Alaska 2002); Mitchell v. Moore, 729 A.2d 1200 (Pa Super. 1999).

Thus, unjust enrichment does not depend on any actual contract, or any "agreement between the parties, objective or subjective." Darling v. Standard Alaska Prod. Co., 818 P.2d 677, 679-680 (Alaska 1991). "Unjust" means where the defendant receives "a true windfall or 'something for nothing.'" Alaska Sales & Serv., Inc. v. Millet, 735 P.2d 743, 746 (Alaska 1987). (citations omitted).

Here, Plaintiff paid significant management fees to Defendant. The Policy and PPM did not set forth what Defendant was to do in exchange for the management fees. Thus, Defendant's receipt of them without providing anything in exchange constitute unjust enrichment because, in fact, Defendant received "something for nothing" --- "a true windfall." Defendant's contention that the claim is precluded by the existence of an express contract is without merit. Db38   Where, as here, the express contract is silent on a particular question of payment, a claim for unjust enrichment is not precluded. Essex Ins. Co. v. RMJC, Inc., 306 Fed. App'x. 749, 753-754 (3d Cir. 2009)   Thus,  Plaintiff has stated a claim for unjust enrichment.

## CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that Defendant's Motion to Dismiss should be denied.

Dated:  June 1, 2010

Respectfully submitted,

William R. Connelly, Esq.
Law Offices of William R. Connelly, LLC
7 West Main Street
Mendham NJ 07945
Phone:  (973) 543-5301

34

Fax:  (973) 543-5140

Nicholas Noel, III, Esq.
Noel, Kovacs & McGuire, P.C.
2505 Newburg Road
Easton PA 18045-1963
Phone:  (601) 258-0866
Fax:  (610) 258-5264

## CERTIFICATION OF SERVICE

I, William R. Connelly, hereby certify that a true and correct copy of the

foregoing Plaintiff's Opposition to Defendant's Motion to Dismiss and Cross-Motion to

Amend Plaintiff's Complaint was electronically filed on April 30, 2010 using CM/ECF

which will send notification of such filing to the following counsel of record:

Matthieu J. Shapiro, Esq.

_____
William R. Connelly