IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL S. RULLE FAMILY DYNASTY TRUST,<br><br>    Plaintiff,<br><br>    v.<br><br>AGL LIFE ASSURANCE COMPANY,<br><br>    Defendant | Civil Action No. 2:10-cv-00231-BMS<br><br>Hon. Berle M. Schiller |

## SUPPLEMENTAL AFFIDAVIT OF MICHAEL S. RULLE

STATE OF NEW JERSEY:
                              :SS
COUNTY OF MORRIS    :

I, Michael S. Rulle, hereby declare under the penalties of perjury, pursuant to 28 U.S.C. §1746, that:

1.      I have previously submitted my affidavit dated April 30, 2010 in opposition to the Defendant's initial motion to dismiss.  That affidavit is referenced and submitted in opposition to the current motion to dismiss filed by AGL and I wish to supplement my statements with this further Supplemental Affidavit again submitted in opposition to the Defendant's motion to dismiss pending before the court.  I am fully familiar with the facts hereafter stated.

2.      In paragraphs 8 through 10 of my initial affidavit, I explained that the desirability of investing in a fund-of-funds, such as the Tremont Opportunity Fund III, L.P., is, to a large degree, based upon the fact that such investment vehicles are highly diversified.  At paragraph 10 of my affidavit, I explained that this was something that was discussed between myself and Mr. Hillman and that I was assured by Mr. Hillman that the diversification of the fund in question would be within usual industry standards, typically no more than five to seven percent being

1

managed by any one investment manager. I was also advised that AGL, a limited partner, would

have access to oversight of the general partner of the fund.

3.      In presenting its latest motion to dismiss, AGL asserts that the Policy and the

Private Placement Memorandum did not promise the degree of diversification as I have alleged.

While it is true that the degree of diversification as promised by Mr. Hillman, and as generally

understood in the industry, it is not specified in the policy or the Private Placement

Memorandum as being no more than five to seven percent, these documents did inform me that

the investment would be highly diversified and it was well within my understanding of how

fund-of-funds are structured that such diversification would be far less than what ultimately

occurred with respect to the Tremont Fund.

4.      Even though the Policy and the Private Placement Memorandum are silent as to

what they meant by utilizing the term "highly diversified" and they fail to specify the level of

diversification, it is my contention that the statements of Mr. Hillman and the usual practices in

the industry with regard to these kinds of funds must be looked at to determine what was in the

parties' contemplation by the utilization of these terms. Attached hereto as **Exhibit A** is an

article published in the LA Times on December 2, 2007. The article cites a discussion with a

financial advisor, Jim Mosteller, concerning diversification of investment in mutual funds. In

discussing the wisdom of dividing up a portfolio among various categories of investment,

Mosteller indicates in the article that he recommends diversification within the categories of

stocks. As is stated by Mosteller "A rule of thumb in investing is to hold no more than five

percent of your total investment portfolio in a single stock". I concur with that assessment.

Moseller's statement applies not only to investments in single stocks but investments in single

funds and fund manager's as well.

An article published in the online industry website Deseret News on August 11, 2006 entitled "'Fund-of-Funds' a citadel of diversification" provides further explanation as to why the financial industry regards investments in fund-of-funds to be highly diversified investments intended to insulate investors from potential shocks to the financial system. As stated in the Deseret News article "Not only have the individual funds that it holds already diversified their individual portfolios, but the fund-of-fund diversifies among them as well. The result is sliced, diced, flip-flopped, granulated diversification taken to the utmost degree". Attached hereto as **Exhibit B** is a true copy of the Deseret News article.

5.      Had I been made aware that 23% of the moneys would be invested under the same manager, whether it was Bernard Madoff or anyone else, I would have advised that the funds be pulled from the investment as this is not a level of diversification that was acceptable and which would be expected in a fund-of-fund. AGL cites to the Private Placement Memorandum dealing with §817(h) of the Internal Revenue Code of 1986, regarding diversification requirements and limitations required by the IRS (55% in any one investment). This provision does not constitute a representation that the diversification promised by Mr. Hillman, and as expected in this fund, would be in the range of 55%. The Private Placement Memorandum only says that the partnership will comply with that requirement and then reiterates the IRS requirement regulations in terms of the upward limitations on diversity. It has no bearing or applicability to diversification as it normally applies to fund-of-funds.

6.      AGL attempts to argue that the statements of Mr. Hillman superseded the policy and the Private Placement Memorandum and, therefore, cannot be considered. In fact, the policy and the Private Placement Memorandum do not specify the degree of diversity and, therefore, there is no contradiction or variance between Mr. Hillman's statement and these documents.

U.S. App. LEXIS 6011 (10th Cir. 2003) (unpublished opinion). The regulatory notice states that the SEC found that a broker had a duty to conduct a further, independent investigation of the financial condition of the issuer under the circumstances. The notice goes on to identify a myriad of acts which the broker is required to take as a matter of course in its due diligence investigation.

9.     These are the kinds of actions which Plaintiff has alleged that AGL failed to follow and which AGL has, in its moving papers, failed to confirm or show it engaged in and fulfilled. There were substantial fees paid by the Plaintiff to AGL and AGL profited by those fees during the course of this investment and it was the expectation that, in exchange for significant fees, AGL would be acting not simply as a conduit between Tremont and the Dynasty Family Trust, but also as a fiduciary and a responsible advisor with respect to the placement and the monitoring of that investment.

10.     For these reasons and the arguments expressed in our accompanying brief, as well as the statements made in my original affidavit of April 30, 2010, I respectfully request that the Defendant's motion to dismiss be denied.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

_____

Michael S. Rulle

Sworn to before me this
_____ day of _____, 2010

_____

Hello Visitor! | Log In or Register                    Subscribe    Place An Ad    LAT Store    Jobs    Cars    Real Estate    Rentals    More Classifieds

Friday, May 28, 2010
8:22 a.m. PDT

LOCAL   U.S.   WORLD   BUSINESS   SPORTS   ENTERTAINMENT   HEALTH   LIVING   TRAVEL   OPINION   MORE        Search        GO

BREAKING    WEATHER    LIVE TRAFFIC    OBITUARIES    VIDEO    NEWSMATCH    NEWSLETTERS    MOBILE    REGISTER

IN THE NEWS:   LAKERS  |  DON'T ASK, DON'T TELL  |  JOE SESTAK  |  SOUTH KOREA  |  GULF OIL SPILL  |  PAKISTAN ATTACKS

 Get an auto loan, even with bad credit

 3 signs you're overpaying for auto insurance

 Pay as little as $13.03 a month for life insurance

# Buy and hold isn't necessarily tried and true

RELATED

IN THIS PACKAGE

Planning for the future isn't just about money

Buy and hold isn't necessarily tried and true

Cash in hand makes market dips more bearable

Withdrawal strategy key to retirement plan

The savings game

The Lockey file

Getting started

Spending smart

Taking stock

Institutional investors use diversification to their benefit

The week ahead

ADS BY GOOGLE

**Hedge Fund Directory**
Stay Ahead Of The Market With Barclay's Hedge Fund Database.
www.BarclayHedge.com

**Dividend Yielding Stocks**
The Power Of Dividend Paying Stocks Get Access To Your Free Report Now!
www.MoneyandMarkets.com

By Gail MarksJarvis
Tribune staff reporter
December 2, 2007

✉ E-mail   🖶 Print   Share ▲|▼   Text Size
☆☆☆☆
☆

PREVIOUS COLUMNS

**Jan. 23:** IRAs can help reduce tax bite
**Jan. 6:** Avoid tapping 401(k) to pay mortgage

**Dec. 9:** In a volatile market, examine college savings optionsue
**Dec. 2:** Buy and hold isn't necessarily tried and true

We try to follow advice that's supposed to be good for us. Parents tell children to eat their vegetables. So the children do.

Wall Street tells adults to be long-term investors—to "buy and hold" stocks and mutual funds for the long term. So investors try. But many investors think they are doing what they've been told to do and end up getting the buy-and-hold lesson terribly wrong.

They buy stocks and mutual funds willy nilly, based on a hot tip, TV chatter, a suggestion from a co-worker or a glowing article, and then, later, they wonder what happened to the glow. They pick mutual funds with confusing names in 401(k) plans, and have no idea why they are making money one day and losing it the next.

They buy a stock with great prospects at one point and then months or years later can't say why they think it's a fine investment. Or they inherit a stock from grandma and tuck it away the same way they did her china.

» Don't miss a thing. Get breaking news alerts delivered to your inbox.

Because many Americans make these mistakes when "buying" investments, they get the "holding" part of the slogan wrong too.

Buy and hold doesn't mean to buy and hold anything. It means to carefully assemble a mixture of stocks and bonds, and then stick with the mixture whether the stock market is good or bad.

That system—which is called "diversifying" or "asset allocation"—tends to work well over time because

something in your investment portfolio is usually climbing, even if something else is being battered.

But if you buy stocks on an impulse you better know when to get out, or you could lose everything you put into it. Companies, after all, go bankrupt and others take investors by surprise with major business missteps and drop sharply in a short period of time.

The buy-and-hold message needs particular attention now as worries build about a possible recession. Experts generally are telling investors that they do not need to flee the stock market.

But when investors hear that, they should not misconstrue the buy-and-hold advice. It's based on the assumption that you have invested with care, building a lot of insulation into your 401(k) or individual retirement account so that if a stock or fund drops sharply, another investment will buffer the plunge and keep you from losing too much.

If you haven't provided yourself insulation, you may end up like investors did in 2000 to 2002. They had bought mutual funds filled with technology stocks, assuming they were a safe bet because the funds had soared in previous years.

Then, as the stock market sank, these well-intentioned people obeyed the buy-and-hold message, held onto the plunging technology mutual funds and lost 80 percent of their money. Roughly five years later, an original investment of $10,000 would have been worth only about $5,000.

To provide insulation against downturns, Willowbrook, Ill., financial adviser Jim Mosteller said he would divide up a portfolio for an investor within 20 years of retirement roughly like this: 32 percent in large-cap funds that invest in the nation's largest companies, 16 percent in small-cap funds that invest in small company stocks, 16 percent in international funds that invest in developed markets like Western Europe and Japan, 8 percent in emerging markets (areas including Brazil, Thailand and Pakistan), 8 percent in real estate investment trusts and 20 percent in bonds.

And Mosteller says he would try to convince investors that they take on extraordinary risk if they rely on a single stock, or a small handful, instead of mutual funds.

He ran into this recently with an individual with 80 percent of his IRA in Walgreen Co. stock. A rule of thumb in investing is to hold no more than 5 percent of your total investment portfolio in a single stock. Yet, Mosteller's client, like most people holding a stock that had done well, protested that it was "a fine company."

"Think of Enron [which collapsed], United [which went into Chapter 11] or General Motors [which has struggled]," he said. "They were all good companies."

Analysts are warning investors to be cautious about investing in certain sectors because they are likely to feel the brunt of an economic slowdown. The obvious examples are financial stocks, home builders and companies—such as retailers—that sell to consumers. The sectors already have declined more than 30 percent.

But Merrill Lynch economist David Rosenberg noted last week that operating earnings at a wide range of companies are slowing. And when that happens stocks tend not to climb, and will fall if profits drop significantly.

Although analysts generally suggest that certain sectors—such as health care and consumer staples—are safer in downturns, nothing is spared in a serious bear market, or a decline of 20 percent or more.

Analysis by Ned Davis Research shows that some of the most popular industries of the last few years could be hard-hit in a bear market. Between 1973 and 2002, the average decline of commodity stocks during bear markets has been 27 percent, while industrial companies dropped 28 percent. The worst declines are 33 percent in information technology and 31 percent in consumer stocks.

The safest four are energy, with a decline of 12 percent; utilities, which lost 13 percent; consumer staples (which make products like soap and toothpaste), down 17 percent; and health care, off 18 percent.

Generally in stock market downturns, the industry groups that gave investors the highest returns over the previous few years suffer the most.

Ned Davis analyst Lance Stonecypher said that if that holds true in the current downturn, energy, materials and commodities would face the highest risk. But that hasn't been the case so far.

*Gail MarksJarvis is a Your Money columnist. Contact her at gmarksjarvis@tribune.com.*

Copyright © 2010. Chicago Tribune

ADS BY GOOGLE

**Hedge Fund Database**
Most Complete Hedge Fund Database For Investors & Managers USD $4,500
www.BarclayHedge.com

**Dividend Yielding Stocks**
The Power Of Dividend Paying Stocks Get Access To Your Free Report Now!
www.MoneyandMarkets.com

RELATED STORIES                              POWERED BY surphace

*From the L.A. Times*
- UnitedHealth tries to lure investors with huge dividend boost
- Stocks plummet on economic worries
- Small investors aren't playing the fool this month

*From KTLA*
- Dow Tumbles Below 10,000 | ktla.com



✉ E-mail   🖶 Print   Digg   Twitter   Facebook   Read This Later        Share

Comments (0)                              Add comments

    Currently there are no comments. Be the first to comment!

                                          Discussion FAQ

advertisement



                    Next video up
                    Loading . . . .

Enjoy more stories like this for **only $1 a week.** Click here to order The Times.

In Case You Missed It...







Opinion: Living longer and dealing with dementia    Trends in Southern California day spas    Exhibit celebrates effects wizard Ray Harryhausen    Canada geese tour the Norton Simon Museum    Recipe: Vanilla cupcakes from Joan's on Third

                                          More spotlights...



ORENCIA
[abatacept]

COULD YOU BECOME ONE OF THEM?

Important Safety Information about ORENCIA (abatacept):

ORENCIA (abatacept) is a...

Important Safety Information >
US Prescribing Information >

| News | Entertainment | Living | Multimedia | Top Blogs | More |
|---|---|---|---|---|---|
| Local | Television | Travel | Video | L. A. Now | Corrections |
| U.S. & World | Movies | Health | Photos | Fabulous Forum | Readers' Rep |
| Business | Music | Food | Data Desk | Ministry of Gossip | Contact Us | Help |
| Technology | Arts & Culture | Home | Your Scene | TV Show Tracker | About Us |
| Sports | Celebrity | Image | Times on Twitter | Company Town | Events |
| Opinion | Envelope | Magazine | Mobile | Politics | LATMG Media Kit |
| Columnists | Calendar | Books | Newsletters | Music | Print Edition |
| Obituaries | Company Town | Autos | Archives | Hero Complex | Subscribe |
| | TV Listings | Hot List | Kindle | Technology | Manage My Account |
| | Movie Listings | Horoscopes | E-edition | Movies | Site Map |
| | Tickets | Crosswords | | | |

# Los Angeles Times

Coastline Pilot | Daily Pilot | Huntington Beach Independent | Valley Sun | Burbank Leader | News Press | KTLA | Hoy | Brand X | LA, Los Angeles Times Magazine | ZAPak |
Baltimore Sun | Chicago Tribune | Daily Press | Hartford Courant | Los Angeles Times | Orlando Sentinel | Sun Sentinel | The Morning Call |

Terms of Service | Privacy Policy | Los Angeles Times, 202 West 1st Street, Los Angeles, California, 90012 | Copyright 2010

*A Tribune Newspaper website*

Exhibit "B"

# Deseret News

## 'Fund of funds' a citadel of diversification

**By Andrew Leckey**

*Published: Friday, Aug. 11, 2006 2:44 p.m. MDT*
In risky times, investors often diversify their diversification.

Just to be on the safe side, they invest in a "fund of funds." It holds an investment portfolio made up of other mutual funds, rather than invested directly in stocks, bonds or other securities.

Not only have the individual funds that it holds already diversified their individual portfolios, but the fund of funds diversifies among them as well. The result is sliced, diced, flip-flopped, granulated diversification taken to the utmost degree.

It's up to the individual investor to decide whether this one-for-all strategy makes sense or is diversification overkill.

A fund of funds can be constructed many ways. Some have an allocation that never changes, others make moderate adjustments, some have specific target dates, and others aggressively shift their holdings to try to seize the highest possible returns.

For the most part, however, their managers prefer to invest in funds that aren't too volatile and have no more risk than the Standard & Poor's 500 index. They realize investors focused on diversification are serious about avoiding potential shocks to the system.

For beginning investors, this is investing made simple. But fund-of-funds investing also is employed by some large institutions and wealthy investors as they seek to spread around their risk. They want to keep a portion of their portfolios on automatic pilot and let a team of fund managers sweat the details.

Fund families are tapping into this philosophy to attract investors and assets.

"With one ticket you can get exposure to a variety of different asset classes," said Scott Couto, senior vice president at Boston-based Evergreen Investments. "It's probably not worth your while if you have $10,000 to invest to buy six or seven mutual funds and do all the paperwork."

Evergreen has launched three distinct fund-of-funds products with its Evergreen Envision Growth (EEGAX), Evergreen Envision Growth & Income Fund (EGAIX) and Evergreen Envision Income Fund (EIIAX). All three invest in shares of an array of Evergreen funds to pursue their goals.

For example, the investment parameters of the Envision Growth are 45 percent to 75 percent domestic equities, 10 percent to 30 percent international equities, 10 percent to 30 percent fixed-income securities, up to 8 percent high-yield fixed income, and up to 8 percent international fixed-income securities.

Fund-of-funds products are attracting significant assets.

"A recent survey of our Vanguard shareholders found that more than two-fifths of them said all-in-one, hands-off investing was one of the most important factors in choosing funds," said Ellen Rinaldi, principal in investment counseling and research for Vanguard Group in Valley Forge, Pa. "With a fund of funds you can discipline your investing without having to do it yourself."

Vanguard's fund-of-funds choices have attracted more than $10 billion since 2003, Rinaldi said, and are especially popular with those who have no interest in rebalancing their investments over time.

The nearly $13 billion Vanguard STAR Fund (VGSTX) owns 11 actively managed funds and has a relatively stable allocation of 63 percent stocks, 25 percent intermediate- and long-term bonds and 12

percent short-term bonds. Holdings include such heavy hitters as Vanguard Windsor (VWNDX) and Windsor II (VWNFX).

Vanguard STAR's three-year annualized return of 11 percent places it in the upper one-fifth of all moderate allocation funds.

The biggest concern about fund-of-funds investments is their cost. Some have higher fees than traditional managed funds because, besides the initial and annual costs you must pay, there is an extra management fee for the underlying funds. An extra layer of expenses can take a bite.

"In looking at fund-of-funds performance over the years, we've found that their managers do a pretty good job if you strip away their expenses," said Andrew Clark, senior research analyst with Lipper Inc. in Denver. "Once you add in all the expense levels, however, it tends to take away from the general performance."

It can be difficult for a smaller fund family to come up with a fund of funds that manages well over a number of asset classes.

"Some of the bigger fund shops have tended to do a better job with a fund of funds than the smaller ones because they have low-cost funds and often don't charge an additional fee to put things together," said Christine Benz, associate director of fund analysis for Morningstar Inc. in Chicago, who admires the low expenses of Vanguard and T. Rowe Price fund-of-funds offerings.

Larger fund families also are more likely to do a better job with domestic stocks and bonds and international stocks, Benz added.

"I would urge investors to be wary of fund of funds that do tactical allocation," she said. "While they may have good short-term performance at various points, it would be difficult for them to bet the market's direction correctly over a longer period of time."

Though a fund of funds is based on investment diversity, they may have a specific focus.

For example, the $98 million AIM International Allocation Fund "A" (AINAX), launched in October, is one of the better performers this year with a 12 percent gain that ranks in the top one-fourth of international allocation funds. It enjoys the reflected glory of that fund family's top overseas funds.

*Andrew Leckey answers questions only through the column. Address questions to Andrew Leckey, "Successful Investing," P.M.B. 184, 369-B Third St., San Rafael, CA 94901-3581, or by e-mail at andrewinv@aol.com.*

© 2010 Deseret News Publishing Company | All rights reserved

Exhibit "C"

# Regulatory Notice 10-22

# Regulation D Offerings

**Obligation of Broker-Dealers to Conduct Reasonable Investigations in Regulation D Offerings**

## Executive Summary

FINRA reminds broker-dealers of their obligation to conduct a reasonable investigation of the issuer and the securities they recommend in offerings made under the Securities and Exchange Commission's Regulation D under the Securities Act of 1933—also known as private placements.

Regulation D provides exemptions from the registration requirements of Section 5 under the Act. Regulation D transactions, however, are not exempt from the antifraud provisions of the federal securities laws. A broker-dealer has a duty—enforceable under federal securities laws and FINRA rules—to conduct a reasonable investigation of securities that it recommends, including those sold in a Regulation D offering.

Moreover, any broker-dealer that recommends securities offered under Regulation D must meet its suitability requirements under NASD Rule 2310 (Suitability), and must comply with the advertising and supervisory rules of FINRA and the SEC.

Questions regarding this *Notice* should be directed to:

➤ Joseph E. Price, Senior Vice President Corporate Financing/Advertising, at (240) 386-4623;

➤ Paul Mathews, Director, Corporate Financing Department, at (240) 386-4639; or

➤ Gary Goldsholle, Vice President and Associate General Counsel, Office of General Counsel, at (202) 728-8104.

## April 2010

### Notice Type
➤ Guidance

### Suggested Routing
➤ Compliance
➤ Legal
➤ Registered Representatives
➤ Senior Management

### Key Topics
➤ Communications With the Public
➤ Private Placements
➤ Suitability
➤ Supervision

### Referenced Rules & Notices
➤ Regulation D
➤ Securities Act Section 17
➤ SEA Section 10(b)
➤ Rule 10b-5
➤ FINRA Rule 2010
➤ FINRA Rule 2020
➤ NASD Rule 2210
➤ NASD Rule 2310
➤ NASD Rule 3010
➤ NTM 03-71
➤ NTM 05-18
➤ NTM 05-48
➤ Regulatory Notice 09-05



Financial Industry Regulatory Authority

## Background and Discussion

Part I of this *Notice* describes Regulation D. Part II describes broker-dealers' regulatory responsibilities to engage in a reasonable investigation of a Regulation D offering, enforceable under the antifraud provisions of the federal securities laws and FINRA rules. Part II also describes specific issues that pertain to a broker-dealer's (BD's) responsibilities and how the scope of a BD's responsibility to conduct a reasonable investigation will necessarily depend upon its affiliation with the issuer, its role in the transaction, and other facts and circumstances of the offering, including whether the offerees are retail investors or more sophisticated institutional investors.[1]

Part III describes practices that some broker-dealers have adopted to help them discharge their reasonable investigation obligations. These practices are especially relevant to Regulation D offerings of securities of companies that are non-reporting under the Securities Exchange Act of 1934. BDs, however, may find that many of the practices are appropriate for other types of offerings.

## I.  Regulation D

The private placement market is an essential source of capital for American business, particularly small firms. According to one estimate, in 2008 companies intended to issue approximately $609 billion of securities in Regulation D offerings.[2] While the private placement market is an important source of capital for many U.S. companies, especially smaller issuers, FINRA has found significant problems in several recent examinations and investigations. These problems include fraud and sales practice abuses in Regulation D offerings. Recently, for example, broker-dealers were sanctioned for providing private placement memoranda and sales materials to investors that contained inaccurate statements or omitted information necessary to make informed investment decisions.[3]

Rule 504 under Regulation D provides an exemption from the registration provisions under Section 3(b) of the Securities Act for limited offerings for which the aggregate offering price of securities within a 12-month period does not exceed $1,000,000. Rule 505 provides an exemption under Section 3(b) of the Act for limited offerings for which the aggregate offering price of securities within a 12-month period does not exceed $5,000,000. Rule 505 permits an offering to an unlimited number of "accredited investors" and up to 35 non-accredited investors. Rule 501 defines "accredited investor" as any person who meets, or who the issuer reasonably believes meets, certain requirements, including natural persons with a net worth in excess of $1,000,000, or annual income in excess of $200,000 (or $300,000 jointly with a spouse).

Rule 506 provides a legal safe harbor for an exemption from registration under Section 4(2) of the Act for the sale of securities to an unlimited number of accredited investors and up to 35 non-accredited investors. Rule 506 (unlike Rule 505) does not limit the permissible size of the offering, but requires that non-accredited investors possess a degree of financial sophistication. Specifically, Rule 506 requires that each non-accredited investor, "either alone or with his purchaser representative(s)," have "such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment," or the issuer must reasonably believe immediately prior to making any sale that the purchaser comes within this description.

Rule 505 and Rule 506 do not require that an issuer provide any specific written information concerning the offering to accredited investors, although issuers must provide specified information to a non-accredited investor who purchases in an offering. In practice, issuers often provide a private placement memorandum that describes the offering to all prospective purchasers, including accredited investors.[4]

## II.  BD Regulatory Requirements in Regulation D Offerings

### A.  Antifraud Provisions and FINRA Rules

The Securities and Exchange Commission (SEC) and federal courts have long held that a BD that recommends a security is under a duty to conduct a reasonable investigation concerning that security and the issuer's representations about it.[5] This duty emanates from the BD's "special relationship" to the customer, and from the fact that in recommending the security, the BD represents to the customer "that a reasonable investigation has been made and that [its] recommendation rests on the conclusions based on such investigation."[6] Failure to comply with this duty can constitute a violation of the antifraud provisions of the federal securities laws and, particularly, Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder.[7] It also can constitute a violation of FINRA Rule 2010, requiring adherence to just and equitable principles of trade, and FINRA Rule 2020, prohibiting manipulative and fraudulent devices.[8]

Courts have found that the amount and nature of the investigation required depends, among other factors, upon the nature of the recommendation, the role of the broker in the transaction, its knowledge of and relationship to the issuer, and the size and stability of the issuer.[9] For example, the SEC and courts recognize that a more thorough investigation is required for "securities issued by smaller companies of recent origin,"[10] which could include many Regulation D issuers. While there are no "iron clad rules as to what a broker must do to meet his responsibility,"[11] the presence of any "red flags" also would alert the broker to the need for further inquiry.[12] Each BD must make a determination of the scope of its investigation based upon the facts and circumstances.

A BD that lacks essential information about an issuer or its securities when it makes a recommendation, including recommendations of securities in Regulation D offerings, must disclose this fact as well as the risks that arise from its lack of information.[13] The degree to which a broker-dealer that relies on information supplied by the issuer may be found to have conducted a reasonable investigation as a basis for its recommendation will depend on the facts and circumstances. With respect to reporting companies under the Securities Exchange Act, in the absence of red flags, a BD that is not an underwriter typically may rely upon the current registration statement and periodic reports of the public company.

In general, however, a BD "may not rely blindly upon the issuer for information concerning a company,"[14] nor may it rely on the information provided by the issuer and its counsel in lieu of conducting its own reasonable investigation.[15] While BDs are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a "high degree of care" in investigating and independently verifying an issuer's representations and claims.[16] Indeed, when an issuer seeks to finance a new speculative venture, BDs "must be particularly careful in verifying the issuer's obviously self-serving statements."[17]

The fact that a BD's customers may be sophisticated and knowledgeable does not obviate the duty to investigate.[18] Moreover, in Regulation D offerings the SEC advises issuers to provide the same information to accredited investors as they are required to provide to non-accredited investors, in view of the antifraud provisions.[19]

## B.  FINRA Suitability Obligations

NASD Rule 2310 states that a BD must have reasonable grounds to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.[20] This analysis has two principal components. First, the "reasonable basis" suitability analysis requires the BD to have a reasonable basis to believe, based on a reasonable investigation, that the recommendation is suitable for at least some investors. Second, the "customer specific suitability" analysis requires that the BD determine whether the security is suitable for the customer to whom it would be recommended.[21]

In the context of a Regulation D offering, Rule 2310 requires broker-dealers to conduct a suitability analysis when recommending securities to both accredited and non-accredited investors that will take into account the investors' knowledge and experience. The fact that an investor meets the net worth or income test for being an accredited investor is only one factor to be considered in the course of a complete suitability analysis. The BD must make reasonable efforts to gather and analyze information about the customer's other holdings, financial situation and needs, tax status, investment objectives and such other information that would enable the firm to make its suitability determination. A BD also must be satisfied that the customer "fully understands the risks involved and is...able...to take those risks."[22]

4

In order to ensure that it has fulfilled its suitability responsibilities, a BD in a Regulation D offering should, at a minimum, conduct a reasonable investigation concerning:

➢ the issuer and its management;

➢ the business prospects of the issuer;

➢ the assets held by or to be acquired by the issuer;

➢ the claims being made; and

➢ the intended use of proceeds of the offering.[23]

A BD must conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.[24]

**C.   Specific Issues Related to a BD's Responsibilities**

The scope of a BD's investigation will necessarily depend upon a number of factors, including the BD's affiliation with the issuer, its role in the transaction, and other facts and circumstances of the offering, including whether the offerees are retail customers or more sophisticated institutional investors.

**1.   BD That Is Affiliated With the Issuer**

A BD that is an affiliate of an issuer in a Regulation D offering must ensure that its affiliation does not compromise its independence as it performs its investigation.[25] The BD must resolve any conflict of interest that could impair its ability to conduct a thorough and independent investigation. Indeed, its affiliation with the issuer typically would raise expectations by its customers, particularly some retail customers, that the BD has special expertise concerning the issuer.[26]

**2.   BD That Prepares the Private Placement Memorandum**

A BD that prepares the private placement memorandum or other offering document has a duty to investigate securities offered under Regulation D and representations made by the issuer in the private placement memorandum or other offering document.[27] In a recent enforcement action, FINRA found that a BD that prepared a private placement memorandum containing material misstatements and omissions about such matters as the amount and timing of distributions and the targeted return of principal to investors violated FINRA Rule 2010, which requires BDs to comply with just and equitable principles of trade.[28]

A BD that assists in the preparation of a private placement memorandum or other offering document should expect that it will be considered a communication with the public by that BD for purposes of NASD Rule 2210, FINRA's advertising rule. If a private placement memorandum or other offering document presents information that is not fair and balanced or that is misleading, then the BD that assisted in its preparation may be deemed to have violated NASD Rule 2210. Moreover, sales literature concerning a private placement that a BD distributes will generally be deemed to constitute a communication by that BD with the public, whether or not the BD assisted in its preparation.

### 3. The Presence of Red Flags

In the course of a reasonable investigation, a BD must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. Red flags might arise from information that is publicly available or information that is discovered during the course of the investigation. A BD's reasonable investigation responsibilities would obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer.[29]

When presented with red flags, the BD must do more than simply rely upon representations by issuer's management, the disclosure in an offering document or even a due diligence report of issuer's counsel. In *Kunz and Cline*, the SEC found that the broker could not justifiably rely on financial statements in private placement memoranda that had been audited and certified by an accountant when numerous "red flags" indicated that the financial statements were inaccurate.[30] The broker had a duty, which it failed to discharge, to conduct a further, independent investigation of the financial condition of the issuer under the circumstances. The SEC also found that the broker acted contrary to just and equitable principles of trade when the private placement memorandum failed to disclose both the broker's consulting relationship with the issuer and the litigation history of the issuer's president and CEO.

An issuer's refusal to provide a broker-dealer with information that is necessary for the broker-dealer to meet its duty to investigate could itself constitute a red flag. If an issuer is not forthcoming with information requested by a broker-dealer (or provides information that is non-responsive or out-of-date), the broker-dealer must determine whether sufficient information is otherwise obtainable. While issuers are not required to provide accredited investors with a private placement memorandum in order to qualify for the exemptions in Rule 505 or Rule 506, these memoranda typically are used in Regulation D offerings and firms may need to consider whether the absence of a private placement memorandum itself might constitute a red flag.

### 4. Reliance on Counsel and Syndicate Managers

A BD may retain counsel or other experts to assist the firm in undertaking and fulfilling its reasonable investigation obligation. A BD must carefully review the qualifications and competency of counsel or experts retained to perform an investigation on its behalf[31] and must ensure that all gaps or omissions in the investigation by such counsel or experts are separately addressed by the BD. Moreover, the use of counsel or experts does not necessarily complete the BD's investigation responsibilities, insofar as a review of the counsel's or expert's report may identify issues or concerns that require further investigation by the BD.

It may be appropriate in a Regulation D offering in which a BD is merely a member of a syndicate or selling group to rely upon a reasonable investigation by the syndicate manager, provided the BD has reason to believe that the syndicate manager has the expertise and absence of conflicts to engage in a thorough and independent inquiry, and that it has in fact performed such an inquiry with respect to the particular Regulation D offering. Any BD who intends to rely upon the efforts of a syndicate manager should meet with the manager, obtain a description of the manager's reasonable investigation efforts, and ask questions of the manager concerning the independence and thoroughness of the manager's exercise of its responsibilities. A BD that relies upon the efforts of the syndicate manager retains its own responsibilities, to the extent that they are not addressed by the syndicate manager's efforts. For example, if there is reason to believe that the syndicate manager has not addressed a particular issue, then each BD participating in the offering will be responsible to the extent that it implicates the BD's own suitability analysis.

### D.  Supervision

A firm that engages in Regulation D offerings must have supervisory procedures under NASD Rule 3010 that are reasonably designed to ensure that the firm's personnel, including its registered representatives:

➢  engage in an inquiry that is sufficiently rigorous to comply with their legal and regulatory requirements;

➢  perform the analysis required by NASD Rule 2310;

➢  qualify their customers as eligible to purchase securities offered pursuant to Regulation D; and

➢  do not violate the antifraud provisions of the federal securities laws or FINRA rules in connection with their preparation or distribution of offering documents or sales literature.

These procedures must be reasonably designed to ensure that each Regulation D offering is properly supervised before it is marketed to other firms or sold directly to customers.[32]

### E.  Documentation of Reasonable Investigation

To demonstrate that it has performed a reasonable investigation, a BD should retain records documenting both the process and results of its investigation. Such records may include descriptions of the meetings that were conducted in the course of the investigation, including meetings with the issuer or other parties, the tasks performed, the documents and other information reviewed, the results of such reviews, the date such events occurred, and the individuals who attended the meetings or conducted the reviews.

## III.  Reasonable Investigation Practices

A BD's reasonable investigation must be tailored to each Regulation D offering in a manner that best ensures that it meets its regulatory responsibilities. Accordingly, a single checklist of possible practices for a BD engaged in a Regulation D offering will not suffice for every offering, and mechanical reliance upon a single checklist may result in an inadequate investigation. Nevertheless, we are providing a list of practices that some firms have adopted to help them adequately discharge their responsibilities. Many of the practices described below are designed to satisfy BDs' regulatory requirements. These practices are especially relevant to Regulation D offerings of securities of companies that are non-reporting under the Securities Exchange Act.

Industry participants that we surveyed described the following as practices that help ensure they meet their reasonable investigation obligations.

### A.   Issuer and Management

Reasonable investigations of the issuer and its management concerning the issuer's history and management's background and qualifications to conduct the business might include:

- ➤ Examining the issuer's governing documents, including any charter, bylaws and partnership agreement, noting particularly the amount of its authorized stock and any restriction on its activities. If the issuer is a corporation, a BD might determine whether it has perpetual existence.
- ➤ Examining historical financial statements of the issuer and its affiliates, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management.
- ➤ Looking for any trends indicated by the financial statements.
- ➤ Inquiring about the business of affiliates of the issuer and the extent to which any cash needs or other expectations for the affiliate might affect the business prospects of the issuer.
- ➤ Inquiring about internal audit controls of the issuer.
- ➤ Contacting customers and suppliers regarding their dealing with the issuer.
- ➤ Reviewing the issuer's contracts, leases, mortgages, financing arrangements, contractual arrangements between the issuer and its management, employment agreements and stock option plans.

➤ Inquiring about past securities offerings by the issuer and the degree of their success while keeping in mind that simply because a certain product or sponsor historically met obligations to investors, there are no guarantees that it will continue to do so, particularly if the issuer has been dependent on continuously raising new capital. This inquiry could be especially important for any blind pool or blank-check offering.

➤ Inquiring about pending litigation of the issuer or its affiliates.

➤ Inquiring about previous or potential regulatory or disciplinary problems of the issuer. A BD might make a credit check of the issuer.

➤ Making reasonable inquiries concerning the issuer's management. A BD might inquire about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change. For example, a BD might inquire about any regulatory or disciplinary history on the part of management and any loans or other transactions between the issuer or its affiliates and members of management that might be inappropriate or might otherwise affect the issuer's business.

➤ Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A BD might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issuer.

➤ Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

**B.  Issuer's Business Prospects**

Reasonable investigations of the issuer's business prospects, and the relationship of those prospects to the proposed price of the securities being offered, might include:

➤ Inquiring about the viability of any patent or other intellectual property rights held by the issuer.

➤ Inquiring about the industry in which the issuer conducts its business, the prospects for that industry, any existing or potential regulatory restrictions on that business and the competitive position of the issuer.

➤ Requesting any business plan, business model or other description of the business intentions of the issuer and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based. A BD might test models with information from representative assets to validate projected returns, break-even points and similar information provided to investors.

➤ Requesting financial models used to generate projections or targeted returns.

➤ Maintaining in the BD's files a summary of the analysis that was performed on financial models provided by the issuer that detail the results of any stress tests performed on the issuer's assumptions and projections.

**C.  Issuer's Assets**

Reasonable investigations of the quality of the assets and facilities of the issuer might include:

➤ Visiting and inspecting a sample of the issuer's assets and facilities to determine whether the value of assets reflected in the financial statements is reasonable and that management's assertions concerning the condition of the issuer's physical plants and the adequacy of its equipment are accurate.

➤ Carefully examining any geological, land use, engineering or other reports by third-party experts that may raise red flags.

➤ Obtaining, with respect to energy development and exploration programs, expert opinions from engineers, geologists and others are necessary as a basis for determining the suitability of the investment prior to recommending the security to investors.

## Endnotes

1   As a general matter, any reference in this *Notice* to the obligations of a BD firm is also intended to cover the concomitant responsibilities of any registered representative who recommends a Regulation D offering to his/her customers and any registered principal who is charged by his/her firm with supervising this registered representative.

2   Office of the Inspector General, Securities and Exchange Commission, *Regulation D Exemption Process 2* (March 31, 2009).

3   *See, e.g.,* Provident Asset Management, LLC, FINRA Case No. 2009017497201 (2010); *Pacific Cornerstone Capital, Inc.* FINRA AWC No. 2007010591701 (2009).

4   A note to Rule 502(b)(1) states that when an issuer provides required information to any non-accredited investor, it should consider providing the information to accredited investors, too, "in view of the anti-fraud provisions of the federal securities laws."

5   *See Hanly v. SEC,* 415 F.2d 589, 595-96 (2d. Cir. 1969); *SEC v. Great Lake Equities Co.,* 1990 U.S. Dist. LEXIS 19819 at *16-17 (E.D. Mich. 1990); *SEC v. North American Research and Development Corp.,* 424 F.2d 63,84 (2d Cir. 1970). *See also SEC v. Current Financial Services, Inc.,* 100 F. Supp. 2d 1, 14-15 (D.D.C. 2000); *District Business Conduct Committee for District No. 4 v. Everest Securities, Inc.,* 1994 NASD Discip. Lexis 188 (Sept. 2, 1994), *aff'd,* 52 S.E.C.

©2010 FINRA. All rights reserved. FINRA and other trademarks of the Financial Industry Regulatory Authority, Inc. may not be used without permission. *Regulatory Notices* attempt to present information to readers in a format that is easily understandable. However, please be aware that in case of any misunderstanding, the rule language prevails.

# Endnotes continued

958, 962-63 (Aug. 26, 1996), *aff'd*, 116 F. 3d 1235 (8th Cir. 1997); Securities Act Release No. 4445, 27 Fed. Reg. 1415 (Feb. 2, 1962).

6    *Hanly, supra* note 5 at 597.

7    See generally *Hanly, supra* note 5.

8    See *Everest Securities, Inc, supra* note 5.

9    See *Hanly, supra* note 5. See also *University Hill Foundation v. Goldman, Sachs & Co.*, 422 F. Supp. 879, 898 (S.D.N.Y. 1976).

10   *Hanly, supra* note 5 at 597.

11   *University Hill Foundation, supra* note 9 at 898.

12   See, e.g., *SEC v. Milan Capital Group, Inc.*, 2000 U.S. Dist. LEXIS 16204 (S.D.N.Y. 2000), where the court held that the duty to independently investigate is greater "where promotional materials are in some ways questionable, for example by promising unusually high returns."

13   See *Hanly, supra* note 5 at 597 ("Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information"). See also Securities Act Release No. 4445, *supra* note 5; Regulatory Notice 09-05 (Guidance to Member Firms Participating in Unregistered Resales of Restricted Securities) (January 2009).

14   *Hanly, supra* note 5 at 597. The duty of inquiry under the antifraud provisions is distinguished from the "reasonable investigation" that, under Section 11(b) of the Securities Act, permits an underwriter to escape liability for misrepresentations in a registration statement. Courts have compared the Section 11 reasonable investigation and the BD's general duty to investigate and concluded that "somewhat more is required of an underwriter than a broker to discharge its obligation to the investing public." *University Hill Foundation, supra* note 9 at 898-99. This is because "an

underwriter's relationship to the issuer is more substantial" than a BD that is only recommending a security, and the underwriter "plays a more central role in the marketing process." *Id.*

15   See *Everest Securities, Inc. v. US, supra* note 5 at 1239 ("reliance on others does not excuse [the respondents] own lack of investigation").

16   *Everest Securities, Inc, supra* note 5 at 963.

17   *Everest Securities, Inc., supra* note 5 at 963.

18   *Hanly* at 596, *supra* note 5.

19   Note to Rule 502(b)(1).

20   FINRA has previously discussed the responsibilities of a BD to conduct a reasonable investigation of securities it is recommending. See, e.g., Notice to Members 03-71 (concerning non-conventional investments)(November 2003); Notice to Members 05-18 (concerning private placements of tenants-in-common interests) (March 2005).

21   *F.J. Kaufman & Co.*, 50 S.E.C. 164, 168-69 (Dec. 13, 1989). See also *In the Matter of Michael Frederick Siegel*, Securities Exchange Act Release No. 58737 (October 6, 2008), 2008 SEC Lexis 2459, at *28.

22   See *James B. Chase*, 56 S.E.C. 149, 159 (2003).

23   BDs should analyze whether the investor's money is likely to be applied according to the stated use of proceeds, and whether the stated use of proceeds is reasonable in light of the issuer's business purpose and prospects. See *In Re Brian Prendergast*, 2001 SEC LEXIS 1533 (August 1, 2001); *Legend Merchant Group, Inc.*, NASD No. C10030058, summarized in NASD Disciplinary Actions (July 2004); *Shelman Securities, Inc.*, NASD No. C06030013, summarized in NASD Disciplinary Actions (February 2004).

## Endnotes continued

24   *See, e.g., Shelman Securities, supra* note 23 (private placement memoranda contained material misrepresentations and omissions about use of proceeds in a previous offering).

25   *See In the Matter of C. Gilman Johnston,* 42 S.E.C. 217 (Aug. 14, 1964) (broker-dealer's control person prepared memorandum describing broker-dealer's own "highly speculative" securities without any reasonable basis for believing that the securities were suitable for some purchasers). *See generally Pacific Cornerstone Capital, supra* note 3 at 10 (person providing information for and reviewing and approving private placement memorandum and sales literature was BD's control person and issuer's founder). Regulation D generally prohibits a broker or other person that is affiliated with the issuer from serving as a purchaser representative to an investor. *See* Rule 501(h)(1)(definition of "purchaser representative").

26   *Cf.* FINRA Rule 5122 (requiring members to comply with certain requirements when engaging in private placement of securities issued by the member or a control entity).

27   *SEC v. Kunz and Cline Investment Management, Inc.* Admin. Proc. File No. 3-9960, *aff'd* 2003 U.S. App. LEXIS 6011 (10th Cir. 2003) (unpublished opinion).

28   *Pacific Cornerstone Capital, Inc., supra* note 3.

29   *Everest Securities, Inc. v. SEC, supra* note 5 at 1239 (finding "the investigation that was performed was itself insufficient," and even a cursory investigation would have uncovered facts showing offering memorandum was materially misleading).

30   *Kunz and Cline, supra* note 27.

31   *See Notice to Members 05-48* (Members' Responsibilities When Outsourcing Activities to Third-Party Service Providers) (July 2005) (discussing a member's accountability and supervisory responsibility for outsourced functions).

32   *Pacific Cornerstone Capital, Inc., supra* note 3 at 9.

U.S. App. LEXIS 6011 (10th Cir. 2003) (unpublished opinion). The regulatory notice states that the SEC found that a broker had a duty to conduct a further, independent investigation of the financial condition of the issuer under the circumstances. The notice goes on to identify a myriad of acts which the broker is required to take as a matter of course in its due diligence investigation.

9.    These are the kinds of actions which Plaintiff has alleged that AGL failed to follow and which AGL has, in its moving papers, failed to confirm or show it engaged in and fulfilled. There were substantial fees paid by the Plaintiff to AGL and AGL profited by those fees during the course of this investment and it was the expectation that, in exchange for significant fees, AGL would be acting not simply as a conduit between Tremont and the Dynasty Family Trust, but also as a fiduciary and a responsible advisor with respect to the placement and the monitoring of that investment.

10. .    For these reasons and the arguments expressed in our accompanying brief, as well as the statements made in my original affidavit of April 30, 2010, I respectfully request that the Defendant's motion to dismiss be denied.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

Michael S. Rulle

Sworn to before me this
___ day of June , 2010

WILLIAM R. CONNELLY, ESQ.
ATTORNEY-AT-LAW
STATE OF NEW JERSEY

5

## FACSIMILE SIGNATURE CERTIFICATION

The undersigned does hereby certify that Michael S. Rulle has acknowledged the genuineness of his signature on the attached Supplemental Affidavit and a copy of said Affidavit with original signature affixed will be filed if requested by the party.

_____
William R. Connelly, Esq.

Dated: June 1, 2010