## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL S. RULLE FAMILY DYNASTY TRUST,

    Plaintiff,

    v.

AGL LIFE ASSURANCE COMPANY,

    Defendant

Civil Action No. 2:10-cv-00231-BMS

Hon. Berle M. Schiller

## AFFIDAVIT OF WILLIAM R. CONNELLY

STATE OF NEW JERSEY:
                   :SS
COUNTY OF MORRIS  :

    WILLIAM R. CONNELLY, being duly sworn, deposes and says:

    1.     I am an Attorney at Law admitted *pro hoc vice* in the within action. I am fully familiar with the facts hereafter stated.

    2.     This Affidavit is submitted in opposition to the Defendant AGL's Motion to Dismiss pending before the Court. This Affidavit provides the Court certain documents of authority for the convenience of the Court which have either been referenced in the Plaintiff's opposition brief or which are applicable to the issues presented in this motion.

    3.     Attached hereto as **Exhibit A** is the NASD Notice to Members 99-35. This Notice issued on May 1999, at page 229, identifies that a variable annuity is an insurance contract that is subject to regulation under state insurance and security laws. It is regulated under the Securities Act of 1933 and the Notice recites that "A distributor of variable annuity contracts to individuals is <u>required to register as a broker/dealer under the Securities Exchange Act of</u>

<u>1934 and become a member of NASD</u>. The distribution of variable annuity contracts is subject

to NASD rules". On page 230, part 4, the registered representative and registered principal are

required to review the customer investment objectives, risk tolerance, and other information to

determine that the variable annuity contract as a whole and the underlying sub-accounts

recommended to the customer are suitable.

4.      Attached hereto as **Exhibit B** is NASD Notice to Members 00-44. This exhibit

again identifies variable life insurance and variable annuity contracts as securities and their

distribution is subject to NASD rules. Among the rules cited at page 299 of this July 2000

Notice is Rule 2310 (suitability) "Which requires that a member, when recommending the

purchase, sale or exchange of any security to a customer, have reasonable grounds for believing

that the recommendation is suitable for the customer upon the basis of the facts disclosed by the

customer". Additionally, at page 300 the Notice states "The issuer of the variable life insurance

policy is an insurance company. The wholesale or retail distributor of individual variable life

insurance policies, which may or may not be related to the insurance company, must register as a

broker/dealer under the Securities Exchange Act of 1934 and become a member of NASD. <u>A</u>

<u>person selling individual variable life insurance, in addition to maintaining current life insurance</u>

<u>licenses under applicable state laws, must be a registered broker/dealer or a registered</u>

<u>representative of a broker/dealer</u>."

5.      The Amended Complaint identifies John Hillman as an Officer and Director of

both the Defendant AGL and its affiliated company Phoenix Equity Planning Corporation

(formerly known as PFG Distribution Company). Attached hereto as **Exhibit C** is the relevant

pages of the deposition of Susan M. Oberlies taken in a related case. Ms. Oberlies is identified

in the Amended Complaint as an Officer and Director of both entities. In her deposition, at page

14 and 15, she identifies a "operational relationship" between Phoenix and AGL and indicates "A number of employees of AGL Life Assurance Company performed services for Phoenix Equity Planning Corporation.  Phoenix Planning Equity Corporation serves as the broker/dealer affiliate of AGL Life Assurance Company".

6.      Attached hereto as **Exhibit D** is the Principal Underwriting Agreement dated January 1, 1996 between AGL and PFG Distribution Company (n/k/a Phoenix Equity Planning Corporation).  On page 2 of this Agreement, the Agreement expressly provides that no person shall offer or sell the products on the retail broker/dealers behalf until such person is duly registered as a representative of such broker/dealer, duly appointed by AGL, and appropriately licensed, registered or otherwise qualified to offer and sell such products under the federal securities laws and any applicable securities laws of each state or other jurisdiction in which such products may be lawfully sold and in which AGL is licensed to sell the products.  On page 4, it establishes that AGL will furnish the Private Placement Memorandum, Financial Statements and other documents and materials reasonably required for use in connection with the distribution of the products.  It says "AGL shall have responsibility for the preparation of all required materials in connection with the marketing or sales of the products, and the payment of any related expenses".  To further solidify the synergy between the two entities, at page 5, AGL agrees to maintain all requires books of account and related financial records for and on behalf of Phoenix as the agent of Phoenix.

7.      John Hillman has submitted his affidavit on behalf of AGL in support of the Defendant's Motion to Dismiss.  He is identified by Mr. Rulle also as the person who Rulle dealt with concerning the investment in the AGL Variable Life Insurance product.  Attached hereto as **Exhibit E** is the FINRA BrokerCheck Report which summarizes Mr. Hillman's professional

background and conduct. On page 1, it indicates that he is registered with Phoenix Equity Planning Corporation as a broker and that he has obtained his Series 26 broker's license (investment company products/variable contracts principal/supervisory examination), a Series 6 license (investment company products/variable contracts general industry/product examination), and his Series 63 license (uniform securities agency state law examination). Among the states in which he is licensed is the State of Alaska where he was licensed on June 7, 1999. He is also designated as an employee of AGL Life Insurance Company in addition to Phoenix Equity Planning Corporation on this registration.

8.      Attached hereto as **Exhibit F** is the BrokerCheck Report for Phoenix Equity Planning Corporation. This report identifies John Hillman as a Director and Vice President who directs the management or policies of the firm. On page 10, it identifies that the company is a registered broker/dealer and was also registered in Alaska on July 18, 1996. Under type of business it says "Broker or Dealer selling Variable Life Insurance or Annuities".

9.      AGL has argued that it is not subject to the securities and exchange laws because it is issuing private sales of securities as opposed to public offerings. Attached hereto as **Exhibit G** is Form D (Notice of Exempt Offering of Securities) filed by AGL with the United States Securities and Exchange Commission. This filing identifies AGL Life Assurance Company as the issuer of insured accounts securities and identifies John Hillman as the Executive Officer and Director of AGL. Private offerings are exempt from <u>public registration</u>, but not from the SEC regulations.

10.      Finally attached hereto as **Exhibit H** is the FINRA advisory entitled "Managing Investment Risk". AGL argues that its policy terms "Investment Loss" or "Investment Performance" encompass any loss of any sort, including fraud or theft losses. However, the

FINRA Notice addresses investment risks and the types of losses which are recognized under the heading of "Investment" losses.  It breaks down those losses into what is known as systematic risks and non-systematic risks.  Notably, among the types of investment risks discussed by FINRA, losses or risks due to fraud or theft are not included as investment risks or losses.

11.     These exhibits are respectfully submitted in support of Plaintiff's opposition to the Defendant's Motion to Dismiss.  For the reasons set forth herein, as well as in the accompanying briefs and affidavits, we respectfully request that the Defendant's Motion to Dismiss be denied.

I respectfully request that the court grant this motion or such other relief as the court may deem just and proper.

_____
William R. Connelly

Sworn to before me this
1st day of June, 2010

MARCELLA POTOCZAK
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 5/13/2014

Exhibit "A"

# NASD Notice to Members 99-35

## The NASD Reminds Members Of Their Responsibilities Regarding The Sales Of Variable Annuities

### Suggested Routing

- ■ Senior Management
- ☐ Advertising
- ☐ Continuing Education
- ☐ Corporate Finance
- ■ Executive Representatives
- ☐ Government Securities
- ■ Institutional
- ■ Insurance
- ■ Internal Audit
- ■ Legal & Compliance
- ☐ Municipal
- ☐ Mutual Fund
- ■ Operations
- ☐ Options
- ■ Registered Representatives
- ☐ Registration
- ☐ Research
- ☐ Syndicate
- ■ Systems
- ■ Trading
- ☐ Training
- ■ Variable Contracts

## Executive Summary

National Association of Securities Dealers, Inc. (NASD®) Rule 3010 requires each member to establish and maintain a system to supervise the activities of each registered representative and associated person in order to achieve compliance with the securities laws, regulations, and NASD rules. Variable life insurance and variable annuities are securities and their distribution is subject to NASD rules. This *Notice* focuses on deferred variable annuity sales and provides a set of guidelines that are intended to assist members in developing appropriate procedures relating to variable annuity sales to customers.

The guidelines identify areas of concern that NASD Regulation, Inc. (NASD Regulation®) would expect to be addressed in the procedures of members that offer and sell variable annuities. Although the specific procedures described are not mandatory, members should consider supplementing their procedures to ensure that they will be adequately designed to achieve compliance with legal and regulatory requirements.

Questions concerning this *Notice* may be directed to Thomas M. Selman, Vice President, Investment Companies/Corporate Financing, NASD Regulation, at (240) 386-4533; Lawrence Kosciulek, Assistant Director, Advertising/Investment Companies, NASD Regulation, at (202) 728-8329; or Elliot R. Curzon, Assistant General Counsel, Office of General Counsel, NASD Regulation, at (202) 728-8451.

## Background

A variable annuity is an insurance contract that is subject to regulation under state insurance and securities laws. Although variable annuities offer investment features similar in many respects to mutual funds, a typical variable annuity offers three basic features not commonly found in mutual funds: (1) tax-deferred treatment of earnings; (2) a death benefit; and (3) annuity payout options that can provide guaranteed income for life.

A customer's premium payments to purchase a variable annuity are allocated to underlying investment portfolios, often termed subaccounts. The variable annuity contract may also include a guaranteed fixed interest subaccount that is part of the general account of the insurer. The general account is composed of the assets of the insurance company issuing the contract. The value of the underlying subaccounts that are not guaranteed will fluctuate in response to market changes and other factors. Because the contract owners assume these investment risks, variable annuities are securities and generally must be registered under the Securities Act of 1933.

The underlying subaccounts that are not guaranteed are funded by a separate account of a life insurance company that, absent an exemption, is required to be registered as an investment company under the Investment Company Act of 1940. Variable annuities assess various fees including fees related to insurance features, *e.g.*, lifetime annuitization and the death benefit. The fees are typically deducted from customer assets in the separate account.

A distributor of variable annuity contracts to individuals is required to register as a broker/dealer under the Securities Exchange Act of 1934 and become a member of the NASD. The distribution of variable annuity contracts is subject to NASD rules.

Typically, variable annuities are designed to be long-term

investments for retirement. Withdrawals before a customer reaches the age of 59 1/2 are generally subject to a 10 percent penalty under the Internal Revenue Code. In addition, many variable annuities assess surrender charges for withdrawals within a specified time period after purchase.

Generally, variable annuities have two phases: the "accumulation" phase when customer contributions are allocated among the underlying investment options and earnings accumulate; and the "distribution" phase when the customer withdraws money, typically as a lump-sum or through various annuity payment options.

The myriad features of variable insurance products make the suitability analysis required under NASD rules particularly complex. NASD Regulation has addressed suitability issues in variable insurance products sales in *Notice to Members 96-86*. In that *Notice*, NASD Regulation stated that when recommending variable annuities or variable life insurance, the member and its registered representatives are required to make reasonable efforts to obtain information concerning the customer's financial and tax status, investment objectives, and such information used or considered reasonable in making recommendations to the customer.[1] In addition, a recent NASD disciplinary action discussed members' responsibilities under Rule 2310 (Suitability Rule) as they apply to the sale of variable life insurance. (*See* In the Matter of DBCC No. 8 v. Miguel Angel Cruz.[2])

## Discussion

NASD Regulation has developed the following guidelines that represent a compilation of industry practices in the supervision of the sale of variable annuities. The guidelines do not

mandate any specific procedure. Rather, they are designed to assist members in developing appropriate procedures relating to variable annuity sales practices. The guidelines are not comprehensive and are not intended as a substitute for the member's responsibilities under NASD Rule 3010. Moreover, the Suitability Rule requires an associated person of a member to make an independent determination whether an investment is suitable for a particular customer, taking into account the customer's investment objectives and financial needs.

## Customer Information

The Suitability Rule requires members and their registered representatives to make reasonable efforts to obtain information concerning a customer's financial and tax status, investment objectives, and such other information used or considered in making recommendations to the customer.

**1.** When recommending a variable annuity, members and their registered representatives should make reasonable efforts to obtain comprehensive customer information, including the customer's occupation, marital status, age, number of dependents, investment objectives, risk tolerance, tax status, previous investment experience, liquid net worth, other investments and savings, and annual income. Retention of this customer information can be made in conjunction with the maintenance of basic customer account information that is required in NASD Rule 3110.

**2.** A registered representative should discuss all relevant facts with the customer, including liquidity issues such as potential surrender charges and the Internal Revenue Service (IRS) penalty; fees, including mortali-

ty and expense charges, administrative charges, and investment advisory fees; any applicable state and local government premium taxes; and market risk.

**3.** The registered representative should seek to ensure that the variable annuity application and any other information provided by the customer to the member is complete and accurate, and promptly forwarded to a registered principal for review.

**4.** When a variable annuity transaction is recommended to a customer, the registered representative and a registered principal should review the customer's investment objectives, risk tolerance, and other information to determine that the variable annuity contract as a whole and the underlying subaccounts recommended to the customer are suitable. The registered principal should compare the information in the account application with other relevant information sources, *e.g.*, an account information form, to check for apparent accuracy and consistency prior to approving the transaction.

## Product Information

**5.** The registered representative should have a thorough knowledge of the specifications of each variable annuity that is recommended, including the death benefit, fees and expenses, subaccount choices, special features, withdrawal privileges, and tax treatment.

**6.** To the extent practical, a current prospectus should be given to the customer when a variable annuity is recommended. Prospectus information about important factors, such as fees and expenses and the illiquidity of the product, should be discussed with the customer.

**7.** Under NASD Rule 2210, the registered representative may only use sales material that is approved by a registered principal of the member.

## Liquidity And Earnings Accrual

Lack of liquidity, which may be caused by surrender charges or penalties for early withdrawal under the Internal Revenue Code, may make a variable annuity an unsuitable investment for customers who have short-term investment objectives. Moreover, although a benefit of a variable annuity investment is that earnings accrue on a tax-deferred basis, a minimum holding period is often necessary before the tax benefits are likely to outweigh the often higher fees imposed on variable annuities relative to alternative investments, such as mutual funds.

**8.** The registered representative should inquire about whether the customer has a long-term investment objective and typically should recommend a variable annuity only if the answer to that question, with consideration of other product attributes, is affirmative. In general, the registered representative should make sure that the customer understands the effect of surrender charges on redemptions and that a withdrawal prior to the age of 59 1/2 could result in a withdrawal tax penalty. In addition, the registered representative should make sure that customers who are 59 1/2 or older are informed when surrender charges apply to withdrawals.

**9.** The member should develop special procedures to screen for any customer whose age may make a long-term investment inappropriate, such as any customer over a specific

age. Based on certain contract features, some customers of advanced age may be unsuitable for a variable annuity investment.

## Income, Net Worth, And Contract Size Thresholds

**10.** Members should establish procedures to require a principal's careful review of variable annuity investments that exceed a stated percentage of the customer's net worth, and any contract in which a customer is investing more than a stated dollar amount.

## Investment In Tax Qualified Accounts

Some tax-qualified retirement plans (e.g., 401(k) plans) provide customers with an option to make investment choices only among several variable annuities. While these variable annuities provide most of the same benefits to investors as variable annuities offered outside of a tax-qualified retirement plan, they do not provide any additional tax deferred treatment of earnings beyond the treatment provided by the tax-qualified retirement plan itself.

**11.** When a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (e.g., 401(k) plan, IRA), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary. The registered representative should recommend a variable annuity only when its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the recommendation.

**12.** A member should conduct an especially comprehensive suitability analysis prior to approving the sale of a variable annuity with surrender charges to a customer in a tax-qualified account subject to plan minimum distribution requirements.

## Variable Annuity Replacements

**13.** The member firm may decide to develop an exchange or replacement analysis document or utilize an existing form authorized by a state insurance commission or other regulatory agency. If such a document is used, then (consistent with the requirements of various states) it should be completed for all variable annuity replacements and should include an explanation of the benefits of replacing one contract for another variable contract. The document also should be signed by the customer, the registered representative, and the registered principal.

**14.** The registered representative and the registered principal should determine, based on the information provided by the customer and their own knowledge of the product features, that replacing the existing contract with a new contract is suitable for the customer. Consideration should be given to such matters as product enhancements and improvements, lower cost structures, and surrender charges.

**15.** The member firm should consider developing compliance systems, such as computer programs, when available, that can monitor and identify those registered representatives whose clients have a particularly high rate of variable annuity replacements or rollovers. These compliance systems should provide the firm with "red flags" that

the firm can investigate to determine whether some of these replacements are unsuitable.

**16.** A retail member should adopt other measures reasonably designed to ensure that replacement sales activity by its registered representatives complies with NASD rules. Members that "wholesale" variable annuities are reminded that they are also subject to NASD rules, and that they should avoid marketing strategies that are designed primarily to encourage inappropriate replacement sales. Upon reasonable request and to the extent practical, wholesale members should assist retail broker/dealers in monitoring the replacement activity of their customers.

## Endnote

[1] *Notice to Members 96-86* also listed specific factors that could be considered when recommending variable annuities and variable life insurance contracts. These factors are:
- a representation by a customer that his or her life insurance needs were already met;
- the customer's express preference for an investment other than an insurance product, the customer's inability to appreciate fully how much of the purchase payment or premium is allocated to cover insurance or their costs, and a customer's ability to understand the complexity of variable products generally;
- the customer's willingness to invest a set amount on a yearly basis;
- the customer's need for liquidity and short-term investment;
- the customer's immediate need for retirement income; and
- the customer's investment sophistication and whether he or she is able to monitor the investment experience of the separate account.

[2] Complaint No. C8A930048 (NBCC Oct. 31, 1997)

© 1999, National Association of Securities Dealers, Inc. (NASD). All rights reserved.

Exhibit "B"

## NASD Notice to Members 00-44

INFORMATIONAL

# Variable Contracts

## The NASD Reminds Members Of Their Responsibilities Regarding The Sale Of Variable Life Insurance

### SUGGESTED ROUTING

*The Suggested Routing function is meant to aid the reader of this document. Each NASD member firm should consider the appropriate distribution in the context of its own organizational structure.*

- Executive Representatives
- Insurance
- Internal Audit
- Legal & Compliance
- Operations
- Registered Representatives
- Senior Management
- Variable Contracts

### KEY TOPICS

- Suitability
- Supervision
- Variable Contracts

### Executive Summary

Due to the growth in sales and the popularity of variable life insurance products, NASD Regulation, Inc. (NASD Regulation℠) has published this *Notice to Members*, which focuses on retail sales to individuals of variable life insurance. This *Notice* provides a set of guidelines to help members in developing supervisory procedures relating to the sales of variable life insurance. The guidelines identify areas of concern that NASD Regulation would expect to be considered in these procedures.

### Questions/Further Information

Questions or comments concerning this *Notice* may be directed to Thomas M. Selman, Vice President, Investment Companies/Corporate Financing, NASD Regulation, at (202) 728-8330; Lawrence Kosciulek, Associate Director, Advertising/Investment Companies Regulation, NASD Regulation, at (202) 728-8329; or Robert J. Smith, Assistant General Counsel, Office of General Counsel, NASD Regulation, at (202) 728-8451.

### Background

Variable life insurance and variable annuity contracts (Variable Contracts) are securities, and accordingly, their distribution is subject to National Association of Securities Dealers, Inc. (NASD*) rules. Of particular importance are:

- Rule 3010 (Supervision), which requires each member to establish and maintain systems to supervise the activities of each registered representative and associated person in order to achieve compliance with the securities laws, regulations, and NASD rules; and

- Rule 2310 (Suitability), which requires that a member, when recommending the purchase, sale, or exchange of any security to a customer, have reasonable grounds for believing that the recommendation is suitable for the customer upon the basis of the facts disclosed by the customer.

NASD has published other *Notices to Members* regarding Variable Contracts, including *Notice to Members 99-35* (May 1999) which provides guidance to assist members in developing appropriate procedures relating to deferred variable annuity sales to customers, and *Notice to Members 96-86* (December 1996) which reminds members that sales of Variable Contracts are subject to NASD suitability requirements.

This *Notice* focuses on retail sales of variable life insurance, including both scheduled premium and flexible premium products. The *Notice* provides a set of guidelines to assist members in developing sales-related supervisory procedures.

### Description Of Variable Life Insurance

Variable life insurance is an insurance policy that is subject to regulation under state insurance and federal securities laws (unless otherwise indicated, references to variable life insurance include both scheduled premium variable life insurance and flexible premium variable universal life insurance).

Similar to traditional life insurance, variable life insurance offers a death benefit that represents the amount the life insurance company is obligated to pay upon the death of the insured. In addition to the death benefit, variable life

## NASD Notice to Members 00-44

insurance generates an investment element usually termed the "cash value." However, the insurance company that issues the variable life insurance policy does not guarantee the cash value. The cash value and in some cases, the death benefit, can fluctuate based on the performance of investment portfolios maintained by the insurance company in a segregated or separate account, and the interest earned on balances in general account options, if any. Generally, the insurance company guarantees the original face amount of the policy as a death benefit as long as the policy holder's premiums are paid on schedule or the cash value is sufficient to meet each fee deduction.

A customer's variable life insurance premium payments typically are invested in an insurance company's separate account, though in some cases, premiums may also be allocated to one or more general account options. The separate account is distinct from the insurance company's general account, which comprises the assets of the insurance company that issues the policy.

The investment portfolios or investment divisions underlying the separate account are often called "subaccounts." The subaccounts are divisions of the separate account that invest in distinct underlying fund portfolios. A customer's policy premium payments, after deductions for any sales expense charges or premium tax charges, are applied to the subaccounts and any general account options in accordance with the customer's allocation election. The value of the subaccounts will fluctuate in accordance with the investment experience of the underlying funds. Because the

policy owners assume investment risks, variable life insurance policies are securities within the meaning of the federal securities laws and must be registered under the Securities Act of 1933, and the separate account and the underlying funds must generally register as investment companies under the Investment Company Act of 1940.

The issuer of the variable life insurance policy is an insurance company. The wholesale or retail distributor of individual variable life insurance policies, which may or may not be related to the insurance company, must register as a broker/dealer under the Securities Exchange Act of 1934 and become a member of the NASD. A person selling individual variable life insurance, in addition to maintaining current life insurance licenses under applicable state laws, must be a registered broker/dealer or a registered representative of a broker/dealer.

Typically the main charges associated with a variable life insurance policy are front-end sales loads, back-end sales loads, administrative charges, cost of insurance charges, mortality and expense risk charges, and various fees associated with each underlying fund option. The cost of insurance charges can vary significantly depending on the individual's personal circumstances (*e.g.*, age, sex, health, smoker/non-smoker, face amount of policy).

### Recent Disciplinary Action

In a recent NASD Regulation disciplinary action, an NASD member was found to have violated NASD Rule 3010 (Supervision) for failing to establish, maintain, and enforce reasonable supervisory procedures. The member's procedures failed to adequately

differentiate between fixed and variable life insurance products. In addition, the member was found to have violated NASD Rule 2110 (Standards of Commercial Honor and Principles of Trade) for engaging in material misrepresentations and omissions, NASD Rule 2210 (Communications with the Public) for the use of misleading sales literature, and NASD Rule 2310 (Suitability Rule) for unsuitable recommendations and sales. (*See Pruco Securities Corp. Letter of Acceptance Waiver and Consent*[1].) The violations included:

- Various misrepresentations, including statements that:

  - New policies could be acquired by customers already owning the firm's life insurance by using cash values or future dividends from customers' existing policies, for little or no additional cash payment;

  - Premium payments would end, or "vanish," after a certain number of years; and

  - Variable life policies were not insurance but were an investment, savings, or retirement plan.

- Unsuitable sales to customers, including retirees and persons who did not know that they were purchasing insurance or did not want life insurance.

- Failure to establish, maintain, and enforce adequate procedures with respect to the review of variable life insurance purchases to determine whether sales were suitable for customers and failure to obtain the customer information necessary to make suitability determinations.

## NASD Notice to Members 00-44

- Use of misleading sales literature.

- Failure to establish, maintain, and enforce reasonable supervisory procedures.

- Failure to register representatives and principals and permitting unregistered persons to sell securities.

### Guidelines For Supervision Of Variable Life Insurance Sales

Variable life insurance may be appropriate for a customer with a need for life insurance and an ability to pay for permanent life insurance protection. Nevertheless, since the cash value and death benefit may fluctuate due to the performance of the investments in the separate account, a variable life insurance customer should also be able to assume investment risk and understand the implications of adverse investment performance.

The following guidelines represent a collection of industry practices regarding the supervision of the sale of variable life insurance. Although these are only guidelines, members are encouraged to refer to them in developing their own policies and procedures relating to variable life insurance sales practices.

### A. Customer Information

NASD Rule 2310 requires that members and their registered representatives, prior to the execution of a recommended transaction, make reasonable efforts to obtain information concerning a customer's financial and tax status, investment objectives, and such other information used or considered to be reasonable in making recommendations to the customer. The NASD has recognized that

members have developed various practices and procedures in order to comply with this rule.

When recommending a variable life insurance policy, members and their registered representatives should make reasonable efforts to obtain comprehensive customer information, such as the customer's age, annual income, net worth, liquid net worth, number of dependents, investment objective, sources of funds for investment, investment experience, existing investments and life insurance, time horizon, and risk tolerance.

The registered representative should document this type of information in a customer account information form and should submit it with every variable life insurance application. A registered principal should review the account information form and verify that the recommendation of both the policy and the subaccount allocation is consistent with the customer's investment objectives and risk tolerance. Some members have designed policy applications that also contain comprehensive customer background information. Whatever the means by which a member collects customer account information (e.g., in paper or electronic form), appropriate customer account information should be reviewed and retained.

### B. Review Of Customer Information

The member should consider whether the customer desires and needs life insurance and whether the customer can afford the premiums likely needed to keep the policy in force.

A member may wish to establish internal percentage ratio guidelines, such as the ratio of scheduled or target premium to income or

household income, or percentage scheduled or target premium to liquid net worth. While these ratio guidelines are no substitute for proper supervision, they may assist in the review for variable life insurance affordability and excessive amounts of coverage. If the ratio exceeds the member's parameters, an extra level of supervision and review may be warranted. If parameters are exceeded, the registered representative should submit additional supporting documentation or a written explanation. To assist principals in their review of variable life insurance applications, members may wish to provide a checklist of items for the principal to review.

Members may choose at the point of sale to utilize allocation percentage guidelines when underlying fund allocations are made.

Members may wish to establish special supervision requirements for sales to older customers. Life insurance is often appropriately purchased by older investors. However, variable life insurance may not be suitable for an older investor who is primarily seeking an investment rather than an insurance product. Additionally, members should carefully consider whether an older investor has the financial means to sustain the likely amount of policy premium payments.

### C. Product Information

Registered representatives should be thoroughly familiar with the features and costs associated with each recommended variable life insurance policy, including surrender charges, premium and cash value charges, separate account charges, underlying fund fees, subaccount investment

## NASD Notice to Members 00-44

options, loan provisions, free-look periods, and policy premium lapse periods. The registered representative also should be able to clearly convey such information to the customer so that the customer can make an informed investment decision regarding the recommendation.

Variable life insurance policies have features of both traditional insurance products and securities. Accordingly, members may provide their registered representatives with examples, such as lifestyle case studies, to illustrate what the member considers to be potentially unsuitable recommendations and what type of activity would warrant an extra level of supervisory review.

Members may also wish to provide customers with member-approved product information brochures, in addition to any required disclosure documents, that explain the features and principal risks associated with variable life insurance.

To the extent practical, registered representatives should provide customers with a current prospectus when recommending a variable life insurance policy. Registered representatives should be available to discuss with customers the information that is contained in the prospectus.

### D.  Variable Life Insurance Replacements

Various states have issued rules governing variable life insurance replacement activity. While the defi- nitions vary, the term "replacement" generally refers to the activity of a customer surrendering or altering existing insurance coverage in order to purchase a new variable life insurance policy. A replacement may not be in the best interests of a customer. For example, a customer

may incur new fees, extended sur- render charge periods, a possible higher insurance risk rating due to ill health, and new suicide and incontestability periods. There may also be unfavorable tax conse- quences. Registered representa- tives should carefully consider whether a replacement is in the best interests of the customer.

Members should adopt procedures for the review of replacement recommendations to ensure that they are suitable. Members should either develop a replacement disclosure form or use an existing form authorized by a state insurance commission or other regulatory body. Consistent with any state requirements, the appropriate form should be completed for each replacement involving variable life insurance. The form should include the signatures of the customer and the registered representative. Members should provide their registered representatives and registered principals with appropriate procedures on replacements. Members should determine that the proposed replacement transaction is suitable and that the registered representative has complied with firm procedures and applicable state regulations regarding disclosure requirements.

A member should review a variable life insurance application to determine that any replacement question is answered. For example, if questions on whether the proposed policy replaces any existing annuity or policy are not completed, then the registered principal should request that the registered representative obtain a completed application.

The member may create a compliance report that tracks replacement activity by each

registered representative. Replacement activity exceeding a certain percentage of the registered representative's total activity could trigger further review. The member may also decide to design a compliance system to flag unacknowledged replacement activity by utilizing background information such as surrenders, reduced face amounts, lapses, and modified surrenders. To assist in this review, a member could use quarterly 1035 exchange reports or other reports that may be provided by a number of insurance companies. Upon reasonable request and to the extent practical, wholesale members should also assist retail broker/dealers in monitoring the replacement activity of their customers.

### E.  Life Insurance Financing

Members should not recommend that a customer finance a variable life insurance policy from the value of another life insurance policy or annuity, such as through the use of loans or cash values, unless the transaction is otherwise suitable for the customer. The NASD believes that the burden of demonstrating that such financed transactions are in the customer's best interests would generally be more difficult than for a routine sale of variable life insurance. In the *Pruco* case, many customers' existing cash values were depleted to pay the premiums of new policies. The new policies lapsed when the required premium for the new variable life insurance policy exceeded the dividend stream or cash value of the original policy.

When financing is recommended, registered representatives should disclose to the policy owner the potential consequences to both the existing and new policy. Members should provide a form to the registered representative that

## NASD Notice to Members 00-44

documents the customer's informed consent to the financing. The form should include the customer's acknowledgment, the registered representative's signature, and a registered principal's signature.

Members should monitor these arrangements so that they can prevent improper and excessive financed and replacement sales. For internalized activity, members could create a system that matches new policies with disbursements from existing policies for a set time period and track that activity. Members should consider whether to vary review and report periods in order to prevent registered representatives from timing financed or replaced transactions to escape detection.

### F. Advertising And Sales Literature

Under NASD Rule 2210, members must file with NASD Regulation's Advertising/Investment Companies Regulation Department all variable life insurance advertisements and sales literature within 10 days of first use or publication. Members are also required to file the format for hypothetical illustrations used in the promotion of variable life insurance policies, since these formats qualify as sales literature. Members must have supervisory procedures in place to ensure

compliance with the rule's filing requirements. Members also must ensure that all advertisements and sales literature regarding variable life insurance are approved in writing by a registered principal and prior to use with the public.

Any communication discussing the tax-deferral benefits of variable life insurance should not obscure or diminish the importance of the life insurance features of the product. Any variable life insurance communication that overemphasizes the investment aspects of the policy or potential performance of the subaccounts may be misleading.

### G. Members' Supervisory Systems And Procedures

*Notice to Members 99-45* (June 1999) provides guidance on member supervisory procedures. The *Notice* emphasizes that NASD Rule 3010 require members, regardless of their size or complexity, to adopt and implement a supervisory system that is tailored specifically to a member's business. Supervisory systems must address the activities of all of the member's registered representatives and associated persons and may include components such as automated exception reports and surveillance programs that monitor unusual activity. Members must adopt

written supervisory procedures that document the supervisory system and that are reasonably designed to achieve compliance with all applicable securities laws and regulations and NASD rules.

Members may wish to design their own supervisory system to monitor variable life insurance sales activities based upon the member's organization and structure. For some members with geographically dispersed offices and personnel, a decentralized supervisory system may be sufficient. For other members, a centralized compliance supervisory system may be more appropriate.

Members should design systems that provide an easy and expeditious way for customers to communicate complaints, and that ensure that customer complaints are acted upon, analyzed, and researched.

### Endnote

[1]Letter of Acceptance, Waiver and Consent No. CAF990010 (July 8, 1999).

© 2000, National Association of Securities Dealers, Inc. (NASD). All rights reserved. Notices to Members attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

Exhibit "C"

Page 14

1          SUSAN M. OBERLIES
2    Corporation?
3          A.     Yes, Robert Primmer.
4          Q.     I hand you what's been marked as
5    Exhibit Number 5.
6          Can you identify that document?
7          A.     That is an organizational chart
8    relative to AGL Life Assurance Company and
9    Phoenix Equity Planning Corporation.
10         Q.     And Phoenix Equity Planning
11   Corporation is one of the defendants in this
12   litigation, as you understand it?
13         A.     Yes.
14         Q.     They were formerly known as PFG
15   Distribution Company?
16         A.     Yes.
17         Q.     Do you recall when that change
18   took place?
19         A.     To the best of my recollection,
20   on or about February 5th, 2009.
21         Q.     I can see from the
22   organizational chart here that they are what I
23   would call sister companies. They're both
24   owned by the same parent.
25         Do they have an operational

Page 16

1          SUSAN M. OBERLIES
2    Equity Planning Corporation as "PFG."
3          If I use that acronym, will you
4    understand what I am referring to?
5          A.     Yes.
6          Q.     What does the Philadelphia
7    Financial Group do?
8          A.     Philadelphia Financial Group is
9    an insurance agency, essentially.
10         Q.     In the organizational chart,
11   Exhibit Number 5, I notice The Phoenix
12   Companies, Inc. are both the top right- and
13   left-hand columns.
14         Is that the same company?
15         A.     Yes, it is.
16         Q.     How many different life
17   insurance companies does The Phoenix Companies
18   own?
19         A.     I'm -- I'm not certain that I
20   would know that information.
21         Q.     For AGL Life Assurance Company,
22   or AGL -- we'll use that term in this
23   deposition -- does it have a niche within The
24   Phoenix Companies' insurance companies? Does
25   it have a special product niche?

Page 15

1          SUSAN M. OBERLIES
2    relationship as well, Phoenix Equity Planning
3    Corporation and AGL?
4          A.     Yes, I would say so.
5          Q.     Could you describe that for me?
6          A.     A number of employees of AGL
7    Life Assurance Company performed services for
8    Phoenix Equity Planning Corporation. And
9    Phoenix Equity Planning Corporation serves as
10   the broker-dealer affiliate of AGL Life
11   Assurance Company.
12         Q.     Is that the only operational
13   function of Phoenix Equity Planning
14   Corporation, to be the broker-dealer affiliate
15   of AGL, or does it have other operations?
16         A.     It has other operations.
17         Q.     What are its other operations?
18         A.     It serves as the broker-dealer
19   affiliate of certain life insurance company
20   affiliates of The Phoenix Companies, Inc. and
21   as the mutual fund underwriter and distributor
22   of the Phoenix Edge Series Fund, a multiple
23   fund of The Phoenix Companies, Inc. affiliate.
24         Q.     And in the course of the
25   deposition today, I may refer to the Phoenix

Page 17

1          SUSAN M. OBERLIES
2          A.     Yes. Essentially we serve high
3    net worth clients and issue certain types of
4    variable annuity and variable life insurance
5    contracts.
6          Q.     So just variable annuities and
7    variable life insurance products?
8          A.     That's correct.
9          Q.     And The Phoenix Companies, Inc.,
10   that's a New York Stock Exchange-listed
11   company?
12         A.     That is correct.
13         Q.     Are any of the other companies
14   publicly listed within this organizational
15   chart?
16         A.     No.
17         Q.     How long have you held the
18   duties of vice president, corporate counsel and
19   secretary for AGL?
20         A.     Approximately ten years.
21         Q.     How long have you been the
22   president, co-chief compliance officer,
23   secretary and one other job, too, for PFG?
24         A.     I have been co-chief compliance
25   officer since February 2009. And I have been

Exhibit "D"

# PRINCIPAL UNDERWRITING AGREEMENT

PRINCIPAL UNDERWRITING AGREEMENT, effective January 1, 1996, by and between

AMERICAN GUARDIAN LIFE ASSURANCE COMPANY ("AGL") and PFG

DISTRIBUTION COMPANY ("PFGD").

WHEREAS:

- Effective January 1, 1996, AGL has established a separate account in the Commonwealth of Pennsylvania for the purpose of receiving and investing assets attributable to certain variable products (the "Products") offered for sale by AGL;

- PFGD is registered as a broker-dealer with the Securities and the Exchange Commission ("SEC") under the Securities Exchange Act of 1934, as amended (the "1934 Act") and is a member in good standing of the National Association of Securities Dealers, Inc. ("NASD");

- AGL desires to have the Products sold and distributed through PFGD and PFGD is willing to sell and distribute the Products under the terms stated herein; and

- PFGD desires to have AGL perform certain services in connection with the sale of the Products;

NOW, THEREFORE, the parties agree as follows:

A. **APPOINTMENT**. AGL appoints PFGD and PFGD agrees to serve as distributor and principal underwriter of the Products during the term of this Principal Underwriting Agreement ("Agreement"). PFGD will be under no obligation to effectuate any particular amount of sales of the Products. PFGD shall be responsible for carrying out its obligations hereunder in continuing compliance with the NASD Rules of Fair Practice and federal and state securities laws.

B. RETAIL BROKER-DEALER AGREEMENTS.

(1)     AGL authorizes PFGD to enter into separate written Selling Agreements, on terms

and conditions PFGD determines are consistent with this Agreement, with

independent retail broker-dealers who are registered as such under the 1934 Act

and are members of the NASD ("retail broker-dealer"), and who agree to

participate in the distribution of the Products and to use their best efforts to solicit

applications for the Products.

(2)     Each Selling Agreement made with a retail broker-dealer shall require the retail

broker-dealer to be responsible for carrying out its sales obligations hereunder in

compliance with the NASD Rules of Fair Practice and federal and state securities

laws, and specifically shall require each such retail broker-dealer to be fully

responsible for:

(a) ensuring that no person shall offer or sell the Products on the retail broker-

dealer's behalf until such person is duly registered as a representative of

such broker-dealer, duly appointed by AGL, and appropriately licensed,

registered or otherwise qualified to offer and sell such Products under the

federal securities laws and any applicable securities laws of each state or

other jurisdiction in which such products may be lawfully sold and in

which AGL is licensed to sell the Products and in which such person shall

offer or sell the Products (such persons hereinafter referred to as

"Representatives"); and

2

(b) training, supervising, and controlling all such persons for purposes of complying on a continuous basis with the NASD Rules of Fair Practice and with federal and state securities law requirements applicable in connection with the offering and sale of the Products. In this connection, the retail broker-dealer shall:

(i) conduct such training (including the preparation and utilization of training materials) as in the opinion of PFGD is necessary to accomplish the purposes of this Agreement;

(ii) establish and implement reasonable written procedures for supervision of sales practices of agents, representatives or brokers selling the Products; and

(iii) take reasonable steps to ensure that its associated persons shall not make recommendations to an applicant to purchase a product nor sell a product in the absence of reasonable grounds to believe that the purchase of the product is suitable for such applicant. A determination of suitability shall be based upon information furnished after reasonable inquiry of the applicant concerning the applicant's insurance and investment objectives, financial situation and needs. AGL and PFGD will rely on the signature of a principal of the retail broker-dealer as evidence that the broker-dealer has made a determination of suitability.

3

(3)    Each retail broker-dealer shall provide that the only representations to be made

concerning the Products will be based on information contained in sales and

promotional material approved by AGL and PFGD.

(4)    Applications for Products solicited by broker-dealers through their

Representatives shall be forwarded to AGL.  All payment for Products shall be

made payable to "American Guardian Life Assurance Company" and remitted

promptly to AGL as agent for PFGD.

(5)    Each broker-dealer who agrees to participate in the distribution of the Products

shall act as an independent contractor and nothing herein shall constitute such

broker-dealer or its agents or employees as employees of PFGD or AGL in

connection with the sale of the Products.

(6)    AGL shall apply for the proper insurance licenses in the appropriate states or

jurisdictions for the Representatives associated with PFGD or with other

independent retail broker-dealers which have entered into agreements with PFGD

for the sale of the Products, provided that AGL reserves the right to refuse to

appoint any proposed Representative as an agent or broker, or to terminate a

Representative once appointed.

## C.   PROMOTIONAL MATERIAL.

(1)    AGL shall furnish PFGD with copies of all private placement memoranda,

financial statements and other documents and materials which PFGD reasonably

requires for use in connection with the distribution of the Products.  AGL shall

have responsibility for the preparation of all required materials in connection with

the marketing or sales of the Products, and the payment of all related expenses.

4

PFGD will, at AGL's sole expense, execute such papers and do such acts and things that shall from time to time be reasonably requested by AGL for the purpose of qualifying and maintaining qualification of the Products for sale under the applicable laws of the various states.

(2)    PFGD shall only use such sales or advertising materials that have been provided or approved by AGL.  PFGD will make timely filings with the NASD and any other securities regulatory authorities of any sales literature or materials relating to the Products as are required by law to be filed.

(3)    PFGD will make timely filings with state securities regulatory authorities of any information related to the Products as required by the Blue Sky laws of particular states in order to qualify and maintain qualification of the Products for sale in such states.

D.  **RECORDS OF REPRESENTATIVES**.  AGL, on behalf of PFGD, shall have the responsibility for maintaining the records of Representatives licensed, registered or otherwise qualified to sell the Products.

E.  **OTHER RECORDS**.  AGL agrees to maintain all required books of account and related financial records for and on behalf of PFGD.  All such books of account and records shall be maintained and preserved pursuant to 1934 Act Rules 17a-3 and 17a-4 (or the corresponding provisions of any future federal securities laws or regulations).  All such books and records shall be maintained by AGL on behalf of and as agent for PFGD.  These books and records are the property of PFGD and shall at all times be subject to reasonable periodic, special or other examination by all regulatory bodies having jurisdiction.  AGL also agrees to send to PFGD's customers all required confirmations of customer transactions.

5

F. **COMPENSATION**.

    (1)    As compensation for the assumption of the distribution expenses of AGL and the performance of services rendered pursuant to this Agreement, PFGD shall receive from AGL such amounts as from time to time may be agreed upon in writing by PFGD and AGL.

    (2)    AGL will, on behalf of PFGD and on its account, in connection with the sale of the Products, pay all amounts due to Representatives or to those broker-dealers who have entered into Selling Agreements with PFGD and AGL and PFGD shall have no obligation to pay such amounts.

G. **INVESTIGATION AND PROCEEDINGS**.  PFGD and AGL agree to cooperate fully with respect to any customer complaint, insurance regulatory investigation or proceeding or judicial proceeding arising in connection with the Products distributed under this Agreement. PFGD and AGL further agree to cooperate fully in any securities regulatory inspection, inquiry, investigation or proceeding or any judicial proceeding with respect to PFGD, AGL, their affiliates and their Representatives to the extent that such inspection, inquiry, investigation or proceeding is in connection with the Products distributed under this Agreement.  Such cooperation shall include prompt notification to the other party of any customer complaint or notice received of any regulatory inspection, inquiry, investigation or proceeding in connection with the Products.

H. **PFGD INDEPENDENT CONTRACTOR**.  PFGD shall be an independent contractor. PFGD is responsible for its own conduct and the employment, control and conduct of its agents and employees and for any injury to such agents or employees or to others through its agent or employees.  PFGD assumes full responsibility for its agents and employees under

6

applicable statutes and agrees to pay all employer taxes thereunder.  All persons selling

Products shall be duly licensed as insurance producers pursuant to applicable state laws and

AGL shall have responsibility for arranging for such licensing.

I.  **INTERESTS IN AND OF PFGD**.  It is understood that a policyholder, director, officer,

employee or agent of AGL may be a shareholder, director, officer, employee or agent of, or

be otherwise interested in, PFGD, any affiliated person of PFGD, any organization in which

PFGD may have an interest or any organization which may have an interest in PFGD; that

PFGD, any such affiliated person or any such organization may have an interest in AGL; and

that the existence of any such dual interest shall not affect the validity hereof or of any

transaction hereunder except as otherwise provided in the Articles of Incorporation or By-

Laws of AGL and PFGD, respectively, or by specific provision of applicable law.

J.  **INDEMNIFICATION**.

(a) AGL agrees to indemnify and hold harmless PFGD and each director or

officer thereof, and each person, if any, who is associated with PFGD

within the meaning of the Securities Exchange Act of 1934 against any

and all loss, liability, claims, damage, and expenses whatsoever (including

any and all expenses reasonably incurred in investigating or defending

against any litigation commenced or threatened or any claim whatsoever)

arising out of any untrue or alleged untrue statements made in sales

material relating to the Products prepared by AGL or supplied to PFGD by

AGL or in any application ("application") filed in any state in order to

qualify the same for sale or the omission or alleged omission therefrom of

7

a material fact necessary in order to make the statements therein, in light

of the circumstances under which they were made, not misleading.

(b) PFGD agrees to indemnify and hold harmless AGL and each director or

officer thereof, and each person, if any, who controls AGL within the

meaning of the Securities Act of 1933, its agents, subsidiaries and

employees, against any and all loss, liability, claims, damage, and

expenses whatsoever (including but not limited to any and all expenses

reasonably incurred in investigating or defending against any litigation

commenced or threatened or any claim whatsoever) arising out of any

untrue or alleged untrue statement or representation made by PFGD

(except as such statements may be made in reliance on the private

placement memorandum and sales material supplied by AGL).

(c) Promptly after receipt by an indemnified party under this section of notice

of the commencement of any such litigation or claim, such indemnified

party will, if a claim in respect thereof is to be made against the

indemnifying party under this Section, notify the indemnifying party of the

commencement thereof. In case any such litigation or claim is brought

against any indemnified party and it notifies the indemnifying party of the

commencement thereof, the indemnifying party will be entitled to

participate therein and, to the extent that it may wish, assume the defense

thereof, with counsel satisfactory to such indemnified party, and after

notice from the indemnifying party to such indemnified party of its

election to assume the defense thereof, the indemnifying party will not be

8

liable to such indemnified party under this Section for any legal or other
expenses subsequently incurred by such indemnified party in connection
with the defense thereof, other than the reasonable cost of investigation.

K. **LIABILITY.** Each party shall be liable for its own misconduct and negligence hereunder.

L. **EFFECTIVE DATE AND TERMINATION.** This Agreement shall become effective as of
the date first above written, and:

    (a) shall continue in force from year-to-year thereafter, subject to prior
termination as provided herein;

    (b) may at any time be terminated on sixty days' written notice to PFGD and
AGL;

    (c) may at any time be terminated by AGL if PFGD fails to perform in a
satisfactory manner;

    (d) shall terminate automatically in the event of its assignment by PFGD and
shall not be assignable by AGL except with the written consent of PFGD;

    (e) may be terminated by PFGD on sixty days' written notice to AGL.

Termination of this agreement pursuant to this section shall be without payment of any penalty.
In the event of termination for any reason, AGL shall retain all records relating hereto, free from
any claim or retention of rights by PFGD.

N. **CONFIDENTIALITY.** PFGD agrees not to disclose or use any records or information
obtained hereunder in any manner whatsoever except as expressly authorized herein, and will
keep confidential any information obtained pursuant hereto, and disclose such information
only if AGL has authorized such disclosure, or if such disclosure is expressly required by
applicable local, state or federal regulatory authorities.

9

O.  **AMENDMENT.** This Agreement may be amended only by mutual consent of the parties by an instrument in writing.

P.  **SEVERABILITY.** If any provision of this Agreement shall be held or made invalid by a Court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby.

Q.  **APPLICABLE LAW AND LIABILITIES.** This Agreement shall be governed by and construed in accordance with the laws of Pennsylvania. This Agreement shall be subject to all applicable provisions of law, including, without limitation, the applicable provisions of the Securities Act of 1940. To the extent that any provisions herein contained conflict with any applicable provisions of law, the latter shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

American Guardian Life Assurance Company

By: _____

Title: _____

PFG Distribution Company

By: _____

Title: _____

10

Exhibit "E"

# BrokerCheck Report

## JOHN KEARNEY HILLMAN

CRD# 2605990

Report #5727I-86646, data current as of Wednesday, April 21, 2010.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 5 |
| Registration and Employment History | 6 |
| About this BrokerCheck Report | 7 |



**Dear Investor:**

FINRA has generated the following BrokerCheck report for JOHN K. HILLMAN. The information contained within this report has been provided by a FINRA member firm(s) and securities regulators as part of the securities industry's registration and licensing process and represents the most current information reported to the Central Registration Depository (CRD₍) system.

FINRA regulates the securities markets for the ultimate benefit and protection of the investor. FINRA believes the general public should have access to information that will help them determine whether to conduct, or continue to conduct, business with a FINRA member firm or any of the member's associated persons. To that end, FINRA has adopted a public disclosure policy to make certain types of information available to you. Examples of information FINRA provides on currently registered individuals and individuals who were registered during the past two years include: actions by regulators, investment-related civil suits, customer disputes that contain allegations of sales practice violations against brokers, all felony charges and convictions, misdemeanor charges and convictions relating to securities violations, and financial events such as bankruptcies, compromises with creditors, judgments, and liens. FINRA also provides certain information on individuals whose registrations terminated more than two years ago.

When evaluating this report, please keep in mind that it may include items that involve pending actions or allegations that may be contested and have not been resolved or proven. Such items may, in the end, be withdrawn or dismissed, or resolved in favor of the firm or broker, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

The information in this report is not the only resource you should consult. FINRA recommends that you learn as much as possible about the individual broker or brokerage firm from other sources, such as professional references, local consumer and investment groups, or friends and family members who already have established investment business relationships.

FINRA BrokerCheck is governed by federal law, Securities and Exchange Commission (SEC) regulations and FINRA rules approved by the SEC. State disclosure programs are governed by state law, and may provide additional information on brokers and firms licensed by the state. Therefore, you should also consider requesting information from your state securities regulator. Refer to www.nasaa.org for a complete list of state securities regulators.

Thank you for using FINRA BrokerCheck.





Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

©2010 FINRA. All rights reserved.    Report# 57271-86646 about JOHN K. HILLMAN. Data current as of Wednesday, April 21, 2010.

www.finra.org/brokercheck

User Guidance

# FINRA

# Report Summary for this Broker

## JOHN K. HILLMAN

CRD# 2605990

**Currently employed by and registered with the following FINRA Firms:**

PHOENIX EQUITY PLANNING
CORPORATION
610 WEST GERMANTOWN PIKE
SUITE 460
PLYMOUTH MEETING, PA  19462
CRD# 38383
Registered with this firm since: 03/20/1996

The report summary provides an overview of the broker's professional background and conduct. The individual broker, a FINRA-registered firm(s), and/or securities regulator(s) have provided the information contained in this report as part of the securities industry's registration and licensing process. The information contained in this report was last updated by the broker, a previous employing brokerage firm, or a securities regulator on 01/07/2010.

## Broker Qualifications

**This broker is registered with:**

• 1 Self-Regulatory Organization

• 51 U.S. states and territories

**Is this broker currently suspended or inactive with any regulator? No**

**This broker has passed:**

• 1 Principal/Supervisory Exam

• 1 General Industry/Product Exam

• 1 State Securities Law Exam

## Registration and Employment History

This broker was previously registered with the following FINRA member firms:

No information reported.

For additional registration and employment history details as reported by the individual broker, refer to the Registration and Employment History section of this report.

## Disclosure of Customer Disputes, Disciplinary, and Regulatory Events

This section includes details regarding disclosure events reported by or about this broker to CRD as part of the securities industry registration and licensing process. Examples of such disclosure events include formal investigations and disciplinary actions initiated by regulators, customer disputes, certain criminal charges and/or convictions, as well as financial disclosures, such as bankruptcies and unpaid judgments or liens.

**Are there events disclosed about this broker?  No**

# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs), states and U.S. territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration became effective. This section also provides the physical location of each branch that the individual broker is associated with for each listed employment.

This individual is currently registered with 1 SRO and is licensed in 51 U.S. states and territories through his or her employer.

## Employment 1 of 1

Firm Name:            PHOENIX EQUITY PLANNING CORPORATION

Main Office Address:  610 WEST GERMANTOWN PIKE
                      SUITE 460
                      PLYMOUTH MEETING, PA  19462

Firm CRD#:            38383

| SRO | Category | Status | Date |
|---|---|---|---|
| FINRA | Invest. Co and Variable Contracts | APPROVED | 03/20/1996 |
| FINRA | Investment Co./Variable Contracts Prin | APPROVED | 03/15/2000 |

| U.S. State/ Territory | Category | Status | Date | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|---|---|---|
| Alabama | Agent | APPROVED | 01/12/2000 | Hawaii | Agent | APPROVED | 01/12/2000 |
| Alaska | Agent | APPROVED | 06/07/1999 | Idaho | Agent | APPROVED | 06/07/1999 |
| Arizona | Agent | APPROVED | 06/07/1999 | Illinois | Agent | APPROVED | 06/07/1999 |
| Arkansas | Agent | APPROVED | 06/08/1999 | Indiana | Agent | APPROVED | 06/07/1999 |
| California | Agent | APPROVED | 06/07/1999 | Iowa | Agent | APPROVED | 06/07/1999 |
| Colorado | Agent | APPROVED | 06/07/1999 | Kansas | Agent | APPROVED | 06/07/1999 |
| Connecticut | Agent | APPROVED | 06/07/1999 | Kentucky | Agent | APPROVED | 01/13/2000 |
| Delaware | Agent | APPROVED | 06/07/1999 | Louisiana | Agent | APPROVED | 06/08/1999 |
| District of Columbia | Agent | APPROVED | 06/11/1999 | Maine | Agent | APPROVED | 06/07/1999 |
| Florida | Agent | APPROVED | 06/08/1999 | Maryland | Agent | APPROVED | 06/07/1999 |
| Georgia | Agent | APPROVED | 06/07/1999 | Massachusetts | Agent | APPROVED | 06/07/1999 |
| | | | | Michigan | Agent | APPROVED | 06/08/1999 |

©2010 FINRA. All rights reserved.    Report# 57271-86646 about JOHN K. HILLMAN. Data current as of Wednesday, April 21, 2010.

FINRA

**Broker Qualifications**

www.finra.org/brokercheck

FINRA

## Employment 1 of 1, continued

| U.S. State/ Territory | Category | Status | Date | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|---|---|---|
| Minnesota | Agent | APPROVED | 06/08/1999 | West Virginia | Agent | APPROVED | 06/07/1999 |
| Mississippi | Agent | APPROVED | 02/01/2000 | Wisconsin | Agent | APPROVED | 06/07/1999 |
| Missouri | Agent | APPROVED | 06/08/1999 | Wyoming | Agent | APPROVED | 06/14/1999 |
| Montana | Agent | APPROVED | 07/22/1996 | | | | |
| Nebraska | Agent | APPROVED | 06/07/1999 | | | | |
| Nevada | Agent | APPROVED | 01/18/2000 | | | | |
| New Hampshire | Agent | APPROVED | 06/07/1999 | | | | |
| New Jersey | Agent | APPROVED | 06/09/1999 | | | | |
| New Mexico | Agent | APPROVED | 01/24/2000 | | | | |
| New York | Agent | APPROVED | 06/07/1999 | | | | |
| North Carolina | Agent | APPROVED | 06/09/1999 | | | | |
| North Dakota | Agent | APPROVED | 07/19/1996 | | | | |
| Ohio | Agent | APPROVED | 06/08/1999 | | | | |
| Oklahoma | Agent | APPROVED | 06/07/1999 | | | | |
| Oregon | Agent | APPROVED | 06/07/1999 | | | | |
| Pennsylvania | Agent | APPROVED | 04/10/1996 | | | | |
| Rhode Island | Agent | APPROVED | 06/07/1999 | | | | |
| South Carolina | Agent | APPROVED | 06/08/1999 | | | | |
| South Dakota | Agent | APPROVED | 07/11/1996 | | | | |
| Tennessee | Agent | APPROVED | 06/08/1999 | | | | |
| Texas | Agent | APPROVED | 03/10/1997 | | | | |
| Utah | Agent | APPROVED | 06/07/1999 | | | | |
| Vermont | Agent | APPROVED | 06/07/1999 | | | | |
| Virginia | Agent | APPROVED | 06/08/1999 | | | | |
| Washington | Agent | APPROVED | 06/07/1999 | | | | |

©2010 FINRA. All rights reserved.   Report# 57271-86646 about JOHN K. HILLMAN. Data current as of Wednesday, April 21, 2010.

3

# Broker Qualifications

www.finra.org/brokercheck

## Employment 1 of 1, continued

### Branch Office Locations

**PHOENIX EQUITY PLANNING CORPORATION**
610 WEST GERMANTOWN PIKE
SUITE 460
PLYMOUTH MEETING, PA  19462

©2010 FINRA. All rights reserved.    Report# 57271-86646 about JOHN K. HILLMAN. Data current as of Wednesday, April 21, 2010.



4

©2010 FINRA. All rights reserved.    Report# 57271-86646 about JOHN K. HILLMAN. Data current as of Wednesday, April 21, 2010.

www.finra.org/brokercheck

# About this BrokerCheck Report

BrokerCheck reports are part of a FINRA initiative to disclose information about FINRA-registered firms and individual brokers to help investors determine whether to conduct, or continue to conduct, business with these firms and brokers. The information contained within these reports is collected through the securities industry's registration and licensing process.

## Who provides the information in BrokerCheck?

Information made available through BrokerCheck is obtained from CRD as reported through the industry registration and licensing process.

The forms used by brokerage firms, to report information as part of the firms registration and licensing process. Forms BD and BDW, are established by the SEC and adopted by all state securities regulators and SROs. FINRA and the North American Securities Administrators Association (NASAA) establish the forms U4 and U5, the forms that are used for the registration and licensing process for individual brokers. These forms are approved by the SEC. Regulators report disciplinary information for firms and individual brokers via Form U6.

## How current is the information contained in BrokerCheck?

Brokerage firms and brokers are required to keep this information accurate and up-to-date (typically not later than 30 days after learning of an event). BrokerCheck data is updated when a firm, broker, or regulator submits new or revised information to CRD. Generally, updated information is available on BrokerCheck Monday through Friday.

## What information is NOT disclosed through BrokerCheck?

Information that has not been reported to CRD or that is not required to be reported through the registration and licensing process is not disclosed through BrokerCheck. Examples of events that are not required to be reported or are no longer reportable include: judgments and liens originally reported as outstanding that have been satisfied and bankruptcy proceedings filed more than 10 years ago. Conversely certain customer complaint information that is not required to be reported may be disclosed provided certain criteria are met.

Additional information not disclosed through BrokerCheck includes Social Security Numbers, residential history information, and physical description information. On a case-by-case basis, FINRA reserves the right to exclude information that contains confidential customer information, offensive and potentially defamatory language or information that raises significant identify theft or privacy concerns that are not outweighed by investor protection concerns. FINRA Rule 8312 describes in detail what information is and is not disclosed through BrokerCheck.

Under FINRA's current public disclosure policy, in certain limited circumstances, most often pursuant to a court order, information is expunged from CRD. Further information about expungement from CRD is available in FINRA notices 99-09, 99-54, 01-65, and 04-16 at www.finra.org.

For more information about the following, select the associated link:

- About BrokerCheck Reports:   http://www.finra.org/brokercheck_reports
- Glossary:   http://www.finra.org/brokercheck_glossary
- Questions Frequently Asked about BrokerCheck Reports:   http://www.finra.org/brokercheck_faq
- Terms and Conditions:   http://brokercheck.finra.org/terms.aspx

For further information regarding FINRA's BrokerCheck program, please visit FINRA's Web site at www.finra.org/brokercheck or call the FINRA BrokerCheck Hotline at (800) 289-9999. This hotline is open Monday through Friday from 8:00 a.m. to 8:00 p.m., Eastern Time (ET).



User Guidance

7

FINRA

## Broker Qualifications

www.finra.org/brokercheck

### Industry Exams this Broker has Passed

This section includes all current principal/supervisory, general product/industry, and/or state securities law exams that the broker has passed. Under certain, limited circumstances, a broker may receive a waiver of an exam requirement based on a combination of previous exams passed and qualifying work experience. Likewise, a new exam requirement may be grandfathered based on a broker's specific qualifying work experience. Information regarding instances of exam waivers or the grandfathering of an exam requirement are not included as part of the BrokerCheck report.

**This individual has passed 1 principal/supervisory exam, 1 general industry/product exam, and 1 state securities law exam.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| Investment Company Products/Variable Contracts Principal Examination | Series 26 | 03/14/2000 |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| Investment Company Products/Variable Contracts Representative Examination | Series 6 | 03/01/1996 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination | Series 63 | 02/01/1996 |

Additional information about the securities industry's qualifications and continuing education requirements, as well as the examinations administered by FINRA to brokers and other securities professionals can be found at http://www.finra.org/Industry/Compliance/Registration/QualificationsExams/index.htm.

©2010 FINRA. All rights reserved.    Report# 57271-86646 about JOHN K. HILLMAN. Data current as of Wednesday, April 21, 2010.

www.finra.org/brokercheck

# Registration and Employment History

## Previously Registered with the Following FINRA Firms

FINRA records show this broker previously held FINRA registrations with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|

No information reported.

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with a FINRA firm and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 08/1990 - Present | AGL LIFE ASSURANCE COMPANY | PLYMOUTH MEETING, PA |
| 08/1990 - Present | PHOENIX EQUITY PLANNING CORPORATION | PLYMOUTH MEETING, PA |
| 08/2007 - 03/2009 | PHOENIX LIFE SOLUTIONS, INC. | PLYMOUTH MEETING, PA |

## Affiliations

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

I HAVE SERVED AS AN OFFICER OF PHOENIX LIFE SOLUTIONS, INC. SINCE JULY 2007. PHOENIX LIFE SOLUTIONS, INC. IS NOT CURRENTLY ENGAGED IN ANY BUSINESS ACTIVITIES, ALTHOUGH I HAVE RETAINED MY OFFICER STATUS. I DEVOTE LESS THAN ONE HOUR PER MONTH TO THIS BUSINESS, INCLUDING DURING SECURITIES TRADING HOURS.

©2010 FINRA. All rights reserved.    Report# 57271-86646 about JOHN K. HILLMAN. Data current as of Wednesday, April 21, 2010.



9

Exhibit "F"

**BrokerCheck Report**

## PHOENIX EQUITY PLANNING CORPORATION

CRD# 38383

Report #39034-82657, data current as of Wednesday, April 21, 2010.

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Firm Profile | 2 - 8 |
| Firm History | 9 |
| Firm Operations | 10 - 17 |
| About this BrokerCheck Report | 18 |



## Dear Investor:

FINRA has generated the following BrokerCheck report for PHOENIX EQUITY PLANNING CORPORATION. The information contained within this report has been provided by a FINRA member firm(s) and securities regulators as part of the securities industry's registration and licensing process and represents the most current information reported to the Central Registration Depository (CRD℠) system.

FINRA regulates the securities markets for the ultimate benefit and protection of the investor. FINRA believes the general public should have access to information that will help them determine whether to conduct, or continue to conduct, business with a FINRA member firm or any of the member's associated persons. To that end, FINRA has adopted a public disclosure policy to make certain types of information available to you. Examples of information FINRA provides on currently registered individuals and individuals who were registered during the past two years include: actions by regulators, investment-related civil suits, customer disputes that contain allegations of sales practice violations against brokers, all felony charges and convictions, misdemeanor charges and convictions relating to securities violations, and financial events such as bankruptcies, compromises with creditors, judgments, and liens. FINRA also provides certain information on individuals whose registrations terminated more than two years ago.

When evaluating this report, please keep in mind that it may include items that involve pending actions or allegations that may be contested and have not been resolved or proven. Such items may, in the end, be withdrawn or dismissed, or resolved in favor of the firm or broker, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

The information in this report is not the only resource you should consult. FINRA recommends that you learn as much as possible about the individual broker or brokerage firm from other sources, such as professional references, local consumer and investment groups, or friends and family members who already have established investment business relationships.

FINRA BrokerCheck is governed by federal law, Securities and Exchange Commission (SEC) regulations and FINRA rules approved by the SEC. State disclosure programs are governed by state law, and may provide additional information on brokers and firms licensed by the state. Therefore, you should also consider requesting information from your state securities regulator. Refer to www.nasaa.org for a complete list of state securities regulators.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.



www.finra.org/brokercheck

User Guidance

# fínra

# Report Summary for this Firm

## PHOENIX EQUITY PLANNING CORPORATION

CRD# 38383

SEC# 8-48416

## Main Office Location

610 WEST GERMANTOWN PIKE
SUITE 460
PLYMOUTH MEETING, PA 19462
Regulated by FINRA Philadelphia Office

## Mailing Address

610 WEST GERMANTOWN PIKE
SUITE 460
PLYMOUTH MEETING, PA 19462

## Business Telephone Number

484 530-4800

The report summary provides an overview of the firm's background. The firm and securities regulators have provided the information contained in this report as part of the securities industry registration and licensing process. More detailed information about this firm can be found in the firm's report. Select "Get Detailed Report" to view more detailed information about this firm. The information contained in this report was last updated by the firm via Uniform Application for Broker-Dealer Registration (Form BD), the Uniform Request for Broker-Dealer Withdrawal (Form BDW), or a securities regulator via a Uniform Disciplinary Action Reporting Form (Form U6) on 03/12/2010.

## Firm Profile

This firm is classified as a corporation.

This firm was formed in Delaware on 01/26/1995.

Its fiscal year ends in December.

## Firm History

Information relating to the firm's history such as Other Business Names, Other Business, and Successions (e.g., mergers or acquisitions) can be found in the firm's full report.

## Firm Operations

This firm is registered with:

- the SEC
- 1 Self-Regulatory Organization
- 52 U.S. states and territories

Is this brokerage firm currently suspended with any regulator?   **No**

This firm conducts 3 types of businesses.

This firm is affiliated with financial or investment institutions.

This firm does not have referral or financial arrangements with other brokers or dealers.

## Disclosure of Arbitration Awards, Disciplinary, Financial, and Regulatory Events

This section includes details regarding disclosure events reported by or about this firm to CRD as part of the securities industry registration and licensing process. Examples of such disclosure events include certain disciplinary actions initiated by regulators, certain criminal charges and/or convictions, financial disclosures such as bankruptcies, and summary information regarding arbitration awards involving securities and commodities disputes between public customers and the firm.

Are there events disclosed about this firm?   **No**

©2010 FINRA. All rights reserved.     Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

1

www.finra.org/brokercheck

# Firm Profile

This firm is classified as a corporation.

This firm was formed in Delaware on 01/26/1995.

Its fiscal year ends in December.

## Firm Names and Locations

This section includes details that were reported to CRD, regarding the firm's full legal name, business and mailing addresses, the firm's "Doing Business As" name (DBA) (if different from the full legal name), and any other name by which the firm conducts business and where such name is used.

**PHOENIX EQUITY PLANNING CORPORATION**
Doing business as PHOENIX EQUITY PLANNING CORPORATION

CRD#   38383

SEC#   8-48416

### Main Office Location

610 WEST GERMANTOWN PIKE
SUITE 460
PLYMOUTH MEETING, PA  19462
**Regulated by FINRA Philadelphia Office**

### Mailing Address

610 WEST GERMANTOWN PIKE
SUITE 460
PLYMOUTH MEETING, PA  19462

### Business Telephone Number

484 530-4800

©2010 FINRA. All rights reserved.   Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.



User Guidance

www.finra.org/brokercheck



# Firm Profile

## Direct Owners and Executive Officers

This section provides information relating to all Direct Owners and Executive Officers as reported by the firm in CRD.

| | |
|---|---|
| **Legal Name & CRD# (if any):** | PFG HOLDINGS, INC. |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Position** | SHAREHOLDER |
| **Position Start Date** | 10/1999 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | FILLIP, JOSEPH ARTHUR JR. |
| | 4663665 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | VICE PRESIDENT, GENERAL COUNSEL AND ASSISTANT SECRETARY |
| **Position Start Date** | 06/2002 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | FISCHER, JOHN THOMAS |
| | 1191103 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | VICE PRESIDENT |
| **Position Start Date** | 10/1999 |

©2010 FINRA. All rights reserved.   Report# 39034-82857 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

www.finra.org/brokercheck

# Firm Profile

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | HILLMAN, JOHN KEARNEY |
| | 2605990 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | DIRECTOR AND VICE PRESIDENT |
| Position Start Date | 07/2001 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | KEIM, KENT CHISHOLM |
| | 4460852 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | VICE PRESIDENT & TREASURER |
| Position Start Date | 01/2004 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | MILLER, TODD RANDALL |

FINRA

User Guidance

www.finra.org/brokercheck

# Firm Profile

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| Is this a domestic or foreign entity or an individual? | 2377746<br>Individual |
| Position | VICE PRESIDENT, CONTROLLER & CHIEF FINANCIAL OFFICER |
| Position Start Date | 01/2004 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | O'CONNELL, GINA COLLOPY<br>2667400 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | SENIOR VICE PRESIDENT |
| Position Start Date | 02/2009 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | OBERLIES, SUSAN MARY<br>3009149 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | DIRECTOR AND PRESIDENT, CORPORATE COUNSEL, SECRETARY AND CO-CHIEF COMPLIANCE OFFICER |
| Position Start Date | 01/2003 |
| Percentage of Ownership | Less than 5% |

©2010 FINRA. All rights reserved.   Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.



User Guidance

5

www.finra.org/brokercheck

# Firm Profile

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | POLKINGHORN, PHILIP KONRAD |
| | 4361585 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | DIRECTOR |
| Position Start Date | 09/2004 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | STORCH, KATHERINE |
| | 3224252 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | CO-CHIEF COMPLIANCE OFFICER |
| Position Start Date | 02/2009 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

©2010 FINRA. All rights reserved.   Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

FINNa

User Guidance

6

www.finra.org/brokercheck

User Guidance

FINRA

## Firm Profile

### Indirect Owners

This section provides information relating to Indirect Owners, if any, as reported by the firm in CRD.

| | |
|---|---|
| Legal Name & CRD# (if any): | PHOENIX LIFE INSURANCE COMPANY |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |
| Company through which indirect ownership is established | PM HOLDINGS, INC. |
| Relationship to Direct Owner | SHAREHOLDER |
| Relationship Established | 10/1999 |
| Percentage of Ownership | 50% but less than 75% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | PM HOLDINGS, INC. |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |
| Company through which indirect ownership is established | PFG HOLDINGS, INC. |
| Relationship to Direct Owner | SHAREHOLDER |
| Relationship Established | 10/1999 |
| Percentage of Ownership | 50% but less than 75% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | THE PHOENIX COMPANIES, INC. |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |

©2010 FINRA. All rights reserved.   Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

©2010 FINRA. All rights reserved.     Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

www.finra.org/brokercheck

# Firm Profile

## Indirect Owners (continued)

| | |
|---|---|
| Company through which indirect ownership is established | PFG HOLDINGS, INC. |
| Relationship to Direct Owner | SHAREHOLDER |
| Relationship Established | 05/2003 |
| Percentage of Ownership | 25% but less than 50% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | Yes |

User Guidance



©2010 FINRA. All rights reserved.   Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

www.finra.org/brokercheck

**Firm History**

This section provides information relating to successions (e.g., mergers or acquisitions,) if any, as reported by the firm in CRD.

No information reported.



©2010 FINRA. All rights reserved.    Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

## Firm Operations

### Registrations

This section provides information about the regulators (e.g., U.S. Securities and Exchange Commission (SEC), self-regulatory organizations, states and U.S. territories) in which the firm is currently registered and licensed, and the date the registration became effective, as well as certain information about the firm's SEC registration.

**This firm is currently registered with the SEC, 1 SRO and 52 U.S. states and territories.**

**Federal Regulator**

| | Status | Date Effective |
|---|---|---|
| SEC | Approved | 01/18/1996 |

### SEC Registration Questions

This firm is registered with the SEC as:

A broker-dealer:     Yes

A broker-dealer and government securities broker or dealer:     No

A government securities broker or dealer only:     No

This firm has ceased activity as a government securities broker or dealer:     No

**Self-Regulatory Organization**

| | Status | Date Effective |
|---|---|---|
| FINRA | Approved | 01/18/1996 |

FINOA

www.finra.org/brokercheck

# Firm Operations

## Registrations (continued)

| U.S. States & Territories | Status | Date Effective | U.S. States & Territories | Status | Date Effective |
|---|---|---|---|---|---|
| Alabama | Approved | 06/18/1996 | North Carolina | Limited | 04/18/1996 |
| Alaska | Approved | 07/18/1996 | North Dakota | Limited | 07/02/1996 |
| Arizona | Approved | 05/28/1996 | Ohio | Approved | 04/19/1996 |
| Arkansas | Limited | 09/25/1996 | Oklahoma | Approved | 06/21/1996 |
| California | Approved | 04/02/1996 | Oregon | Limited | 05/30/1996 |
| Colorado | Approved | 06/21/1996 | Pennsylvania | Approved | 04/10/1996 |
| Connecticut | Approved | 06/21/1996 | Puerto Rico | Approved | 04/28/2009 |
| Delaware | Approved | 04/25/1996 | Rhode Island | Approved | 07/01/1996 |
| District of Columbia | Approved | 05/11/1996 | South Carolina | Approved | 04/15/1996 |
| Florida | Approved | 04/25/1996 | South Dakota | Approved | 06/11/1996 |
| Georgia | Approved | 06/05/1996 | Tennessee | Approved | 04/16/1996 |
| Hawaii | Approved | 09/18/1996 | Texas | Limited | 06/19/1996 |
| Idaho | Approved | 07/02/1996 | Utah | Approved | 06/17/1996 |
| Illinois | Approved | 04/25/1996 | Vermont | Approved | 07/09/1996 |
| Indiana | Approved | 05/31/1996 | Virginia | Approved | 04/12/1996 |
| Iowa | Approved | 06/25/1996 | Washington | Approved | 04/16/1996 |
| Kansas | Approved | 07/02/1996 | West Virginia | Approved | 07/10/1996 |
| Kentucky | Approved | 04/12/1996 | Wisconsin | Approved | 08/19/1996 |
| Louisiana | Approved | 08/07/1996 | Wyoming | Approved | 04/22/1996 |
| Maine | Approved | 06/27/1996 | | | |
| Maryland | Approved | 04/17/1996 | | | |
| Massachusetts | Approved | 06/20/1996 | | | |
| Michigan | Approved | 07/09/1996 | | | |
| Minnesota | Approved | 06/26/1996 | | | |
| Mississippi | Approved | 07/03/1996 | | | |
| Missouri | Approved | 06/24/1996 | | | |
| Montana | Limited | 06/10/1996 | | | |
| Nebraska | Approved | 07/26/1996 | | | |
| Nevada | Limited | 04/19/1996 | | | |
| New Hampshire | Approved | 10/01/1996 | | | |
| New Jersey | Approved | 05/03/1996 | | | |
| New Mexico | Approved | 06/14/1996 | | | |
| New York | Approved | 04/11/1996 | | | |

©2010 FINRA. All rights reserved.   Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

User Guidance

www.finra.org/brokercheck

## Firm Operations

### Types of Business

This section provides the types of business and any other business or other non-securities business the firm is engaged in or is expected to be engaged in as reported by the firm in CRD.

**This firm currently conducts 3 types of businesses.**

### Types of Business

Mutual fund or underwriter or sponsor

Broker or dealer selling variable life insurance or annuities

Other

### Other Types of Business

This firm does not affect transactions in commodities, commodity futures, or commodity options.
This firm does not engage in other non-securities business.
Non-Securities Business Description:

©2010 FINRA. All rights reserved.    Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.



User Guidance

©2010 FINRA. All rights reserved.    Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

www.finra.org/brokercheck

## Firm Operations

### Clearing Arrangements

This firm does not hold or maintain funds or securities or provide clearing services for other broker-dealer(s).

### Introducing Arrangements

This firm does not refer or introduce customers to other brokers and dealers.

User Guidance

FINRA

©2010 FINRA. All rights reserved.    Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

## Firm Operations

### Industry Arrangements

This firm does not have books or records maintained by a third party.

This firm does not have accounts, funds, or securities maintained by a third party.

This firm does not have customer accounts, funds, or securities maintained by a third party.

### Control Persons/Financing

This firm does not have individuals who control its management or policies through agreement.

This firm does not have individuals who wholly or partly finance the firm's business.

FINLA

www.finra.org/brokercheck

## Firm Operations

### Organization Affiliates

This section provides any information on control relationships the firm has with other firms in the securities, investment advisory, or banking business as reported by the firm in CRD.

This firm is, directly or indirectly:
- in control of
- controlled by
- or under common control with

the following partnerships, corporations, or other organizations engaged in the securities or investment advisory business.

**SAYBRUS EQUITY SERVICES, INC is under common control with the firm.**

| | |
|---|---|
| **CRD #:** | 153319 |
| **Business Address:** | ONE AMERICAN ROW<br>HARTFORD, CT  06115 |
| **Effective Date:** | 02/09/2010 |
| **Foreign Entity:** | No |
| **Country:** | |
| **Securities Activities:** | Yes |
| **Investment Advisory Activities:** | No |
| **Description:** | SAYBRUS EQUITY SERVICES, INC IS INDIRECTLY OWNED BY THE PHOENIX COMPANIES, WHICH INDIRECTLY OWNS THE APPLICANT |

**1851 SECURITIES, INC is under common control with the firm.**

| | |
|---|---|
| **CRD #:** | 153006 |
| **Business Address:** | ONE AMERICAN ROW<br>HARTFORD, CT  06115 |
| **Effective Date:** | 02/09/2010 |
| **Foreign Entity:** | No |
| **Country:** | |
| **Securities Activities:** | Yes |
| **Investment Advisory Activities:** | No |
| **Description:** | 1851 SECURITIES IS INDIRECTLY OWNED BY THE PHOENIX COMPANIES, INC, WHICH INDIRECTLY OPENS THE APPLICANT |

©2010 FINRA. All rights reserved.   Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.



www.finra.org/brokercheck

# Firm Operations

## Organization Affiliates (continued)

**GOODWIN CAPITAL ADVISERS, INC. is under common control with the firm.**

| | |
|---|---|
| CRD #: | 108290 |
| Business Address: | ONE AMERICAN ROW<br>HARTFORD, CT  06102 |
| Effective Date: | 10/29/1999 |
| Foreign Entity: | No |
| Country: | |
| Securities Activities: | No |
| Investment Advisory Activities: | Yes |
| Description: | OWNED BY THE PHOENIX COMPANIES, INC., WHICH INDIRECTLY AND PARTIALLY OWNS APPLICANT. |

**PHOENIX VARIABLE ADVISORS, INC. is under common control with the firm.**

| | |
|---|---|
| CRD #: | 108987 |
| Business Address: | ONE AMERICAN ROW<br>HARTFORD, CT  06102 |
| Effective Date: | 10/29/1999 |
| Foreign Entity: | No |
| Country: | |
| Securities Activities: | No |
| Investment Advisory Activities: | Yes |
| Description: | OWNED BY PM HOLDINGS, INC. WHICH INDIRECTLY OWNS APPLICANT. |

**This firm is not directly or indirectly, controlled by the following:**

· bank holding company
· national bank
· state member bank of the Federal Reserve System
· state non-member bank
· savings bank or association
· credit union
· or foreign bank

©2010 FINRA. All rights reserved.    Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

FINra

www.finra.org/brokercheck

**Firm Operations**

**Organization Affiliates (continued)**

©2010 FINRA. All rights reserved.    Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.



User Guidance



www.finra.org/brokercheck

# About this BrokerCheck Report

BrokerCheck reports are part of a FINRA initiative to disclose information about FINRA-registered firms and individual brokers to help investors determine whether to conduct, or continue to conduct, business with these firms and brokers. The information contained within these reports is collected through the securities industry's registration and licensing process.

## Who provides the information in BrokerCheck?

Information made available through BrokerCheck is obtained from CRD as reported through the industry registration and licensing process.

The forms used by brokerage firms, to report information as part of the firms registration and licensing process, Forms BD and BDW, are established by the SEC and adopted by all state securities regulators and SROs. FINRA and the North American Securities Administrators Association (NASAA) establish the Forms U4 and U5, the forms that are used for the registration and licensing process for individual brokers. These forms are approved by the SEC. Regulators report disciplinary information for firms and individual brokers via Form U6.

## How current is the information contained in BrokerCheck?

Brokerage firms and brokers are required to keep this information accurate and up-to-date (typically not later than 30 days after learning of an event). BrokerCheck data is updated when a firm, broker, or regulator submits new or revised information to CRD. Generally, updated information is available on BrokerCheck Monday through Friday.

## What information is NOT disclosed through BrokerCheck?

Information that has not been reported to CRD or that is not required to be reported through the registration and licensing process is not disclosed through BrokerCheck. Examples of events that are not required to be reported or are no longer reportable include: judgments and liens originally reported as outstanding that have been satisfied and bankruptcy proceedings filed more than 10 years ago. Conversely certain customer complaint information that is not required to be reported may be disclosed provided certain criteria are met.

Additional information not disclosed through BrokerCheck includes Social Security Numbers, residential history information, and physical description information. On a case-by-case basis, FINRA reserves the right to exclude information that contains confidential customer information, offensive and potentially defamatory language or information that raises significant identity theft or privacy concerns that are not outweighed by investor protection concerns. FINRA Rule 8312 describes in detail what information is and is not disclosed through BrokerCheck.

Under FINRA's current public disclosure policy, in certain limited circumstances, most often pursuant to a court order, information is expunged from CRD. Further information about expungement from CRD is available in FINRA notices 99-09, 99-54, 01-65, and 04-16 at www.finra.org.

For further information regarding FINRA's BrokerCheck program, please visit FINRA's Web site at www.finra.org/brokercheck or call the FINRA BrokerCheck Hotline at (800) 289-9999. This hotline is open Monday through Friday from 8:00 a.m. to 8:00 p.m., Eastern Time (ET).

For more information about the following, select the associated link:
- About BrokerCheck Reports:   http://www.finra.org/brokercheck_reports
- Glossary:   http://www.finra.org/brokercheck_glossary
- Questions Frequently Asked about BrokerCheck Reports:   http://www.finra.org/brokercheck_faq
- Terms and Conditions:   http://brokercheck.finra.org/terms.aspx

©2010 FINRA. All rights reserved.    Report# 39034-82657 about PHOENIX EQUITY PLANNING CORPORATION. Data current as of Wednesday, April 21, 2010.

User Guidance



Exhibit "G"

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION
Washington, D.C.**

| OMB APPROVAL |
| --- |
| OMB Number: 3235-0076 |
| Expires: September 30, 2008 |
| Estimated Average burden |
| hours per response: 4.0 |

# FORM D

**Notice of Exempt Offering of Securities**

## 1. Issuer's Identity

CIK (Filer ID Number)     Previous Name(s)  ☒ None
0001464674

**Entity Type**
☐ Corporation
☐ Limited Partnership
☐ Limited Liability Company
☐ General Partnership
☐ Business Trust
☒ Other

Name of Issuer
AGL Life Assurance Co Separate
Account VL 99
Jurisdiction of
Incorporation/Organization
PENNSYLVANIA

Year of Incorporation/Organization
☐ Over Five Years Ago
☒ Within Last Five Years (Specify     2009
Year)
☐ Yet to Be Formed

## 2. Principal Place of Business and Contact Information

Name of Issuer
AGL Life Assurance Co Separate Account VL 99

| Street Address 1 | Street Address 2 | |
| --- | --- | --- |
| 610 W. GERMANTOWN PIKE | SUITE 460 | |
| City | State/Province/Country | ZIP/Postal Code |
| PLYMOUTH MEETING | PA | 19462 |

Phone No. of Issuer
484-530-4800

**3. Related Persons**

| Last Name | First Name | Middle Name |
|---|---|---|
| Hillman | John | K |

| Street Address 1 | Street Address 2 |
|---|---|
| 610 W Germantown Pike | Suite 460 |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Plymouth Meeting | PA | 19462 |

Relationship:   ☒ Executive Officer   ☒ Director   ☐ Promoter

Clarification of Response (if Necessary)

Executive Officer and Director of AGL Life Assurance Company

| Last Name | First Name | Middle Name |
|---|---|---|
| Fischer | John | T |

| Street Address 1 | Street Address 2 |
|---|---|
| 610 W Germantown Pike | Suite 460 |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Plymouth Meeting | PA | 19462 |

Relationship:   ☒ Executive Officer   ☒ Director   ☐ Promoter

Clarification of Response (if Necessary)

Executive Officer and Director of AGL Life Assurance Company

| Last Name | First Name | Middle Name |
|---|---|---|
| Keim | Kent | C |

| Street Address 1 | Street Address 2 |
|---|---|
| 610 W Germantown Pike | Suite 460 |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Plymouth Meeting | PA | 19462 |

Relationship:   ☒ Executive Officer   ☐ Director   ☐ Promoter

Clarification of Response (if Necessary)

Executive Officer of AGL Life Assurance Company

| Last Name | First Name | Middle Name |
|---|---|---|
| Fillip | Joseph | A |

| Street Address 1 | Street Address 2 |
|---|---|
| 610 W Germantown Pike | Suite 460 |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Plymouth Meeting | PA | 19462 |

Relationship:   ☒ Executive Officer   ☐ Director   ☐ Promoter

Clarification of Response (if Necessary)

Executive Officer of AGL Life Assurance Company

| Last Name | First Name | Middle Name |
|---|---|---|
| Cassidy | Edward | W |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 610 W Germantown Pike | Suite 460 | |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Plymouth Meeting | PA | 19462 |

Relationship:  ☐ Executive Officer   ☒ Director   ☐ Promoter

Clarification of Response (if Necessary)

   Director of AGL Life Assurance Company

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Lautensack | Robert | G |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 610 W Germantown Pike | Suite 460 | |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Plymouth Meeting | PA | 19462 |

Relationship:  ☐ Executive Officer   ☒ Director   ☐ Promoter

Clarification of Response (if Necessary)

   Director of AGL Life Assurance Company

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Pellerin | David | R |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 610 W Germantown Pike | Suite 460 | |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Plymouth Meeting | PA | 19462 |

Relationship:  ☐ Executive Officer   ☒ Director   ☐ Promoter

Clarification of Response (if Necessary)

   Director of AGL Life Assurance Company

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Polkinghorn | Philip | K |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 610 W Germantown Pike | Suite 460 | |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Plymouth Meeting | PA | 19462 |

Relationship:  ☐ Executive Officer   ☒ Director   ☐ Promoter

Clarification of Response (if Necessary)

   Director of AGL Life Assurance Company

Last Name                           First Name                        Middle Name
**Rashid**                          **Zafar**
Street Address 1                                      Street Address 2
**610 W. Germantown Pike**                            **Suite 460**
City                                State/Province/Country            ZIP/Postal Code
**Plymouth Meeting**                **PA**                            **19462**
Relationship:          ☐  Executive Officer        ☒   Director          ☐   Promoter
Clarification of Response (if Necessary)
   **Director of AGL Life Assurance Company**

## 4. Industry Group

☐ Agriculture

**Banking & Financial Services**
- ☐ Commercial Banking
- ☒ Insurance
- ☐ Investing
- ☐ Investment Banking
- ☐ Pooled Investment Fund

- ☐ Other Banking & Financial Services

**Health Care**
- ☐ Biotechnology
- ☐ Health Insurance
- ☐ Hospitals & Physicians
- ☐ Pharmaceuticals
- ☐ Other Health Care

☐ Manufacturing

**Real Estate**
- ☐ Commercial
- ☐ Construction
- ☐ REITS & Finance
- ☐ Residential
- ☐ Other Real Estate

☐ Retailing

☐ Restaurants

**Technology**
- ☐ Computers
- ☐ Telecommunications
- ☐ Other Technology

**Travel**
- ☐ Airlines & Airports
- ☐ Lodging & Conventions
- ☐ Tourism & Travel Services
- ☐ Other Travel

☐ Other

☐ Business Services

**Energy**
- ☐ Coal Mining
- ☐ Electric Utilities
- ☐ Energy Conservation
- ☐ Environmental Services
- ☐ Oil & Gas
- ☐ Other Energy

## 5. Issuer Size

**Revenue Range**
- ☐ No Revenues
- ☐ $1 - $1,000,000
- ☐ $1,000,001 - $5,000,000
- ☐ $5,000,001 - $25,000,000
- ☐ $25,000,001 - $100,000,000
- ☐ Over $100,000,000
- ☐ Decline to Disclose
- ☒ Not Applicable

**Aggregate Net Asset Value Range**
- ☐ No Aggregate Net Asset Value
- ☐ $1 - $5,000,000
- ☐ $5,000,001 - $25,000,000
- ☐ $25,000,001 - $50,000,000
- ☐ $50,000,001 - $100,000,000
- ☐ Over $100,000,000
- ☐ Decline to Disclose
- ☐ Not Applicable

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

- ☐ Rule 504(b)(1) (not (i), (ii) or (iii))
- ☐ Rule 504 (b)(1)(i)
- ☐ Rule 504 (b)(1)(ii)
- ☐ Rule 504 (b)(1)(iii)
- ☐ Rule 505
- ☒ Rule 506
- ☐ Securities Act Section 4(6)
- ☐ Investment Company Act Section 3(c)

**7. Type of Filing**

- ☒ New Notice          Date of First Sale  2009-07-01          ☐ First Sale Yet to Occur
- ☐ Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year?          ☐ Yes          ☒ No

**9. Type(s) of Securities Offered (select all that apply)**

- ☐ Pooled Investment Fund Interests
- ☐ Tenant-in-Common Securities
- ☐ Mineral Property Securities
- ☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
- ☐ Equity
- ☐ Debt
- ☐ Option, Warrant or Other Right to Acquire Another Security
- ☒ Other (describe)

insurance company separate account interests

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?          ☐ Yes          ☒ No

Clarification of Response (if Necessary)

**11. Minimum Investment**

Minimum investment accepted from any outside investor          $   500000   USD

## 12. Sales Compensation

Recipient

Recipient CRD Number    ☐ None

(Associated) Broker or Dealer    ☐ None

(Associated) Broker or Dealer CRD Number    ☐ None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation    ☐ All States

**13. Offering and Sales Amounts**

| | | | | |
|---|---|---|---|---|
| Total Offering Amount | $ | USD | ☒ | Indefinite |
| Total Amount Sold | $ | 1193177 USD | | |
| Total Remaining to be Sold | $ | USD | ☒ | Indefinite |

Clarification of Response (if Necessary)

**14. Investors**

☐  Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors.
    Number of such non-accredited investors who already have invested in the offering
    Regardless of whether securities in the offering have been or may be sold to persons who do not
    qualify as accredited investors, enter the total number of investors who already have invested in the
    offering:

**15. Sales Commissions & Finders' Fees Expenses**

Provide separately the amounts of sales commissions and finders' fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

|  |  |  |  |
|---|---|---|---|
| Sales Commissions $ | 0 | USD | ☐ Estimate |
| Finders' Fees $ | 0 | USD | ☐ Estimate |

Clarification of Response (if Necessary)

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$   0   USD        ☐ Estimate

Clarification of Response (if Necessary)

Exhibit "H"



Investors > Smart Investing > Advanced Investing

**Managing Investment Risk**

When you invest, you take certain risks. With insured bank investments, such as certificates of deposit (CDs), you face inflation risk, which means that you may not earn enough over time to keep pace with the increasing cost of living. With investments that aren't insured, such as stocks, bonds, and mutual funds, you face the risk that you might lose money, which can happen if the price falls and you sell for less than you paid to buy.

Just because you take investment risks doesn't mean you can't exert some control over what happens to the money you invest. In fact, the opposite is true.

If you know the types of risks you might face, make choices about those you are willing to take, and understand how to build and balance your portfolio to offset potential problems, you are managing investment risk to your advantage.

## Why Take Risks?

The question you might have at this point is, "Why would I want to risk losing some or all of my money?" In fact, you might not want to put money at risk that you expect to need in the short term—to make the down payment on a home, for example, or pay a tuition bill for next semester, or cover emergency expenses. By taking certain risks with the rest of your money, however, you may earn dividends or interest. In addition, the value of the assets you purchase may increase over the long term.

If you prefer to avoid risk and put your money in an FDIC-insured certificate of deposit (CD) at your bank, the most you can earn is the interest that the bank is paying. This may be good enough in some years, say, when interest rates are high or when other investments are falling. But on average, and over the long haul, stocks and bonds tend to grow more rapidly, which would make it easier or even possible to reach your savings goals. That's because avoiding investment risk entirely provides no protection against inflation, which decreases the value of your savings over time.

On the other hand, if you concentrate on only the riskiest investments, it's entirely possible, even likely, that you will lose money.

For many people, it's best to manage risk by building a diversified portfolio that holds several different types of investments. This approach provides the reasonable expectation that at least some of the investments will increase in value over a period of time. So even if the return on other investments is disappointing, your overall results may be positive.

## Types of Investment Risk

There are many different types of investment risk. The two general types of risk are:

- Losing money, which you can identify as investment risk
- Losing buying power, which is inflation risk

It probably comes as no surprise that there are several different ways you might lose money on an investment. To manage these risks, you need to know what they are.

Most investment risk is described as either systematic or nonsystematic. While those terms seem intimidating, what they refer to is actually straightforward.

## Systematic Risk

Systematic risk is also known as market risk and relates to factors that affect the overall economy or securities markets. Systematic risk affects all companies, regardless of the company's financial condition, management, or capital structure, and, depending on the investment, can involve international as well as domestic factors. Here are some of the most common systematic risks:

- **Interest-rate risk** describes the risk that the value of a security will go down because of changes in interest rates. For example, when interest rates overall increase, bond issuers must offer higher coupon rates on new bonds in order to attract investors. The consequence is that the prices of existing bonds drop because investors prefer the newer bonds paying the higher rate. On the other hand, there's also interest-rate risk when rates fall because maturing bonds or bonds that are paid off before maturity must be reinvested at a lower yield.

- **Inflation risk** describes the risk that increases in the prices of goods and services, and therefore the cost of living, reduce your purchasing power. Let's say a can of soda increases from $1 to $2. In the past, $2 would have bought two cans of soda, but now $2 can buy only one can, resulting in a decline in the value of your money.

Inflation risk and interest rate risk are closely tied, as interest rates generally rise with inflation. Because of this, inflation risk can also reduce the value of your investments. For example, to keep pace with inflation and compensate for the loss of purchasing power, lenders will demand increased interest rates. This can lead to existing bonds losing value because, as mentioned above, newly issued bonds will offer higher interest rates. Inflation can go in cycles, however. When interest rates are low, new bonds will likely offer lower interest rates.

- **Currency risk** occurs because many world currencies float against each other. If money needs to be converted to a different currency to make an investment, any change in the exchange rate between that currency and yours can increase or reduce your investment return. You are usually only impacted by currency risk if you invest in international securities or funds that invest in international securities.

  For example, assume that the current exchange rate of the U.S. dollar to British pound is $1=0.53 British pounds. If you invest $1,000 in a mutual fund that invests in the stock of British companies, this will equal 530 pounds ($1,000 x 0.53 pounds = 530 pounds). Six months later, assume the dollar strengthens and the exchange rate becomes $1=0.65 pounds. If the value of the fund does not change, converting the original investment of 530 pounds into dollars will return only $815 (530 pounds/0.65 pounds = $815). Consequently, while the value of the mutual fund has not changed in the local currency, a change in the exchange rate has devalued the original investment of $1,000 into $815. On the other hand, if the dollar were to weaken, the value of the investment would go up. So if the exchange rate changes to $1=0.43 pounds, the original investment of $1,000 would increase to $1,233 (530 pounds/0.43 pounds = $1,233).

  As with most risks, currency risk can be managed to a certain extent by allocating only a limited portion of your portfolio to international investments and diversifying this portion across various countries and regions.

- **Liquidity risk** is the risk that you might not be able to buy or sell investments quickly for a price that is close to the true underlying value of the asset. Sometimes you may not be able to sell the investment at all if there are no buyers for it. Liquidity risk is usually higher in over-the-counter markets and small-capitalization stocks. Foreign investments can pose liquidity risks as well. The size of foreign markets, the number of companies listed, and hours of trading may limit your ability to buy or sell a foreign investment.

- **Sociopolitical risk** is the possibility that instability or unrest in one or more regions of the world will affect investment markets. Terrorist attacks, war, and pandemics are just examples of events, whether actual or anticipated, that impact investor attitudes toward the market in general and result in system-wide fluctuations in stock prices. Some events, such as the September 11, 2001, attacks on the World Trade Center and the Pentagon, can lead to wide-scale disruptions of financial markets, further exposing investments to risks. Similarly, if you are investing overseas, problems there may undermine those markets, or a new government in a particular country may restrict investment by non-citizens or nationalize businesses.

Your chief defense against systematic risk, as you'll see, is to build a portfolio that includes investments that react differently to the same economic factors. It's a strategy known as asset allocation. This generally involves investing in both bonds and stocks or the funds that own them, always holding some of each. That's because historical patterns show that when bonds as a group—though not every bond—are providing a strong return, stocks on the whole tend to provide a disappointing return. The reverse is also true.

Bonds tend to provide strong returns, measured by the combination of change in value and investment earnings, when investor demand for them increases. That demand may be driven by concerns about volatility risk in the stock market—what's sometimes described as a flight to safety— or by the potential for higher yield that results when interest rates increase, or by both factors occurring at the same time.

That is, when investors believe they can benefit from good returns with less risk than they would be exposed to by owning stock, they are willing to pay more than par value to own bonds. In fact, they may sell stock to invest in bonds. The sale of stock combined with limited new buying drives stock prices down, reducing return.

In a different phase of the cycle, those same investors might sell off bonds to buy stock, with just the opposite effect on stock and bond prices. If you owned both bonds and stocks in both periods, you would benefit from the strong returns on the asset class that was in greater demand at any one time. You would also be ready when investor sentiment changes and the other asset class provides stronger returns. To manage systematic risk, you can allocate your total investment portfolio so that it includes some stock and some bonds as well as some cash investments.

## Nonsystematic Risk

Nonsystematic risk, in contrast to systematic risk, affects a much smaller number of companies or investments and is associated with investing in a particular product, company, or industry sector.

Here are some examples of nonsystematic risk:

- **Management risk**, also known as company risk, refers to the impact that bad management decisions, other internal missteps, or even external situations can have on a company's performance and, as a consequence,

on the value of investments in that company. Even if you research a company carefully before investing and it appears to have solid management, there is probably no way to know that a competitor is about to bring a superior product to market. Nor is it easy to anticipate a financial or personal scandal that undermines a company's image, its stock price, or the rating of its bonds.

- **Credit risk**, also called default risk, is the possibility that a bond issuer won't pay interest as scheduled or repay the principal at maturity. Credit risk may also be a problem with insurance companies that sell annuity contracts, where your ability to collect the interest and income you expect is dependent on the claims-paying ability of the issuer.

One way to manage nonsystematic risk is to spread your investment dollars around, diversifying your portfolio holdings within each major asset class—stock, bonds, and cash—either by owning individual securities or mutual funds that invest in those securities. While you're likely to feel the impact of a company that crashes and burns, it should be much less traumatic if that company's stock is just one among several you own.

## Other Investment Risks

The investment decisions you make—and sometimes those you avoid making—can expose you to certain risks that can impede your progress toward meeting your investment goals.

For example, buying and selling investments in your accounts too frequently, perhaps in an attempt to take advantage of short-term gains or avoid short-term losses, can increase your trading costs. The money you spend on trading reduces the balance in your account or eats into the amount you have to invest. If you decide to invest in something that's receiving a lot of media attention, you may be increasing the possibility that you're buying at the market peak, setting yourself up for future losses. Or, if you sell in a sudden market downturn, it can mean not only locking in your losses but also missing out on future gains.

You can also increase your investment risk if you don't monitor the performance of your portfolio and make appropriate changes. For example, you should be aware of investments that have failed to live up to your expectations, and shed them when you determine that they are unlikely to improve, using the money from that sale for another investment.

## Assessing Risk

It's one thing to know that there are risks in investing. But how do you figure out ahead of time what those risks might be, which ones you are willing to take, and which ones may never be worth taking? There are three basic steps to assessing risk:

- Understanding the risk posed by certain categories of investments
- Determining the kind of risk you are comfortable taking
- Evaluating specific investments

You can follow this path on your own or with the help of one or more investment professionals, including stockbrokers, registered investment advisers, and financial planners with expertise in these areas.

## Step 1: Determining the Risk of an Asset Class

The first step in assessing investment risk is to understand the types of risk a particular category or group of investments—called an asset class—might expose you to. For example, stock, bonds, and cash are considered separate asset classes because each of them puts your money to work in different ways. As a result, each asset class poses particular risks that may not be characteristic of the other classes. If you understand what those risks are, you can generally take steps to offset those risks.

- **Stock**—Because shares of stock don't have a fixed value but reflect changing investor demand, one of the greatest risks you face when you invest in stock is volatility, or significant price changes in relatively rapid succession. In fact, in some cases, you must be prepared for stock prices to move from hour to hour and even from minute to minute. However, over longer periods, the short-term fluctuations tend to smooth out to show a gradual increase, a gradual decrease, or a basically flat stock price.

  For example, if a stock you bought for $25 a share dropped $5 in price in the following week because of disappointing news about a new product, you suffered a 20% loss. If you had purchased 200 shares at a cost of $5,000, your investment would now be worth just $4,000. If you sold at that point—and there might have been good reason to do so—you would have lost $1,000, plus whatever transaction fees you paid.

  While some gains or losses of value seem logical, others may not, as may be the case when a company announces increased earnings and its stock price drops. If you have researched the investment before you made it and believe that the company is strong, you might hold on to the stock. In that case, you might be rewarded down the road if the investment then increases in value and perhaps pays dividends as well. While positive results aren't guaranteed, you can learn to anticipate when patience is likely to pay off.

- **Bonds**—Bonds have a fixed value—usually $1,000 per bond—or what is known as par or face value. If you hold a bond until maturity, you will get that amount back, plus the interest the bond earns, unless the issuer of the bond defaults, or fails to pay. In addition to the risk of default, you also face potential market risk if you sell bonds before maturity. For example, if the price of the bonds in the secondary market—or what other

investors will pay to buy them—is less than par, and you sell the bonds at that point, you may realize a loss on the sale.

The market value of bonds may decrease if there's a rise in interest rates between the time the bonds were issued and their maturity dates. In that case, demand for older bonds paying lower rates decreases. If you sell, you must settle for the price you can get and potentially take that loss. Market prices can also fall below par if the bonds are downgraded by an independent rating agency because of problems with the company's finances.

Some bonds have a provision that allows the issuer to "call" the bond and repay the face value of the bond to you before its maturity. Often there is a set "call date," after which a bond issuer can pay off the bond. With these bonds, you might not receive the bond's original coupon rate for the bond's entire term. Once the call date has been reached, the stream of a callable bond's interest payments is uncertain, and any appreciation in the market value of the bond may not rise above the call price. These risks are part of call risk.

Similar to when a homeowner seeks to refinance a mortgage at a lower rate to save money when loan rates decline, a bond issuer often calls a bond after interest rates drop, allowing the issuer to sell new bonds paying lower interest rates—thus saving the issuer money. The bond's principal is repaid early, but the investor is left unable to find a similar bond with as attractive a yield. This is known as reinvestment risk.

- **Cash**—The primary risk you face with cash investments, including U.S. Treasury bills and money market mutual funds, is losing ground to inflation. In addition, you should be aware that money in money market funds usually is not insured. While such funds have rarely resulted in investor losses, the potential is always there.

Other asset classes, including real estate, pose their own risks, while investment products, such as annuities or mutual funds that invest in a specific asset class, tend to share the risks of that class. That means that the risk you face with a stock mutual fund is very much like the risk you face with individual stock, although most mutual funds are diversified, which helps to offset nonsystematic risk.

## Step 2: Selecting Risk

The second step is to determine the kinds of risk you are comfortable taking at a particular point in time. Since it's rarely possible to avoid investment risk entirely, the goal of this step is to determine the level of risk that is appropriate for you and your situation. Your decision will be driven in large part by:

- Your age
- Your goals and your timeline for meeting them
- Your financial responsibilities
- Your other financial resources

Age is one of the most important issues in managing investment risk. In general, the younger you are, the more investment risk you can afford to take. The reason is simple: You have more time to make up for any losses you might suffer in the short term.

You can use recent history to illustrate the validity of this point. Suppose two people, one 30 and the other 60, had been similarly invested in October 2007 in portfolios overloaded with stocks. By March 2009, both would almost certainly have lost substantial amounts of money. But while the younger person has perhaps 35 years to recover and accumulate investment assets, the older person may be forced to delay retirement.

On the other hand, having a long time to recover from losses doesn't mean you can ignore the importance of managing risk and choosing investments carefully and selling them when appropriate. The younger you are, the more stock and stock funds—both mutual funds and exchange traded funds—you might consider buying. But stock in a poorly run company, a company with massive debt and noncompetitive products, or a company whose stock is wildly overpriced, probably isn't a good investment from a risk-management perspective, no matter how old you are.

As you get closer to retirement, managing investment risk generally means moving at least some of your assets out of more volatile stock and stock funds into income-producing equities and bonds. Determine what percentage of your assets you want to transfer, and when. That way you won't have more exposure to a potential downturn than you've prepared for. The consensus, though, is to include at least some investments with growth potential (and therefore greater risk to principal) after you retire since you'll need more money if you live longer than expected. Without growth potential, you're vulnerable to inflation.

Keep in mind that your attitude toward investment risk may—and probably should—change over time. If you are the primary source of support for a number of people, you may be willing to take less investment risk than you did when you were responsible for just yourself.

In contrast, the larger your investment base, the more willing you may be to take added risk with a portion of your total portfolio. In a worst-case scenario, you could manage without the money you lost. And if your calculated risk pays off, you may have even more financial security than you had before.

Many people also find that the more clearly they understand how investments work, the more comfortable they feel about taking risk.

**Step 3: Evaluating Specific Investments**

The third step is evaluating specific investments that you are considering within an asset class. There are tools you can use to evaluate the risk of a particular investment—a process that makes a lot of sense to follow both before you make a new purchase and as part of a regular reassessment of your portfolio. It's important to remember that part of managing investment risk is not only deciding what to buy and when to buy it, but also what to sell and when to sell it.

For stocks and bonds, the place to start is with information about the issuer, since the value of the investment is directly linked to the strength of the company—or in the case of certain bonds, the government or government agency—behind them.

- **Company Documents**—Each public company must register its securities with the Securities and Exchange Commission (SEC) and provide updated information on a periodic basis. ,The annual report on Form 10-K contains audited financial statements as well as a wealth of detailed information about the company, the people who run it, the risks of investing in the company, and much more. Companies also submit to the SEC three additional quarterly reports called 10-Qs and interim reports on Form 8-K. You can access these company filings using the SEC's EDGAR database. While they aren't always exciting reading, SEC filings can be a treasure trove of information about a company.

  When you're reading a company's financial statements, don't skip over the footnotes. They often contain red flags that can alert you to pending lawsuits, regulatory investigations, or other issues that could have a negative impact on the company's bottom line.

  The company's prospectus, especially the risk factors section, is another reliable tool to help you evaluate the investment risk of a newly issued stock, an individual mutual fund or exchange-traded fund, or a REIT (real estate investment trust). The investment company offering the mutual fund, ETF, or REIT must update its prospectus every year, including an evaluation of the level of risk you are taking by owning that particular investment. You'll also want to look at how the fund, ETF, or REIT has done in the past, especially if it has been around long enough to have weathered a full economic cycle of market ups and downs—which might be as long as 10 years. Keep in mind, however, that past results cannot predict future performance. Also verify that mutual fund managers have not changed. In actively managed funds, it is the managers' picks that determine returns and the level of risk the fund assumes. Past returns would not reflect a new manager's performance.

- **Rating Services**—It's important to check what one or more of the independent rating services has to say about specific corporate and municipal bonds that you may own or may be considering. Each of the rating companies—including A.M. Best Company, Inc.; Dominion Bond Rating Service Ltd. (also known as DBRS Ltd.); Egan-Jones Rating Company; Fitch, Inc.; Japan Credit Rating Agency, Ltd.; LACE Financial Corp.; Moody's Investors Service; Rating and Investment Information, Inc.; Realpoint, LLC (which focuses on commercial mortgage-backed securities); and Standard & Poor's Ratings Services—evaluates the issuing company a little differently, but all of them are focused on the issuer's ability to meet its financial obligations. The higher the letter grade a rating company assigns, the lower the risk you are taking. But remember that ratings aren't perfect and can't tell you whether or not your investment will go up or down in value.

  Also remember that managing investment risk doesn't mean avoiding risk altogether. There might be times when you include a lower-rated bond or bond fund in your portfolio to take advantage of the higher yield it can provide.

  Research companies also rate or rank stocks and mutual funds based on specific sets of criteria. Brokerage firms that sell investments similarly provide their assessments of the probable performance of specific equity investments. Before you rely on ratings to select your investments, learn about the methodologies and criteria the research company uses in its ratings. You might find some research companies' methods more useful than others'.

**Take a Broad View**

While the past performance of an investment never guarantees what will happen in the future, it is still an important tool. For example, a historical perspective can alert you to the kinds of losses you should be prepared for—an awareness that's essential to managing your risk. A sense of the past can also tell you which asset class or classes have provided the strongest return over time and what their average returns are.

Another way to assess investment risk is to stay tuned to what's happening in the world around you. For example, investment professionals who learn that a company is being investigated by its regulator may decide it's time to unload any of its securities that their clients own or that they hold in their own accounts. Similarly, political turmoil in a particular area of the world might increase the risk of investing in that region. While you don't want to overreact, you don't want to take more risk than you are comfortable with.

**Investing to Minimize Risk**

While some investors assume a high level of risk by going for the gold—or looking for winners—most people are interested in minimizing risk while realizing a satisfactory return. If that's your approach, you might consider two basic investment strategies: asset allocation and diversification.

**Using Asset Allocation**

When you allocate your assets, you decide—usually on a percentage basis—what portion of your total portfolio to invest in different asset classes, usually stock, bonds, and cash or cash equivalents. You can make these investments either directly by purchasing individual securities or indirectly by choosing funds that invest in those securities.

As you build a more extensive portfolio, you may also include other asset classes, such as real estate, which can also help to spread out your investment risk and so moderate it.

Asset allocation is a useful tool in managing systematic risk because different categories of investments respond to changing economic and political conditions in different ways. By including different asset classes in your portfolio, you increase the probability that some of your investments will provide satisfactory returns even if others are flat or losing value. Put another way, you're reducing the risk of major losses that can result from over-emphasizing a single asset class, however resilient you might expect that class to be.

For example, in periods of strong corporate earnings and relative stability, many investors choose to own stock or stock mutual funds. The effect of this demand is to drive stock prices up, increasing their total return, which is the sum of the dividends they pay plus any change in value. If investors find the money to invest in stock by selling some of their bond holdings or by simply not putting any new money into bonds, then bond prices will tend to fall because there is a greater supply of bonds than of investors competing for them. Falling prices reduce the bonds' total return. In contrast, in periods of rising interest rates and economic uncertainty, many investors prefer to own bonds or keep a substantial percentage of their portfolio in cash. That can depress the total return that stock provides while increasing the return from bonds.

While you can recognize historical patterns that seem to indicate a strong period for a particular asset class or classes, the length and intensity of these cyclical patterns are not predictable. That's why it's important to have money in multiple asset classes at all times. You can always adjust your portfolio allocation if economic signs seem to favor one asset class over another.

Financial services companies make adjustments to the asset mix they recommend for portfolios on a regular basis, based on their assessment of the current market environment. For example, a firm might suggest that you increase your cash allocation by a certain percentage and reduce your equity holdings by a similar percentage in a period of rising interest rates and increasing international tension. Companies frequently display their recommended portfolio mix as a pie chart, showing the percentage allocated to each asset class.

Modifying your asset allocation modestly from time to time is not the same thing as market timing, which typically involves making frequent shifts in your portfolio holdings in anticipation of which way the markets will turn. Because no one knows what will happen, this technique rarely produces positive long-term results.

**Using Diversification**

When you diversify, you divide the money you've allocated to a particular asset class, such as stocks, among various categories of investments that belong to that asset class. These smaller groups are called subclasses. For example, within the stock category you might choose subclasses based on different market capitalizations: some large companies or funds that invest in large companies, some mid-sized companies or funds that invest in them, and some small companies or funds that invest in them. You might also include securities issued by companies that represent different sectors of the economy, such as technology companies, manufacturing companies, pharmaceutical companies, and utility companies.

Similarly, if you're buying bonds, you might choose bonds from different issuers—the federal government, state and local governments, and corporations—as well as those with different terms and different credit ratings.

Diversification, with its emphasis on variety, allows you to manage nonsystematic risk by tapping into the potential strength of different subclasses, which, like the larger asset classes, tend to do better in some periods than in others. For example, there are times when the performance of small company stock outpaces the performance of larger, more stable companies. And there are times when small company stock falters.

Similarly, there are periods when intermediate-term bonds—U.S. Treasury notes are a good example—provide a stronger return than short- or long-term bonds from the same issuer. Rather than trying to determine which bonds to buy at which time, there are different strategies you can use.

For example, you can buy bonds with different terms, or maturity dates. This approach, called a barbell strategy, involves investing roughly equivalent amounts in short-term and long-term bonds, weighting your portfolio at either end. That way, you can limit risk by having at least a portion of your total bond portfolio in whichever of those two subclasses is providing the stronger return.

Alternatively, you can buy bonds with the same term but different maturity dates. Using this strategy, called laddering, you invest roughly equivalent amounts in a series of fixed-income securities that mature in a rolling pattern, perhaps every two years. Instead of investing $15,000 in one note that will mature in 10 years, you invest $3,000 in a note maturing in two years, another $3,000 in a note maturing in four years, and so on. This approach helps you manage risk in two ways:

- If rates drop just before the first note matures, you'll have to invest only $3,000 at the new lower rate rather than the full $15,000. If rates behave in traditional fashion, they will typically go up again at some point in the ten-year span covered by your ladder.
- If you need money in the short term for either a planned or unplanned expense, you could use the amount of the maturing bond to meet that need without having to sell a larger bond in the secondary market.

## How Much Diversification?

In contrast to a limited number of asset classes, the universe of individual investments is huge. Which raises the question: How many different investments should you own to diversify your portfolio broadly enough to manage investment risk? Unfortunately, there is no simple or single answer that is right for everyone. Whether your stock portfolio includes six securities, 20 securities, or more is a decision you have to make in consultation with your investment professional or based on your own research and judgment.

In general, however, the decision will depend on how closely the investments track one another's returns—a concept called correlation. For example, if Stock A always goes up and down the same amount as Stock B, they are said to be perfectly correlated. If Stock A always goes up the same amount that Stock B goes down, they are said to be negatively correlated. In the real world, securities often are positively correlated with one another to varying degrees. The less positively correlated your investments are with one another, the better diversified you are.

Building a diversified portfolio is one of the reasons many investors turn to pooled investments—including mutual funds, exchange traded funds, and the investment portfolios of variable annuities. Pooled investments typically include a larger number and variety of underlying investments than you are likely to assemble on your own, so they help spread out your risk. You do have to make sure, however, that even the pooled investments you own are diversified—for example, owning two mutual funds that invest in the same subclass of stocks won't help you to diversify.

With any investment strategy, it's important that you not only choose an asset allocation and diversify your holdings when you establish your portfolio, but also stay actively attuned to the results of your choices. A critical step in managing investment risk is keeping track of whether or not your investments, both individually and as a group, are meeting reasonable expectations. Be prepared to make adjustments when the situation calls for it.

## Measuring Risk

You can't measure risk by putting it on a scale or lining it up against a yardstick. One way to put the risk of a particular investment into context—called the risk premium in the case of stock or the default premium in the case of bonds—is to evaluate its return in relation to the return on a risk-free investment.

Is there actually a risk-free investment? The one that comes closest is the 13-week U.S. Treasury bill, also referred to as the 91-day bill. This investment serves as a benchmark for evaluating the risk of investing in stock for two reasons:

- The shortness of the term, which significantly reduces reinvestment risk.
- The backing of the U.S. government, which virtually eliminates default, or credit risk

The long-term Treasury bond is the risk-free standard for measuring the default risk posed by a corporate bond. While both are vulnerable to inflation and market risk, the Treasury bond is considered free of default risk.

## Modern Portfolio Theory

In big-picture terms, managing risk is about the allocation and diversification of holdings in your portfolio. So when you choose new investments, you do it with an eye to what you already own and how the new investment helps you achieve greater balance. For example, you might include some investments that may be volatile because they have the potential to increase dramatically in value, which other investments in your portfolio are unlikely to do.

Whether you're aware of it or not, by approaching risk in this way—rather than always buying the safest investments—you're being influenced by what's called modern portfolio theory, or sometimes simply portfolio theory. While it's standard practice today, the concept of minimizing risk by combining volatile and price-stable investments in a single portfolio was a significant departure from traditional investing practices.

In fact, modern portfolio theory, for which economists Harry Markowitz, William Sharpe, and Merton Miller shared the Nobel Prize in 1990, employs a scientific approach to measuring risk, and by extension, to choosing investments. It involves calculating projected returns of various portfolio combinations to identify those that are likely to provide the best returns at different levels of risk.

©2010 FINRA. All rights reserved. FINRA is a registered trademark of the Financial Industry Regulatory Authority, Inc.