## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE MICHAEL S. RULLE | : | |
| FAMILY DYNASTY TRUST, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AGL LIFE ASSURANCE COMPANY, | : | No. 10-231 |
| Defendant. | : | |

## MEMORANDUM

**Schiller, J.**                                                                                                 **July 7, 2010**

Bernard Madoff's deceit bilked unsuspecting investors out of billions of dollars. Among those who lost money due to Madoff's fraud was the Michael S. Rulle Family Dynasty Trust ("Rulle Trust"), the contract holder of a life insurance policy issued by Defendant AGL Life Assurance Company ("AGL") and on which Michael S. Rulle is the named insured. The insured elected to have the premiums invested in the Tremont Opportunity fund, which in turn selected some investments that Madoff managed. As a result, the value of the investment account in Plaintiff's policy decreased. Plaintiff filed a lawsuit seeking to hold AGL responsible for this investment loss. The Amended Complaint alleged violations of federal and state securities laws, breach of contract, breach of fiduciary duty, negligence, negligent misrepresentation, unjust enrichment, and breach of the implied covenant of good faith and fair dealing. Presently before the Court is Defendant's motion to dismiss the Amended Complaint. For the reasons that follow, the Court will grant the motion in part and dismiss the securities law, breach of contract, and breach of good faith and fair dealing claims. The Court will leave for another day the negligence, breach of fiduciary duty, negligent misrepresentation, and unjust enrichment claims to allow the parties to further brief the issue of which state's laws should govern these claims.

I.      **BACKGROUND**

A.      **The Players**

The Rulle Trust is a beneficiary and contract holder under a variable life insurance policy known as the Flexible Premium Variable Life Insurance Contract issued by AGL Life Assurance Company.  (Am. Compl. ¶ 2.)  Michael S. Rulle is the insured.  (Am. Compl. Ex. A [Policy] at 3.)  At the time he applied for the Policy, Rulle worked at Hamilton Partners, Ltd. making investment decisions.  (*Id*. at "Agent's Report.")  The terms of the Policy are governed by Alaska law.  (Am. Compl. ¶ 25; Policy at 3, 9.)

AGL is an affiliate company of the Phoenix Companies, Inc.  (Am. Compl. ¶ 2.)  The Phoenix Equity Planning Corporation ("Phoenix Equity"), formerly named PFG Distribution Company, is a broker-dealer licensed by the SEC and is also registered with the Financial Industry Regulatory Association ("FINRA").  (*Id*. ¶¶ 4, 5.)  Both AGL and Phoenix Equity are controlled by PFG Holdings, Inc.  (*Id*. ¶ 5.)  AGL and Phoenix Equity entered into an agreement whereby AGL would sell its variable life insurance securities products through Phoenix Equity as the licensed broker-dealer.  (*Id*. ¶ 6.)  AGL and Phoenix Equity share some officers and directors in common.  (*Id*. ¶ 8.)  John Hillman, the Director, President, and CEO of AGL, and the Director and Vice President of Phoenix Equity, is a FINRA licensed broker.  (*Id*. ¶ 10.)

B.      **The Solicitation**

Hillman sought to have Rulle invest in American Masters Opportunity Insurance Fund, L.P., a "fund of funds" AGL obtained that subsequently was renamed the Tremont Opportunity Fund.  (*Id*. ¶¶ 18-19.)  Hillman told Rulle that the American Masters Opportunity Fund was a reputable "fund of funds" selected by AGL to participate in the Flexible Premium Variable Life Insurance Policy of

2

AGL as one of the two Investment Accounts in which net premiums could be allocated.  (*Id.* ¶ 20.)

Hillman represented that the American Masters Opportunity Fund was highly diversified and "the

investor would be as far removed from making investment decisions as possible." (*Id.*)  Hillman told

Rulle that "in the range of 7% or less of the funds" Rulle invested would be placed with any one

manager.  (*Id.* ¶ 22.)   The Rulle Trust and AGL entered into a Flexible Premium Variable Life

Insurance Contract on or about October 5, 2001.  (*Id.* ¶ 2.)  The Policy had an initial face amount of

$17,600,000 and the initial premium to be paid by Plaintiff was $1,200,000.  (Policy at 3.)  Plaintiff

paid this first premium payment and additional premium payments of $1,200,000, $1,000,000, and

$250,000 in 2002, 2003, 2004.  (Am. Compl. ¶ 41.)

## C.    The Policy and Its Terms

A variable universal life insurance policy allows the policy holder to invest a portion of

the premiums in optional investment accounts offered by the policy.  (Am. Compl. ¶ 24.)  Because

the investments are held within a policy, gains inside the policy are shielded from income taxes, as

is the payout when the insured dies.  (*Id.*)  The policy is suitable only for those "of substantial

financial means."  (AGL Mot. to Dismiss Ex. 1 [AGL Private Placement Memorandum ("AGL

PPM")] at 10.)  According to the AGL PPM, one had to qualify to purchase a flexible premium

variable life insurance policy and could do so only by demonstrating "substantial experience in

making investment decisions of this type." (*Id.*)

According to the Amended Complaint, Plaintiff was able to choose among two investment

accounts for investment of the Policy premiums.  (Am. Compl. ¶ 45.)  One of these options was the

American Masters Opportunity Insurance Fund, whose objective was to: (1) achieve long-term

capital appreciation and (2) consistently generate positive returns irrespective of stock market

volatility or direction, while focusing on the preservation of capital.  (Policy at 5.)  The investment account sought to "invest with various portfolio managers believed to be able to meet the Partnership's objectives."  (*Id.*)  Pursuant to the Policy, however, AGL could "establish and operate the Variable Account as a managed account or an account which purchases shares from the portfolios of funds managed by investment managers retained by [AGL]."  (*Id.* at 13.)  AGL was also able to contract with investment managers or manage directly the assets held in the Investment Accounts. (Am. Compl. ¶ 30; Policy at 13.)  AGL could also "deduct an Asset Charge from the Account Value allocated to Investment Accounts that [were] managed directly as well as any costs and expenses [that arose] from such Investment Accounts.  In either case, investment managers [were] selected by us in our discretion."  (Am. Compl. ¶ 30; Policy at 13.)  The Rulle Trust invested in the American Masters Opportunity Insurance Fund, L.P. Account, which later changed its name to Tremont Opportunity Fund III, L.P., a Delaware Partnership managed by Tremont Partners, Inc. ("Tremont"). (Am. Compl. ¶¶ 12-13; Def.'s Mem. of Law in Supp. of Mot. to Dismiss [Def.'s Mem.] at 3 n.4.)

The Policy states the "[t]he Account Value [of the Investment Accounts] will increase or decrease in accordance with increases and decreases in the value of the Investment Accounts in which the Account Value is invested."  (Policy at 14.)

The value of an investment account reflects:

- Any amounts transferred to the Investment Account during the current Valuation Period;
- The investment income and realized and unrealized capital gains credited to such assets in the Valuation Period;
- Any amounts transferred from an Investment Account during the current Valuation Period;
- Realized and unrealized capital losses charged against those assets during the Valuation Period;

4

- Any amount charged or reserved against the Investment Account for taxes;
- Any expenses charged or reserved against the Investment Account for expenses incurred in operating such Investment Account;
- The mortality and expense risk charge for the Valuation Period; and
- Any other Monthly Charges deducted from the Investment Account for This Contract.

(Policy at 13.)  The Account Value of the Policy is the value of the Investment Accounts plus the value of the Borrowed Fund.[1]  (*Id*. at 15.)  The Account Value of the Contract when the Initial Premium was received equaled the Net Premium invested in the Investment Accounts minus the cost of Insurance Charges, Policy Loads, and any charges for Special Insurance Class Rating.  (*Id*.)  Subsequently, the Account Value factors in, among other items, new Net Premiums invested in the Investment Accounts, any increase in value of the Investment Account due to investment results, partial withdrawals, insurance charges, and policy loads.  (*Id*.)  The Net Account Value is "the Account Value minus any Contract Loan Balance and accrued unpaid interest."  (*Id*.)

The assets in the Investment Accounts belong to AGL; Policy Owners, such as Rulle, possess no legal, equitable, direct or indirect interest in any specific investment item held in the Investment Accounts or the Policy.  (AGL PPM at 37.)  Consistent with this statement, contract owners had no right to require Tremont or any manager "to acquire or dispose of any particular asset, to make, fund or allocate funds to any investment or to incur or pay any particular liability of a portfolio."  (Def.'s Mot. to Dismiss Ex. 2 [American Masters Opportunity Insurance Fund, L.P. Confidential Private Placement Memorandum] ("AMO PPL") at 34.)  The AMO PPL continues, "[t]here will be no

---

[1] The "Borrowed Fund" is defined as "[a]n account established for any amounts transferred from the Investment Accounts as a result of loans.  The account is credited with interest and is not based on the experience of any investment Account."  (Policy at 9.)

prearranged plan between the General Partner (or any Manager) and any Contract Owner to invest any amounts in any particular assets or subject to any particular arrangement." (*Id*.) Thus, Tremont was vested with sole discretion in determining the allocation of portfolio assets. (*Id*.) The AMO PPL states "[t]he Partnership and each portfolio thereof intends to comply with the diversification requirements imposed by [the tax code], and the regulations thereunder." (*Id*. at 33.) A portfolio is considered diversified only if:

> (i) no more that 55% of the value of the total assets of the portfolio is represented by any one investment, (ii) no more than 70% of the value of the total assets of the portfolio is represented by any two investments, (iii) no more than 80% of the value of the total assets of the portfolio is represented by any three investments, and (iv) no more than 90% of the value of the total assets is represented by any four investments. Thus, under this general rule, a portfolio is required to invest a specified portion of its assets in at least five distinct investments.

(*Id*. at 34.)

**D.     The AGL Private Placement Memorandum**

Hillman also provided Rulle with the AGL PPM. The AGL PPM offered as "Investment Accounts" a Money Market Account or the American Masters Opportunity Insurance Fund, L.P. Account. (AGL PPM at 1.) Similar to the language in the Policy, the AGL PPM noted that American Masters Opportunity sought to achieve long-term capital appreciation and consistently generate positive returns irrespective of stock market volatility or direction, while focusing on capital preservation. (*Id*. at 38.) The AGL PPM also touted the use of a multi-manager investment format, in which Tremont would select the various portfolio managers. (*Id*.) The format was "designed to provide investors with a diversified investment portfolio, as well as enable them to obtain above-average returns over a market cycle." (*Id*. at 38.) However, investors were warned: "**There can be no guarantee of future performance and there is no assurance that the Partnership will be able**

6

**to achieve its investment objectives or be profitable.**" (*Id*. (emphasis in original).) Investors were also informed that the value of their Investment Account would fluctuate based on the performance of the investments selected by the investment managers. (*Id*. at 11.) Therefore, "Policy Owners [bore] the entire investment risk, including the risk of loss of principal for all amounts invested in the Policy." (*Id*.) The AGL PPM also set forth various risk factors attached to the investments, noting that "[w]hen a Policy Owner invest[ed] in the Investment Accounts, the Policy Owner [was] assuming the entire risk of an investment in the underlying securities, including the risk of loss of the entire principal." (*Id*. at 14.) Plaintiff was informed that, "[t]he risk may include, among others: (1) the risk of poor performance or default by one or more issuers of securities that comprise the Investment Accounts' assets . . . ." (*Id*. at 14-15.) Neither the AGL PPM or AMO PPM, however, defined the terms "investment performance" or "investment results" to include money lost by fraud or theft. (Am. Compl. ¶¶ 37-39.) Moreover, Plaintiff argues, fraud or theft of funds is not listed among the risk factors included in the AGL PPM. (Pl.'s Opp'n at 13.)

Rulle also received a copy of the American Masters Opportunity Insurance Fund, L.P. Private Placement Memorandum and Limited Partnership Agreement. These documents largely reiterate the strategy, risks, and investment objectives found in the AGL PPM and the Policy. (AMO PPL at ii - iii, vi, 1-3, 21-31.) Tremont, as the General Partner, was vested with overall responsibility for implementing the investment strategy and selecting the managers with which the Partnership would invest. (*Id*. at 1-2 ("The General Partner will select Managers . . . .").)

### E.    Plaintiff's Investment

Rulle elected to have AGL place his premiums in Investment Account 2 - American Masters Opportunity Insurance Fund, L.P. (*See* Am. Compl. ¶¶ 12, 33, 45; Policy at 5.) Tremont,

7

as the General Partner of the Tremont Opportunity Fund, placed Plaintiff's money in various hedge

funds, including: the Rye Select Broad Market Prime Fund L.P., the Rye Select Broad Market Fund

L.P., the Rye Select Broad Market XL Fund L.P., and the Rye Select Equities Fund.  (Am. Compl.

¶ 14.)  Unfortunately for Plaintiff, Bernard Madoff and/or Madoff Investment Securities LLC

ultimately controlled the Rye Select Funds.  (*Id*. ¶¶ 14, 42.)  Madoff was arrested in 2008 and

subsequently pled guilty to criminal securities fraud charges as a result of the massive Ponzi scheme

he operated.  (*Id*. ¶ 42.)  AGL informed Plaintiff that the value of the portion of its account invested

in investments controlled by Madoff had fallen to zero.  (*Id*. ¶ 43.)

According to Plaintiff, the writing was on the wall with respect to Madoff's fraud.  Articles

in industry newsletters questioned how Madoff could consistently produce such high returns.  (Am.

Compl. ¶¶ 52-53.)  Some investment advisors recognized the warning signs and refused to invest

with Madoff.  (*Id*. ¶ 54.)  AGL, however, ignored these and other warning signs, including the fact

that Madoff was audited by a small operation owned by his brother-in-law, the fact that he limited

access to his books and records, and the fact that he did not employ any third party administrators

or custodians but instead ran a "back office" operation.  (*Id*. ¶ 49.)

Plaintiff also claims that the money was not invested in accordance with the terms of the

Policy and the AGL PPM.  Specifically, Plaintiff alleges that AGL failed to invest among diverse

and separate investment managers and thus his investment was not properly diversified.  (*Id*. ¶¶ 58-

59.)  Rulle learned that of the top ten funds identified by AGL as having separate managers as of

September 30, 2008, four of them were controlled by Madoff; in fact, 23% of the Rulle Trust was

invested in funds managed by Madoff.  (*Id*. ¶ 61.)  Plaintiff finds it suspicious that just prior to

Madoff's scheme being exposed in 2008, Tremont modified its private placement memorandum to

reflect a higher allocation (30%) among managers.  (*Id*. ¶¶ 63-64.)

Count I is a breach of contract claim alleging that AGL improperly valued Plaintiff's account by considering Madoff's fraud when determining that a portion of the account's value was zero.  (*Id*. ¶¶ 44, 66-69.)  Plaintiff claims that AGL never informed it of the risk of fraud and that the only losses contemplated by the Policy and the AGL PPM, neither of which defined "investment performance" or "investment results," were investment losses.  (*Id*. ¶¶ 37-39, 66.)  Count II alleges that since AGL controlled all aspects of the investment account, it assumed a fiduciary relationship with Plaintiff and that AGL breached that duty by failing to detect Madoff's Ponzi scheme and failing to discover that Plaintiff's investments were not adequately diversified.  (*Id*. ¶¶ 71-79.)  Count III is premised on the common law duty of good faith and fair dealing.  (*Id*. ¶¶ 82-86.)  Count IV is a federal securities fraud claim in which Plaintiff claims that AGL misrepresented the nature of the Tremont Opportunity Fund and failed to inform Plaintiff that it failed to conduct due diligence on the Tremont Opportunity Fund or that the investment would not be properly diversified.  (*Id*. ¶¶ 88-98.)  Count V is brought under the Alaska and Pennsylvania Securities Acts and Count VI is a professional negligence, negligence, and gross negligence claim. (*Id*. ¶¶ 100-09.)  Count VII alleges negligent misrepresentation based on the fact that 23% of the Rulle Trust's money was invested in a single fund and Defendant's misrepresentation that Madoff's accounts were "equity market neutral."  (*Id*. ¶ 111-17.)  Finally, Count VIII is an unjust enrichment claim based on AGL's improper collection of management fees based upon the Policy's net asset values. (*Id*. ¶¶ 119-21.)

## II.    STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers and Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 272 (3d Cir. 2001). A court should accept the complaint's allegations as true, read those allegations in the light most favorable to the plaintiff, and determine whether a reasonable reading indicates that relief may be warranted. *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A court need not credit "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997); *see also Iqbal*, 129 S. Ct. at 1949.

"Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 547. Although the federal rules impose no probability requirement at the pleading stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Simply reciting the elements will not suffice. *Id.* (concluding that pleading that offers labels and conclusions without further factual enhancement will not survive motion to dismiss); *see also Phillips*, 515 F.3d at 231.

The Third Circuit Court of Appeals has recently directed district courts to conduct a two-part

analysis when faced with a 12(b)(6) motion.  First, the legal elements and factual allegations of the claim should be separated, with the well-pleaded facts accepted as true but the legal conclusions disregarded.  *Fowler v. UPMC Shadyside*, 578 F.3d at 210-11.  Second, the court must then make a common sense determination of whether the facts alleged in the complaint are sufficient to show a plausible claim for relief.  *Id*.  If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged – but has failed to show – that the pleader is entitled to relief.  *Id*. at 211.

In considering a motion to dismiss, courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.  *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004).

## III.    DISCUSSION

### A.    Breach of Contract

The Policy contains an Alaska choice of law provision and the parties agree that Alaska law governs its terms.  The goal in interpreting a contract is to give effect to the reasonable expectations of the parties.  *Keffer v. Keffer*, 852 P.2d 394, 397 (Alaska 1993).  Barring ambiguity, the plain language of the contract controls.  *Rockstad v. Erikson*, 113 P.3d 1215, 1222 (Alaska 2005).  "If contract language is unambiguous, the meaning of the contract is decided as a matter of law."  *Keffer*, 852 P.2d at 397.  A court may find ambiguity only if the contract as a whole and all extrinsic evidence support two different but reasonable interpretations.  *Rockstad*, 113 P.3d at 1222.

The first page of the AGL PPM states "THE POLICY OWNER BEARS THE ENTIRE INVESTMENT RISK FOR ALL AMOUNTS INVESTED IN THE POLICY, INCLUDING THE

11

RISK OF LOSS OF PRINCIPAL.   THERE IS NO GUARANTEED MINIMUM ACCOUNT

VALUE."  (AGL PPM at 1; *see also id*. at 11-12, 14-15 (emphasis in original).)  It further warns

Plaintiff that the value of amounts invested in the Investment Accounts "will vary up or down in

accordance with the performance of the investments."  (*Id*. at 1.)

      The General Partner, Tremont, managed the Tremont Opportunity Fund and was responsible

for selecting the various portfolio managers.  (*Id*. at 38, 39, 42.)  The investment strategy of the

Tremont Opportunity Fund was summarized in the AGL PPM.  It employed a multi-manager format

and it was believed that different managers would use different investment strategies and trading

techniques to create a diversified portfolio that would achieve above-average returns.  (AGL PPM

at 38.)   Nonetheless, Plaintiff was warned that "**[t]here can be no guarantee of future**

**performance and there is no assurance that the Partnership will be able to achieve its**

**investment objectives or be profitable.**" (*Id*. (emphasis in original).)  The possibility of a total loss

of investment was also made clear.  (*Id*. at 39.)

      Despite these clear warnings, Plaintiff claims that the value of the Investment Account was

dependant upon the investment performance of the Tremont Opportunity Fund and that such

investment performance did not include fraud by one of the money managers selected by Tremont.

(Am. Compl. ¶¶ 37-39.)  None of the documents Defendant provided Plaintiff defined investment

results as encompassing moneys lost by fraud or theft, nor did the Plaintiff intend for that to be the

case. (*Id*.)

      This argument ignores both the plain language of the Policy and the reality of the situation.

Plaintiff lost money because Rulle – not AGL – elected to invest in the Tremont Opportunity Fund,

and Tremont subsequently placed those funds in investments managed by Madoff.  When Madoff's

illegal activity was uncovered, the investments he managed, including those in which Plaintiff invested, lost their value.  The Policy did not render AGL an insurer of Plaintiff's investment account; to the contrary, Plaintiff bore the risk of drops in the value of its account.

Plaintiff asserts that disputed issues of fact render dismissal of the contract claim unwarranted at this time.  For example, Plaintiff claims that Hillman solicited Rulle to invest with AGL and that Rulle only created the Rulle Trust after Hillman assured him that the Policy contained an investment vehicle that satisfied Rulle's needs.  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss the Am. Compl. [Pl.'s Opp'n] at 10-11.)  As an initial matter, Plaintiff's arguments are primarily underlied by Rulle's affidavit, which is not appropriate for this Court to consider when ruling on a motion to dismiss.  Regardless, the testimony does not help Plaintiff.  It does not matter who first approached whom or when the Rulle Trust was created.  The Amended Complaint makes clear that "Plaintiff was allowed to choose among two investment accounts for investment of the Policy premiums.  It allocated the annual net premium to . . . [the Tremont Opportunity Fund]."  (Am Compl. ¶ 45.) Thus, Defendant placed Plaintiff's money in accordance with Plaintiff's request.

Plaintiff also claims that Defendant failed to insure proper diversification of the funds in which it was invested.  The Policy states that the investment strategy "is to invest with various portfolio managers" and the AGL PPM states that Tremont "will attempt to accomplish [its] investment objectives by investing with various portfolio managers (the 'Managers') which [Tremont] believes are able to meet the Partnership's objectives."  (Policy at 5; AGL PPM at 38.) The multi-manager format, "whereby investments are made through a variety of managers utilizing different and, if possible, non-correlated investment strategies and trading techniques, is designed to provide investors with a diversified investment portfolio, as well as enable them to obtain above-

average returns over a market cycle." (AGL PPM at 38.) Plaintiff complains that 23% of Plaintiff's

investment funds were ultimately controlled by Madoff contrary to Hillman's representation to Rulle

that the investment account would be diversified consistent with industry standards "and in the range

of 7% or less of the funds would be placed with any one manager." (Am. Compl. ¶ 22.)

Plaintiff's argument is unpersuasive.  Neither the Policy nor the AGL PPM guarantee a

particular mix of assets nor does either limit the percentage of money invested with a single manager.

Additionally, the AGL PPM makes clear that "**[t]here can be no guarantee of future performance**

**and there is no assurance that the Partnership will be able to achieve its investment objectives**

**or be profitable**." (AGL PPM at 38 (emphasis in original).)  There is no basis for a breach of

contract claim given the language in the Policy.  The Policy contains no language indicating that

funds would be invested in such a way that no particular money manager control more than 7% of

the aggregate funds.  Nor can Hillman's statement, made before the Parties entered into the contract,

regarding the percentage of Plaintiff's investment that would be entrusted to a single manager, serve

as the basis for a breach of the Policy because of the parol evidence rule.  The parol evidence rule

is a rule of substantive law which holds that an integrated written contract may not be varied or

contradicted by prior negotiations or agreements. *Still v. Cunningham*, 94 P.3d 1104, 1109 (Alaska

2004).  Because the Policy is an integrated written contract and is not ambiguous, Hillman's

purported representation cannot be used to amend its terms.  The Court rejects Plaintiff's argument

that the parol evidence rule is inapplicable because the Amended Complaint alleges fraud and

misrepresentation.  (Pl.'s Opp'n at 15.)  Under Alaska law, the parol evidence rule does not apply

if the contract was formed as a result of misrepresentation or mutual mistake, neither of which is

applicable here. *See Diagnostic Imaging Ctr. Assocs. v. H & P*, 815 P.2d 865, 867 (Alaska 1991).

According to the Amended Complaint, AGL misrepresented or concealed the following facts: (1) that approximately 23% of Plaintiff's account had been invested in a single fund; (2) that Madoff-controlled accounts were "equity market neutral" when they were not. Neither of these alleged misrepresentations relate to the formation of the contract. Finally, Tremont made investment decisions, not AGL. Accordingly, Defendant did not control where Tremont invested Plaintiff's premiums, a fact made clear to Plaintiff. Thus, Hillman's belief that the Tremont Opportunity Fund would invest "in the range of" 7% or less of the funds with any one manager cannot serve as the basis for a new contract term found nowhere in the written agreement. (*See* Am. Compl. ¶ 22.)

Plaintiff argues that Alaska courts apply the doctrine of reasonable expectations to insurance contracts. Under that doctrine, "[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *Alaska v. Underwriters at Lloyds, London*, 755 P.2d 396, 400 (Alaska 1988). The Rulle Trust contends that it reasonably expected that loss due to fraud was not included in the Policy provision related to the decrease in the value of the Investment Account. (Pl.'s Opp'n at 12.)

Even accepting that the doctrine of reasonable expectations applies here, Plaintiff's expectation that AGL would act to insure the money in his Investment Account is unreasonable. The AGL PPM repeatedly cautions that the Policy Owner bears the investment risk for all amounts invested in the policy, including the risk of loss of principal. (AGL PPM at 1, 38-39.) Plaintiff makes much of the fact that although the AGL PPM lists a number of risk factors "when evaluating the merits and suitability of an investment in the Partnership," fraud is not listed as one of those risks. (Pl.'s Opp'n at 13; AGL PPM at 39-43.) Nowhere in the Policy or AGM PPL does it state

15

or even intimate that only those losses attributed to listed risks would be factored into determining the value of the Investment Account.  There is nothing to indicate that AGL was insuring Plaintiff against the possibility that the value of its investment account would fall due to third-party fraud. Nothing about such life insurance contracts would suggest to a reasonable person that he was being insured against securities fraud as well.  Furthermore, Plaintiff was clearly informed that his Investment Account was managed by Tremont, which acted as the General Partner and that it was the General Partner that selected the money managers and allocated the assets among those money managers.  (AGL PPM at 38.)  Plaintiff concedes this point in his Amended Complaint when he notes that he was not to have any contact with the General Partners about "any investment matters regarding the General Partners' investment strategies and decisions concerning investment partnership assets."  (Am. Compl. ¶ 36 (emphasis omitted).)  Plaintiff is attempting to graft additional terms into the Policy.

Similarly, Plaintiff's argument that Defendant breached the contract by failing to properly diversify runs counter to the language of the contract.  Nowhere does AGL guarantee that the General Partner will select money managers who will ensure that a set percentage of money will be placed in a specific investment or that a fixed number of money managers will be used to attempt to achieve the objective of Plaintiff's investment.  Nor would it be reasonable to expect so much from the contract.

Plaintiff's reading of the Parties' agreement would render Defendant liable for any fraud committed by any person or entity whose actions caused an underlying fund or security to decrease in value.  This Court rejects Plaintiff's attempt to alter the clear wording of his agreement to place the risk of investment loss on AGL.

16

### B.      Federal and State Securities Claims

*1.      Federal Securities Laws*

The federal securities laws make it unlawful:

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  A plaintiff must specify each statement alleged to have been misleading as well as why the statement was misleading. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 259 (3d Cir. 2009).  Furthermore, a plaintiff must identify the "who" of the alleged misrepresentation or omission.  *See Mill Bridge V, Inc. v. Benton*, Civ. A. No. 08-2806, 2009 WL 4639641, at *18 (E.D. Pa. Dec. 3, 2009).

The plaintiff must also allege facts that permit a strong inference of either reckless or conscious behavior.  *Avaya*, 564 F.3d at 252, 267.  "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, a 'mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 & n.12 (1976)).

Also relevant to this case is the Private Securities Litigation Reform Act of 1995 (the

"PSLRA").  The PSLRA requires that complaints in private securities actions alleging that the defendant made a false or misleading statement or omitted a material fact necessary to avoid misleading a party "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Additionally, for those cases in which the plaintiff must show that the defendant acted with a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id*. § 78u-4(b)(2).  Failure to comply with either of these edicts "shall, on the motion of any defendant" lead to dismissal of the complaint.  *Id*. § 78u-4(b)(3); *see also Avaya*, 564 F.3d 242, 252-53 (noting that PSLRA requires plaintiff to meet both pleading requirements found in § 78u-4(b)(1) and (b)(2) to survive motion to dismiss).

Plaintiff contends that the "PSLRA does not apply to this action because Plaintiff does not anticipate a 'class' as contemplated by the PSLRA."  (Pl.'s Opp'n at 16 n.5.)  This is incorrect as a matter of law.  *See Klein v. Autek Corp.*, 147 F. App'x 270, 273 (3d Cir. 2005) ("In light of the plain language of the PSLRA, we can see no basis to relax the pleading requirements applicable to securities fraud claims that do not involve class actions.").

The PSLRA sets forth the appropriate standard to use in private securities actions, although Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled with particularity is nearly identical to § 78u4-(b)(1)'s demands.  *Avaya*, 564 F.3d at 253.  The scienter pleading requirement, however, found in the PSLRA is more stringent than the requirements of Rule 9(b).  *Id*.  For a

complaint to properly create a "strong inference that the defendant acted" with scienter, the inference "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *Avaya*, 564 F.3d at 267. This standard requires courts to consider plausible nonculpable inferences. *Tellabs*, at 323-24.

Plaintiff's securities claim is based on the allegation that "Defendant caused a portion of Plaintiff's moneys to be transferred to investment funds that were controlled, taken and lost by Madoff in a fraudulent scheme." (Am. Compl. ¶ 90.)

Plaintiff also points to the following four statements as misrepresentations and/or omissions:

- AGL stated that the Tremont Opportunity Fund had a "multi-manager concept" which would provide significant diversification and lessening of risks associated with the investment.
- AGL gave multiple standards for evaluation of the investment which implied that it was actually tracking the value of the investment.
- AGL failed to state that it conducted no due diligence of any funds, including the Tremont Opportunity Fund, either prior to offering or during the time of the Policy.
- AGL failed to state that almost 23% of the entire investment pool would be in the hands of a single manager, thereby effectively eliminating or greatly reducing the concept of diversification.

(*Id.* ¶ 93.)

Plaintiff spends a great deal of time arguing that AGL, as an investment advisor, broker, dealer, and FINRA member, owed Plaintiff a fiduciary duty and as such, its investment recommendations were required to have a reasonable basis and to be in accordance with the client's objectives and financial status. (Pl.'s Opp'n at 17-20.) Fatal to Plaintiff's federal securities claim, however, is its failure to adequately plead scienter. Plaintiff's Amended Complaint contains no allegation that would support a finding of scienter, let alone a strong inference of scienter. A "strong inference" of scienter can be established by alleging facts that provide strong circumstantial evidence

19

of conscious misbehavior or recklessness.  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228,

237 (3d Cir. 2004).  Reckless behavior involves not merely simple, or even inexcusable negligence,

but requires an extreme departure from the standards of ordinary care which presents a danger of

misleading buyers or sellers that is either known to the defendant or is so obvious that the defendant

must have been aware of the risk.  *See Avaya*, 564 F.3d at 267 n.42 (quoting *In re Advanta Secs.*

*Litig.*, 180 F.3d 525, 535 (3d Cir. 1999)).

       The Court is at a loss to find any allegations in the Amended Complaint that suggest

conscious misbehavior or recklessness on the part of AGL.  The Amended Complaint suggests that

AGL knowingly, recklessly, and/or negligently ignored warning signs that could have alerted it to

Madoff's illegal Ponzi scheme.  But, as noted previously, AGL did not ultimately determine which

money managers the General Partner used, a fact made abundantly clear to Plaintiff.  Thus, AGL

lacked any knowledge that Madoff was managing any of Plaintiff's investments, let alone that he was

running a Ponzi scheme.  The contention that AGL intended to deceive by failing to tell Plaintiff that

it had not conducted due diligence is also implausible.  AGL clearly informed Plaintiff that it was

not making investment decisions and that the risk of loss rested with Plaintiff.  There is no basis for

asserting that AGL acted intentionally or recklessly when it described the Tremont Opportunity

Fund.  Stripped to its essence, Plaintiff's claim is that Defendant violated federal securities law when

it failed to inform it that investments Rulle selected in 2001 would significantly decrease in value

due to the discovery seven years later that a money manager that AGL had no part in selecting was

running a Ponzi scheme.  Plaintiff's securities fraud claims are fanciful and cannot survive a motion

a dismiss.

2.      *State Securities Laws*

The Pennsylvania Securities Act is modeled after the Federal version and requires the same

elements of proof.  *See Leder v. Shinfeld*, 609 F. Supp. 2d 386, 395 (E.D. Pa. 2009) ("The absence

of guiding precedent from Pennsylvania courts notwithstanding, it has long been the practice in this

Circuit to treat [Pennsylvania Securities Act] claims as requiring the same elements of proof as

required under Rule 10b-5."); *Rosen v. Commc'n Servs. Group, Inc.*, 155 F. Supp. 2d 310, 321 n.14

(E.D. Pa. 2001).   Federal Rule of Civil Procedure 9(b) also applies to Plaintiff's Pennsylvania

Securities Act claim.   *Leder*, 609 F. Supp. at 396 (citations omitted).

Similar to the Federal Securities Laws, the Alaska Securities Act prohibits one from, in

connection with the purchase or sale of a security, directly or indirectly:

> (1) employ[ing] a device, scheme, or artifice to defraud;
> (2) mak[ing] an untrue statement of a material fact or omit[ting] to state a material
> fact necessary in order to make the statements made, in the light of the circumstances
> under which they are made, not misleading; or
> (3) engag[ing] in an act, practice, or course of business that operates or would operate
> as a fraud or deceit upon a person.

ALASKA STAT § 44.55.010(a).   As Plaintiff notes, Alaska has an "analogous anti-fraud statute[]

which [has] adopted the federal language in this context and are alleged in Count V."  (Pl.'s Opp'n

at 24.)

Defendant concedes that the PSLRA's heightened pleading requirements do not apply to

Plaintiff's state securities claims.   (Def.'s Mem. at 14.)   Nonetheless, the Court agrees with

Defendant's contention that Plaintiff's failure to plead any culpable mental state is fatal to its

securities fraud claim.  Finally, the securities claims, which merely recite the elements of the statutes,

fall short of federal pleading requirements, including Federal Rule of Civil Procedure 9(b).  Count

V is therefore dismissed.

### C.    Duty of Good Faith and Fair Dealing

Plaintiff's Complaint also alleges that Defendant violated the common law duty of good faith and fair dealing.  Specifically, Plaintiff states that "[t]here is implied in every contract a duty of good faith and fair dealing that neither party will do anything to deprive the other of the fruits of the contract."  (Am. Compl. ¶ 82.)  The Policy contained this implied duty and AGL purportedly violated it by failing to perform according to the terms of the contract.  (*Id*. ¶ 84.)

As Plaintiff notes, Alaska law recognizes that "[t]he fiduciary relationship inherent in every insurance contract gives rise to an implied covenant of good faith and fair dealing."  *O.K. Lumber Co. v. Providence Wash. Ins. Co.*, 759 P.2d 523, 525 (Alaska 1988) (citations omitted). Furthermore, the Alaska Supreme Court has held that "in the first-party context, an insured's cause of action against an insurer for breach of the duty of good faith and fair dealing sounds in tort." *State Farm Fire and Cas. Co. v. Nicholson*, 777 P.2d 1152, 1156 (Alaska 1989); *see also Municipality of Anchorage v. Gentile*, 922 P.2d 248, 260 (Alaska 1996) (recognizing that in Alaska, breach of covenant of good faith and fair dealing is a tort in the insurance context).  The Alaska Supreme Court recognizes the tort based on a number of policy rationales:  the adhesionary aspects of the insurance contract, the lack of bargaining strength of the insured, the contract's standardized terms, the reason the insured enters the contract, the nature of insurance, the exclusive control the insurer maintains over the claims process, and the fact that a tort is necessary to guarantee insurers do not arbitrarily deny coverage and delay payment of claims with little penalty.  *Id*. at 1156-57 (citing *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)).

Not one of those concerns is implicated in this case.  Although insurance might play a

22

tangential role here, it is not the center of the dispute.  *See Gentile*, 922 P.2d at 261 (refusing to apply good faith and fair dealing tort because none of the public policy concerns for applying the tort were implicated).  This claim revolves around the investment made as part of a life insurance policy and has nothing to do with the insurance aspect of the Policy.  There is no allegation that AGL failed to investigate a claim or that Plaintiff was in an unequal bargaining position and hence found itself signing a contract of adhesion.  Additionally, the Plaintiff in this case is the Rulle Trust, which is not a person, nor is it the insured.  Finally, the AGL PPM includes minimum suitability requirements for potential Policy Owners.  Among those requirements, the Policy Owner is "acquiring a Policy for investment purposes only . . . has adequate means of providing for his or her current needs and personal contingencies outside of the Policy and . . . has substantial experience in making investment decisions of this type."  (AGL PPM at 10.)  Given the circumstances surrounding this Policy, it is not clear that Alaska would recognize a tort for breach of the implied covenant of good faith and fair dealing here.

But, notwithstanding the possibility that Alaska law would recognize an implied covenant of good faith and fair dealing in this instance, Plaintiff's claim still must be dismissed.  The Amended Complaint argues that AGL's act of "improperly diminishing the account value set forth in Plaintiff's account . . . constitute[s] breaches of the implied covenant of good faith and fair dealing."  (Am. Compl. ¶ 84.)  As discussed earlier, Defendant did not improperly diminish Plaintiff's account under the terms of the Policy.  Plaintiff can thus point to no actions by Defendant that breached an implied covenant of good faith and fair dealing.

### D.      Negligence, Breach of Fiduciary Duty, and Unjust Enrichment

Plaintiff's remaining claims are for negligence, negligent misrepresentation, breach of

fiduciary duty, and unjust enrichment.  The parties dispute which state's laws apply to these claims. Plaintiff suggests that it is too soon procedurally for the Court to make a choice of law determination, although it points the Court to Alaska law.  (Pl.'s Opp'n at 24 ("[A] choice of law determination is premature on a motion to dismiss because it involves a fact-specific analysis, and thus, should await full discovery on all claims.  To the extent a choice of law determination is made at this juncture, Alaska is the state with the most significant contacts.").)  Defendant argues that Pennsylvania law applies to these claims.  (Def.'s Mem. at 18-21.)

The Court does not believe that it has enough briefing to properly determine if: (1) the law of Alaska and Pennsylvania differ with respect to Plaintiff's negligence, breach of fiduciary duty, and unjust enrichment claims; and (2) assuming the laws differ, which state's law should apply to each of these claims.  Accordingly, the Court will reserve judgment on these claims and allow the parties additional time and pages to advocate their positions.

## IV.    CONCLUSION

Plaintiff's claims for breach of contract, violation of federal and state securities laws, and breach of the implied covenant of good faith and fair dealing all fail to state a claim and are dismissed.  The Court reserves judgment on Plaintiff's negligence, negligent misrepresentation, breach of fiduciary, and unjust enrichment claims.  An Order consistent with this Memorandum will be docketed separately.